FILED
2020 Jun-17  AM 09:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SHEET METAL WORKERS LOCAL 19 PENSION FUND, Individually and On Behalf of All Others Similarly Situated, | ) ) ) Case No.: _____ |
| | ) |
| Plaintiff, | ) CLASS ACTION COMPLAINT FOR ) VIOLATIONS OF THE FEDERAL |
| v. | ) SECURITIES LAWS ) |
| PROASSURANCE CORPORATION, W. STANCIL STARNES, EDWARD L. RAND, JR., DANA S. HENDRICKS, HOWARD H. FRIEDMAN, and MICHAEL L. BOGUSKI, | ) ) JURY TRIAL DEMANDED ) ) ) ) |
| Defendants. | ) ) |

Plaintiff Sheet Metal Workers Local 19 Pension Fund ("Plaintiff") alleges the following upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel, which included: (a) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC") made by ProAssurance Corporation ("ProAssurance" or the "Company") and related parties; (b) review and analysis of press releases and other publications disseminated by ProAssurance and related parties; (c) review and analysis of shareholder communications, conference calls and postings on ProAssurance's website concerning the Company's public statements; (d) review and analysis of news articles concerning ProAssurance and related parties; and (e) review of other publicly available information concerning ProAssurance, related parties, and/or the Individual Defendants (as defined below).

1

## I.   **NATURE OF THE ACTION**

1.      This is a federal securities class action against ProAssurance and certain of its officers for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased or otherwise acquired ProAssurance common stock from April 26, 2019 through May 7, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that certain defendants made a series of false and misleading statements and omissions, which artificially inflated the Company's stock price.

2.      ProAssurance is one of the largest medical liability insurance providers in the United States.  ProAssurance's most important division is its Specialty Property and Casualty segment ("Specialty P&C"), which has consistently accounted for at least 60% of the Company's gross premiums written since 2015.  This segment includes a healthcare professional liability line of business, primarily offered to healthcare providers.  While the Company provides traditional liability insurance products, ProAssurance also provides "innovative and customized products to meet the risk management needs of larger healthcare organizations or groups."

3.      In 2016, ProAssurance underwrote a very large specialty policy for one large healthcare provider customer.  Unbeknownst to investors, this policy was underwritten on very detrimental terms to ProAssurance.  By April 2019, the Company was unquestionably aware of severe negative trends within this sector that had been occurring for at least 18 months.  In spite of a highly concerning "risk of a worsening loss environment in the broader healthcare professional liability insurance market," ProAssurance executives misleadingly stated that its reserves were "adequate" and "appropriate," reflecting a "conservative view" when established.

4.      Throughout the Class Period, Defendants misrepresented the Company's underwriting and reserve standards, and failed to adequately reserve for losses.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) ProAssurance lacked adequate underwriting process and risk management controls necessary to set appropriate loss reserves in its Specialty P&C segment; (ii) ProAssurance failed to properly assess a large national healthcare account that experienced losses far exceeding the assumptions made when the account was underwritten; and (iii) as a result, ProAssurance was subject to materially heightened risk of financial loss and reserve charges.

5.      On January 22, 2020, ProAssurance announced that because of a deteriorating loss experience related mainly to one large healthcare account underwritten in 2016, the Company was estimating a $37 million adverse development in its Specialty P&C loss reserves for the fourth quarter of 2019.  Additionally, the Company stated that since mid-2019 it had been executing a "comprehensive underwriting strategy in response to emerging trends and changing conditions in healthcare professional liability."

6.      In response to these disclosures, ProAssurance's stock price fell $4.18 per share, or 11%, to close at $33.40 per share on January 23, 2020.

7.      On February 20, 2020, ProAssurance announced its 2019 fourth quarter and full year results.  The Company revealed that the adverse development from this one large national healthcare account was actually $51.5 million, much larger than the initial estimate of $37 million only a month prior.  The Company discussed that "[i]n the span of twelve months, we restructured the majority of our executive team [and] consolidated our Specialty P&C operations" under new leadership.

8.      Then, on May 8, 2020, ProAssurance announced that the large healthcare client would likely not renew its policy and instead would likely exercise an option for tail coverage that would result in an additional $50 million in losses in the second quarter of 2020.  This loss, when combined with the $51.5 adverse development, meant that the Company would suffer over $100 million in losses from a single account.

9.      In response to these disclosures, ProAssurance's stock price fell $4.38 per share, or 22%, to close at $15.95 per share on May 8, 2020.

10.     Plaintiff and the other Class members have suffered significant damages due to Defendants' false and misleading statements and omissions.

## II.   JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as the Company conducts business in this Judicial District.   The Company maintains its principal executive offices in this Judicial District. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

III.     **CLASS ACTION ALLEGATIONS**

14.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired ProAssurance common stock from April 26, 2019 through May 7, 2020, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of ProAssurance and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

15.     The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Throughout the Class Period, ProAssurance's common stock was actively traded on the New York Stock Exchange ("NYSE") (an open and efficient market) under the symbol "PRA."   Millions of ProAssurance shares were traded publicly during the Class Period on the NYSE.   As of May 1, 2020, ProAssurance had over 53 million shares of common stock outstanding.   Record owners and the other members of the Class may be identified from records maintained by ProAssurance and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

5

17.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of ProAssurance;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of ProAssurance;

e)      whether the market price of ProAssurance common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

IV.     **PARTIES**

20.     Plaintiff Sheet Metal Workers Local 19 Pension Fund purchased ProAssurance common stock during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and suffered damages as a result of the federal securities law violations alleged herein.

21.     Defendant ProAssurance is incorporated under the laws of the Delaware, and maintains its principal executive offices at 100 Brookwood Place, Birmingham, Alabama. ProAssurance common stock trades on the NYSE under the symbol "PRA."

22.     Defendant W. Stancil Starnes ("Starnes") served as Chief Executive Officer ("CEO") of ProAssurance from January 2, 2007 through July 1, 2019.

23.     Defendant Edward L. Rand, Jr. ("Rand") served as President and Chief Operating Officer until July 1, 2019, when he was appointed as ProAssurance's CEO.

24.     Defendant Dana S. Hendricks ("Hendricks") has served at all relevant times as the Company's Executive Vice President and CFO.

25.     Defendant Howard H. Friedman ("Friedman") served as President of Healthcare Professional Liability until his retirement on May 13, 2019.

26.     Defendant Michael L. Boguski ("Boguski") has served as President of Specialty P&C since May 13, 2019.

27.     Defendants Starnes, Rand, Hendricks, Friedman, and Boguski are referred to as the "Individual Defendants."

28.     ProAssurance and the Individual Defendants are referred to as the "Defendants."

29.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of ProAssurance, were privy to confidential, proprietary and material adverse non-

public information concerning ProAssurance, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

30.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of ProAssurance's business.

31.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

32.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock is, and is, registered with the SEC pursuant to the

Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to ProAssurance's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of ProAssurance's common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

33.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ProAssurance's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

34.     ProAssurance is one of the largest medical liability insurance providers in the United States. While the Company provides traditional liability insurance products, ProAssurance also provides "innovative and customized products to meet the risk management needs of larger healthcare organizations or groups." ProAssurance's most important division is Specialty P&C, which includes a healthcare professional liability line of business, primarily offered to healthcare providers. The Company reports adjustments to reserves from prior periods, presented as "net favorable developments."

**B.**   **Defendants' Materially False and Misleading Statements**

35.   On April 25, 2019, after the market closed, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2019, where it reported, "Net favorable prior year reserve development in the first quarter of 2019 was $10.3 million, compared to $22.8 million in the prior year quarter."  The press release included a Management Commentary from Starnes which represented:

> Our concern about the broad loss trends in healthcare professional liability continues to have a major impact on operating results, and this increasing severity will likely affect our results for the foreseeable future.  Our view of these trends influences our current accident year loss picks, which continue to rise, and leads us to increased caution in our analysis of prior period reserves, both of which have a significant impact on the operating results of our largest operating segment, Specialty P&C.  We make no apology for taking the actions needed to protect our balance sheet, no matter the short-term impact.  This is consistent with our long-term strategy and the long tail nature of our business.  As has historically been the case the caution we take in establishing our reserves allows us to focus on our future without undue concerns about past liabilities, something that will be especially important as Mike Boguski and his team bring together all of our Specialty P&C operations under unified leadership.  All of this overshadows several positive aspects of the quarter, including higher renewal pricing, solid retention of existing business, continued profitability in our Workers' Compensation Insurance segment, and a recovery of the majority of last quarter's mark-to-market losses in our equity trading portfolio resulting in a quarter-over-quarter increase in net income.

36.   On April 26, 2019, the Company conducted an earnings call where Rand discussed the favorable reserve development and represented, "I want to emphasize that our reserving philosophy has not changed.  What continues to change is our assessment of the loss environment." Rand further stated, "We are pleased with our top line growth in the first quarter, especially so given the challenging environment we've described.  Top line growth at the expense of the bottom line is a pitfall we are committed to avoiding.  And the continued success of our underwriting teams and their ability to adequately price for the assumed risk is evidence of a prudent strategy."

37.     On the same call, Friedman said that in spite of the Specialty P&C segment operating "in the red this quarter," and "despite the challenging loss environment, we continue to grow our top line with responsible underwriting, while getting the price we think is appropriate." Friedman discussed the loss trends in healthcare professional liability, stating that "consideration of these trends colors any decisions made within the broader segment.  We continue to uphold our underwriting standards, writing good business in lieu of easy business, emphasizing adequate pricing over retention, and walking away from potential accounts we think carry too much risk for the premium."   Friedman further represented that ProAssurance's "disciplined approach" to underwriting allowed the Company "to avoid any unexpected increases of severity in our paid losses."

38.     In response to an analyst question regarding when to expect an uptick in paid losses as a result of these trends, Friedman revealed that the Company had been reviewing these issues for a year and a half, or since late 2017.  Friedman represented, "We started to talk about what we were seeing in terms of increases in the case reserves that were being established probably 18 months ago or so now and we've continued to monitor that.  But those case reserves are established relatively early in the life of a claim after it is reported by evaluation of the damages and the potential liability.  And that's done by the expert claims professionals that are on our staff."

39.     When asked by an analyst about Specialty P&C reserves developing unfavorably in the future, Starnes replied, "if we thought we were going to see unfavorable development, we'd take that into account today.  We wouldn't wait for it.  So we're doing what we think is called for, which is just reducing the amount of favorable development.  We're not having to add to reserves."

40.     On August 7, 2019, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2019, where it reported, "Net favorable prior accident

year reserve development in the second quarter of 2019 was $16.0 million, compared to $22.8 million in the prior year quarter. While we continue to observe an increase in claim severity in the broader healthcare professional liability industry, it is somewhat more favorable than the severity assumptions previously used to establish initial reserves, hence we continue to see net favorable development relating to prior accident years." The press release included a Management Commentary from Rand which represented:

> I cannot overstate the importance we place on disciplined underwriting. Our ability to attain appropriate pricing for the risk we assume is paramount to the success of ProAssurance, and vital to the security we provide to our customers. Stretching to grow where you can't get appropriate premium is a mistake that has crippled insurance companies in the past, and will do so again in the future. There will always be losses, and our job as an insurance company is to write at adequate pricing across our entire book, reflecting individual risk parameters, so that we can help our insureds when the unexpected does happen.

> We continue to be focused on the risk of a worsening loss environment in the broader healthcare professional liability insurance market, which influences our current accident year loss picks and influences our analysis of prior year reserves. Our view of this increasing severity will likely affect our results for the foreseeable future. As we adjust pricing and our risk appetite to reflect these severity trends, a degree of contraction is expected as some competitors seek to grow at any cost. This will not affect our proven, long-term strategy, which has delivered real value to shareholders for almost 30 years.

41.    On August 8, 2019, the Company conducted an earnings call where Rand discussed the favorable reserve development and represented that "we do continue to view our reserves as adequate and continue to see on a quarter-over-quarter basis that the loss trends while worse than they have been are still not at the level that's embedded in our reserving for those prior accident years. So that's why we end up continuing to have a level of favorable development. As we have talked in the past, take a pretty conservative view when we establish those reserves and a pretty pessimistic view of what loss trends will do. And loss trends, while worse than they have been

over the last number of years, continue to be slightly better than kind of what's embedded in that reserving analysis."

42.     On the same call, Hendricks reiterated Rand's statements regarding underwriting and stated, "we are dedicated to maintaining the disciplined underwriting standards necessary to write business at premium appropriate to the assumed risk.  We are willing to walk away from business we deem to be underpriced."

43.     Also on the same call, Boguski stated that the Specialty P&C segment's "underwriting discipline, combined with our deep specialization, high quality risk selection, and ability to attain the right price for the exposure, are the cornerstones of our strategy to achieve a long-term underwriting profit."

44.     On November 5, 2019, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2019, where it reported, "Net favorable prior accident year reserve development was $15.9 million in the third quarter of 2019, compared to $21.5 million in the prior-year quarter.  While our perception of increasing claim severity in the broader healthcare professional liability industry has not changed from recent quarters, our reserves for prior accident years continue to develop favorably as current severity trends are somewhat more favorable than the severity assumptions we used to establish those initial reserves. This allows for continuing net favorable development relating to prior accident years."  The press release included a Management Commentary from Rand which represented:

> Our medical professional liability products, which make up the largest line of business in the segment, continue to build upon a strong book of business despite a loss environment that affects our current accident year loss picks and influences our analysis of reserves for prior year losses.  These headwinds affected overall premiums in the segment, but we were able to implement renewal rate increases for another consecutive quarter with only a modest impact to retention, while adding new business at higher rates than in 2018.

\* \* \*

We continue to expect loss severity trends perceived in the broader healthcare professional liability marketplace to weigh on operating performance for the remainder of the year, and into 2020. Our view of these trends, and the intensely competitive property casualty landscape, demand caution as we strive to create long-term value for our customers and shareholders. This is not the time to aggressively seek market share and top line growth. We are willing to walk away from business where it makes sense to do so, rather than chase under-priced business into dangerous territory. Instead, we continue to focus on improving underwriting results and managing expenses, applying our deep expertise to strengthen our position as a market leader in the lines in which we specialize.

45.     On November 6, 2019, the Company conducted an earnings call where Rand represented, "[W]e recognize our Specialty P&C segment results are not in an acceptable level and we are taking necessary steps to return to underwriting profitability through pricing and underwriting that will reflect emerging loss trends. Even as we secured another consecutive quarter of renewal rate increases in our Specialty P&C lines and recognized favorable reserve development, our net loss ratio increased in the quarter. While we have been quick to react to the increase in perceived severity trends, we are being cautious in reflecting the impact of the steps we have taken given the uncertainty in the loss environment. These severity trends continue to influence our view of reserves and our loss assumptions and I assure you we are being appropriately disciplined in our analysis."

46.     On the same call, Hendricks discussed the Company's reported favorable reserve development and stated, "While our reserves continue to develop favorably, prior accident year development was lower as compared to the prior year period which accounted for approximately 3 points of the increase in the net loss ratio and was primarily due to our observation of increased loss severity trends in the broader healthcare professional liability industry."

47.     Also on the same call, Boguski represented, "These results are consistent with our focus on underwriting discipline as we continue to emphasize careful risk selection, rate adequacy, and a willingness to walk away from business that does not fit our goal of achieving a long-term underwriting profit."   Additionally, Boguski discussed changes in leadership and business decisions related to the Specialty S&C segment and related lines of business:

> Since Q2 of 2019, the senior leadership team has executed on several strategic business decisions designed to improve operating performance as we bring together all the Specialty P&C product lines and operations under a unified organizational and management structure.
>
> This includes leadership and organizational structure changes, restructuring healthcare professional liability underwriting into two distinct units, standard physicians and specialty, consolidation of several internal operations, and evaluation and leverage of systems investments.  We also recruited new executive leadership in targeted areas and announced the integration of the podiatric, chiropractic, dental and LawyerCare lines into a specialized small business transactional unit.  We are enthusiastic about the impact these changes will have in the future with a focus on improving the company's competitive position, operating efficiency, underwriting results, and delivery of superior service to our distribution partners and healthcare customers.

48.     The above statements in paragraphs 34-47 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) ProAssurance lacked adequate underwriting process and risk management controls necessary to set appropriate loss reserves in its Specialty P&C segment; (ii) ProAssurance failed to properly assess a large national healthcare account that experienced losses far exceeding the assumptions made when the account was underwritten; and (iii) as a result, ProAssurance was subject to materially heightened risk of financial loss and reserve charges.

### C.     **The Truth Is Revealed**

49.     On January 22, 2020, after the market closed, the Company surprised investors when it issued a press release disclosing a preliminary loss estimate of $37 million in the healthcare professional liability line due to "deteriorating loss experience in our Specialty Property & Casualty segment for the fourth quarter of 2019," just three months after reporting net favorable reserves in the third quarter of 2019.  The Company stated that the "adverse development in our prior accident year loss reserves is driven by a large national healthcare account written since 2016," revealing this account publicly for the first time.

50.     Additionally, the press release included a statement from Rand discussing the loss reserve estimate and the Company's "comprehensive underwriting strategy," which began in the middle of 2019:

> As we have observed and discussed over the past 18 months, results in the medical professional liability line are deteriorating.  Following our usual year-end review of updated loss data with internal and external actuaries, management concluded that additional reserves were needed in our Specialty Property & Casualty segment, particularly in regard to a single large national healthcare account that has experienced losses far exceeding the assumptions made when the account was underwritten.  Since the middle of 2019, new leadership in the Specialty P&C segment has executed a comprehensive underwriting strategy in response to emerging loss trends and changing conditions in healthcare professional liability. This includes organizational structure enhancements, recruitment of additional talent in Specialty underwriting, tightening of underwriting criteria, terms and conditions and price strengthening.  We are encouraged by our progress, and believe this strategy has positioned the Company for future success.

51.     In response to these disclosures, ProAssurance's stock price fell $4.18 per share, or 11%, to close at $33.40 per share on January 23, 2020.

52.     On February 20, 2020, the Company issued a press release announcing its financial results for the fourth quarter ended and year ended December 31, 2019.  The Company revealed that the adverse development from the large national healthcare account was $51.5 million, a

nearly 40% increase from the initial estimate of $37 million only a month prior.  Additionally, the press release included a statement from Rand stating in relevant part, "In the span of twelve months, we restructured the majority of our executive team [and] consolidated our Specialty Property & Casualty operations under Mike Boguski's leadership."

53.    On May 7, 2020, after the market closed, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2020, where it reported, "Net favorable reserve development recognized in the first quarter was $6.0 million, $4.3 million lower quarter-over-quarter," which was "primarily attributable to our Specialty P&C segment given elevated loss severity in the broader healthcare professional liability ('HCPL') industry."

54.    On the same day, also after the market closed, ProAssurance filed a quarterly report on Form 10-Q for the first quarter ended March 31, 2020, disclosing a net loss up to $50 million to be recognized in the second quarter if the insured large national healthcare account made the "more likely than not" decision to exercise its option to purchase "tail coverage," which provides protection for future claims filed after a claims-made policy has been discontinued.  The insured's option to purchase tail coverage and the resultant additional $50 million in losses were not previously disclosed.  The 10-Q represented:

> *Specialty P&C Segment.* Loss costs within this segment are impacted by many factors including but not limited to the nature of the claim, including whether or not the claim is an individual or a mass tort claim, the personal situation of the claimant or the claimant's family, the outcome of jury trials, the legislative and judicial climate where any potential litigation may occur, general economic and social trends and, for claims involving bodily injury, the trend of healthcare costs.  Within our Specialty P&C segment, for our HCPL business (76% of our consolidated gross reserve for losses and loss adjustment expenses as of December 31, 2019), we set an initial reserve based upon our evaluation of the current loss environment including frequency, severity, economic inflation, social inflation and legal trends. The initial loss ratio for our HCPL business has ranged from 87% to 106% in recent years.  We have recently trended towards the higher end of this range due to increases in loss severity in the broader HCPL industry, including our excess and

17

surplus lines of business (see further discussion in our Segment Operating Results - Specialty Property & Casualty section that follows under the heading "Losses"). ***This range also reflects the higher than average current accident year net loss ratio recorded in 2019 due to increased reserve estimates for a large national healthcare account that exceeded the assumptions we made when originally underwriting the account. The policy term for this account expires towards the end of the second quarter of 2020. Based on underwriting negotiations with the insured to-date, we believe it is more likely than not that the account will not renew on terms offered by us and the insured will exercise its option to purchase the extended reporting endorsement or "tail" coverage. Based on preliminary projected exposure data provided, if the account exercises its option to purchase tail coverage, a net loss of up to approximately $50 million could be recognized in the second quarter of 2020; if the insured chooses to exercise this tail policy all premium and corresponding losses will be fully recognized in the same period the tail policy is written.*** (emphasis added).

55.     On May 8, 2020, the Company conducted an earnings call, where Boguski discussed the large national healthcare account, tail coverage option, and $50 million loss:

> I wanted to talk about recent developments pertaining to the large national healthcare account we discussed last quarter. As you'll recall, we increased reserve estimates for this account in the fourth quarter of 2019. As losses exceeded the assumptions the company made when originally underwriting this risk.

> The policy term for this account expires towards the end of the second quarter of 2020. Based on renewal discussions, we believe it is more likely than not that the account will not renew on terms offered by ProAssurance and the insured will exercise its option to purchase the extended reporting endorsement or tail coverage.

> Based on preliminary projected exposure data provided to the company, if the account exercises its option to purchase tail coverage, a net loss of up to approximately $50 million could be recognized in the second quarter of 2020, as all premium and corresponding losses will be fully recognized in the same period that tail policy is written.

56.     In response to questions from Greg Peters, a Raymond James & Associates analyst, regarding "this incredibly large loss from this one account that I continue to be challenged with," and if ProAssurance had identified any other similar contracts, Boguski replied, "I mentioned in our last call that we've been through the book of business, Greg, and this was a unique national account structure – a unique structure for this national account and there are no other structures in

18

our book of business that would even be close to the structure that was offered here. So, I'm very confident in that."

57.    In response to these disclosures, ProAssurance's stock price fell $4.38 per share, or 22%, to close at $15.95 per share on May 8, 2020.

## VI.    UNDISCLOSED ADVERSE FACTS

58.    The market for ProAssurance common stock was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and omissions described herein, ProAssurance common stock traded at artificially inflated prices during the Class Period.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.  Plaintiff and the other members of the Class purchased or otherwise acquired ProAssurance common stock relying upon the integrity of the market price of the Company's common stock and market information relating to ProAssurance, and have been damaged thereby.

59.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.

## VII.    LOSS CAUSATION

60.    During the Class Period, as detailed herein, the Defendants made a series of false and misleading statements and omissions that artificially inflated the prices of ProAssurance common stock and operated as a fraud or deceit on Class Period purchasers of ProAssurance common stock by failing to disclose to investors material adverse facts.  When Defendants' misrepresentations and fraudulent conduct were disclosed, the price of ProAssurance common

stock fell precipitously as the prior inflation came out of the prices of the Company's common stock. As a result of their purchases of ProAssurance common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

61. By Defendants' failing to disclose the true state of the Company's business, investors were not aware of the true state of the Company's financial status. Therefore, the Defendants presented a misleading picture of ProAssurance's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused ProAssurance to conceal the truth.

62. The decline in the price of ProAssurance's common stock after the truth came to light was a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of ProAssurance's common stock price decline negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of ProAssurance common stock and the subsequent decline in the value of ProAssurance common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   SCIENTER ALLEGATIONS

63. As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

64.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ProAssurance, their control over, receipt and/or modification of ProAssurance's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning ProAssurance, participated in the fraudulent scheme alleged herein.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

65.     At all relevant times, the market for ProAssurance's common stock was an efficient market for the following reasons, among others:

a)     ProAssurance's common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b)     As a regulated issuer, ProAssurance filed periodic public reports with the SEC and the NYSE;

c)     ProAssurance's common stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d)     ProAssurance regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

66.     As a result of the foregoing, the market for ProAssurance's common stock promptly digested current information regarding ProAssurance from all publicly available sources and reflected such information in ProAssurance's stock price. Under these circumstances, all purchasers of ProAssurance's common stock during the Class Period suffered similar injury

through their purchase of ProAssurance's common stock at artificially inflated prices and a presumption of reliance applies.

67.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding ProAssurance's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.     NO SAFE HARBOR

68.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

69.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ProAssurance who knew that the statement was false when made.

## XI.  CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All the Defendants**

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

71.     During the Class Period, ProAssurance and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ProAssurance common stock; and (iii) cause Plaintiff and the other members of the Class to purchase ProAssurance common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

72.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ProAssurance common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Exchange Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of ProAssurance, as alleged herein.

73.     ProAssurance and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of ProAssurance as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ProAssurance's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about ProAssurance and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ProAssurance's common stock during the Class Period.

74.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all

relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

75.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing ProAssurance's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ProAssurance common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of ProAssurance shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired

ProAssurance common stock during the Class Period at artificially inflated high prices and were damaged thereby.

77.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of ProAssurance, which were not disclosed by the Exchange Act Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired ProAssurance common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

78.     By virtue of the foregoing, ProAssurance and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     The Individual Defendants were and acted as controlling persons of ProAssurance within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual

Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.    As set forth above, ProAssurance and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount which

may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the other members of the Class pre-judgment and post-

judgment interest, as well as their reasonable attorneys' fees and experts' witness

fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.


## XIII.  <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated: June 16, 2020

Respectfully Submitted,

*/s/ Steven B. Singer*
Steven B. Singer
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

Joseph E. White, III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com

*/s/ David J. Guin*_____
David J. Guin
Tammy M. Stokes
Dawn Stith Evans
**GUIN, STOKES & EVANS, LLC**
300 Richard Arrington Jr. Blvd. N.
Suite 600/Title Bldg.
Birmingham, AL 35203
Tel.:   205-226-2282
Email: davidg@gseattorneys.com
Email: tammys@gseattorneys.com
Email: devans@gseattorneys.com

***Counsel for Plaintiff***

**THE FOLLOWING DEFENDANTS TO BE SERVED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, AS FOLLOWS:**

**PROASSURANCE CORPORATION**
**c/o James J. Morello**
**100 Brookwood Place, Ste 500**
**Birmingham, AL 35209**

**PROASSURANCE CORPORATION**
**100 Brookwood Place, Ste 500**
**Birmingham, AL 35209**

**W. STANCIL STARNES,**
**100 Brookwood Place, Ste 500**
**Birmingham, AL 35209**

**EDWARD L. RAND, JR.,**
**100 Brookwood Place, Ste 500**
**Birmingham, AL 35209**

**DANA S. HENDRICKS,**
**100 Brookwood Place, Ste 500**
**Birmingham, AL 35209**

**HOWARD H. FRIEDMAN,**
**100 Brookwood Place, Ste 500**
**Birmingham, AL 35209**

**MICHAEL L. BOGUSKI**
**100 Brookwood Place, Ste 500**
**Birmingham, AL 35209**