FILED
2021 Mar-26  PM 11:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SHEET METAL WORKERS LOCAL 19 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 2:20-cv-00856-AKK <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE |
| vs. | ) ) | FEDERAL SECURITIES LAWS |
| PROASSURANCE CORPORATION, et al., | ) ) | |
| Defendants. | ) ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................... 2

II.    PARTIES ............................................................................................................ 8

     A.    Lead Plaintiffs ....................................................................................... 8

     B.    Defendants ............................................................................................. 8

III.   JURISDICTION AND VENUE ....................................................................... 12

IV.   OVERVIEW OF DEFENDANTS' FRAUD ................................................... 13

     A.    ProAssurance's Background ................................................................ 13

           1.    ProAssurance's HCPL Insurance Business and Policies ........... 13

           2.    ProAssurance's Purportedly "Conservative," "Responsible," and "Disciplined" Business Strategy ................................................. 15

           3.    ProAssurance's Reserve Setting Processes .............................. 16

           4.    Defendants' Reinsurance Practices and Disclosures ................. 18

     B.    Unbeknownst to Investors, ProAssurance Signs TeamHealth ............. 20

           1.    TeamHealth Was a Large, Unconventional Account that Netted ProAssurance the "Single Largest Premium" in Its History ..... 20

           2.    The TeamHealth Policy Presented Extraordinary Risks for ProAssurance Due to the Policy's Unique Structure and TeamHealth's Enhanced Risk Profile ......................................... 22

               a.    Underwriting HCPL Policies for Large Accounts, Like TeamHealth, Presents Significantly Higher Liability Risks .......... 23

               b.    Defendants Routinely Acknowledged that the Severity of Large Physician Group Liabilities Was Increasing in the Industry ........................................................................... 24

               c.    TeamHealth Was Subject to an Increased Risk of Malpractice Claims Due to Its Practice of Prioritizing Profits over Patients ....................................................... 26

               d.    The "Unique" Structure of the TeamHealth Policy Further Exposed ProAssurance to Enhanced Liability ............................. 29

4840-9468-0034.v1

**Page**

C.      Defendants Continue to Tout ProAssurance's "Conservative"
         Underwriting and Reserves Practices, While Concealing the Company's
         Risky and Unconventional TeamHealth Policy ...................................................29

D.      TeamHealth's Claim Frequency Begins to Dramatically Increase .......................31

E.      Defendants Conceal Massive Losses by Understating TeamHealth's Loss
         Reserves, Filing Materially False Financial Statements, and
         Misrepresenting ProAssurance's Purportedly "Disciplined" and
         "Cautious" Practices .............................................................................................33

F.      The Mounting Undisclosed Losses on the TeamHealth Account Cause
         ProAssurance to Restructure Its Executive Management Team, Strengthen
         Its Underwriting Policies, and Internally Acknowledge TeamHealth's
         Issues .....................................................................................................................36

G.      Defendants Finally Reveal the Massive Losses Originating from the
         TeamHealth Account, Causing ProAssurance's Stock to Plummet .....................39

V.      LEAD PLAINTIFFS' FORENSIC ANALYSIS OF STATE INSURANCE
         FILINGS ...........................................................................................................................44

A.      Background on ProAssurance's State Insurance Filings .......................................44

B.      The Number of Claims Reported by TeamHealth Increased Exponentially
         Leading Up to the Class Period .............................................................................46

C.      Defendants Intentionally Understated TeamHealth's Loss Reserves in
         Statutory Filings and Filings with the SEC ..........................................................48

D.      The Above Forensic Analysis Could Not Have Been Performed by
         Investors During the Class Period ..........................................................................55

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................................56

A.      Defendants' Materially False and Misleading Statements and Omissions ...........56

         1.      Defendants' August 7, 2018 Materially False and Misleading
                  Statements .................................................................................................56

         2.      Defendants' August 8, 2018 Materially False and Misleading
                  Statements .................................................................................................58

         3.      Defendants' September 6, 2018 Materially False and Misleading
                  Statements .................................................................................................59

4840-9468-0034.v1

**Page**

4.     Defendants' November 6, 2018 Materially False and Misleading
Statements ....................................................................................59

5.     Defendants' November 7, 2018 Materially False and Misleading
Statements ....................................................................................60

6.     Defendants' February 21, 2019 Materially False and Misleading
Statements ....................................................................................60

7.     Defendants' February 22, 2019 Materially False and Misleading
Statements ....................................................................................61

8.     Defendants' April 25, 2019 Materially False and Misleading
Statements ....................................................................................62

9.     Defendants' April 26, 2019 Materially False and Misleading
Statements ....................................................................................63

10.    Defendants' May 1, 2019 Materially False and Misleading
Statements ....................................................................................65

11.    Defendants' August 7, 2019 Materially False and Misleading
Statements ....................................................................................66

12.    Defendants' August 8, 2019 Materially False and Misleading
Statements ....................................................................................67

13.    Defendants' November 5, 2019 Materially False and Misleading
Statements ....................................................................................68

14.    Defendants' November 6, 2019 Materially False and Misleading
Statements ....................................................................................69

15.    Defendants' January 22, 2020 Materially False and Misleading
Statements ....................................................................................70

16.    Defendants' February 20, 2020 Materially False and Misleading
Statements ....................................................................................71

17.    Defendants' February 21, 2020 Materially False and Misleading
Statements ....................................................................................72

B.     SOX Certifications Throughout the Class Period.................................................73

C.     Defendants' Materially False and Misleading Financial Statements,
Reported Results, and Disclosures..........................................................................74

- iii -

**Page**

1.   ProAssurance's Financial Reporting Responsibilities as an SEC
     Registrant ...................................................................................76

2.   Overview of Relevant GAAP and SEC Accounting Rules
     Governing Insurance Company Loss Reserves and Accrual of Loss
     Expenses ......................................................................................77

3.   ProAssurance Violated GAAP by Failing to Set and Maintain
     Sufficient Loss Reserves for Loss and Loss Adjustment Expenses ..........79

     a.   Professional Standards Required Consideration of, but
          ProAssurance Failed to Adequately Consider Historical
          Information, Modified by Current Trends and Other Factors
          in Setting Loss Reserves ..............................................................79

     b.   The "Unique Structure" of ProAssurance's Agreement with
          the Inherently Risky TeamHealth Should Have Resulted in
          the Setting of Higher Loss Reserves ...........................................80

4.   Defendants' GAAP and SEC Violations Were Quantitatively and
     Qualitatively Material to ProAssurance's Financial Statements and
     Related Disclosures......................................................................81

5.   ProAssurance Artificially Understated Its Net Loss Ratios.....................85

6.   ProAssurance Violated GAAP and SEC Disclosure Rules ......................86

     a.   ProAssurance Failed to Disclose the Contingent Liability
          Related to the TeamHealth "Tail Coverage" in Its Year End
          2019 Financial Statements ...........................................................86

     b.   ProAssurance Violated Item 303 by Failing to Disclose
          Known Trends, Uncertainties, and Significant Economic
          Changes..................................................................................91

VII.   ADDITIONAL SCIENTER ALLEGATIONS .................................................93

       A.   Defendants Repeatedly Represented that They Were Heavily Involved
            with, and Had Intimate Knowledge of, the Company's Loss Reserves,
            Underwriting Processes, and Financial Results....................................94

       B.   Defendants Repeatedly Represented that They Regularly Reviewed and
            Updated the Data Underlying Their Loss Reserves, with a Specific Focus
            on Severity and Frequency Trends ......................................................98

**Page**

      C.     The Importance of SP&C to the Company's Financial Results, and the Magnitude of the Fraud's Impact on ProAssurance's Financial Performance, Support an Inference of Scienter ....................................................100

      D.     The Individual Defendants Knew the Company's Deteriorating Operating Results Were Directly Caused by TeamHealth ....................................................102

      E.     The Departure and/or Demotion of Several Key Executives Supports a Strong Inference of Scienter ....................................................104

      F.     The Individual Defendants' Certifications of the Company's Statutory Filings and SOX Certifications Are Probative of Scienter ....................................................104

      G.     The Individual Defendants' Compensation Incentivized Their Fraud ...............106

      H.     ProAssurance Is Legally Responsible for the Conduct of the Individual Defendants ....................................................107

VIII.   LOSS CAUSATION....................................................107

      A.     January 22, 2020 Corrective Disclosure ....................................................108

      B.     May 7-8, 2020 Corrective Disclosures ....................................................110

IX.    CLASS ACTION ALLEGATIONS ....................................................111

X.     UNDISCLOSED ADVERSE FACTS....................................................113

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE ....................................................114

XII.   NO SAFE HARBOR ....................................................115

XIII.  COUNTS....................................................117

COUNT I ....................................................117

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)....................................................117

COUNT II ....................................................119

For Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants) .......119

PRAYER FOR RELIEF ....................................................121

JURY DEMAND ....................................................121

- v -

1.     Lead Plaintiffs Central Laborers' Pension Fund and Plymouth County Retirement System (collectively, "Lead Plaintiffs") bring this action under the federal securities laws, individually and on behalf of all persons or entities that purchased or otherwise acquired the common stock of ProAssurance Corporation ("ProAssurance" or the "Company") between August 8, 2018 and May 7, 2020, inclusive (the "Class Period"), and were damaged thereby (the "Class").[1] This action asserts claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon the ongoing investigation of their undersigned counsel ("Lead Counsel"), which includes, *inter alia*, review and analysis of: (a) public filings with the United States Securities and Exchange Commission ("SEC") made by ProAssurance and related parties; (b) press releases and other publications disseminated by ProAssurance and related parties; (c) shareholder communications, conference calls, and postings on ProAssurance's websites; (d) news articles and public reports; (e) research reports by securities and financial analysts; (f) data reflecting the price of ProAssurance common stock; (g) interviews with former ProAssurance employees; (h) consultation with relevant forensic and economic experts; and (i) other publicly available material and data identified herein. Lead Counsel's investigation of the facts underlying this action is ongoing, and Lead Counsel further believes that relevant facts are

---

[1]    Excluded from the Class are ProAssurance, ProAssurance's former Chief Executive Officer ("CEO") W. Stancil Starnes ("Starnes"), ProAssurance's current CEO Edward L. Rand, Jr. ("Rand"), ProAssurance's current Chief Financial Officer ("CFO") Dana S. Hendricks ("Hendricks"), ProAssurance's former President of Healthcare Professional Liability Howard Friedman ("Friedman"), and ProAssurance's current President of Specialty Property & Casualty Operations Michael Boguski ("Boguski") (collectively, "Defendants"), as well as all present or former executive officers of ProAssurance and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

4840-9468-0034.v1

known only by Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

3.    ProAssurance is an insurance company that went to great lengths to build a reputation staked on its purportedly "disciplined" approach to business, including its supposedly "conservative" underwriting and loss reserves practices.  In the first half of 2020, the Company shocked the market by recognizing charges totaling ***more than $130 million***, wiping out nearly three years' worth of net income.  Defendants disclosed that the charges were driven by a single unnamed "large national account," the initial policy for which was issued in 2016.  They did not, however, disclose that they knew by at least the second quarter of 2018 ("2Q18") that ProAssurance's loss reserves for this undisclosed large national account – an inherently risky physician staffing company by the name of TeamHealth – were massively understated and failed to adequately reflect  the enormous amount of liability ProAssurance faced in connection with the extraordinarily risky policy, which had been underwritten pursuant to a "unique structure" that was unlike any "others in [the Company's] book of business."   Instead, Defendants actively concealed these material facts from investors for almost two years through a series of accounting misstatements and material misrepresentations.  Defendants also concealed that they knew by at least the start of 2020 that TeamHealth was highly unlikely to renew its policy and would instead exercise its option to purchase "tail coverage," which would (and ultimately did) expose ProAssurance to substantial additional losses.  The truth about Defendants' material misstatements and omissions was ultimately revealed through two corrective disclosures, the last of which occurred on May 7, 2020, and caused the Company's stock price to plummet all the way down to $15.95 per share – ***a more than 67% decline from its Class Period high of $49.40***.

4.       ProAssurance is one of the largest providers of healthcare professional liability ("HCPL") insurance in the country.  Throughout the Class Period, the Company was heavily dependent upon revenue derived from HCPL policy premiums, which accounted for 89% of the premiums in ProAssurance's core Specialty Property & Casualty ("SP&C") segment.  As an insurance provider, the Company's financial health is directly tied to the strength of its underwriting practices and its continuous maintenance of adequate loss reserves (*i.e.*, money set aside for future payments related to covered claims).

5.       Historically, ProAssurance's strategy for differentiating itself from its competitors has been to promote its conservatism, both in its underwriting of policies and its maintenance of loss reserves, which Defendants often stated would benefit ProAssurance during shifts in market conditions.  In mid-2016, however, ProAssurance significantly deviated from its purportedly conservative practices when it decided to insure TeamHealth – a particularly risky physician staffing company that was susceptible to enhanced medical malpractice liability risks.  Specifically, TeamHealth had a unique corporate structure that enabled it to evade laws intended to promote adequate medical care, and it also had a profits-over-patients culture that exposed it to higher rates of medical malpractice claims.  Despite this enhanced risk profile, Defendants chose not only to insure TeamHealth, but to do so pursuant to what the Company has now admitted was ***an unusual, particularly risky contractual structure unlike any other in ProAssurance's portfolio***.  As the Company has also acknowledged, it did so in order to secure the large premiums that came along with insuring an account the size of TeamHealth, which at the time represented "***the single largest premium ever billed by ProAssurance***."

6.       Despite the obvious materiality of these facts, Defendants made no disclosures whatsoever regarding the Company's unique and inherently risky TeamHealth policy until almost four years later, when Defendants stunned investors through a series of announcements on January

- 3 -

20, 2020, and May 7, 2020, which disclosed that ProAssurance had suffered the largest loss from a single account in its history, resulting in charges of ***more than an astonishing $130 million***. Tellingly, even then, the Company declined to identify the TeamHealth account by name, instead attributing the massive losses to an unnamed "large national health care account written since 2016." While Defendants have steadfastly refused to identify the "large national health care account" responsible for these charges – and, in fact, have never even publicly disclosed that the Company insured TeamHealth – Lead Plaintiffs' independent investigation has confirmed that the account responsible for the massive charges recognized by ProAssurance in early 2020 was TeamHealth. Moreover, as further detailed herein, Defendants knew for years that the extraordinarily risky TeamHealth account was experiencing an exponential rise in its number of outstanding claims, causing it to generate extraordinary losses, but Defendants knowingly concealed this information from investors.

7.    Indeed, by the start of 2018, the "frequency" (*i.e.*, number) of TeamHealth claims reported had begun to rise dramatically. At the same time, the HCPL industry as a whole was experiencing a rise in the "severity" (*i.e.*, average cost) of its claims – a dynamic Defendants frequently spoke about both prior to and during the Class Period. As a result, Defendants knew by no later than 2Q18 that the Company's liabilities for its TeamHealth account would substantially exceed the loss reserves established for the account. Yet, instead of increasing their loss reserves for the account and disclosing TeamHealth's issues to investors, Defendants actively concealed them and knowingly reported loss reserves that ***massively understated the Company's liabilities for its TeamHealth account***. As a result, ProAssurance's reported financial results violated Generally Accepted Accounting Principles ("GAAP") and SEC disclosure rules by, among other things, materially misstating the Company's net losses and loss adjustment expenses, net loss ratio, net income, and earnings per share ("EPS"), and misstated related financial metrics

- 4 -

reported for the SP&C segment.  In addition, Defendants' concealment of the truth regarding the ongoing issues with the TeamHealth account rendered several of their Class Period statements to investors regarding the Company's supposedly "conservative" underwriting and reserve practices materially false and misleading.

8.     The glaring and unmistakable nature of Defendants' massively understated reserves for the TeamHealth account is confirmed by Lead Plaintiffs' extensive forensic analysis of ProAssurance's quarterly and annual statements filed with state insurance departments, as further described herein.  This analysis, which could not have been performed by investors during the Class Period, demonstrates that the reserve amounts reported for TeamHealth's skyrocketing number of claims corresponded to *impossibly low average severity rates* that had no rational basis in fact.  Indeed, during the Class Period the average severity rates implied by ProAssurance's loss reserves for its TeamHealth account were as much as *35.5% lower* than the average severity rates implied by the Company's loss reserves for its other HCPL accounts, despite the fact that Defendants knew, based on TeamHealth's enhanced risk profile, that TeamHealth's average severity rate should have been at least as high – *if not significantly higher* – than the rates applicable to the Company's other HCPL clients.

9.     Moreover, there is no doubt that Defendants were expressly aware of the TeamHealth account's massively understated loss reserves during the Class Period, particularly given the significant impact the account – which "represented the single largest premium ever billed by ProAssurance" – had on ProAssurance's operating results.  In addition, Defendants repeatedly stated throughout the Class Period that they were intimately involved with, and knowledgeable about, ProAssurance's reserves processes, which they represented to be heavily focused on both new and historical data concerning frequency and severity – even going so far as to describe "the severity of claims" as "*the most influential factor* affecting the analysis of our

HCPL reserves and the related development recognized." Defendants also spoke at length during the Class Period regarding their purported "*concern[s] about increasing severity* in the broader market," attempting to allay investors' concerns about such trends by assuring them that Defendants closely monitored severity rates. Based on the foregoing, Defendants clearly knew – or were severely reckless in not knowing – about the impossibly low average severity rates implied by their loss reserves for the TeamHealth account, which clearly indicated that those reserves were massively understated.

10.    Defendants' knowledge of the serious issues concerning the TeamHealth account is further confirmed by the fact that ProAssurance undertook a *complete restructuring of its executive management team* beginning in early 2019, parting ways with several top executives that had close ties to the TeamHealth account, including Defendants Starnes and Friedman, and disbanding the National Healthcare Team responsible for underwriting the TeamHealth policy. Yet, even after implementing such corrective measures, Defendants continued to conceal the massive problems related to the TeamHealth account and continued to misstate ProAssurance's reported financial results by materially understating the Company's loss reserves for its TeamHealth account.

11.    Ultimately, Defendants' fraud was revealed through a series of corrective disclosures in the first half of 2020. First, on January 22, 2020, Defendants shocked the market by disclosing that higher-than-anticipated medical malpractice claims for an unnamed "large national account" (*i.e.*, TeamHealth) had resulted in an estimated $37 million "adverse development" for the Company's prior accident year loss reserves.[2] The Company further

---

[2]    The term "adverse development" refers to an increase in the aggregate amount of loss reserves required for a given group of claims following a reevaluation of such claims in connection with a periodic reporting date.

4840-9468-0034.v1

revealed that it expected to book an additional $33 million to $43 million in charges to true-up its current accident year loss and loss adjustment expenses incurred related to the same large national account.  As a result of this disclosure, ProAssurance's stock price fell ***more than 11%***, from $37.58 per share on January 22, 2020, to a closing price of $33.40 per share on January 23, 2020.[3]

12.    Defendants, however, continued to conceal the full truth regarding the TeamHealth account.  Specifically, Defendants knew that by the time they disclosed the adverse development on January 22, 2020, TeamHealth was highly unlikely to renew its policy and would instead exercise its option to purchase "tail coverage," which would expose ProAssurance to substantial additional losses.  But Defendants concealed this information from investors until May 7, 2020, when they disclosed that the unnamed "large national account" that had driven the massive charges disclosed just a few months prior would exercise its option to purchase "tail coverage," exposing ProAssurance to an additional "net loss of up to approximately $50 million."  The market was once again stunned, causing the Company's stock price to plummet ***another nearly 22%***, from $20.33 per share on May 7, 2020, to $15.95 per share on May 8, 2020.[4]

13.    The collective charges of more than $130 million that Defendants belatedly recognized in connection with the TeamHealth account were massive and extraordinarily material to the  Company's financial condition.  Indeed, they were nearly ***three times greater*** than the Company's annual net income of $47 million for all of 2018, and nearly wiped out all of ProAssurance's combined $155 million of profits earned over the course of the three-year period

---

[3]    The following month, Defendants clarified that the $37 million of adverse development charges disclosed in January were driven by a $44.5 million adverse development for 4Q19 attributable to the unnamed single "large national account" (*i.e.*, TeamHealth), which brought the total TeamHealth-related adverse development for the entire fiscal year 2019 to ***$51.5 million***.

[4]    Ultimately, ProAssurance ended up recognizing a charge of $45.7 million in 2Q20 as a result of TeamHealth's decision to exercise its option to purchase "tail coverage."

4840-9468-0034.v1

spanning 2017 through 2019.  As a result, between January 2020 (when the Company first began to disclose the truth about its TeamHealth policy) and the end of the Class Period, ProAssurance's stock price lost ***almost 60% of its value***, causing substantial harm to Lead Plaintiffs and the Class.

## II.    PARTIES

### A.    Lead Plaintiffs

14.    Lead Plaintiff Central Laborers' Pension Fund is an institutional investor established in 1965 that provides pension benefits to retired laborers and their beneficiaries throughout most of Illinois.  It manages approximately $1 billion in assets and has over 16,000 participants.  As set forth in its certification filed on August 17, 2020 (ECF No. 30-2), Central Laborers' Pension Fund purchased ProAssurance common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

15.    Lead Plaintiff Plymouth County Retirement System is a public pension system established in 1937 for the benefit of current and retired municipal and county employees of Plymouth County, Massachusetts.  It manages nearly $1.2 billion in assets and has over 11,000 participants.  As set forth in its certification filed on August 17, 2020 (ECF No. 30-2), Plymouth County Retirement System purchased ProAssurance common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

### B.    Defendants

16.    Defendant ProAssurance is a provider of medical malpractice and other liability insurance.  The Company is incorporated under the laws of the State of Delaware, and maintains its principal executive offices at 100 Brookwood Place, Birmingham, Alabama 35209.  ProAssurance common stock trades on the NYSE under the symbol "PRA."

17.    Defendant Starnes served as ProAssurance's CEO from January 2, 2007, through July 1, 2019.  Starnes was appointed to ProAssurance's Board of Directors in September 2007 and

currently serves as its Executive Chairman. Starnes first associated with ProAssurance's predecessor in 1979, when he began defending insured physicians on behalf of the Company. He subsequently became ProAssurance's lead outside defense counsel and, according to ProAssurance's website, "was a vital outside voice in many key decisions that shaped the Company." His "primary work was in the field of medical liability defense" with a "34-year history" in the courtroom. During the Class Period, Starnes certified several of the Company's periodic financial reports filed on Form 10-Q, and regularly spoke with investors and securities analysts about the Company prior to and during the Class Period. Starnes served as a director of ProAssurance Specialty Insurance Company, Inc. ("PRA-Specialty"), ProAssurance's relevant insurance subsidiary from 2015 through 2Q19.

18.    Defendant Rand has served as ProAssurance's CEO since July 1, 2019. Rand has also served as a member of ProAssurance's Board of Directors since 2019. Prior to becoming CEO, Rand was ProAssurance's Chief Operating Officer ("COO"), and also previously served as CFO, Executive Vice President, and Senior Vice President of Finance since joining ProAssurance in November 2004. During the Class Period, Rand certified several of the Company's periodic financial reports on Forms 10-Q and 10-K, and regularly spoke with investors and securities analysts about the Company. Rand signed each quarterly and annual statutory insurance filing for PRA-Specialty from 2015 through 2Q18 and served as a director of PRA-Specialty from 2015 through the end of the Class Period.

19.    Defendant Hendricks has served as ProAssurance's CFO since September 2018. Previously, Hendricks served as the Senior Vice President of Business Operations for the Podiatry Insurance Company of America ("PICA"), a ProAssurance subsidiary. Prior to joining PICA in 2001, Hendricks held various finance, data analysis, and accounting positions with other insurance companies. Prior to and during the Class Period, Hendricks certified the Company's periodic

financial reports on Forms 10-Q and 10-K, and regularly spoke with investors and securities analysts about the Company.  Hendricks signed each quarterly and annual statutory insurance filing for PRA-Specialty from 3Q18 through the end of the Class Period.

20.    Defendant Friedman served as President of Healthcare Professional Liability at ProAssurance from January 2014 to May 2019.  Friedman also previously served as ProAssurance's Chief Underwriting Officer and Chief Actuary, as well as its Co-President of Professional Liability Group, CFO, Corporate Secretary, and Senior Vice President of Corporate Development.  Friedman first joined ProAssurance's predecessor in 1996.  Prior to and during the Class Period, Friedman regularly spoke with investors and securities analysts about the Company. Friedman signed each quarterly and annual statutory insurance filing for PRA-Specialty from 2015 through 1Q19 and served as a director of PRA-Specialty during the same time period.

21.    Defendant Boguski has served as President of ProAssurance's SP&C operating division since May 13, 2019.  Boguski effectively replaced Defendant Friedman after ProAssurance restructured its executive team and consolidated its SP&C operations (including the Healthcare Professional Liability segment previously led by Friedman) under Boguski's leadership in February 2019.  Previously, Boguski served as the President of Eastern Insurance ("Eastern") – ProAssurance's workers' compensation insurance operating subsidiary – a position he held since ProAssurance acquired Eastern in 2014.  According to ProAssurance's website, Boguski has "almost 30 years of industry experience," including significant insurance underwriting experience. Prior to and during the Class Period, Boguski regularly spoke with investors and securities analysts about the Company.  Boguski signed each quarterly and annual statutory insurance filing for PRA-Specialty from 3Q18 through the end of the Class Period.

22.    Defendants Starnes, Rand, Hendricks, Friedman, and Boguski are referred to as the "Individual Defendants."

- 10 -

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of ProAssurance, directly participated in the day-to-day operations and affairs of the Company at the highest levels and were privy to confidential, proprietary, and material adverse non-public information concerning ProAssurance, its operations, finances, financial condition, and present and future business prospects, including critical client contracts and significant sources of premium revenue, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at meetings, including management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection with their responsibilities as senior executive officers and/or directors of ProAssurance.  Because of their possession of such information, the Individual Defendants knew or were severely reckless in not knowing that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein, particularly with regard to its risk management and underwriting policies and practices, as well as its public disclosures of information to the investing public. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of ProAssurance's business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated

- 11 -

documents alleged herein to be materially misleading and had the ability and opportunity to prevent their issuance or cause them to be corrected.

26.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ProAssurance's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ProAssurance common stock would be based on truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ProAssurance's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## III.    JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 CFR §240.10b-5.

29.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

30.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as conduct giving rise to the violations of the Exchange Act alleged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.  Defendants reside or transact business within this District, and ProAssurance maintains its primary office at 100 Brookwood Place, Birmingham, Alabama 35209.

31.    In connection with the acts and conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, the Internet, and the facilities of national securities exchanges.

## IV.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    ProAssurance's Background

#### 1.    ProAssurance's HCPL Insurance Business and Policies

32.    ProAssurance is one of the largest HCPL insurance providers in the United States. The Company reports its underwriting results in four segments:  SP&C, Workers' Compensation, Segregated Portfolio Cell Reinsurance, and Lloyd's Syndicates.  Since its founding, the vast majority of ProAssurance's revenues have been generated by the SP&C segment.  For instance, throughout the Class Period, the SP&C segment generated 53% of ProAssurance's consolidated revenue and 59% of its consolidated net premiums earned.  Within the SP&C segment, HCPL insurance policies represent roughly 90% of the segment's business, revenues, and premiums written.

33.    The Company's HCPL policies protect healthcare professionals from negligence and other claims like medical malpractice.  In the context of medical malpractice, there can be an extended delay between the time of the treatment or procedure being challenged and the time the

- 13 -

patient files a claim.  In order to address this issue, companies like ProAssurance often issue "claims-made" policies, as opposed to "occurrence-based" policies.

34.     Under a claims-made policy, the insurance provider is liable for claims *filed* during the active policy year.  For example, if ProAssurance issued a claims-made HCPL policy to a physician for the year 2017, that policy would provide insurance coverage for all claims reported to the Company by the physician in 2017, even if the challenged medical treatment occurred in some prior year (subject to any applicable limitations in the policy).

35.     Conversely, under an occurrence-based policy, the insurance provider is liable for all claims arising out of events that *occurred* during the active policy year, regardless of when they are actually reported to, or known by, the insurance provider.  Under such circumstances, it can be more difficult for the insurance company to determine how many claims it may be required to insure, the amount of potential future liabilities for those claims, or when the Company might be called upon in the future to make those payments, even after the policy period ends.

36.     Thus, claims-made policies reduce liability volatility for an insurance company like ProAssurance by limiting the period of time for which it is exposed to liability for claims, and by providing *contemporaneous notice* of the number of claims for which the insurance provider may be liable in a given year, thus making potential future liability much more predictable.

37.     ProAssurance, however, offers certain claims-made policyholders the ability to exercise an option for an extended reporting period, referred to as "tail coverage," at the end of the active policy period, but only if the insured has decided to cancel or otherwise not renew its claims-made policy for another term.  According to the Company's website, "[t]ail coverage permits an insured to report claims that are made *after* the policy has expired or cancelled if the alleged wrongful act took place during the expired or cancelled policy period."  As such, tail coverage can greatly increase the Company's potential future liability by extending the amount of time during

4840-9468-0034.v1

which a covered claim can be reported. Indeed, as Defendant Rand noted during the Company's May 8, 2020 earnings call, "people probably cringe" because tail coverage "more or less converts at the very end of that life of that policy, that policy from a claims-made policy to more of an occurrence-based policy."

### 2. ProAssurance's Purportedly "Conservative," "Responsible," and "Disciplined" Business Strategy

38.     ProAssurance's profitability is determined by its ability to generate income through insurance policy premiums, while limiting the Company's eventual liabilities under such policies. As such, ProAssurance's profitability is directly related to the effectiveness of its policy underwriting practices. The most important consideration in the underwriting process is the underwriters' evaluation of the future expected losses under the policy at issue (*i.e.*, the costs of resolving covered claims, including claim-related expenses). This analysis of expected losses, which drives the policy's premium pricing, is dependent upon a number of factors, including the nature of the insured's business, historical data concerning its past claims, and claim data from entities in similar geographies and/or industries.

39.     To this end, both before and throughout the Class Period, Defendants repeatedly assured investors that ProAssurance's SP&C segment was committed to achieving profitability on its HCPL policies through a purported "disciplined approach to business," including by implementing conservative, risk-averse underwriting practices; diligently maintaining reserves that accurately reflected the Company's true liabilities; and purchasing reinsurance protection to adequately limit ProAssurance's exposure to liability under its HCPL policies. Indeed, Defendants repeatedly promoted the Company's purported conservatism as a competitive advantage over ProAssurance's industry peers, even claiming the Company was so extraordinarily conservative in underwriting and maintaining reserves that it would ***benefit*** from more difficult market conditions that harmed other insurers. For example, in its 2015 Form 10-K, ProAssurance stated:

- 15 -

We have sustained our financial stability during difficult market conditions through responsible underwriting, pricing and loss reserving practices and through conservative investment practices. . . . We recognize the importance that our customers and producers place on the financial strength of our insurance subsidiaries and we manage our business to protect our financial security.[5]

40.    Similarly, during a May 9, 2016 earnings call, Defendant Starnes touted ProAssurance's "disciplined approach to business" as "sowing the seeds of future success," and stated: "We remain very disciplined in the way we underwrite our risk . . . and if we cannot obtain an adequate price for the risk we are asked to take, we respectfully decline the risk." Starnes also stated: "I would say to you that *an investor at ProAssurance can be assured that we're going to continue to run the Company in a disciplined way*, that we would take a very measured and disciplined approach to our capital management, and the past is prologue." During the same call, Defendant Friedman "stress[ed] that we're using . . . disciplined methods to establish reserves."

41.    Defendants continued to make substantially similar statements immediately before and throughout the Class Period. For example, on June 19, 2018, Defendant Rand represented to investors that "*we take a very conservative approach to how we underwrite [our HCPL] business, how we price that business and then how we reserve that business*." In ProAssurance's 2019 Form 10-K, Defendants reiterated that ProAssurance was "*committed to disciplined underwriting, pricing and loss reserving practices . . . even during difficult market conditions*."

### 3.    ProAssurance's Reserve Setting Processes

42.    In addition to ProAssurance's underwriting conservatism, the Company also repeatedly emphasized to investors its sound processes for accurately assessing and managing risk by conservatively estimating liabilities for the policies it issued. In most cases, time elapses between the occurrence of a covered event, the reporting of a claim concerning that event to

---

[5]    The Company repeated this statement in its 2016-2018 Forms 10-K.

ProAssurance, and any eventual payment by the Company related to the event. Thus, to recognize liabilities for the ultimate payment of policy losses and related expenses, insurers like ProAssurance must establish loss reserves as balance sheet liabilities with corresponding income statement charges (*i.e.*, expenses) representing the anticipated amount required to settle claims in the future. Because they represent expected future losses that the Company will be required to pay, loss reserve measures are extremely important to insurance companies' investors.

43.    The establishment of loss reserves is meant to ensure that sufficient financial resources will be available to ultimately cover the cost of claims filed. Loss reserves are required to be established at each applicable financial reporting date for both known and unknown losses that have been incurred as of such date. The adequacy of such reserves for unpaid claims must be reevaluated and adjusted in each successive accounting period.

44.    Establishing the appropriate level of reserves directly impacts ProAssurance's financial results, which investors rely upon to make informed investment decisions. For every dollar ProAssurance uses to establish a loss reserve, the Company is required to deduct one dollar from its operating income and net income before taxes. Therefore, if a company like ProAssurance maintains inadequate reserves, it is required to increase them immediately, which results in a commensurate reduction in net income in the period in which the inadequacy is identified and corrected.

45.    Significantly, if a company's loss reserves are inadequate – whether by failing to establish adequate initial reserves, or by failing to increase reserves to account for new information obtained during or after the policy term – it necessarily overstates the company's net income by understating its expenses (and liabilities). As such, establishing or maintaining inadequate reserves falsely conveys financial strength by overstating income and understating expenses.

- 17 -

46.     Securities analysts have long recognized the critical importance to investors of ProAssurance's reserve development.  For example, an April 4, 2018 report by SunTrust stated that the Company's "reserve development is . . . *the most important contributor to earnings*." Likewise, a November 7, 2018 Boenning & Scattergood analyst opined that "[m]uch of the [Company's] *strong performance is related to significant favorable prior-year loss reserve development*."    Indeed, ProAssurance's loss reserves have consistently been the Company's largest expense item on its income statement and the largest liability on its balance sheet.  As a result, information concerning ProAssurance's reserves for losses and loss adjustment expenses – including the Company's processes for setting and reevaluating such reserves – is highly material information to investors.

47.     Importantly, prior to and throughout the Class Period, ProAssurance's loss reserve amounts were established by the Company's most senior management – including the Individual Defendants – through a process that purportedly took into consideration both historical and current information, as well as predictive analysis provided by ProAssurance's actuaries and accountants. As explained in an April 2017 report on ProAssurance by securities analysts at Boenning & Scattergood: "Actuaries determine appropriate reserves, but a company's senior executives decide the final amount to book."  ProAssurance has further confirmed this to be the case, repeatedly stating in its quarterly and annual SEC filings that the Company's reserves are "*established by management* after taking into consideration a variety of factors," and that such reserves are "*regularly reviewed and updated by management as new data becomes available*."

**4.     Defendants' Reinsurance Practices and Disclosures**

48.     Another important component of managing insurance risks is the purchase of "reinsurance" (known as insurance for insurers), which is the practice whereby an insurer reduces its exposure to certain obligations resulting from claims on its policies by transferring a portion of

the policy risk to a third party.  In effect, the insurer of the underlying policy pays the reinsuring third party part of the policy's premium to assume a portion of the insurer's liability, thereby limiting the extent of both the up-side and down-side financial effects for the insurer.

49.    As explained by a December 2014 whitepaper published by the U.S. Department of the Treasury's Federal Insurance Office ("FIO"), reinsurance is an "important mechanism by which an insurer manages risk and the amount of capital it must hold to support such risk" (*i.e.*, loss reserves), "thereby tempering the adverse impacts of [loss] volatility."[6]  The FIO report also highlighted the "vital" role reinsurance plays in "help[ing] stabilize the net losses (*i.e.*, after reinsurance recoveries) in an insurer's portfolio."   The National Association of Insurance Commissioners similarly describes reinsurance as an "essential mechanism by which insurance companies manage risk . . . [and] best achieve a targeted risk profile."   As a result, reinsurance provides a critical tool for limiting insurance companies' potential losses, which makes it a core consideration for investors in such companies.

50.    Prior to and throughout the Class Period, in the Company's quarterly and annual SEC filings, Defendants repeatedly assured investors that ProAssurance maintained considerable reinsurance to mitigate the Company's risk of outsized losses.  Specifically, Defendants told investors that ProAssurance used reinsurance for its HCPL policies "to provide capacity to write larger limits of liability, to provide reimbursement for losses incurred under the higher limit coverages we offer [and] to provide protection against losses in excess of policy limits."

---

[6]    Federal Insurance Office, U.S. Department of the Treasury, *The Breadth and Scope of the Global Reinsurance Market and the Critical Role Such Market Plays in Supporting Insurance in the United States*, December 2014.

B.    **Unbeknownst to Investors, ProAssurance Signs TeamHealth**

1.    **TeamHealth Was a Large, Unconventional Account that Netted ProAssurance the "Single Largest Premium" in Its History**

51.    Since the Company's inception over 40 years ago, underwriting professional liability policies for solo practitioners and small physician groups traditionally accounted for more than 90% of ProAssurance's HCPL business.  Beginning around 2015, however, the policyholder mix in the HCPL industry began to shift towards underwriting policies for much larger groups of physicians like hospitals and massive national healthcare provider entities, which included thousands of physicians within a single group or system.  To respond to this changing landscape, ProAssurance created the "National Healthcare Team," a group of underwriters specifically tasked with selling HCPL policies to large physician groups.  Defendant Friedman was the National Healthcare Team leader responsible for approving all underwriting decision-making and overseeing the activities of team members, including other high-level executives, such as VP Charles Francis and VP of Underwriting Wesley Butler ("Butler").

52.    In 2016, the National Healthcare Team landed ProAssurance's self-proclaimed "*single largest premium ever billed*" – TeamHealth, a massive healthcare physician staffing company employing over 18,000 affiliated clinicians serving approximately 3,400 healthcare provider facilities in nearly all 50 states.  In ProAssurance's press release reporting financial results for 2Q16 – the same quarter in which the TeamHealth policy was initially underwritten – the Company disclosed that, as compared to 2Q15, quarterly physician premiums "were $3.0 million higher (+3.9%), largely the result of the addition of several large accounts."  With respect to the TeamHealth account specifically, the press release further represented (without identifying TeamHealth by name) that the "several large accounts" included "a significant multi-state physician group that represented *the single largest premium ever billed by ProAssurance*."

- 20 -

53.     The following day, Defendant Friedman reiterated the extraordinary significance of the TeamHealth signing – again, without specifically identifying TeamHealth by name – during the Company's earnings call for 2Q16 on August 4, 2016, specifically stating:

> Premium for our 12-month policies were $9.3 million higher than the year ago quarter, a 14.3% increase, and was led by the writing of several large accounts including the multistate account mentioned in the news release. ***That's the single largest premium we've ever written and it represents solid evidence of our ability to succeed*** in an evolving world where physician consolidation is continuing . . . .

54.     During that same call, Defendant Friedman boasted about the efforts of his National Healthcare Team and demonstrated his intimate knowledge of the TeamHealth Policy (without specifically identifying TeamHealth by name).  Significantly, however, at no time did Defendants disclose that the policy was radically and completely different than any policy ProAssurance had ever written previously, or that it dramatically deviated from the Company's conservative underwriting practices.

55.     Several former ProAssurance employees have also confirmed that the TeamHealth signing was a significant development within the Company.[7]  For example, CW 1[8] stated that there "was a great deal of elation and celebration" when the TeamHealth account was signed because "***it was the biggest account written that year***."  CW 2[9] similarly recalled that "TeamHealth was

---

[7]   Former ProAssurance employees are referred to herein as "CW __" to protect their confidentiality.

[8]   CW 1 worked in ProAssurance's Florida office as an Account Executive from July 1997 to March 2020.  CW 1 was responsible for marketing and selling professional medical liability insurance to physicians, physician groups, and hospitals.

[9]   CW 2 worked in ProAssurance's Alabama office from September 2014 to August 2019, as Director of Operations and Assistant Vice President of Operations.  CW 2 was responsible for implementing an Underwriting Advisory Committee to assist with improving communication between different ProAssurance departments, which exposed CW 2 to information concerning both underwriting and claims.  CW 2 reported to several different managers, including Defendant Friedman.

- 21 -

by far the largest client" ProAssurance had been able to sign in the "specialty" space.  CW 3[10] further conveyed the significance of the TeamHealth account to ProAssurance, explaining that the "Company needed this account to hit their goal" of selling $50 million worth of new policies in 2016.  CW 3 further stated the account was so large that simply landing TeamHealth alone got Defendants 20% of the way there, which is why "***this was a big deal Company-wide and it was big news within the Company***."

56.    Moreover, former employees confirmed that, in light of the size of the TeamHealth account and its impact on ProAssurance's financial performance, the terms of the policy – including any exceptions to ProAssurance's standard underwriting pricing, reserving, reinsurance structure, or other routine terms and conditions – would have required express approval from high-level ProAssurance executives.   Indeed, according to CW 4,[11] a former ProAssurance Underwriting Operations Systems Analyst and Operations Supervisor who worked with the TeamHealth account, writing a policy for an account of the size and magnitude of TeamHealth required the approval of "very high-level" executives at the Company, including "at least" Defendant Friedman.  CW 3 similarly indicated that, due to the large size of the TeamHealth policy, Defendant Friedman would have been required to approve the policy's underwriting.

### 2.    The TeamHealth Policy Presented Extraordinary Risks for ProAssurance Due to the Policy's Unique Structure and TeamHealth's Enhanced Risk Profile

57.    Despite Defendants' repeated assurances that ProAssurance maintained a "conservative" and "disciplined" approach to business, unbeknownst to investors, the Company

---

[10]   CW 3 worked in ProAssurance's Florida office from 2001 to April 2020 as a Manager of Customer Service, Sales, and Marketing.  In this role, CW 3 managed customer service representatives and marketing specialists.

[11]   CW 4 worked at ProAssurance from February 2012 to September 2018.

deviated significantly from these purported practices when it signed TeamHealth. Indeed, TeamHealth was a particularly risky client for several reasons, including: (a) TeamHealth's massive scale; (b) the increasing risks posed by large physician groups in general; and (c) TeamHealth's well-known, and controversial, profits-centric philosophy. Despite these known risks, ProAssurance not only chose to insure TeamHealth, but the Company made the unfathomable decision to do so pursuant to a highly unusual, inherently risky contractual structure that was unique to TeamHealth, which ultimately resulted in the massive charges detailed herein.

>        **a.    Underwriting HCPL Policies for Large Accounts, Like TeamHealth, Presents Significantly Higher Liability Risks**

58.    Underwriting HCPL policies for large healthcare providers is significantly more risky than underwriting HCPL policies for individual physicians or small physician groups. This is true primarily because claims and policy limits for a large healthcare institution are typically much greater than for a small medical practice, which Defendants routinely acknowledged.

59.    For instance, during the Company's earnings call on February 22, 2018, Defendant Friedman opined that larger hospital groups "added a good bit of exposure in and had increased their potential for loss severity, in part due to the fact that there are higher policy limits available." Likewise, during a conference on March 6, 2018, Defendant Rand noted that, with respect to "the more complicated larger entities that we insure[,] . . . *the expected damages that if we don't win are thought to be higher*." During an earnings call on November 7, 2018, Defendant Friedman emphasized that the Company was seeing "significant verdicts" in the hospital professional liability area, including "verdicts north of $100 million." And during a February 21, 2020 earnings call, Defendant Boguski also explained that "there's no question as the physician's market has consolidated and there's been more capital and competition in that large account space that the loss volatility, in general, has been more volatile than the physicians' book."

- 23 -

60.    Significantly, while Defendants acknowledged – during a November 3, 2016 earnings call, for example – that physician staffing companies such as TeamHealth have "***risk profiles that are a good bit different than the traditional physician business***," they nevertheless assured investors that ProAssurance had "***always been rather cautious from an underwriting perspective on that business***."  Indeed, Defendant Friedman underscored during this same call that, when underwriting policies for large physician staffing companies, "the pricing and the terms are really key for us" so the Company placed "a great deal of emphasis on evaluating the internal processes" of such businesses when pricing and structuring those policies.

### b.    Defendants Routinely Acknowledged that the Severity of Large Physician Group Liabilities Was Increasing in the Industry

61.    In the HCPL industry, companies like ProAssurance can generally have their loss costs (*i.e.*, the cost to defend and/or indemnify policyholders against covered claims) increase primarily in two different ways – an increase in the number of claims being reported (*i.e.*, "frequency"), and/or an increase in the amount of liability per claim (*i.e.*, "severity").  During a March 20, 2018 investor conference, Defendant Starnes aptly explained these concepts to investors, stating: "You talk about loss cost in the insurance world with 2 phrases: frequency and severity.  Frequency means how many claims you get. . . .  The second loss cost is severity, how bad is the claim, how much does it cost to resolve."

62.    During the same conference, Defendant Starnes further addressed how ProAssurance would respond to fluctuations in the frequency or severity of claims.  Regarding claims frequency, he represented that ProAssurance "can respond quickly with the claims-made book of business to changes in frequency, because ***we see frequency on a real live – real-time basis***. . . . our ability to respond to frequency with the claims-made book of business is quite fine."

63.     With respect to increasing claims severity, however, Defendant Starnes acknowledged that "[s]everity ripples through every open claim file you have," such that "when severity goes up, you don't just apply it to the business you're writing going forward, it ripples back through every open claim you have."  Significantly, Starnes emphasized that "if you wake up one day and severity has resulted in your reserves becoming inadequate, *you've got to add to those reserves*, and the only place you've got to get that is your capital."  Starnes further assured investors that "*when we see any sign of an increase in severity, it tempers our expectations for our reserves [and] we've always done everything we can to make sure we have adequate reserves, because that's the protection for our insureds and for our shareholders*."

64.     By 2018, Defendants began acknowledging that the severity of claims being reported by large physician groups such as TeamHealth was on the rise industry-wide.  For instance, during a February 22, 2018 earnings call, Defendant Friedman stated that, "[b]ased on both our own data and what we are hearing and seeing in the broader market, severity may be picking up a bit," specifically for "larger groups of physicians and . . . larger health systems."  During a June 19, 2018 investor conference, Defendant Rand stated that "there is the potential for both kind of the continuation of the severity trend that we are seeing, and for that to drive an increase in frequency."

65.     Defendants continued to acknowledge this trend throughout the Class Period, but repeatedly assured investors that ProAssurance's "conservatism" and "discipline" mitigated the risks to the Company, and that the Individual Defendants were closely monitoring developments to make sure that the Company was fully protected.  On November 7, 2018, for example, while Defendant Friedman asserted "there is overall concern in the industry about loss severity," he emphasized that "*the potential change in severity influences our loss [picks] and affects our evaluation of reserves*," and that "the caution we are using as we evaluate reserves and determine

- 25 -

loss ratios will continue to affect this [SP&C] segment in the fourth quarter and into 2019."
Similarly, in an April 26, 2019 earnings call, Defendant Rand assured investors that "*we continue to act cautiously* in the face of what we view as worsening loss trends in the broader healthcare liability line," as the "*greater severity in underlying losses has a direct effect on our loss picks* and our evaluation of reserves."  During the same call, Defendant Starnes made clear to investors that, "[i]f we thought we were going to see unfavorable development, we'd take that into account today, we wouldn't wait for it.  So we're doing what we think is called for, which is just reducing the amount of favorable development.  We're not having to add to reserves."

66.    Accordingly, Defendants were well aware, and publicly acknowledged, that large physician accounts such as TeamHealth were exposed to higher liabilities per claim, and claims from these large groups were *increasing* in severity.  Defendants assured investors, however, that the Company's cautious and responsible practices effectively mitigated such risks.  But that was not, in fact, the case.  In reality, the average severity rates implied by Defendants' loss reserves for the TeamHealth account were *impossibly low*, and were, in fact, dramatically *less* than the average severity rates implied by Defendants' loss reserves for its other, less-risky HCPL clients, as further detailed in §V., *infra*.

**c.    TeamHealth Was Subject to an Increased Risk of Malpractice Claims Due to Its Practice of Prioritizing Profits over Patients**

67.    Even in the category of large physician staffing companies, TeamHealth stood out as particularly prone to medical malpractice claims due to its well-known reputation of prioritizing profits over patients.  While TeamHealth was founded in 1979 as a small group of physicians, by the time TeamHealth became a ProAssurance client in 2016, TeamHealth had more than 18,000 physicians and clinicians in 3,400 medical facilities and physician groups in 47 states.  TeamHealth controls the terms of employment for physicians, all physician staffing decisions and collection

- 26 -

practices, and sets the rates that its physicians charge patients.  In 2017, TeamHealth was acquired by funds affiliated with The Blackstone Group, a private equity firm, for approximately $6.1 billion.  As a result, while TeamHealth facially resembles a healthcare provider, it operates like a private equity-controlled firm fully incentivized to increase its own profits.

68.     In order to ensure that a physician's primary focus is on patient care, many states have historically banned the corporate practice of medicine and require doctors to work for themselves or other doctors, not for profit-driven corporations like TeamHealth.  As a November 27, 2019 *ProPublica* article explained, "'[t]here is this tension between being a health care provider and doing what's best for their care . . . and being a profit-maximizing firm that aggressively goes after patients,'" because, among other reasons, "a corporation's obligations to its shareholders may not align with a physician's obligation to his patients."[12]

69.     TeamHealth's profits-over-patients culture has led the company to employ a host of practices that have subjected its physicians to elevated medical malpractice claims and liability for years.  For example, according to a *qui tam* lawsuit filed in 2016,[13] since at least 2011, TeamHealth had engaged in a scheme to defraud Medicare and Medicaid by "falsely indicat[ing] to [the Centers for Medicare & Medicaid Services] that a physician performed the services at issue, when in fact a [non-physician practitioner] performed them."[14]  The result was a medical record that falsely indicated the patient was treated by both the physician and the non-physician

---

[12]  Wendi C. Thomas et al., *This Doctors Group Is Owned by a Private Equity Firm and Repeatedly Sued the Poor Until We Called Them*, ProPublica (Nov. 27, 2019), https://www.propublica.org/article/this-doctors-group-is-owned-by-a-private-equity-firm-and-repeatedly-sued-the-poor-until-we-called-them.

[13]  *United States of America et al., ex rel. Caleb Hernandez & Jason Whaley, Relator v. Team Health Holdings, Inc. et al.*, No. 2:16-cv-00432 (E.D. Tex.).

[14]  *Id.*

practitioner – an unethical practice that placed its physicians at risk of liability for patient care its physicians in fact did not provide, resulting in unwarranted and excessive exposure to medical malpractice claims.

70.    Indeed, a 2016 class action lawsuit filed against TeamHealth **by its own physicians** in ProAssurance's home federal district court in the Northern District of Alabama expressly alleged TeamHealth's practice of fraudulently misrepresenting doctor oversight "is easiest understood in the context of patient charts and the liability risk that physicians assume in signing those charts." [15]  As the plaintiff TeamHealth physicians stated: (a) "[a] physician is responsible for every patient whose chart he/she signs"; (b) "[p]hysicians can be held liable for the treatment provided to a patient, regardless of whether the physician saw the patient directly"; and (c) "[i]n fact, multiple [TeamHealth physicians] have been sued" because they "signed off on patient charts."[16]  Similar class action lawsuits were filed by TeamHealth's own doctors against TeamHealth in 2018 and 2019.[17]  According to a *qui tam* lawsuit filed in 2014, a Wisconsin hospital where TeamHealth took over the anesthesiology group engaged in similar fraudulent billing practices that also subjected TeamHealth's doctors to increased liability.[18]

71.    Importantly, by the time ProAssurance signed its contract with TeamHealth in 2016, there were extensive public allegations of TeamHealth's longstanding misconduct, which

---

[15]  *Dixie Emergency Physician LLC, et al. v. Team Health Inc., et al.*, No. 7:16-cv-1622 (N.D. Ala.).

[16]  *Id.*

[17]  *See Carlos Sanchez v. Team Health, LLC, F/K/A Team Health, Inc., et al.*, No. 1:18-cv-21174 (S.D. Fla.); *JMF Medical, LLC, et al. v. Team Health, LLC, F/K/A Team Health, Inc., et al.*, No. 3:19-cv-00837 (M.D. La.).

[18]  *United States of America et al., ex rel. John Mamalakis M.D., Relator*, No. 2:14-cv-00349 (E.D. Wis.).

amplified its physicians' exposure to medical malpractice claims. Furthermore, these practices persisted throughout the Class Period. While such facts were readily available to Defendants before ProAssurance signed TeamHealth as a client and at all times during the Class Period, *investors had no way of knowing* that TeamHealth was insured by ProAssurance (let alone under a unique structure that exposed ProAssurance to substantial risk), and that the Company was exposed to those risks because Defendants never publicly disclosed that they insured TeamHealth as a client.

> **d.    The "Unique" Structure of the TeamHealth Policy Further Exposed ProAssurance to Enhanced Liability**

72.    As detailed above, the nature and structure of TeamHealth's business made it particularly susceptible to increased risks of liability from medical malpractice claims – risks of which Defendants were undoubtedly aware and publicly acknowledged. Despite the presence of these extraordinary risks, however, Defendants agreed not only to insure TeamHealth, but they did so pursuant to a "*unique structure*" that was unlike any "others in [their] book of business." Indeed, as Defendant Boguski would be forced to later admit in May 2020: "there are no other structures in our book of business *that would even be close* to the structure that was offered here." Specifically, as further detailed in §VI.A.17., *infra*, according to Defendants, the TeamHealth policy was "unique[ly] structured" with respect to "the reinsurance side" and "pricing"; "was a miss on the loss projections and attachment points"; was subjected to claims severity that was "not contemplated as well as we needed to"; and contained a highly unfavorable tail coverage option.

> **C.    Defendants Continue to Tout ProAssurance's "Conservative" Underwriting and Reserves Practices, While Concealing the Company's Risky and Unconventional TeamHealth Policy**

73.    As detailed above, Defendants signed TeamHealth – an inherently risky client whose practices made it particularly susceptible to medical malpractice claims – to a "unique" policy unlike any "others in [their] book of business," which exposed the Company to a substantial

amount of liability. Defendants not only concealed these material risks, but they also knowingly failed to adequately reserve for them, despite Defendants' knowledge of data clearly indicating that their reserves for the TeamHealth account were woefully inadequate, as further detailed in §V., *infra*. Such actions represented a significant departure from the "conservative" and "disciplined" underwriting and reserve practices ProAssurance had historically touted to investors.

74.    But instead of disclosing these facts to investors, Defendants effectively did the opposite, continuing to boast to investors both prior to and during the Class Period about ProAssurance's purportedly conservative and disciplined underwriting and reserve practices. For example, in February 2018, Defendant Starnes represented that "market conditions will ultimately favor companies such as ProAssurance that had **maintained underwriting and claims discipline**, [and] have a strong balance sheet." On June 19, 2018, Defendant Rand similarly stated that "**we take a very conservative approach to how we underwrite [the HCPL] business, how we price that business and then how we reserve that business**."

75.    Securities analysts credited Defendants' repeated representations that ProAssurance was unusually conservative in its underwriting and loss reserve updating, calling ProAssurance "**one of the most conservative insurers in the sector**," and noting that these practices provided a competitive advantage in the industry. In an April 11, 2017 report, Boenning & Scattergood stated that "PRA's exceptional underwriting performance over the last 10 years largely reflects favorable loss reserve development," adding: "**PRA's reserves appear very conservatively stated**. Reserves have developed favorably in each of the last 14 years and 24 of the last 25 years." A May 4, 2018 Boenning & Scattergood report stated that ProAssurance was "one of the most conservative insurers in the sector," and that the analyst expected reserve development that was "still very strong," despite a worsening loss environment. Similarly, a May 8, 2018 Raymond James report listed statements during the Company's 1Q18 earnings call by

- 30 -

Defendants Friedman and Starnes that the Company "stand[s] to benefit" from a worsening loss environment as "Conference Call Highlights." And, another Boenning & Scattergood report dated August 8, 2018 proclaimed that ProAssurance "*is one of the most conservative insurers in the sector*," noting the Company was "averaging 13% growth per year for the last 25 years."

> **D.    TeamHealth's Claim Frequency Begins to Dramatically Increase**

76.    As further detailed in §V., *infra*, Lead Plaintiffs' in-depth forensic analysis reveals that, beginning in late-2017, ProAssurance began experiencing a dramatic increase in the number of outstanding claims being reported under its TeamHealth policy. Moreover, this indisputable upward trend in frequency dramatically worsened as the Class Period progressed:

**TABLE 1**

| Number of Outstanding TeamHealth Claims | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 |
| Claims | 2 | 2 | 3 | 38 | 203 | 279 | 336 | 474 | 710 | 744 | 802 | 895 |

77.    Significantly, because the TeamHealth policy was a claims-made policy, Defendants were unquestionably aware of the number of covered TeamHealth claims being reporting in real time. Indeed, as Defendant Rand aptly noted during a June 19, 2018 investor conference: "We write almost exclusively a claims made book of [HCPL] business. *So we do know the number of claims that are going to come in, and that's important* in [the HCPL] line of business." During a February 22, 2018 investor conference, Defendant Friedman likewise noted that "[a]s a writer of claims made policies, *we can adjust relatively quickly to rising [claim] frequency* as compared to [occurrence] policies that lock insurers into coverage that can prove to be unprofitable in a worsening [loss] environment."

78.    Thus, this extraordinary increase in the number of claims outstanding for TeamHealth indisputably put Defendants on notice that the aforementioned risks pertaining to TeamHealth were materializing. Investors, however, had no way to access the information needed

in order to uncover these facts.  Moreover, as further detailed in §V., *infra*, Defendants actively concealed the massive problems with the Company's TeamHealth account by knowingly failing to incorporate data reflecting the rapidly rising number of outstanding TeamHealth claims into their reported loss reserves, which resulted in severely understated loss reserves and massively suppressed average severity rates for Team Health's claims.

79.    In addition, Defendants continued to tell investors that the Company was effectively insulated from negative industry trends by ProAssurance's disciplined underwriting and strong reserve levels.  For example, on March 6, 2018, Defendant Rand stated: "We reserve very conservatively . . .  So we sit on a very strong reserve position, and over the last 10 or so years, that has manifested itself in significant [favorable] reserve development for the organization."  On May 4, 2018, Defendant Friedman touted the Company's cautious approach to its reserves, stating "[i]ndustry-wide, we continue to see a number of reports of large verdicts and while our paid loss data remains relatively stable, *we are reflecting caution about this severity movement in our loss picks*."  Friedman further stated: "We price in order to be competitive, and *we reserve more conservatively than that because of where severity might go*."

80.    The fact that Defendants knew full well before the start of the Class Period on August 8, 2018, that the Company's TeamHealth-related reserves were nowhere near adequate to cover the ever-increasing amount of expected future losses associated with TeamHealth's claims, is further confirmed by numerous former ProAssurance executives.  For instance, CW 2 represented that, by at least 2018, it was clear that TeamHealth was incurring more claims than Defendants had initially anticipated, and it was clear that "TeamHealth was definitely a loss proposition for us."  CW 3 reiterated that, by 2018, "TeamHealth's claims were increasing, and people were generally concerned about it."  According to CW 2, it was also well known internally

- 32 -

by 2019 that TeamHealth was "not going to be renewing" and would instead exercise its option for tail coverage.

> **E.    Defendants Conceal Massive Losses by Understating TeamHealth's Loss Reserves, Filing Materially False Financial Statements, and Misrepresenting ProAssurance's Purportedly "Disciplined" and "Cautious" Practices**

81.    While the developments described above were certainly foreseeable to Defendants, given their decision to insure the inherently risky TeamHealth pursuant to a "unique structure" that was unlike any "others in [their] book of business," investors had no way of knowing that TeamHealth was even a client of ProAssurance – let alone one that had been signed to a uniquely risky policy that was incurring a massive amount of undisclosed losses.  Yet, instead of disclosing these material facts, Defendants chose to conceal them from investors, thereby rendering numerous public statements by Defendants affirmatively false and misleading, and artificially inflating the Company's stock price as a result.

82.    For example, on August 7, 2018, Defendants filed with the SEC a Form 10-Q, in which Defendants falsely asserted that the Company's reserves processes paid particular attention to "claims frequency and severity," and that "[w]e re-evaluate our previously established reserve each quarter based on our ***most recently available claims data and currently available industry trend information***."  Contrary to these representations, as further detailed in §V., *infra*, Defendants knowingly ***ignored*** actual claims data regarding TeamHealth's dramatically rising frequency and effectively ***suppressed*** the average severity rate of TeamHealth's claims at a time when severity in the HCPL segment was generally increasing, particularly for companies with enhanced risk profiles like TeamHealth.

83.    Moreover, throughout the Class Period, Defendants continued to falsely assure investors of ProAssurance's "strong, experienced, and disciplined" approach to its business – including its "cautious" approach to loss reserves and its "disciplined" underwriting standards.

For example, Defendants falsely represented that ProAssurance was "continuing to do as we always have: *reserve cautiously, underwrite responsibly and price logically*," and made numerous other similar statements throughout the Class Period. These statements, however, were materially false and misleading, because Defendants failed to disclose that the Company was – *at that time* – suffering massive losses as a result of the uniquely structured and extraordinarily risky policy it had underwritten for its TeamHealth account, and that Defendants were knowingly understating the loss reserves required for that account. By concealing these material adverse facts, while representing that everything was fine and that ProAssurance was diligently maintaining its disciplined business practices, Defendants materially misled investors.

84.    Defendants also falsely assured investors throughout the Class Period that they were "taking a more cautious approach" in setting reserves and that they were "being prudent in protecting our balance sheet" such that "potential change in severity influences our loss [picks] and . . . evaluation of reserves." On February 22, 2019, for instance, Defendant Friedman stated that Defendants "believe it is more important than ever to establish and *evaluate reserves with a conservatism* that has resulted in success over the years." On April 26, 2019, Defendant Starnes assured investors that "*[i]f we thought we were going to see unfavorable development, we'd take that into account today, we wouldn't wait for it*." And on August 8, 2019, Defendant Rand reiterated that "*we do continue to view our reserves as adequate*," while further noting "*[we] take a pretty conservative view when we establish those reserves and a pretty pessimistic view of what loss trends will do*."

85.    In truth, however, Defendants were at the time knowingly reporting massively understated loss reserves for the Company's TeamHealth account, by failing to incorporate data reflecting the rapidly increasing number of TeamHealth claims outstanding – thereby effectively suppressing the average severity rate of TeamHealth's claims at a time when severity in the HCPL

segment was generally increasing, particularly for companies with enhanced risk profiles, like TeamHealth. As a result, Defendants' statements about ProAssurance's purportedly "cautious approach" to reserve practices and its purportedly "adequate" reserves were materially false and misleading. *See* §IV.B., *supra*.

86. Moreover, Defendants also made materially false and misleading statements to investors about claim frequency. For example, on August 8, 2018, Defendant Friedman told investors: "***Frequency, we're not yet seeing any change***. And while we logically may expect a frequency increase, ***we're not seeing frequency change at this point in time***." However, at the time Friedman made these statements, the frequency of TeamHealth's outstanding claims had already started to skyrocket, dramatically rising from ***three*** outstanding claims in 2Q17 to ***336*** outstanding claims by the end of 2Q18. *See* Table 1, *supra*. By failing to disclose these material adverse facts, Defendant Friedman's statements regarding frequency were materially false and misleading when made.

87. Finally, by knowingly understating the Company's loss reserves for its TeamHealth account, Defendants caused the Company's financial statements filed with the SEC to be materially misstated in violation of GAAP and SEC disclosure requirements. *See* §VI.C., *infra*. Specifically, Defendants' reported financial results understated the Company's liability for reserve for losses and loss adjustment expenses, and understated the corresponding net loss and loss adjustment expenses incurred, resulting in overstated net income and EPS and understated net loss ratios. As detailed in Table 7, *infra*, both the Company's consolidated and SP&C segment's financial results reported between 2Q18 and 3Q19 were materially false and misleading.

- 35 -

**F.    The Mounting Undisclosed Losses on the TeamHealth Account Cause ProAssurance to Restructure Its Executive Management Team, Strengthen Its Underwriting Policies, and Internally Acknowledge TeamHealth's Issues**

88.    As set forth above, the TeamHealth account represented at the time of signing "***the single largest premium***" the Company had written in its entire history.  Given the account's magnitude and obvious importance to the Company, the Individual Defendants closely monitored developments related to TeamHealth – including the increasing number of claims and losses incurred on the account.

89.    Accordingly, in response to the mounting undisclosed losses the Company began experiencing in late 2017 due to TeamHealth's rapidly increasing number of claims (which continued throughout the Class Period), ProAssurance implemented significant changes in 2019, including major turnover in the Company's executive management team, and a restructuring of the SP&C segment.  Defendants confirmed such changes at the end of the Class Period, stating in the Company's January 22, 2020 press release that "[s]ince the middle of 2019, new leadership in the Specialty P&C segment has executed a comprehensive underwriting strategy in response to emerging loss trends and changing conditions in healthcare professional liability."  Furthermore, the Company's February 20, 2020 press release disclosed that, "'[i]n the span of twelve months, we restructured the majority of our executive team.'"

90.    The management changes initiated by ProAssurance in 2019 effectively disbanded the National Health Team, as the Company rid itself of the top-level National Healthcare Team members primarily responsible for underwriting the TeamHealth policy.  Specifically, on February 21, 2019, the Company announced that Defendant Friedman – ProAssurance's then-President of Healthcare Professional Liability, Chief Underwriting Officer, Chief Actuary, and acting leader of the National Healthcare Team – was retiring.

- 36 -

91.    On April 4, 2019, the Company issued a press release announcing that Defendant Boguski would replace Defendant Friedman and "assume the presidency of Specialty P&C on May 13, 2019."  Two months later, the Company revealed another significant top-executive management change on May 22, 2019, when ProAssurance announced that its long-standing CEO of 12 consecutive years, Defendant Starnes, was being replaced effective as of July 1, 2019. Tellingly, Starnes departed even though he had ***more than three years remaining*** on a five-year employment contract entered into on May 31, 2017.  It was also announced at that time that the Board of Directors had elected Defendant Rand, the Company's then-President and COO, to succeed Defendant Starnes as CEO.

92.    According to CW 5[19] and CW 3, shortly after Defendant Rand took over the role of CEO in July 2019, ProAssurance held a company-wide meeting (the "Summer 2019 Meeting"), which was an iteration of a regularly recurring meeting that was held every quarter.  According to CW 5, the Summer 2019 Meeting was the first quarterly company-wide meeting held after Rand took over as CEO, and it was attended by all of the Company's senior executives, as well as the recently "retired" Defendant Friedman – who had previously led the National Healthcare Team, including the underwriting of the TeamHealth policy.

93.    According to CW 5, Defendants Rand and Hendricks both spoke during the Summer 2019 Meeting about the worsening situation with a "'problematic account.'"  Notably, according to CW 3 and CW 5, the "problematic account" was not identified by name, but it was described as a larger HCPL account underwritten by the National Healthcare Team, which was causing ProAssurance to be "hemorrhaging money."  According to CW 3 and CW 5, Defendant Rand also gave a presentation, which included slides highlighting the massive losses generating

---

[19]  CW 5 worked in ProAssurance's Alabama office as an underwriter from February 2016 to August 2020.

from the voluminous number of claims filed by the single unnamed account. Following the Summer 2019 Meeting, CW 5 consulted with colleagues from ProAssurance's Claims Department, who informed CW 5 that the unnamed problematic account discussed at the Summer 2019 Meeting was TeamHealth, and that it had been apparent for a significant period of time that the TeamHealth account was extremely problematic.

94.    Shortly after the Summer 2019 Meeting, in September 2019, ProAssurance terminated Butler, its VP of Underwriting and the National Healthcare Team member personally responsible for underwriting TeamHealth's policy. In addition, Defendants replaced the National Healthcare Team with a new set of underwriters tasked with the extensive and daunting task of re-underwriting all of the large healthcare organization policies previously underwritten by the National Healthcare Team, including the TeamHealth policy. In essence, ProAssurance cleaned house of all senior executives and underwriters responsible for the ongoing TeamHealth debacle.

95.    During a November 6, 2019 earnings call, Defendant Rand explained that when the "new leadership teams came in" during the "second quarter of 2019," they "started evaluating" ProAssurance's "[HCPL] book with a critical eye." On the same call, Defendant Boguski stated: "Since Q2 of 2019, the senior leadership team has executed on several strategic business decisions designed to improve operating performance . . . ." Similarly, in a January 22, 2020 press release, the Company represented that, "[s]ince middle of 2019, new leadership in the Specialty P&C segment has executed a comprehensive underwriting strategy in response to emerging loss trends and changing conditions in healthcare professional liability," which included "recruitment of additional talent in Specialty underwriting, [and] tightening of underwriting criteria, terms and conditions."

96.    The scope of such changes indicate that Defendants were well aware of the material problems with ProAssurance's TeamHealth account and were actively trying to manage the fallout

from them, while simultaneously concealing these serious issues from investors.  Indeed, despite Defendants' representations that the Company's "comprehensive underwriting strategy" included "tightening of underwriting criteria, terms and conditions," Defendants continued to conceal the real reason for the substantial changes in leadership and restructuring of operations: that ProAssurance's uniquely structured policy for its inherently risky TeamHealth account was at that time causing the Company to suffer serious financial harms.

### G.    Defendants Finally Reveal the Massive Losses Originating from the TeamHealth Account, Causing ProAssurance's Stock to Plummet

97.    As recently as November 6, 2019, Defendants continued to acknowledge increasing severity trends while assuaging investor concerns by making statements such as "[t]he severity trends continue to influence our view of reserves and our loss assumptions, and I assure you *we are being appropriately disciplined in our analysis*."  But after the market closed on January 22, 2020 – just over two months after Defendants assured investors of their "disciplined" approach to reserves and reported net favorable reserves for 3Q19 – Defendants stunned the market by disclosing an estimated *$37 million adverse development* in prior accident year loss reserves. ProAssurance revealed that the adverse development was "driven by" an undisclosed "large national healthcare account written since 2016" – while failing to identify that account (TeamHealth) by name.  The Company also revealed that it expected to take additional charges of *$33 million to $43 million* to true-up its current accident year loss and loss adjustment expenses for SP&C in 4Q19, "reflect[ing] deteriorating loss experience" in the TeamHealth account.  In addition, Defendants disclosed that the separate charges for the prior accident year loss reserves and the current accident year loss were expected to "result in a full-year 2019 net loss ratio between 105% and 109%" for the SP&C segment.  Moreover, these losses would cause the Company's SP&C segment to report an operating loss for 4Q19 that was *2,274.4% higher* than the operating loss reported by the segment for the same quarter in 2018.

- 39 -

98.     In the Company's January 22, 2020 press release, Defendant Rand commented about the adverse development, falsely stating that "management concluded that additional reserves were needed" in our SP&C segment for "a single large national healthcare account that has experienced losses far exceeding the assumptions made when the account was underwritten" in response to "***our usual year-end review of updated loss data with internal and external actuaries***."  In truth, as detailed above in §V., *infra*, Defendants were aware by early 2018 (***more than two years prior***) that the TeamHealth account was generating massive losses due to increasing medical malpractice claims, would require significant additional loss reserves, and that the account would almost certainly not be renewed under the terms offered by ProAssurance, resulting in TeamHealth exercising its option for tail coverage instead.

99.     Moreover, in an attempt to continue to deceive and assuage investor fears in response to this shocking news, Defendant Rand touted "leadership changes" made in 2019 and the "comprehensive underwriting strategy" developed "in response to emerging loss trends and changing conditions" in the SP&C segment.  He further emphasized that Defendants were "encouraged by our progress, and believed this strategy ha[d] positioned the Company for future success."

100.    Analysts were shocked by the unexpected reserve charge, with Boenning & Scattergood commenting in its January 23, 2020 report that "this ***reserve charge is particularly surprising***" because "[w]e consider ProAssurance one of the most conservative insurers in the industry when it comes to loss reserve adequacy," the mantra Defendants had routinely espoused to the market for years.  That analyst also noted that ProAssurance's "[m]anagement also expects to book a current accident year net loss ratio between 134% and 148%" – or 49.4% higher than the Company's reported current accident year net loss ratio during the Class Period – "to reflect the deteriorating loss experience in the national healthcare account [*i.e.*, TeamHealth]."

- 40 -

101.    The market was clearly shocked by Defendants' January 22, 2020 revelations, causing the price of ProAssurance common stock to *fall 11%*, from $37.58 per share on January 22, 2020, to $33.40 per share on January 23, 2020.

102.    A month later, on February 20, 2020, ProAssurance announced its financial results for 4Q19 and FY19, and provided more color concerning the large adverse loss development.  ProAssurance told investors that the estimated $37 million adverse development in its SP&C segment for 4Q19 was driven by a *$44.5 million* adverse development *from just one account*, the "large national healthcare account" (*i.e.*, TeamHealth), which brought the total TeamHealth-related adverse development for the entire fiscal year 2019 to *$51.5 million*.[20]  In the Company's press release, Defendant Rand once again failed to disclose the full truth, and instead continued to conceal the true extent of the known financial problems underlying TeamHealth's account.  While Rand acknowledged that "[o]ur results for 2019 were not acceptable," he omitted that imminent and significant additional losses related to TeamHealth had yet to be disclosed, and instead misleadingly stated that the Company's "accomplishments in the past year position ProAssurance well for the next chapter in the company's story."  In reality, however, Defendants knew that TeamHealth would almost certainly not renew the policy at the price and/or on the terms ProAssurance would offer it, and would instead exercise its tail coverage option, thereby exposing the Company to substantial additional losses.

103.    But Defendants did not disclose this fact until almost three months later, on May 7, 2020, when Defendants once again stunned investors when they revealed that the large undisclosed national account (*i.e.*, TeamHealth) was unlikely to renew its policy, and would instead exercise

---

[20]    Excluding TeamHealth, the SP&C segment had a positive reserve development of $7.8 million in 4Q19.  The positive development of $7.8 million combined with the $44.5 million adverse development from TeamHealth resulted in $36.8 million in adverse development for the segment overall, in line with the Company's preliminary estimate of $37 million reported in January.

its option for tail coverage (which it ultimately did), thereby dramatically increasing the Company's losses from this account. Specifically, Defendants stated that "the Company believes it is *more likely than not* that the account will not renew on terms offered by ProAssurance" and that "the insured will *exercise its option to purchase the extended reporting endorsement or tail coverage*." Notably, Defendants further disclosed that TeamHealth's exercise of the option to purchase tail coverage could result in an additional "*net loss of up to approximately $50 million*" that would be recognized in 2Q20.[21]

104.    During the Company earnings call held the next morning, Defendant Boguski confirmed that TeamHealth's "losses exceeded the assumptions the company made when originally underwriting the risk." Moreover, Defendant Boguski admitted that the TeamHealth account – the largest single account in the Company's history – was a "unique" account that was completely different from every other policy the Company had ever issued, and one which dramatically deviated from the Company's supposedly "conservative" and "cautious" underwriting practices. Indeed, as Boguski was forced to admit, "this was a unique national account structure," and "*there are no other structures in our book of business that would even be close to the structure that was offered here*." In response to these disclosures, the price of ProAssurance common stock *plummeted another nearly 22%*, or $4.38 per share, to close at $15.95 per share on May 8, 2020. In total, between January 2020 (when the Company first began to disclose the truth about its TeamHealth policy) to the end of the Class Period, ProAssurance stock lost *almost 60% of its value*.

105.    Securities analysts took note of the anticipated tail policy charge. For example, in a May 11, 2020 report, Boenning & Scattergood stated:

---

[21]  The actual loss resulting from the TeamHealth tail policy recognized in 2Q20 was $45.7 million.

> We lowered our 2020 [EPS] estimate for several reasons, the most significant of which is a potential net loss . . . of up to $50 million in 2Q20 related to a healthcare professional liability . . . policy providing coverage for a large national healthcare account. . . .  If the tail coverage is purchased, management estimates a net loss of up to $50 million could be reported in 2Q20.

The report added that "[o]ur estimate for 2020 assumes ProAssurance books a $50 million net loss related to the account in 2Q20."  Similarly, Raymond James analysts stated in a May 11, 2020 report: "We are revising our estimates to reflect the impact of the exercise of a potential tail policy, that could result in a policy-related loss of up to $50 mm."

106.    The dramatic declines in ProAssurance's stock price following the corrective disclosures on January 20, 2020, and May 7, 2020, in addition to negative analyst commentary, demonstrate that the market was shocked by the negative information disclosed on those dates. Indeed, the losses to ProAssurance emanating from the TeamHealth account had a devastating impact on the Company's overall operating results, with nearly *every* metric of ProAssurance's financial results impacted.  *See* §VI.C., *infra*.  All told, the TeamHealth account would cause ProAssurance to recognize charges totaling approximately $130.2 million to $140.2 million between 4Q19 and 2Q20 – $51.5 million for adverse development of prior year reserves recognized during fiscal year 2019; approximately $33 million to $43 million to true-up the Company's 2019 accident year loss pick (4Q19); and approximately $45.7 million for TeamHealth's exercise of tail coverage (recorded in 2Q20).  Indeed, the TeamHealth losses were so significant that they were nearly ***three times greater*** than the consolidated Company's annual net income of $47 million for 2018, and wiped out all of ProAssurance's combined $155 million of profits earned over the course of three years between 2017 and 2019.

## V.    LEAD PLAINTIFFS' FORENSIC ANALYSIS OF STATE INSURANCE FILINGS

### A.    Background on ProAssurance's State Insurance Filings

107.    Insurance companies are required to file with their respective domiciliary state insurance departments quarterly and annual financial statements (as well as numerous related schedules and forms) that are prepared using Statutory Accounting Principles ("SAP").[22]  These filings (referred to herein as "Statutory Filings") contain specialized information not found in financial statements prepared and filed with the SEC in accordance with GAAP.  While "GAAP is designed to meet the varying needs of the different users of financial statements[,] SAP is designed to address the concerns of regulators, who are the primary users of statutory financial statements."[23]

108.    One of the important features of Statutory Filings is that they are prepared for each insurance company subsidiary – unlike ProAssurance's quarterly and annual filings with the SEC, which are prepared on a consolidated, company-wide basis, and by segment.  This is particularly important for large companies like ProAssurance, which maintains ten U.S. insurance company subsidiaries, domiciled in five different U.S. states.  The Statutory Filings permit certain analyses of ProAssurance's insurance operations on a subsidiary, line of business, and state level that are not possible to ascertain through review of ProAssurance's SEC filings and other public statements alone.

---

[22]    While similar to GAAP in many respects, SAP differs in that it emphasizes solvency issues, whereas GAAP emphasizes financial performance.  Both SAP and GAAP, however, require accurate reporting of core company financial metrics.

[23]    National Association of Insurance Commissioners ("NAIC"), Accounting Practices and Procedures Manual, Vol. 1, Preamble, ¶20.

4840-9468-0034.v1

109.    Statutory Filings, however, are generally incredibly lengthy, data-intensive documents, rendering the information contained within them virtually indecipherable to those outside of the insurance industry, like investors and financial analysts.    For example, ProAssurance's 4Q19 (annual) state Statutory Filings alone consisted of *92 separate documents*, spanning approximately *2,800 pages in length*.    Given the tremendous amount of detailed information contained within these filings – much of which is only provided on an aggregated basis – it is extremely difficult for investors to ascertain useful information from them.    This difficulty is further exacerbated by the fact that insurance companies generally do not disclose who their specific clients are or where they are located, as was the case with ProAssurance, which concealed – and, in fact, continues to conceal – the fact that TeamHealth was one of its clients, let alone a problematic one warranting additional scrutiny from investors.

110.    Accordingly, Lead Plaintiffs have consulted extensively with experienced practitioners from the accounting and insurance industries to undertake a detailed forensic analysis of more than 5,000 pages worth of ProAssurance's Statutory Filings, which was aided by additional information uncovered through other aspects of Lead Plaintiffs' investigation, including the identification of TeamHealth as the undisclosed "large national healthcare account" responsible for driving the charges recognized by ProAssurance in the first half of 2020.    As explained below, this analysis uncovered valuable information confirming that Defendants actively concealed material adverse information regarding the TeamHealth account and knowingly understated the Company's loss reserves for the TeamHealth account by massive amounts during the Class Period.

111.    The relevant data identified by Lead Plaintiffs' forensic analysis comes from the quarterly and annual Statutory Filings of PRA-Specialty, which is a wholly owned subsidiary of ProAssurance that primarily provides HCPL insurance policies.

- 45 -

112.    Importantly, at all relevant times, PRA-Specialty's quarterly and annual Statutory Filings were signed by four of the Individual Defendants, each of whom expressly attested to the truth and completeness, and therefore possessed direct personal knowledge, of the figures set forth therein.  The signatories to PRA-Specialty's statutory filings included:

- Defendant Friedman, who, in his role as a Director of PRA-Specialty, signed each of PRA-Specialty's quarterly and annual Statutory Filings from 2015 through 1Q19;

- Defendant Rand, who, in his role as a Director of PRA-Specialty, signed PRA-Specialty's quarterly and annual Statutory Filings from 2015 through 2Q18;

- Defendant Hendricks, who signed PRA-Specialty's quarterly and annual Statutory Filings from 3Q18 through 3Q20; and

- Defendant Boguski, who signed PRA-Specialty's quarterly and annual Statutory Filings from 3Q18 through 3Q20.

113.    In addition, Defendant Starnes served as a Director of PRA-Specialty from 2015 through 2Q19.

## B.    The Number of Claims Reported by TeamHealth Increased Exponentially Leading Up to the Class Period

114.    TeamHealth is a physician staffing company based in Tennessee.  Based on information obtained through their investigation and extensive review of Statutory Filings by ProAssurance subsidiaries, Lead Plaintiffs determined that, beginning in or around 2Q16 and continuing through at least the end of the Class Period, ProAssurance's TeamHealth account, the existence of which has ***never*** been disclosed publicly, comprised effectively all of the business disclosed on the Tennessee line of the "Physicians" page of Supplement A to Schedule T of PRA-Specialty's quarterly Statutory Filings and annual supplemental Statutory Filings.[24]

---

[24]  For ease of reference, and given the negligible contribution of other Tennessee business outside of TeamHealth after 2016, all calculations herein that are derived from the Statutory Filings assume that 100% of the "Tennessee-Physicians" data is attributable to TeamHealth.

115.    Lead Plaintiffs' analysis of PRA-Specialty's Statutory Filings reveals that ProAssurance began experiencing a dramatic and obvious increase in the number of outstanding claims on its TeamHealth policy in late-2017, as shown below:

**TABLE 2**

| Number of Outstanding TeamHealth Claims | | | | | | |
|---|---|---|---|---|---|---|
| | **3Q16** | **4Q16** | **1Q17** | **2Q17** | **3Q17** | **4Q17** | **1Q18** |
| Claims Outstanding | 2 | 2 | 2 | 3 | 38 | 203 | 279 |

116.    Moreover, this indisputably negative trend dramatically worsened as the Class Period progressed, as shown below:

**TABLE 3**

| Number of Outstanding TeamHealth Claims | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **3Q17** | **4Q17** | **1Q18** | **2Q18** | **3Q18** | **4Q18** | **1Q19** | **2Q19** | **3Q19** |
| Claims Outstanding | 38 | 203 | 279 | 336 | 474 | 710 | 744 | 802 | 895 |

117.    Significantly, as addressed in §IV.A.1, *supra*, because the TeamHealth policy was a claims-made policy, Defendants admittedly were aware of the number of covered claims being reported as they occurred in real time.  As such, the extraordinary increase in the number of claims outstanding clearly put Defendants on notice of concerns related to the TeamHealth account by no later than the end of 2Q18 on June 30, 2018.  Indeed, by that time, the number of TeamHealth claims had increased by ***almost 900% in just three quarters***, and was dramatically increasing each quarter.   However, despite the obvious evidence that ProAssurance's liability under the TeamHealth policy inevitably would be substantially higher than Defendants had anticipated when they initially set reserves for that policy, Defendants neither disclosed this information to investors nor took the action needed to ensure that their loss reserves for TeamHealth were adequate.

118.    That this concealed information was material and necessarily should have been disclosed is further underscored by additional facts regarding the alarming performance of the

TeamHealth account, which would have been known internally at ProAssurance, including to each of the Individual Defendants based upon their roles with PRA-Specialty, as noted in ¶112, *supra*.

119.    First, the TeamHealth policy was the source of approximately 11.24% of the Company's claims-made HCPL claims outstanding for accident years 2016 through 2018, and was generating approximately ***five times*** as many claims per dollar of premium as the rest of ProAssurance's claims-made HCPL operations during that time.

120.    Second, the number of claims outstanding under the TeamHealth policy comprised an astounding 84.5% of the net increase in claims outstanding for 2017 and 61.9% of the increase for 2018 for ProAssurance's ***entire*** claims-made HCPL business in those years.  In other words, TeamHealth was, ***by itself***, the cause of the vast majority of the Company's total increase in claims outstanding for ProAssurance's most prominent and (historically) most profitable business line (HCPL) for at least two consecutive years.

121.    In sum, it is unfathomable that the Individual Defendants were not aware of TeamHealth's significant and increasingly worsening claim frequency trend both before and throughout the Class Period.

C.    **Defendants Intentionally Understated TeamHealth's Loss Reserves in Statutory Filings and Filings with the SEC**

122.    Lead Plaintiffs' forensic analysis of PRA-Specialty's Statutory Filings further reveals that, by at least June 30, 2018, Defendants were intentionally concealing the extent of losses incurred from the dramatically rising number of TeamHealth-related claims by employing unrealistic assumptions and reporting impossibly low loss reserves for TeamHealth-related claims. Moreover, the loss reserve understatements were so dramatic that they must have been known by the Individual Defendants, who professed both intimate knowledge of and extensive involvement in ProAssurance's reserve processes.  *See* §§VII.A.-B., *infra*.  This is particularly true given the ***impossibly low average severity rates*** corresponding to Defendants' loss reserves for TeamHealth,

- 48 -

as further detailed below, and Defendants' repeated representations throughout the Class Period that they regularly updated and reviewed the data underlying the Company's established loss reserves – **with a particular focus on severity rates** – and made adjustments that reflected such data each period.

123.    Defendants' dramatic understatement of loss reserves for ProAssurance's TeamHealth-related claims is evidenced by the extraordinarily suppressed average severity rates associated with the TeamHealth account **after** the number of TeamHealth claims started to dramatically increase in 4Q17.[25]  For example, in 3Q17 (before the number of TeamHealth claims began to dramatically rise), PRA-Specialty's Statutory Filings implied that it would cost ProAssurance an average of approximately **$170,878 per claim** to resolve the TeamHealth claims outstanding at that time.  This average severity rate was significantly **higher** than the **$136,952 per claim** average severity rate for all of PRA-Specialty's non‑TeamHealth-related claims during the same period.  This is not surprising because, as explained *supra*, Defendants knew from the start that the average severity rates for TeamHealth's claims were likely to be as high as, if not higher than, the Company's other policies.  *See* §IV.B.2, *supra*.  Significantly, however, this dynamic changed after the number of TeamHealth claims outstanding began to dramatically increase in 4Q17, with the average severity rates for TeamHealth-related claims **severely declining** while the average severity rates for ProAssurance's non-TeamHealth-related claims remained essentially the same.

---

[25]    "Average severity rate" refers to the approximate average cost of resolving a claim under a given policy or policies.  It is generally calculated by dividing the total amount of loss reserves by the total number of claims outstanding.  Defendants did **not** report average severity rates in any of their public filings prior to or during the Class Period.  Instead, the average severity rates alleged herein were derived through Lead Plaintiffs' forensic examination of Defendants' Statutory Filings.

124.    Specifically, as illustrated in Table 4 below, from 3Q17 to 2Q18, the implied average severity rate for TeamHealth's claims dropped from $170,878 per claim to $88,562 per claim – a ***massive 48% decline***.  By contrast, the implied average severity rate for all of PRA-Specialty's outstanding non-TeamHealth-related claims was essentially ***unchanged*** during that same period (hovering between $130,436 per claim and $137,245 per claim), resulting in a massive disparity between the implied average severity rates for PRA-Specialty's TeamHealth-related claims and non-TeamHealth- related claims.  As shown in Table 4 below, this dramatic disparity continued during the Class Period for each subsequent quarter through 3Q19:

**TABLE 4**
**Difference in PRA-Specialty Average Severity Rates for TeamHealth-Related Claims**
**Versus Non-TeamHealth-Related Claims Through Q3 2019**

| Average Severity | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 |
|---|---|---|---|---|---|---|---|---|---|
| Non-TeamHealth | $136,952 | $136,418 | $130,436 | $137,245 | $123,580 | $130,902 | $126,358 | $119,640 | $120,165 |
| TeamHealth | $170,878 | $113,242 | $90,044 | $88,562 | $92,624 | $86,355 | $85,866 | $83,773 | $79,278 |
| Percentage Difference | 24.8% | -17.0% | -31.0% | -35.5% | -25.0% | -34.0% | -32.0% | -30.0% | -34.0% |

125.    There was no plausible explanation for the dramatic – and sustained – disparity between the implied average severity rates for TeamHealth-related claims and non-TeamHealth-related claims.  In fact, for the reasons set forth in § IV.B.2, *supra*, the average severity rates for TeamHealth's claims should have been at least as high as – ***if not significantly higher than*** – those applicable to the Company's other accounts, given the inherently risky nature and structure of TeamHealth's operations.

126.    Indeed, Defendants acknowledged to investors on numerous occasions that larger physician-based organizations – like TeamHealth – were generally susceptible to higher average severity rates.  Consistent with Defendants' representations, the average severity rates applicable to TeamHealth's claims would be expected to be at least as high as – and more likely significantly higher than those – applicable to the Company's other clients HCPL.  But instead, Defendants did

- 50 -

the ***exact opposite***, reporting massively understated loss reserves that implied impossibly low average severity rates for TeamHealth's claims, as detailed in Table 4 above.

127.    Moreover, there is no question that Defendants were aware of the impossibly low average severity rates associated with TeamHealth's loss reserves before and during the Class Period.  Indeed, as detailed *infra*, Defendants repeatedly represented to investors: (a) that they were intimately involved in, and knowledgeable about, ProAssurance's reserves processes; (b) that those processes were heavily focused on new and historical data concerning frequency and severity – even going so far as to describe "the severity of claims" as "***the most influential factor*** affecting the analysis of our HCPL reserves and the related development recognized"; and (c) that Defendants were "***concerned about increasing severity*** in the broader market."  *See* §VII.A.-B., *infra*.  Given these representations, there is no question that Defendants were expressly aware of – or at least severely reckless in disregarding – the massively suppressed average severity rates for TeamHealth, which in turn established that the loss reserves for TeamHealth, one of the Company's largest and most risky accounts, were dramatically and consistently understated.

128.    This is particularly true given the disproportionately high number of claims outstanding for the TeamHealth account in 2017 and 2018.  Specifically, as noted above, the TeamHealth policy generated approximately ***five times*** as many claims per dollar of premium as the rest of ProAssurance's claims-made HCPL operations for accident years 2016 through 2018, and it also represented 84.5% and 61.9% of the net increases in ProAssurance's claims outstanding for its ***entire*** HCPL operations in 2017 and 2018, respectively.  Given the Individual Defendants' duties and obligations as directors and signatories for PRA-Specialty, as well as their professed hands-on involvement in ProAssurance's reserve processes, these facts would have drawn the attention of Defendants and warranted additional scrutiny of the TeamHealth's reserves.

129.    Defendants finally acknowledged their massive understatements of TeamHealth's loss reserves (without specifically identifying TeamHealth by name) by taking charges totaling approximately $77.5 million to $87.5 million in connection with the reporting of their financial results at year-end 2019.[26]    As a result, the actual average severity rate for TeamHealth's claims can be derived from PRA-Specialty's 2019 annual Statutory Filings, which reflected the charges recognized by ProAssurance in connection with its previously understated TeamHealth loss reserves.    As illustrated by Table 5 below, the ***true*** average severity rate for TeamHealth-related claims was $148,405 per claim, which was ***nearly double*** the $79,278 per claim average severity rate implied by Defendants' loss reserves just one quarter prior (3Q19) and significantly higher than the average severity rates implied by Defendants' loss reserves for 2Q18 through 2Q19.    Table 5 also demonstrates that the true TeamHealth average severity rate was generally in line with, and even slightly higher than, the average severity rate for non-TeamHealth claims – a stark contrast from the large disparity implied by PRA-Specialty's prior Statutory Filings.

**TABLE 5**
**Difference in PRA-Specialty Average Severity Rates for TeamHealth-Related**
**Claims Versus Non-TeamHealth Related Claims Through 4Q19**

| Average Severity | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 |
|---|---|---|---|---|---|---|---|---|---|---|
| Non-TeamHealth | $136,952 | $136,418 | $130,436 | $137,245 | $123,580 | $130,902 | $126,358 | $119,640 | $120,165 | $145,155 |
| TeamHealth | $170,878 | $113,242 | $90,044 | $88,562 | $92,624 | $86,355 | $85,866 | $83,773 | $79,278 | $148,405 |
| **Percentage Difference** | **24.8%** | **-17.0%** | **-31.0%** | **-35.5%** | **-25.0%** | **-34.0%** | **-32.0%** | **-30.0%** | **-34.0%** | **2.2%** |

130.    The true average severity rate for TeamHealth-related claims ($148,405 per claim) can also be used to estimate Defendants' cumulative understatements of TeamHealth-related loss

---

[26]    The 4Q19 charges of approximately $77.5 million to $87.5 million were comprised of a $44.5 million charge for previously undisclosed adverse development of prior accident years (*i.e.*, accident years 2018 and prior), which was specifically disclosed, and a charge of approximately $33 million to $44 million to "true-up" the insufficient reserves for the then-current accident year (2019), which was not specifically disclosed but can be derived from the data in ProAssurance's Form 8-K/A, filed with the SEC on March 16, 2020.

reserves and corresponding loss adjustment expenses ("LAE") on a quarterly basis from 2Q18 through 3Q19.[27]  As illustrated by Table 6 below, this analysis establishes that PRA-Specialty's TeamHealth-related loss reserves and corresponding LAE were cumulatively under-reserved by approximately $82.3 million (before considering any potential effects of reinsurance) by the end of 3Q19 (and remained that way until Defendants reported their financial results for 4Q19).  This figure ($82.3 million) closely approximates the roughly $77.5 million to $87.5 million in additional charges (net of reinsurance), that Defendants ultimately recorded in 4Q19 in order to correct the understated loss and LAE reserves for ProAssurance's TeamHealth account.  In other words, Defendants' artificial suppression of the implied average severity rates for TeamHealth-related claims from 2Q18 through 3Q19 was effectively responsible for ***all*** of the under-reserving disclosed by the Company in early 2020.

---

[27]  Loss adjustment expenses (also known as "claim adjustment expenses") are all costs associated with the payment and settlement of claims ***other than*** the amount of loss itself, such as the cost of investigating and litigating claims.  Supplements A to Schedule T of PRA-Specialty's Statutory Filings, from which Lead Plaintiffs derived the average severity rates set forth above, do not include such amounts, but the loss reserve understatements acknowledged by Defendants in connection with the reporting of ProAssurance's financial results at year-end 2019 did.  Thus, for purposes of calculating the cumulative understatements set forth in Table 6, Lead Plaintiffs applied a conservative LAE rate of 33% (as a percentage of the losses incurred, which are the amounts paid to or on behalf of policyholders to claimants), based upon the direct LAE rates reported by PRA-Specialty's MPL HCPL in Tennessee (Physicians or otherwise) in 2017, 2018, and 2019, which were 33.0%, 34.5%, and 36.9% of direct loss costs incurred, respectively.  PRA-Specialty's Statutory Filings do not break down its direct loss adjustment expenses incurred any further.  However, Physicians makes up the vast majority (~90% of premiums earned) of PRA-Specialty's MPL HCPL operations in Tennessee.

**TABLE 6**
**Cumulative Understatement of TeamHealth-Related Loss**
**and LAE Reserves by Quarter**

| PRA-Specialty; TeamHealth Severity | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 |
|---|---|---|---|---|---|---|
| Corrected Severity (4Q19), TeamHealth | $148,405 | $148,405 | $148,405 | $148,405 | $148,405 | $148,405 |
| Implied Average Severity, TeamHealth | $88,562 | $92,624 | $86,355 | $85,866 | $83,773 | $79,278 |
| Difference (Per Claim) | $59,844 | $55,782 | $62,050 | $62,539 | $64,632 | $69,127 |
| Number of TeamHealth Claims Outstanding | 336 | 474 | 710 | 744 | 802 | 895 |
| Understatement of Reserves (Pure Loss) | $20,107,440 | $26,440,471 | $44,055,624 | $46,529,210 | $51,835,262 | $61,869,090 |
| Adjustment for Loss Adjustment Expenses | 1.33 | 1.33 | 1.33 | 1.33 | 1.33 | 1.33 |
| Cumulative Understatement of Reserves for Loss and Loss Adjustment Expenses | $26,742,895 | $35,165,826 | $58,593,981 | $61,883,849 | $68,940,898 | $82,285,890 |

131.    As further detailed in §VI.C., *infra*, Defendants' understatements of TeamHealth-related loss reserves in PRA-Specialty's Statutory Filings caused corresponding misrepresentations in ProAssurance's Forms 10-Q and 10-K filed with the SEC from 2Q18 through 3Q19.  Specifically, the understated loss reserves in PRA-Specialty's Statutory Filings caused Defendants to materially misstate ProAssurance's consolidated net income, EPS, loss reserves, and pre-tax income, and related financial metrics for the SP&C segment, reported in the Company's quarterly and annual SEC filings.  *See* §VI.C., *infra*.[28]

---

[28]    Defendants' understatements of TeamHealth's loss reserves in PRA-Specialty's Statutory Filings were necessarily incorporated into ProAssurance's SEC filings.  Even though Statutory Filings are governed by SAP and SEC filings are governed by GAAP, both SAP and GAAP mandate that insurers report their respective best estimates for reserves for unpaid loss and loss adjustment expenses.  *See* ASC 944-40-30-1; SSAP No. 55.  In addition, Securities Act Industry Guide 6 requires insurance companies to disclose the amount of the difference, if any, between GAAP basis loss reserves and SAP basis loss reserves.  ProAssurance's disclosures in its SEC and Statutory Filings indicate that the only difference between its GAAP and SAP loss reserves relates to its treatment of reserves for death, disability, and retirement – a reserve type that was insignificant to TeamHealth's policy.  Moreover, the alignment between the loss reserves reported in the Statutory Filings of ProAssurance's subsidiaries and the loss reserves reported in the Company's SEC filings is further confirmed by the alignment between the reserve development triangles in ProAssurance's Forms 10-K for its claims-made HCPL operations and the reserve development triangles in Schedule P - Part 2F - Section 2 of the Combined Annual Statement of the ProAssurance Group of Companies.

**D.     The Above Forensic Analysis Could Not Have Been Performed by Investors During the Class Period**

132.    The TeamHealth account's adverse trends and Defendants' artificial suppression of ProAssurance's losses on the TeamHealth account were not discernible by investors during the Class Period, for a variety of reasons.

133.    As an initial matter, the public did not know during the Class Period that ProAssurance insured TeamHealth, let alone that TeamHealth was the unnamed "large national healthcare account" responsible for the massive reserve-related charges recorded by the Company in 4Q19.  Without knowing both the size of the charges recorded in 4Q19 and that they had been caused by TeamHealth, an investor could not have ascertained that TeamHealth comprised nearly all of the business results disclosed on the Tennessee line of the "Physicians" page of Supplement A to Schedule T of PRA-Specialty's Statutory Filings – a critical underpinning of Lead Plaintiffs' forensic analysis that was only ascertainable with the benefit of information gleaned through Lead Plaintiffs' investigation and Defendants' corrective disclosures.

134.    Moreover, even with the benefit of such information, the data that Lead Plaintiffs were able to discern from PRA-Specialty's Statutory Filings, as described above, would not have been readily apparent to an investor.  Instead, it was derived only through a detailed analysis of information contained within *thousands* of pages of state Statutory Filings from *hundreds* of separate documents, which involved independent calculations performed in consultation with individuals possessing specialized knowledge of the insurance industry and its accounting practices.

135.    In addition, the adverse trends and losses on the TeamHealth account were further obscured from the public by the fact that the ProAssurance subsidiary that issued the TeamHealth policy (PRA-Specialty) ceded all of its premiums and claims-related costs to another ProAssurance subsidiary (PRA-Casualty).  As a result, the data underlying the calculations performed in Lead

- 55 -

Plaintiffs' forensic analysis was not included in the Statutory Filings of the entity that ultimately bore the losses, further obscuring the nature of those losses from investors and precluding in-depth analysis of such losses by investors during the Class Period.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    Defendants' Materially False and Misleading Statements and Omissions

#### 1.    Defendants' August 7, 2018 Materially False and Misleading Statements

136.    After the market closed on August 7, 2018, the day before the start of the Class Period, ProAssurance filed with the SEC a Form 8-K accompanied by a press release announcing the Company's financial results for 2Q18, and its Form 10-Q for 2Q18, which was signed by Defendant Rand (collectively, the "2Q18 SEC Filings").

137.    As further detailed in §VI.C., *infra*, the financial results reported in the 2Q18 SEC Filings were materially false and misleading because: (a) the Company's consolidated financial results violated GAAP and SEC disclosure requirements by understating the Company's liability for reserve losses and loss adjustment expenses, understating the corresponding net losses and loss adjustment expenses in the income statement, overstating net income and EPS, and understating the net loss ratios; and (b) the SP&C segment's financial results violated GAAP and SEC disclosure requirements by understating the segment's net losses and loss adjustment expenses, understating the net loss ratios, and misstating the segment's operating results.

138.    In the 2Q18 Form 10-Q, Defendants made the following statements (collectively, the "Reserve Statements"):

> ProAssurance believes that the methods it uses to establish reserves are ***reasonable and appropriate****. . . .*  ProAssurance considers the views of the actuaries as well as other factors, such as ***known, anticipated or estimated changes in frequency and severity of claims***, loss retention levels and premium rates, in establishing the amount of its reserve for losses.

- 56 -

\*     \*     \*

Our reserve is ***established by management*** after taking into consideration a variety of factors including premium rates, ***claims frequency and severity***, [and] historical paid and incurred ***loss development trends*** . . . We update and review the data underlying the estimation of our reserve for losses each reporting period and ***make adjustments to loss estimation assumptions that we believe best reflect emerging data***.

\*     \*     \*

*HCPL*.  Over the past several years the ***most influential factor*** affecting the analysis of our HCPL reserves and the related development recognized has been ***the change, or lack thereof, in the severity of claims***. . . .  ***Our estimate of this trend and our expectations about changes in this trend impact a variety of factors, from the selection of expected loss ratios to the ultimate point estimates established by management***.

\*     \*     \*

We re-evaluate our previously established reserve each quarter ***based on our most recently available claims data and currently available industry trend information***.

139.     The Reserve Statements were materially false and misleading when made because Defendants were at that time knowingly reporting massively understated loss reserves for the Company's uniquely structured TeamHealth account, by failing to incorporate data reflecting the rapidly increasing number of TeamHealth claims outstanding – thereby effectively suppressing the average severity rate of TeamHealth's claims at a time when severity in the HCPL segment was generally increasing, particularly for companies with enhanced risk profiles, like TeamHealth. *See* §V., *supra*.

140.     As a result, the methods used to establish Defendants' reserves were ***not*** "reasonable and appropriate," did ***not*** consider "known, anticipated or estimated changes in frequency and severity of claims," did ***not*** consider actual "claims frequency and severity," "loss development trends," or Defendants' actual "expectations about changes in [the severity] trend," Defendants' reserves processes were ***not*** based on the "most recently available claims data and

currently available industry trend information," and Defendants certainly did ***not*** "make adjustments to loss estimation assumptions that [they] believe best reflect emerging data."

2. **Defendants' August 8, 2018 Materially False and Misleading Statements**

141. On August 8, 2018, Defendants convened a call with analysts to discuss the Company's 2Q18 financial results. During his opening remarks on the call, Defendant Starnes stated, in relevant part:

> This was a strong quarter for us and ***the results continue to underscore our optimism for the future*** and our continued ***confidence in the long-term strategy*** we've laid out. Trends in Healthcare Professional Liability continue to point to a business climate that will favor strong, experienced and ***disciplined*** companies such as ProAssurance.

142. During that same call, Defendant Freidman stated, in relevant part:

> ***Frequency, we're not yet seeing any change***. And while we logically may expect a frequency increase, ***we're not seeing frequency change at this point in time***.

143. The statements referenced in ¶¶141-142 were materially false and misleading when made. Specifically, for the reasons stated in ¶139, *supra*, it was materially misleading for Defendants to proclaim that their "***results***" supported a view of "optimism for the future" and "continued confidence in [their] long-term strategy," ***without*** disclosing the massive problems they were then facing – and, in fact, actively concealing – with regard to their "single largest" account. It was also materially false and misleading for Defendants to tell investors "***we're not seeing frequency change at this point in time***," when in truth they were seeing a massive increase in the frequency of claims reported by TeamHealth, and were knowingly understating TeamHealth's reserves by dramatically suppressing the average severity rates for TeamHealth's rapidly increasing number of claims.

### 3. Defendants' September 6, 2018 Materially False and Misleading Statements

144.    On September 6, 2018, ProAssurance participated in the KBW Insurance Conference, wherein Defendant Rand answered questions from analysts.  During the conference, Defendant Rand commented on the Company's response to increasing loss severity trends, stating, in relevant part:

> And then as we look at the totality of reserves and we go through that actuarial evaluation of our reserves on a quarterly basis that is what ultimately results in for us what has been favorable development of reserves, ***we end up taking a more cautious approach there as well***.
>
> ***When we establish our reserves***, kind of that big bucket of reserves, ***we assume basically that current trends worsen***.  That is kind of part of the process just because we've seen that happen in the industry time and time again.  And now ***we assume they worsen a little more***.
>
> And so that ***causes us to be more cautious***.

145.    The statements referenced in ¶144 were materially false and misleading when made.  Specifically, for the reasons stated in ¶139, *supra*, Defendants were ***not*** taking "***a more cautious approach***" and they were ***not*** assuming "***current trends [would] worsen***."  Instead, they were knowingly understating their reserves by ***suppressing*** TeamHealth's average severity rates, effectively (and falsely) implying that TeamHealth's severity trends were getting ***better***, not worse.

### 4. Defendants' November 6, 2018 Materially False and Misleading Statements

146.    On November 6, 2018, after the market closed, ProAssurance filed with the SEC a Form 8-K accompanied by a press release announcing the Company's financial results for 3Q18, and its Form 10-Q for 3Q18, which was signed by Defendant Rand (collectively, the "3Q18 SEC Filings").

147.    As further detailed in §VI.C., *infra*, the Company's consolidated and SP&C segment's financial results reported in the 3Q18 SEC Filings were materially false and misleading

- 59 -

when made for the same reasons stated in ¶137, *supra*. Additionally, the 3Q18 Form 10-Q contained the same Reserve Statements described in ¶138, *supra*, which were materially false and misleading when made for the same reasons stated in ¶¶139-140, *supra*.

### 5. Defendants' November 7, 2018 Materially False and Misleading Statements

148. On November 7, 2018, Defendants convened a call with analysts to discuss the Company's 3Q18 financial results. During the call, Defendant Friedman made a series of statements devised to allay investor concerns about increasing loss severity in the industry. To assuage those concerns, Friedman represented that not only would ProAssurance not be negatively affected by this trend, but that the Company would actually "benefit as the market reacts to the trends," due to its supposedly "prudent" and "conservative" practices:

> In short, there is overall concern in the industry about loss severity. While we remain confident that ProAssurance will benefit as the market reacts to these trends, *we're also being prudent in protecting our balance sheet* . . . as the *potential change in severity influences our loss [picks] and affects our evaluation of reserves*.
>
> \*       \*       \*
>
> *We are continuing to establish and evaluate reserves with the same conservativism we have always used*, . . . and *that conservativism extends to our evaluation of reserves*.

149. The statements referenced in ¶148 were materially false and misleading when made. Specifically, for the reasons stated in ¶139, *supra*, Defendants were *not* "being prudent in protecting [their] balance sheet," and their "evaluation of reserves" for TeamHealth was *neither* "conservativ[e]" *nor* "influence[d]" by growing concerns over severity.

### 6. Defendants' February 21, 2019 Materially False and Misleading Statements

150. On February 21, 2019, after the market closed, ProAssurance filed with the SEC a Form 8-K accompanied by a press release announcing the Company's financial results for 4Q18

- 60 -

and full year 2018, and its Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"), which was signed by Defendants Starnes, Rand, and Hendricks (collectively, the "4Q18 SEC Filings").

151.     As further detailed in §VI.C., *infra*, the Company's consolidated and SP&C segment's financial results reported in the 4Q18 SEC Filings for 4Q18 and full year 2018 were materially false and misleading when made for the same reasons stated in ¶137, *supra*. Additionally, the 2018 Form 10-K contained the same Reserve Statements described in ¶138, *supra*, which were materially false and misleading when made for the same reasons stated in ¶¶139-140, *supra*.

### 7.     Defendants' February 22, 2019 Materially False and Misleading Statements

152.     On February 22, 2019, Defendants convened a call with analysts to discuss the Company's financial results for 4Q18 and full year 2018.  During the call, Defendant Friedman again repeatedly assured investors that the Company had taken steps to address "increased severity" in the market and would "benefit" as a result, including by emphasizing that the Company took "a cautious view of the potential for a rise in severity" and that it was "more important than ever to establish and evaluate reserves with a conservatism," stating, in relevant part:

> While we believe that ProAssurance will benefit as the market reacts to emerging loss trends, we want to underscore ***our continuing dedication to protecting the strength of our balance sheet***.  That requires that we take a ***cautious view of the potential for a rise in severity***, which in turn influences our loss picks and colors the evaluation of our reserves.
>
> *             *             *
>
> Finally, with the broader loss environment continuing to show ***signs of increased severity***, we selected higher initial loss ratios in certain portions of our business to reflect the caution expressed above.  We believe it is ***more important than ever to establish and evaluate reserves with a conservatism*** that has resulted in success over the years. . . . [T]he rewards of conservative reserving practices and rational pricing are paid back with interest.

153.    The statements referenced in ¶152 were materially false and misleading when made.  Specifically, for the reasons stated in ¶139, *supra*, Defendants were ***not*** taking a "***cautious view of the potential for a rise in severity***" and were ***not*** evaluating their reserves with "***conservatism***," as Defendant Friedman falsely represented.

### 8.    Defendants' April 25, 2019 Materially False and Misleading Statements

154.    On April 25, 2019, after the market closed, ProAssurance filed with the SEC a Form 8-K accompanied by a press release announcing the Company's financial results for 1Q19, and filed on May 1, 2019 its 1Q19 Form 10-Q, signed by Defendant Hendricks (collectively, the "1Q19 SEC Filings").

155.    In the 1Q19 press release, Defendant Starnes represented that ProAssurance was closely monitoring and fully cognizant of the "increasing severity" in the HCPL insurance industry, and had specifically set its reserves with an "increased caution" as a result of these trends, stating in relevant part:

> "Our ***concern about the broad loss trends in healthcare professional liability*** continues to have a major impact on operating results, and this ***increasing severity*** will likely affect our results for the foreseeable future.  Our view of these trends influences our current accident year loss picks, which continue to rise, and ***leads us to increased caution in our analysis of prior period reserves***, both of which have a significant impact on the operating results of our largest operating segment, Specialty P&C. . . .  As has historically been the case the ***caution we take in establishing our reserves*** allows us to focus on our future ***without undue concerns about past liabilities*** . . . ."

156.    The statements referenced in ¶155 were materially false and misleading when made.  Contrary to Defendant Starnes's representations that Defendants' "'concern about the broad loss trends'" and "'increasing severity'" was resulting in "'increased caution in [Defendants'] analysis of prior period reserves,'" Defendants were in fact doing the ***exact opposite***: massively understating their loss reserves by dramatically ***suppressing*** the average severity rates for TeamHealth's rapidly increasing number of claims.  As a result, Defendants were ***not*** "'taking the

- 62 -

actions needed to protect [their] balance sheet.'"  Moreover, in direct contrast to Starnes's statement that "'the caution we take in establishing our reserves allows us to focus on our future without undue concerns about past liabilities,'" Defendants were at that time concealing massive "'concerns about past liabilities'" due to the fact that they had failed to exercise "'caution . . . in establishing [their] reserves'" for TeamHealth.  Even worse, instead of acknowledging that material, non-public facts and correcting TeamHealth's massively understated loss reserves, Defendants concealed the problem by failing to incorporate data reflecting the rapidly increasing number of outstanding TeamHealth claims, thereby effectively suppressing the average severity rate of TeamHealth's claims at a time when severity in the HCPL segment was generally increasing, particularly for companies with enhanced risk profiles, like TeamHealth.

157.    As further detailed above in §VI.C., *infra*, the Company's consolidated and SP&C segment's financial results reported in the 1Q19 SEC Filings were materially false and misleading when made for the same reasons stated in ¶137, *supra*.

**9.    Defendants' April 26, 2019 Materially False and Misleading Statements**

158.    On April 26, 2019, Defendants convened a call with analysts to discuss the Company's 1Q19 financial results.  During the call, Defendant Starnes stated, in relevant part:

> [W]e will always take the actions needed to ensure the strength of our balance sheet, no matter the short-term impact.  To be frank, that means ***continuing to do as we always have: reserve cautiously, underwrite responsibly and price logically***.

159.    During the same call, Defendant Rand stated, in relevant part:

> As Stan mentioned, we ***continue to act cautiously*** in the face of what we view as ***worsening loss trends*** in the broader healthcare liability line.  While we would again emphasize that we are not seeing the trends in our paid data, the increasing number of large verdicts, increases in the demands of plaintiff attorneys and ***greater severity in underlying losses as a direct effect on our loss picks and our evaluation of reserves***.

*        *        *

- 63 -

Top line growth at the expense of the bottom line is a pitfall we are committed to avoiding.  And the ***continued success of our underwriting teams and their ability to adequately price for the assumed risk is evidence of a prudent strategy***.

160.    During the same call, Defendant Friedman stated, in relevant part:

By this time, the point regarding severity trends in Healthcare Professional Liability has been well made.  However, I would be remiss if I didn't reiterate that ***our consideration of these trends colors any decisions made within the broader segment***.

We ***continue to uphold our underwriting standards***, writing good business in lieu of easy business, emphasizing adequate pricing over retention and walking away from potential accounts we think carry too much risk for the premium.  While ***this disciplined approach has so far enabled us to avoid any unexpected increases of severity*** in our paid losses, the risk of increasing severity is all too real.

161.    The statements referenced in ¶¶158-160 were materially false and misleading when made.  Specifically, for the reasons stated in ¶139, *supra*, Defendants were ***not*** "tak[ing] the actions needed to ensure the strength of [their] balance sheet," they were ***not*** "reserving cautiously," and the "greater severity in underlying losses" was ***not*** having "a direct effect on [their] . . . evaluation of reserves."  Nor was Defendants' "consideration of these [severity] trends color[ing]" their reserves decisions for TeamHealth.  Moreover, it was materially misleading for Defendants to claim that they "always . . . underwrite responsibly," and tout the "continued success of [their] underwriting teams" and their "disciplined approach" to "uphold [their] standards," while at the same time ***concealing*** that they had agreed to a uniquely structured agreement with TeamHealth – a large, inherently risky client that was at that time generating massive losses for the Company, which Defendants were actively concealing.

162.    During the call, Defendant Friedman also stated, in relevant part:

We don't pick development.  ***We reestimate our ultimate losses and development is a fallout from that*** – a subtraction, if you will.  And the ***concern about severity has caused us to reevaluate*** the expected ultimate values of all of the open claims.

163.    The statement referenced in ¶162 was materially false and misleading when made.  Instead of reevaluating the expected ultimate values of TeamHealth's claims in light of "the

- 64 -

concern about severity," Defendants did the **_exact opposite_**: continued to report massively understated loss reserves that reflected dramatically suppressed average severity rates for TeamHealth's rapidly increasing number of claims.

164.    Also during the call, Defendants Rand and Starnes responded to a question about the possibility of reserves "develop[ing] unfavorably" by stating, in relevant part:

> **[Defendant Rand:]**    I think we are being **_appropriately cautious given the environment that we believe we are in_** and we'll continue to monitor that, but I don't know that I can say one way or the other.  But certainly, everything we do is to focus on maintaining the strength of our balance sheet.

> **[Defendant Starnes:]**    If we thought we were going to see unfavorable development, **_we'd take that into account today, we wouldn't wait for it_**.  So we're doing what we think is called for, which is just reducing the amount of favorable development.  **_We're not having to add to reserves_**.

165.    The statements referenced in ¶164 were materially false and misleading when made.    Specifically, for the reasons stated in ¶139, *supra*, Defendants were **_not_** "being appropriately cautious given the environment" they were in, and they were **_not_** "tak[ing] into account" that their reserves for TeamHealth were **_at that time_** massively understated.

### 10.    Defendants' May 1, 2019 Materially False and Misleading Statements

166.    The 1Q19 Form 10-Q contained the same Reserve Statements described in ¶138, *supra*, however, two of those disclosures were revised as follows:[29]

> *HCPL.*  Over the past several years the **_most influential factor_** affecting the analysis of our HCPL reserves and the related development recognized has been an **_observed increase in claim severity_** for the broader HCPL industry as well as higher initial loss expectations on incurred claims. . . .  **_Our estimate of this trend and our expectations about changes in this trend impact a variety of factors, from the selection of expected loss ratios to the ultimate point estimates established by management_**.

---

[29]    The "Reserve Statements" as modified to include the revised disclosures described in this paragraph, will be collectively referred to as the "Revised Reserve Statements."

\*     \*     \*

We re-evaluate our previously established reserve each quarter based upon the *most recently completed actuarial analysis supplemented by any new analysis, information or trends* that have emerged since the date of that study. We also take into account *currently available industry trend information*.

167.     The Revised Reserve Statements described in ¶¶138 and 166 were materially false and misleading when made for the same reasons stated in ¶¶139-140, *supra*.

**11.     Defendants' August 7, 2019 Materially False and Misleading Statements**

168.     On August 7, 2019, after the market closed, ProAssurance filed with the SEC a Form 8-K accompanied by a press release announcing the Company's financial results for 2Q19, and its Form 10-Q for 2Q19, which was signed by Defendant Hendricks (collectively, the "2Q19 SEC Filings").

169.     In the 2Q19 press release, Defendant Rand stated, in relevant part:

"We continue to be *focused on the risk of a worsening loss environment* in the broader healthcare professional liability insurance market, which *influences our current accident year loss picks and influences our analysis of prior year reserves*."

170.     The statements referenced in ¶169 were materially false and misleading when made. Specifically, for the reasons stated in ¶139, *supra*, Defendants' purported focus on "'the risk of a worsening loss environment'" was *not* influencing their reserves processes for TeamHealth.

171.     As further detailed in §VI.C., *infra*, the Company's consolidated and SP&C segment's financial results reported in the 2Q19 SEC Filings were materially false and misleading when made for the same reasons stated in ¶137, *supra*. Additionally, the 2Q19 Form 10-Q contained statements substantially similar to the Revised Reserve Statements described in ¶¶138 and 166, *supra*, which were materially false and misleading when made for the same reasons stated in ¶¶139-140, *supra*.

- 66 -

**12.    Defendants' August 8, 2019 Materially False and Misleading Statements**

172.    On August 8, 2019, Defendants convened a call with analysts to discuss the Company's 2Q19 financial results.  During the call, Defendant Hendricks stated, in relevant part:

> The results of our specialty P&C segment continue to reflect our ***cautious approach to the loss environment***, that Ned previously mentioned.

173.    The statement in ¶172 was materially false and misleading when made. Specifically, for the reasons stated in ¶139, *supra*, Defendants were ***not*** employing a "cautious approach to the loss environment."

174.    During the same call, Defendant Rand stated, in relevant part:

> We were able to secure rate increases across our Specialty Property Casualty segment with only a modest impact to our retention.  This is a result of our ***dedication to disciplined underwriting***, making sure we write business and assume risk only if we can get appropriate premium through the exposure that's presented.  ***To do otherwise would compromise the security of our customers, our employees and our shareholders***.

175.    During the same call, Defendant Boguski stated, in relevant part:

> This ***underwriting discipline*** combined with our deep specialization, high quality risk selection and ability to obtain the right price for the exposure are the ***cornerstones of our strategy*** to achieve a long-term underwriting profit.

176.    The statements referenced in ¶¶174-175 touting Defendants' purported "dedication to disciplined underwriting" and "underwriting discipline," were materially misleading when made for the reasons stated in ¶139, *supra*.

177.    During the question-and-answer portion of the call, analysts specifically asked Defendant Rand how he could "reconcile" the Company's "favorable reserve development" with the "substantial increases in severity" that were occurring in the market.  As set forth below, Defendant Rand responded by assuring analysts that not only were the Company's reserves fully "adequate" and "conservative," but that they absolutely took into account what the Company called a "pessimistic view of what loss trends will do":

**[Charles Gregory Peters - Raymond James & Associates, Inc., Research Division - Equity Analyst:]** I wanted to circle back to the Specialty Property Casualty results and specifically you talked about what you're doing from an underwriting perspective and reserving perspective about increased severity in the market, but not in your own book. *I'm trying to reconcile that cautious posture with the fact that you're continuing to report favorable reserve development. To me it seems like if you're concerned about substantial increases in severity, that reserve development would also diminish substantially*.

**[Defendant Rand:]** So if you kind of look over time, you will see that the amount of favorable development has reduced over time, but we *do continue to view our reserves as adequate* and continue to see on a quarter-over-quarter basis that *loss trends* while worse than they have been are still *not at the level that's embedded in our reserving for those prior accident years*. So that's why we end up continuing to have a level of favorable development. As we have talked in the past, take a *pretty conservative view when we establish those reserves and a pretty pessimistic view of what loss trends* will do. And loss trends while worse than they have been over the last number of years, continue to be *slightly better than kind of what's embedded in that reserving analysis*.

178.    Defendant Rand's statements referenced in ¶177 were materially false and misleading when made. Specifically, for the reasons stated in ¶139, *supra*, Defendants were ***not*** taking a "pretty conservative view" with regard to their reserves for TeamHealth, which were ***not*** "adequate," because the "loss trends" were ***not*** "better than" what was "embedded in that reserving analysis."

### 13.    Defendants' November 5, 2019 Materially False and Misleading Statements

179.    On November 5, 2019, after the market closed, ProAssurance filed with the SEC a Form 8-K accompanied by a press release announcing the Company's financial results for 3Q19, and its Form 10-Q for 3Q19, which was signed by Defendant Hendricks (collectively, the "3Q19 SEC Filings").

180.    As further detailed in §VI.C., *infra*, the Company's consolidated and SP&C segment's financial results reported in the 3Q19 SEC Filings were materially false and misleading when made for the same reasons stated in ¶137, *supra*. Additionally, the 3Q19 Form 10-Q contained statements substantially similar to the Revised Reserve Statements described in ¶¶138

and 166, *supra*, which were materially false and misleading when made for the same reasons stated in ¶¶139-140, *supra*.

> ### 14. Defendants' November 6, 2019 Materially False and Misleading Statements

181.    On November 6, 2019, Defendants convened a call with analysts to discuss the Company's 3Q19 financial results.  During the call, Defendant Rand once again assured investors that Defendants' reserve processes were adequately accounting for "the increase in perceived severity trends," stating, in relevant part:

> While we have been ***quick to react to the increase in perceived severity trends***, ***we are being cautious*** and reflecting the impact of the steps we have taken given the uncertainty in the loss environment.  The severity trends continue to influence our view of reserves and our loss assumptions, and I assure you ***we are being appropriately disciplined in our analysis***.

182.    The statements referenced in ¶181 were materially false and misleading when made.  Contrary to Defendant Rand's statements that Defendants had "been ***quick to react to the increase in perceived severity trends***," and were "***being cautious***" and "***appropriately disciplined***" in their analysis of the Company's reserves and loss assumptions, Defendants were in fact knowingly reporting massively understated loss reserves for the Company's uniquely structured TeamHealth account, by failing to incorporate data reflecting the rapidly increasing number of TeamHealth claims outstanding – thereby effectively suppressing the average severity rate of TeamHealth's claims at a time when severity in the HCPL segment was generally increasing, particularly for companies with enhanced risk profiles, like TeamHealth.

183.    During the same call, Defendant Boguski stated:

> These results are consistent with our ***focus on underwriting discipline*** as we ***continue to emphasize careful risk selection***, rate adequacy and a willingness to walk away from business that does not fit our goal of achieving a long-term underwriting profit.

184.    The statements referenced in ¶183 touting Defendants' purported "*focus on underwriting discipline*" and "*emphasi[s on] careful risk selection*" were materially misleading when made for the reasons stated in ¶139, *supra*.

185.    During the same call, Defendant Boguski stated, in relevant part:

> Just a comment on our current trends.  It's been *relatively flat on the frequency side, even perhaps slightly down*.  And on the severity trend side, as we go through our quarterly actuarial analysis, it's been in that 2 to 3 point range for quite some time.  So that's kind of our view.

186.    The statement referenced in ¶185 was materially false and misleading when made, because Defendants told investors the Company was "*relatively flat on the frequency side, even perhaps slightly down*," when in truth they were seeing a massive increase in the frequency of claims from their "single largest" account, TeamHealth, and were knowingly understating anticipated reserves by dramatically suppressing the average severity rates for TeamHealth's rapidly increasing number of claims.  Thus, Defendants' statement misled investors into believing that claims frequency was not increasing, when in fact it was dramatically increasing for one of its most important accounts.

### 15.    Defendants' January 22, 2020 Materially False and Misleading Statements

187.    On January 22, 2020, ProAssurance filed with the SEC a Form 8-K accompanied by a press release disclosing an "*estimate of $37 million of adverse development in our prior accident year loss reserves* in response to deteriorating loss experience in our Specialty Property & Casualty segment for the fourth quarter of 2019."  ProAssurance further disclosed that the "adverse development" was "driven by a large national healthcare account written since 2016."  However, while ProAssurance disclosed the existence of an "adverse development" it failed to fully reveal the true extent of the financial impact on the Company's financial health and the

problems associated with the underwriting of the large national account at issue. More specifically, Defendant Rand stated, in relevant part:

> "Following our usual year-end review of updated loss data with internal and external actuaries, management concluded that additional reserves were needed in our Specialty Property & Casualty segment, particularly in regard to a ***single large national healthcare account that has experienced losses far exceeding the assumptions made when the account was underwritten***."

188.    The statement referenced in ¶187 was materially misleading when made, because Defendants knew at the time that TeamHealth was highly unlikely to renew its policy at its spring 2020 anniversary date, and would instead exercise its option for tail coverage, which would expose ProAssurance to substantial additional losses. *See* §VI.C.6.a, *infra*.

### 16.    Defendants' February 20, 2020 Materially False and Misleading Statements

189.    On February 20, 2020, after the market closed, ProAssurance filed with the SEC a Form 8-K accompanied by a press release announcing the Company's financial results for 4Q19 and full year 2019. Also on February 20, 2020, ProAssurance filed with the SEC its Form 10-K for the year ended December 31, 2019 ("2019 Form 10-K"), which was signed by Defendants Rand and Hendricks.

190.    As further detailed above, on February 20, 2020, the Company clarified that the adverse development related to TeamHealth for 4Q19 was actually $44.5 million, more than 100% of the $37 million adverse development disclosed a month prior, and that the adverse development related to TeamHealth for all of 2019 was $51.5 million. The 2019 Form 10-K stated, in relevant part:

> ***The unfavorable development recognized in our Specialty P&C segment in 2019 was driven by $51.5 million of unfavorable prior year reserve development related to the previously mentioned large national healthcare account*** that has experienced losses far exceeding the assumptions we made when underwriting the account, beginning in 2016. Excluding the unfavorable development related to this account, our Specialty P&C segment recognized favorable prior year reserve development totaling $45.8 million in 2019.

- 71 -

191.    The statements referenced in ¶190 were materially false and misleading when made, because Defendants knew at that time the Company discussed its "unfavorable development . . . related to the previously mentioned large national healthcare account," that TeamHealth was highly unlikely to renew its policy at its spring 2020 anniversary date, and would instead exercise its option for tail coverage, which could expose the Company to substantial additional losses, but Defendants concealed this material non-public information from investors. *See* §VI.C.6.a, *infra*.

### 17.    Defendants' February 21, 2020 Materially False and Misleading Statements

192.    On February 21, 2020, Defendant ProAssurance convened an earnings call with analysts.

193.    During the question and answer portion of the call, Defendant Boguski engaged in the following exchange regarding TeamHealth, stating in relevant part:

**[Matthew John Carletti - JMP Securities LLC, Research Division - MD and Senior Analyst:]**    [W]hat additional color [can you] give us around that large national health care account that drove the adverse development. . . . ***[J]ust help us understand kind of what is driving a loss of that magnitude***.    I think we have a good feel for kind of the limits profiles and reinsurance profiles and your physicians' book.  But can you walk us through kind of what you're seeing whether in this case or broadly in the health care side?  And then how we might think about reinsurance structures on that side of the business?

**[Defendant Boguski:]**    With respect to the national account, it was – at the end of the day, ***on the reinsurance side, it was not a vertical severity insurance exposure, it was a unique structure that was more on an aggregate basis***.

I will say this, with respect to that structure, we have no others in our book of business.  And it was a miss on the loss projections and attachment points.  The pricing, there was a unique structure and there were severity over that period that was maybe not as contemplated as well as we needed to.  And that really, at the end of the day, is the rationale for that result.  We're encouraged that we've identified it, we're certainly – have looked at our overall specialty book of business to make sure we don't have any similar structures, and we don't, and we just have to take it from here.

**[Matthew John Carletti:]**    Okay.  And so in regard to that, is there – I guess, that particular structure.  Is there any kind of – ***are we close to any sort of limits on the account or reinsurance, kind of capping it***?  Or is it more of – you

guys have just put a good scrub on it, put a lot of conservatism on it, and you're at a higher confidence point in the reserving?

> [Defendant Boguski:]  *It's the higher confidence point in reserving*.

194.    The statements referenced in ¶193 were materially misleading when made, because Defendants knew at the time that TeamHealth was highly unlikely to renew its policy at its spring 2020 anniversary date, and would instead exercise its option for tail coverage, which would expose ProAssurance to substantial additional losses, but Defendants concealed this material non-public information from investors.  *See* §VI.C.6.a., *infra*.  As such, it was materially misleading for Defendant Boguski to imply that Defendants did not anticipate any further negative fallout from the TeamHealth account by stating "[w]e're encouraged that we've identified it . . . we don't have any similar structures . . . and we just have to take it from here," and that Defendants had a "higher confidence point in reserving."

### B.    SOX Certifications Throughout the Class Period

195.    In connection with each quarterly report ProAssurance filed with the SEC during the Class Period, Defendants Starnes, Hendricks, and/or Rand (*see, e.g.*, ¶¶136, 146, 150, 154, 168, 179, 189, *supra*), signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  Pursuant to §302 of SOX, and also covered by §§304 and 906 of SOX, Defendants Starnes, Hendricks, and/or Rand certified that ProAssurance's financial statements fairly and adequately presented the financial condition of the Company.  For example, in connection with the 1Q19 Form 10-Q filed by the Company on May 1, 2019, Defendants Starnes and Hendricks certified, in relevant part, that:

> 1.  I have reviewed this quarterly report on Form 10-Q of ProAssurance Corporation;

> 2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

- 73 -

3. Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report* . . . .

196.    Similarly, in connection with the Company's 1Q19 Form 10-Q filed on May 1, 2019, Defendants Starnes and Hendricks certified that:

[P]ursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

*(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company*.

197.    Defendants Starnes, Hendricks, and/or Rand filed similar certifications to those in ¶¶195-196 in connections with every other Form 10-Q filed by ProAssurance during the Class Period, and the Forms 10-K filed on February 21, 2019 and February 20, 2020.

198.    The SOX Certifications signed by Defendants Starnes, Hendricks, and Rand during the Class Period were materially false and misleading when made because the Company failed to disclose material adverse information regarding the Company's business, accounting, and financial operations and prospects as alleged herein.

199.    Additionally, each of the SOX Certifications signed during the Class Period was materially false and misleading because, contrary to the representation that ProAssurance's SEC filings did "*not contain any untrue statement of a material fact*" or omission, the SEC filings to which the certification were appended contained numerous false and misleading statements and omissions, as set forth herein.

## C.    Defendants' Materially False and Misleading Financial Statements, Reported Results, and Disclosures

200.    The Class Period begins on August 8, 2018.  After the market closed the day prior, ProAssurance filed the 2Q18 SEC Filings.  For the reasons set forth in §V. and further detailed

below, the financial results reported by Defendants in the Company's 2Q18 SEC Filings – specifically, those set forth in Table 7 below – were materially false and misleading and violated both GAAP and SEC disclosure rules.  In particular, Defendants' reported financial results understated the Company's consolidated liability for reserve for losses and loss adjustment expenses, and understated the corresponding net losses and loss adjustment expenses in the income statement, thus overstating net income and EPS.  Furthermore, ProAssurance separately reported 2Q18 net losses and loss adjustment expenses, as well as operating results for its SP&C segment, each of which were each materially inflated for the same reasons the Company's corresponding consolidated financial results were misstated.  During the Class Period, Defendants reported additional quarterly and full-year consolidated and SP&C segment financial results, as summarized by Table 7 below, that were materially false and misleading and violated both GAAP and SEC disclosure rules, for the reasons set forth in §V., *supra*, and further detailed below.

**TABLE 7**
**Defendants' False and Misleading Financial Results**

| ProAssurance Consolidated Results | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2Q18** | **3Q18** | **4Q18** | **FY18** | **1Q19** | **2Q19** | **3Q19** |
| Net Losses and Loss Adjustment Expense | $161,728 | $147,605 | $154,089 | $593,210 | $159,755 | $168,440 | $161,614 |
| Net Income (loss) | $28,423 | $31,228 | ($24,450) | $47,057 | ($31,650) | ($11,536) | ($17,193) |
| EPS – Net Income (loss) per Diluted Share | $0.53 | $0.58 | ($0.46) | $0.88 | ($0.59) | ($0.21) | ($0.32) |
| Net Loss Ratio | 72.3% | 71.6% | 76.3% | 72.4% | 76.8% | 80.5% | 74.9% |
| SP&C Segment Results | | | | | | | |
| Net Losses and Loss Adjustment Expenses | $111,838 | $98,363 | $91,687 | $384,431 | ($107,658) | ($106,017) | ($107,573) |
| Segment Operating Results | $5,103 | ($4,079) | ($4,943) | $781 | ($11,997) | ($8,399) | ($10,178) |
| Net Loss Ratio | 77.7% | 81.4% | 80.8% | 78.2% | 86.8% | 84.1% | 85.9% |

201.    During this same period, Defendants also improperly omitted significant financial statement disclosures required by GAAP and SEC rules, as further detailed below.  As a result,

4840-9468-0034.v1

ProAssurance's Class Period financial statements were materially false and misleading and could not be relied upon.

### 1. ProAssurance's Financial Reporting Responsibilities as an SEC Registrant

202.    Like all public companies registered with the SEC, ProAssurance was responsible for preparing and publicly filing its own quarterly and annual financial statements on SEC Forms 10-Q and 10-K, respectively, in accordance with GAAP and SEC Rules.  GAAP comprises the approved accounting rules, conventions, and procedures recognized and employed by the accounting profession for the preparation of financial statements and disclosures therein at a particular time.[30]  The information contained in ProAssurance's Class Period financial statements was material to investors.  Notably, the SEC provides that "*[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures*."[31]

203.    ProAssurance repeatedly, but falsely, assured investors in each of its quarterly and annual financial statements filed with the SEC during the Class Period that "[o]ur Consolidated Financial Statements are prepared in conformity with GAAP."  Likewise, each of the Company's quarterly financial statement filings on Form 10-Q during the Class Period asserted that "[t]he financial statements have been prepared in accordance with GAAP for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X."  These

---

[30]    The SEC has the statutory authority for the promulgation of GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board ("FASB").  The FASB's promulgated standards are generally contained within the FASB Accounting Standards Codification ("ASC"), which are considered to be the highest standards of GAAP.

[31]    SEC Regulation SX (17 C.F.R. §210.4-01(a)(1)).

4840-9468-0034.v1

statements were materially false and misleading when made because ProAssurance's Class Period financial statements were not, in fact, prepared in accordance with GAAP for the reasons described below.

204.    The fundamental objective of financial reporting is to provide accurate and reliable information to investors and other financial statement users in making informed investment and lending decisions.  To that end, the FASB's Concept Statement No. 8, Objective 2 states:

> The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity.  Those decisions involve buying, selling, or holding equity and debt instruments and providing or settling loans and other forms of credit.

205.    Accordingly, in making their investment decisions, investors depend heavily on registrants to provide honest and accurate financial information in their quarterly and annual financial statements filed with the SEC, including full and accurate disclosure that complies with SEC regulations and GAAP.

### 2.    Overview of Relevant GAAP and SEC Accounting Rules Governing Insurance Company Loss Reserves and Accrual of Loss Expenses

206.    Insurance companies like ProAssurance derive most of their revenue by charging premiums in exchange for providing insurance coverage that contractually obligates the insurance company to indemnify their policyholders against covered claims.

207.    GAAP requires insurance companies like ProAssurance to account for these claim liabilities by estimating, establishing, recording, and continually revising a balance sheet liability known as a "[r]eserve for loss and loss adjustment expenses," which is an amount intended to cover the cost of all known and unknown claims incurred but unpaid as of the date of the financial statements.  GAAP also requires the Company to simultaneously record a corresponding charge (expense) as loss and loss adjustment expenses on its income statement in accordance with accrual

accounting principles, because a liability has been incurred even though the claim has not yet been paid. Accordingly, ***increases to the loss reserves liability account also increase the Company's reported loss expenses – which in turn reduce net income and EPS in the public financial statements***.

208.    GAAP further requires that the Company's reserves for losses be sufficient to cover all losses and loss adjustment expenses from: (a) currently known individual claims, referred to as "case reserves"; and (b) presently unknown losses from claims that are reasonably likely to have been incurred but not yet reported ("IBNR"). ProAssurance is required to use historical experience, as adjusted for current trends and other factors that would modify past experience, to estimate its reserves for both known and unreported claim losses, as well as LAE. Collectively, ProAssurance groups its liability for known and unknown claims and LAE into a single line item – titled "[r]eserve for losses and loss adjustment expenses" – on the balance sheet of its public financial statements.

209.    GAAP codifies this reserve requirement in ASC Topic 944, *Financial Services – Insurance*. Specifically, ASC 944-40-25-1 to 25-2 address the recognition of insurance claim costs and provide:

**Claim Costs**

25-1  Both of the following shall be accrued when insured events occur:

> a.      A liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been reported to the insurer)

> b.      A liability for claim adjustment expenses; that is a liability for all costs expected to be incurred in connection with the settlement of unpaid claims.

25-2  The estimated liability for unpaid claims includes the amount of money that will be required for future payments on both of the following:

> a.      Claims that have been reported to the insurer

b.    Claims relating to insured events that have occurred but have not been reported to the insurer as of the date the liability is estimated.

210.    As alleged below, ProAssurance understated its liability for unpaid claims and claim adjustment expenses during the Class Period, and in doing so, materially understated net losses and loss adjustment expenses and overstated net income and EPS.

### 3.    ProAssurance Violated GAAP by Failing to Set and Maintain Sufficient Loss Reserves for Loss and Loss Adjustment Expenses

#### a.    Professional Standards Required Consideration of, but ProAssurance Failed to Adequately Consider Historical Information, Modified by Current Trends and Other Factors in Setting Loss Reserves

211.    GAAP required that ProAssurance consider all relevant factors, including, past experience and historical trends, modified for current conditions, when estimating and establishing insurance loss reserves for the ultimate cost of claims settlement.  Specifically, ASC 944-40-30-1 prescribes that:

The liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), ***using past experience adjusted for current trends, and any other factors that would modify past experience***.

212.    During the Class Period, ProAssurance repeatedly represented that it established loss reserves based upon, among other things, historical experience and claims frequency and severity:[32]

The reserve for losses is established based on estimates of individual claims and actuarially determined estimates of future losses ***based on ProAssurance's past loss experience, available industry data and projections as to future claims frequency, severity, inflationary trends and settlement patterns***.

---

[32]    This disclosure was made in each of the Company's Forms 10-K for the years ended December 31, 2017, 2018, and 2019, with similar disclosures appearing in each quarterly Form 10-Q during 2018 and 2019.

4840-9468-0034.v1

213.    However, this disclosure was false each time it was made.  As alleged in §V., *supra*, Defendants had access to and knowledge of data clearly indicating that ProAssurance's loss reserves for TeamHealth's claims were chronically and materially understated throughout the Class Period and, as a result, the Company's publicly disseminated financial statements during this period violated GAAP.

214.    For example, Defendants ignored the following critical factors, past experience, and red flags relating to frequency, severity, and unique risk in setting loss reserves for TeamHealth:

> The dramatically increasing number of claims (frequency) related to TeamHealth immediately prior to and throughout the Class Period.  Such claims accounted for the vast majority of the increase in outstanding claims for ProAssurance's *entire* claims-made HCPL business, and exceeded *five times* as many claims per dollar of premium as the rest of ProAssurance's HCPL operations combined during the Class Period.  *See* §V., *supra*.

> The *true* average severity of TeamHealth claims prior to and during the Class Period, which was no less than the average severity of non-TeamHealth claims within the same claims-made HCPL business unit.  Instead of properly recognizing this fact, Defendants continued to materially under reserve for TeamHealth related claims, despite the fact that doing so artificially suppressed the implied average severity rate for TeamHealth-related claims to levels *significantly below* the rest of the Company's claims-made HCPL operations.  *See* §V., *supra*.  There can be little doubt that Defendants were aware of the impossibly low TeamHealth average severity rates resulting from the failure to set adequate loss reserves, as Defendants regularly commented that they monitored the frequency and severity of claims in setting loss reserves.  *See, e.g.*, ¶148 ("*potential change in severity influences our loss [picks] and affects our evaluation of reserves*").

**b.    The "Unique Structure" of ProAssurance's Agreement with the Inherently Risky TeamHealth Should Have Resulted in the Setting of Higher Loss Reserves**

215.    As further detailed in §IV.G., *supra*, Defendants primarily attributed the abysmal results of the TeamHealth account to the "unique structure" of ProAssurance's policy for TeamHealth, which Defendants described as unlike any "others in [their] book of business," particularly with the regard to the reinsurance component of the deal.  This one-time decision to

- 80 -

employ a unique, extraordinarily risky structure for an account that Defendants said represented the "single largest" premium in its history, was clearly inconsistent with Defendants' earlier disclosures – disclosures that reassured investors that the Company was committed to "responsible" and "disciplined" underwriting practices. Given the material size of the TeamHealth account and the unusually large amount of risk presented by the client, ProAssurance's willingness to agree to a "unique structure" that was unlike any "others in [their] book of business," exposed the Company to significantly higher losses in connection with the TeamHealth policy, as Defendants would ultimately admit through two corrective disclosures at the end of the Class Period.

216.    Consequently, Defendants either knew or were reckless in not knowing that their already inherently high loss exposure for TeamHealth claims increased significantly as a result of their decision to abandon ProAssurance's usual HCPL portfolio insurance practices and agree to a "unique structure" that was unlike any "others in [their] book of business." This was highly relevant information that should have resulted in materially higher loss reserves than what ProAssurance recorded for TeamHealth. In violation of GAAP, however, Defendants did not account for this additional loss exposure when setting loss reserves for TeamHealth throughout the Class Period. Moreover, there is little doubt that Defendants failed to properly account for the increased risk attached to the "unique" TeamHealth policy, as Defendant Boguski effectively admitted on February 21, 2020. *See* §VI.A.17., *supra*.

4.    **Defendants' GAAP and SEC Violations Were Quantitatively and Qualitatively Material to ProAssurance's Financial Statements and Related Disclosures**

217.    Defendants' improper failure to incorporate the factors described in §VI.C.3.a. in setting and maintaining adequate loss reserves for TeamHealth violated GAAP. As a result, Defendants materially understated reserve for losses and loss adjustment expenses, net losses and

loss adjustment expenses, and overstated net income and EPS in the Company's financial statements filed with the SEC during the Class Period.

218.    The SEC has set forth guidance for accountants to evaluate materiality as it relates to an SEC registrant's financial statements:[33]

> "The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

219.    Thus, there is little doubt that the misstatements of ProAssurance's loss reserves were material to its financial reports.  As Defendants regularly acknowledged during the Class Period, "[d]ue to the size of our consolidated reserve for losses . . . even a small percentage adjustment to our total reserve estimate could have a material effect on our results of operations for the period in which the adjustment is made."  Moreover, as illustrated in Table 8, the misstatements directly attributable to Defendants' improper understatement of TeamHealth loss reserves materially inflated the Company's consolidated reported net income and EPS during the Class Period, on a cumulative basis, in the range of 65% to ***more than 6,000%***:

---

[33]    SEC Codification of Staff Accounting Bulletins, *Assessing Materiality*, Topic 1-M.  Topic 1-M is also directly incorporated in GAAP through ASC 250-10-S99.

TABLE 8

| Impact of Understatement of Reserves for Losses and Loss adjustment Expenses | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *(in thousands, except per share amounts)* | | | | | | | | |
| **Iron Curtain Method** *(Cumulative misstatement)* | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | FYE 2018 | YTD 2019 (3Q) |
| **Understatement of Reserve for Loss & LAE, and related Net Losses and LAE** | $ 26,743 | $ 35,166 | $ 58,594 | $ 61,884 | $ 68,941 | $ 82,286 | $ 58,594 | $ 82,286 |
| Understatment after tax *(21% disclosed rate)* | $ 21,127 | $ 27,781 | $ 46,289 | $ 48,888 | $ 54,463 | $ 65,006 | $ 46,289 | $ 65,006 |
| **Consolidated Financial Metrics:** | | | | | | | | |
| Net Income (loss), as Incorrectly Reported | $ 28,423 | $ 31,228 | $ (24,450) | $ 31,650 | $ 11,536 | $ 17,193 | 47,057 | $ 60,379 |
| Net Income (loss), as Corrected | $ 7,296 | $ 3,447 | $ (70,739) | $ (17,238) | $ (42,927) | $ (47,813) | $ 768 | $ (4,627) |
| **Overstatement of Net Income** | $ 21,127 | $ 27,781 | $ 46,289 | $ 48,888 | $ 54,463 | $ 65,006 | $ 46,289 | $ 65,006 |
| **Percentage Overstated** | **290%** | **806%** | **65%\*** | **284%\*** | **127%\*** | **136%\*** | **6029%** | **1,405%\*** |
| Earnings (loss) per Share, as Incorrectly Reported | $ 0.53 | $ 0.58 | $ (0.46) | $ 0.59 | $ 0.21 | $ 0.32 | $ 0.88 | $ 1.12 |
| Earnings (loss) per Share, as Corrected | $ 0.14 | $ 0.06 | $ (1.32) | $ (0.32) | $ (0.80) | $ (0.89) | $ 0.01 | $ (0.09) |
| **Overstatement of Earnings per share** | $ 0.39 | $ 0.52 | $ 0.86 | $ 0.91 | $ 1.01 | $ 1.21 | $ 0.87 | $ 1.21 |
| **Percentage Overstated** | **289%** | **802%** | **65%\*** | **284%\*** | **127%\*** | **136%\*** | **6043%** | **1,401%\*** |
| **Rollover Method** *(Incremental misstatement)* | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | FYE 2018 | YTD 2019 (3Q) |
| **Understatement of Reserve for Loss & LAE, and related Net Losses and LAE** | $ 26,743 | $ 8,423 | $ 23,428 | $ 3,290 | $ 7,057 | $ 13,345 | $ 23,428 | $ 13,345 |
| Understatement after tax *(21% disclosed rate)* | $ 21,127 | $ 6,654 | $ 18,508 | $ 2,599 | $ 5,575 | $ 10,543 | $ 18,508 | $ 10,543 |
| **Consolidated Financial Metrics:** | | | | | | | | |
| Net Income (loss), as Incorrectly Reported | $ 28,423 | $ 31,228 | $ (24,450) | $ 31,650 | $ 11,536 | $ 17,193 | 47,057 | $ 60,379 |
| Net Income (loss), as Corrected | $ 7,296 | $ 24,574 | $ (42,958) | $ 29,051 | $ 5,961 | $ 6,650 | 28,549 | $ 49,836 |
| **Overstatement of Net Income** | $ 21,127 | $ 6,654 | $ 18,508 | $ 2,599 | $ 5,575 | $ 10,543 | $ 18,508 | $ 10,543 |
| **Percentage Overstated** | **290%** | **27%** | **43.1%\*** | **9%** | **94%** | **159%** | **65%** | **21%** |
| Earnings (loss) per Share, as Incorrectly Reported | $ 0.53 | $ 0.58 | $ (0.46) | $ 0.59 | $ 0.21 | $ 0.32 | $ 0.88 | $ 1.12 |
| Earnings (loss) per Share, as Corrected | $ 0.14 | $ 0.46 | $ (0.80) | $ 0.54 | $ 0.11 | $ 0.12 | $ 0.53 | $ 0.93 |
| **Overstatement of Earnings per share** | $ 0.39 | $ 0.12 | $ 0.34 | $ 0.05 | $ 0.10 | $ 0.20 | $ 0.35 | $ 0.19 |
| **Percentage Overstated** | **289%** | **27%** | **42.6%\*** | **9%** | **89%** | **159%** | **65%** | **21%** |
| \* Corrected metric is a loss (negative number). Accordingly, "Percentage Overstated" calculated as Overstatement / absolute value of the "as Corrected" figure. | | | | | | | | |

220.    As the first row of figures in Table 8 illustrates, Defendants continued to issue materially misstated financial statements in which the cumulative "[u]nderstatement of [r]eserve for [l]oss and LAE" grew incrementally each quarter by the additional loss understatement in each successive accounting period during the Class Period, until 4Q19. Accordingly, each of the financial statements issued for the periods referenced above were improperly inflated by the amount required to correct the cumulative misstatement each quarter. Further, Table 8 demonstrates that Defendants' failure to provide an adequate reserve for losses and loss adjustment expense was material to the Company's reported consolidated net income and EPS for each annual

and quarterly period in the Class Period, on both a cumulative and incremental basis.[34]  As noted in Table 7, *supra*, ProAssurance also disclosed quarterly and year-end "[n]et losses and loss adjustment expenses" and "[o]perating [r]esults" for its SP&C segment that were also materially inflated during the Class Period for the same reasons the corresponding consolidated figures were misstated, as explained herein.

221.    Defendants' failure to accrue adequate loss reserves was also material from a qualitative standpoint.  According to SEC Staff Accounting Bulletin No. 99 – *Materiality* ("SAB No. 99"), "the [SEC] staff believes that there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material . . . ."  SAB No. 99 goes on to identify examples of certain "considerations that may well render material a quantitatively small misstatement of a financial statement item."  While not an exhaustive list, several of the considerations from SAB No. 99 apply to ProAssurance's understatement of TeamHealth loss reserves, including the following:

- "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the company's operations and profitability";

- "whether the misstatement masks a change in earnings or other trends"; and

- "whether the misstatement changes a loss into income or vice versa."

222.    As alleged herein: (a) the improper understatement of TeamHealth claims' losses were reported in ProAssurance's SP&C segment, the Company's ***most important business***

---

[34]    In evaluating the materiality of previously uncorrected financial statement misstatements, the SEC requires registrants to evaluate both the cumulative impact of correcting a misstatement that has built up over time in the current period (the "iron curtain" method), as well as the incremental impact of correcting only the incremental portion of the misstatement that originated in each particular accounting period (the "rollover" method).  SEC Codification of Staff Accounting Bulletins, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements*, Topic 1-N.

*segment*, which was responsible for the majority of the Company's profit; (b) the improper failure to accrue and provide adequate loss reserves for the TeamHealth claims concealed the fact that ProAssurance's earnings were declining as a direct result of the TeamHealth losses, thus masking the deterioration of ProAssurance's underwriting; and (c) as can be seen in Table 8 *supra*, the improper failure to accrue and provide adequate loss reserves for the TeamHealth account, if properly reported, would have changed the reported net income to a net loss in 1Q19, 2Q19, and 3Q19.  Accordingly, the considerations set forth above render ProAssurance's understatement of TeamHealth loss reserves both qualitatively and quantitatively material.

### 5.    ProAssurance Artificially Understated Its Net Loss Ratios

223.    In addition to closely monitoring ProAssurance's loss reserves and net income, analysts tracking the Company also paid close attention to ProAssurance's reported loss ratios, which are measures of the Company's expected claim losses relative to the net premiums earned on the same policies.  In particular, ProAssurance consistently reported both its consolidated and SP&C segment net loss ratios in its Forms 10-Q and 10-K, press releases, and earnings conference calls during the Class Period, referring to the ratio as a "key" measure used "in evaluating our performance."  ProAssurance indicated that its net loss ratio "is calculated as net losses and loss adjustment expenses incurred divided by net premiums earned."

224.    Because net losses and loss adjustment expenses are the numerator in the Company's net loss ratio calculation, and because ProAssurance consistently and materially understated its net losses and loss adjustment expenses incurred by understating loss reserves for TeamHealth, as detailed in §V., *supra*, the Company also consistently and materially understated both its consolidated and SP&C segment net loss ratios during the Class Period as illustrated in Table 9 below:

**TABLE 9**

| Understatement of Consolidated and SP&C Segment Net Loss Ratios | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Consolidated Net Loss Ratio Understatement** | | | | | | | | |
| | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | FYE 2018 | YTD 2019 (3Q) |
| Cumulative misstatement: | | | | | | | | |
| Loss Ratio (As Reported) | 72.3% | 71.6% | 76.3% | 76.8% | 80.5% | 74.9% | 72.4% | 77.4% |
| Loss Ratio (As Corrected) | 84.3% | 88.7% | 105.3% | 106.5% | 113.5% | 113.0% | 79.6% | 90.4% |
| **Percentage Point Understatment of Net Loss Ratio** | **12.0%** | **17.1%** | **29.0%** | **29.7%** | **33.0%** | **38.1%** | **7.2%** | **13.0%** |
| | | | | | | | | |
| Incremental misstatement: | | | | | | | | |
| Loss Ratio (As Reported) | 72.3% | 71.6% | 76.3% | 76.8% | 80.5% | 74.9% | 72.4% | 77.4% |
| Loss Ratio (As Corrected) | 84.3% | 75.7% | 87.9% | 78.3% | 83.9% | 81.1% | 79.6% | 81.1% |
| **Percentage Point Understatment of Net Loss Ratio** | **12.0%** | **4.1%** | **11.6%** | **1.6%** | **3.4%** | **6.2%** | **7.2%** | **3.7%** |
| | | | | | | | | |
| **SP&C Segment Net Loss Ratio Understatement** | | | | | | | | |
| | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | FYE 2018 | YTD 2019 (3Q) |
| Cumulative misstatement: | | | | | | | | |
| Loss Ratio (As Reported) | 77.7% | 81.4% | 80.8% | 86.8% | 84.1% | 85.9% | 78.2% | 85.6% |
| Loss Ratio (As Corrected) | 96.3% | 110.5% | 133.1% | 136.7% | 138.8% | 151.6% | 90.1% | 107.5% |
| **Percentage Point Understatment of Net Loss Ratio** | **18.6%** | **29.1%** | **52.2%** | **49.9%** | **54.7%** | **65.7%** | **11.9%** | **21.9%** |
| | | | | | | | | |
| Incremental misstatement | | | | | | | | |
| Loss Ratio (As Reported) | 77.7% | 81.4% | 80.8% | 86.8% | 84.1% | 85.9% | 78.2% | 85.6% |
| Loss Ratio (As Corrected) | 96.3% | 88.4% | 101.7% | 89.4% | 89.7% | 96.6% | 90.1% | 91.9% |
| **Percentage Point Understatment of Net Loss Ratio** | **18.6%** | **7.0%** | **20.9%** | **2.7%** | **5.6%** | **10.7%** | **11.9%** | **6.3%** |

### 6.    ProAssurance Violated GAAP and SEC Disclosure Rules

#### a.    ProAssurance Failed to Disclose the Contingent Liability Related to the TeamHealth "Tail Coverage" in Its Year End 2019 Financial Statements

225.    Defendants violated GAAP by failing to disclose in the Company's 2019 Form 10-K that it was probable, and in fact highly likely, that TeamHealth would not renew its policy in early 2020, and would instead exercise its unilateral option for an extended reporting endorsement or "tail coverage" feature in its existing ProAssurance policy at that time. This tail coverage would immediately saddle ProAssurance with a net liability for as much as $50 million in additional claims liability in excess of additional premium upon execution of the endorsement.

226.    The TeamHealth policy was a "claims-made" policy. Claims-made policies only cover claims that are made during the active policy period. Upon cancellation or non-renewal of such a policy, an insured can generally no longer file claims, even if the events that led to the claim occurred during the policy period. The ProAssurance claims-made policy, however, gave TeamHealth the unilateral option to purchase tail coverage upon cancellation or non-renewal of its

- 86 -

policy in the form of an extended reporting endorsement. An extended reporting endorsement allows the non-renewing customer to file a malpractice claim even after a policy is cancelled, so long as the newly reported claim stems from an event that occurred prior to the cancellation date of the original policy.

227.    While the extended reporting endorsement was not unique to the TeamHealth policy, the magnitude of the potential additional TeamHealth loss exposure that ProAssurance would incur if the endorsement was exercised was staggering, hugely significant for a single account, and undoubtedly material to the consolidated financial statements. This is indisputable, as stated in its 1Q20 Form 10-Q, filed on May 7, 2020, the Company belatedly disclosed the existence of a contingent liability for unpaid claims, stating:

> [T]he Company believes it is more likely than not that the account [TeamHealth] will not renew on terms offered [and] will exercise its option to purchase the extended reporting endorsement or 'tail' coverage. . . . [I]f the account exercises its option to purchase tail coverage, a net loss of up to approximately $50 million could be recognized in the second quarter of 2020; if the insured chooses to exercise this tail policy, all premium and corresponding losses will be fully recognized in the same period the tail policy is written.

228.    As noted below, however, GAAP and SEC rules required this disclosure be made a quarter earlier in the Company's 2019 Form 10-K, filed on February 22, 2020.

229.    Under ASC 450, *Contingencies*, insurance reserves for unpaid claims are a type of loss contingency which is defined as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[35]  Further, an accrual for a loss contingency (*i.e.*, an insurance loss reserve or liability) and related loss provision (*i.e*., charge to income or expense) must be made when both of the following conditions are met:

---

[35]    ASC 450-10-20 (ASC Master Glossary – Loss Contingency).

- "***Information available before the financial statements are issued*** . . . indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.

- The amount of loss can be reasonably estimated."[36]

230.    When a probable or "likely" loss is not accrued because a reasonable estimate cannot be made, ASC 450 still requires that a company disclose such conditions.[37]  ***Disclosure must also be made even*** "***if there is at least a reasonable possibility that a loss may have been incurred***" (ASC 450-20-50-3) (*i.e.*, less than probable but more than a remote likelihood).  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss, or state that such an estimate cannot be made.[38]

231.    ASC 450 refers to ASC 944-40 for rules applicable to insurance entities, including required disclosures in financial statements.[39]  SEC Staff Accounting Bulletins, *Contingency Disclosures Regarding Property-Casualty Insurance Reserves for Unpaid Claim Costs*, Topic 5.W ("SAB Topic 5.W"), quoted in ASC 944-40-S99-1, provides relevant guidance on assessing uncertainties under ASC 450 with respect to insurance reserves.[40]

232.    SAB Topic 5.W states that "specific uncertainties (conditions, situations and/or sets of circumstances) not considered to be normal and recurring ***because of their significance*** and/or nature can result in loss contingencies" under ASC 450, and include "significant risks to an individual claim or group of related claims."[41]  SAB Topic 5.W further states that ASC 275, *Risks*

---

[36]   ASC 450-20-25-2.

[37]   ASC 450-20-50-3 through 50-5, and 944-40-S99-1.

[38]   ASC 450-20-50-3 through 50-5, and 944-40-S99-1.

[39]   ASC 450-10-60-9.

[40]   SAB Topic 5.W.

[41]   *Id.*

*and Uncertainties*, provides that disclosures regarding certain significant estimates should be made when "'[i]t is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events . . . [and] the effect of the change would be material to the financial statements.'"[42]

233. These GAAP and SEC rules make clear that the TeamHealth tail coverage was a "contingent liability" for ProAssurance within the meaning of ASC 275, 450, and 944, as it was at least reasonably possible, if not probable, that TeamHealth would not renew its policy and instead exercise the tail coverage option in early 2020, which would immediately saddle ProAssurance with nearly $50 million in additional net liabilities. Because this extended reporting endorsement allowed TeamHealth to extend the time to file claims for events occurring prior to the spring 2020 cancellation date (including events that occurred in 2019 and prior), the tail coverage represented a material contingent liability as of December 31, 2019.

234. Defendants knew or were reckless in not knowing, ***before the year-end 2019 financial statements were filed*** on February 20, 2020, that it was ***at least reasonably possible*** (more than a remote likelihood) that TeamHealth would not renew its policy at the spring 2020 anniversary date, and instead exercise the extended reporting endorsement. For example, by the end of 4Q19 and prior to the filing of the Company's 2019 10-K, Defendants were well aware of the magnitude of the massive TeamHealth claim losses announced in 4Q19 because, among other things, they were intimately involved with the reserve process as detailed at §VII.A., *infra*, signed certifications for the 2019 10-K and financial statements containing the disclosures detailing the massive 4Q19 losses attributed to TeamHealth as detailed at §VII.B., *infra*, and were intimately

---

[42]   *Id.*

familiar with the size and scope of the TeamHealth losses as demonstrated by their numerous remarks during the earnings conference call on February 21, 2020, a day after filing the 2019 Form 10-K.

235.    As a result of their knowledge of the TeamHealth-related losses recognized in 4Q19 and in the full year 2019 financial statements, Defendants also knew before the 2019 year-end financial statements were filed that the TeamHealth-related losses that ProAssurance recognized over the course of the policies' terms far exceeded the premium being charged and, in order to stem the massive losses it was incurring on such the TeamHealth account, ProAssurance would need to raise TeamHealth's renewal premium by a massive amount. For example, statutory filings indicate that the loss ratio on the TeamHealth account was approximately 332% from 2Q16 through 4Q19.[43] Given this situation, Defendants would have known that, in order to price the TeamHealth policy in-line with its target loss ratio of approximately 78.5%, ProAssurance would have to raise the renewal premium by approximately 424% (332%/78.5%).[44] Given their experience in the industry, Defendants also knew that it was at least "reasonably possible" (if not probable) that TeamHealth would refuse such a massive premium increase and instead exercise the extended reporting endorsement. Not surprisingly, this is exactly what happened.

236.    In violation of the GAAP and SEC rules, Defendants failed to disclose in ProAssurance's 2019 Form 10-K, that: (a) it was at least reasonably possible if not probable that TeamHealth, a single yet major account, would not renew its policy and instead exercise its extended reporting endorsement in 2Q20, which would immediately create a material contingent

---

[43]    The estimated 332% loss ratio assumes the same 33% LAE adjustment explained at ¶130 n.27, *supra*.

[44]    ProAssurance's Forms 10-K for the years ended December 31, 2017 and December 31, 2018 both disclosed a "target loss ratio" of 78.5% for its HCPL business.

liability; and (b) that the liability could be as much as $50 million or, in the alternative, disclose that the estimated range was not yet refined, but was material.

b. **ProAssurance Violated Item 303 by Failing to Disclose Known Trends, Uncertainties, and Significant Economic Changes**

237.    ProAssurance's annual and quarterly reports filed with the SEC are also subject to the disclosure requirements of, among other things, Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303").  Item 303(a)(3)(ii) generally requires companies to disclose in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of its Forms 10-Q and 10-K, any known trends, uncertainties, commitments, and significant economic changes that are reasonably likely to have a material favorable or unfavorable impact on the company's financial condition.

238.    The purpose of the MD&A discussion, according to the SEC, is to provide investors with information "necessary to an understanding of a [company's] financial condition, changes in financial condition and results of operations."  In particular, the SEC has enunciated three principal objectives of the MD&A: (a) to provide an explanation of a company's financial statements that enables investors to see the company through management's eyes; (b) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (c) to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can judge the extent to which past performance predicts future performance.

239.    To this end, Item 303(a)(3)(i) and (ii) requires a registrant's quarterly and annual financial statements filed with the SEC to describe any significant financial changes, known trends, or uncertainties that have had or that the registrant reasonably expects will have a material

favorable or unfavorable impact on income from its continuing operations, by specifically directing registrants to:

- "***Describe any . . . significant economic changes that materially affected the amount of reported income from continuing operations*** and, in each case, indicate the extent to which income was so affected."

- "***Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on . . . income from continuing operations***.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues . . . the change in the relationship shall be disclosed."

240.    In light of the foregoing, Item 303 required ProAssurance to disclose in its Class Period financial statements the material facts concerning the known, but concealed, negative trend of inordinately rising claims and losses associated with TeamHealth that was clearly evident by 2Q18 at the latest.  As alleged at §V., *supra*, Defendants knew or should have known that this alarming rise in TeamHealth-related claims, which were accumulating at approximately five times the rate of the rest of its claims-made HCPL operations and was a "known trend" that would require a material charge to increase loss reserves that was reasonably expected to have an "unfavorable material effect" on the Company's future operating and net income within the meaning of Item 303.  As such, Defendants violated Item 303 by failing to disclose this known trend in TeamHealth claim frequency, and the associated need to increase loss reserves during the Class Period that, as illustrated in Table 8, would (and did) materially reduce ProAssurance's income from continuing operations and consolidated net income and EPS throughout the Class Period.

241.    Additionally, Item 303 required ProAssurance to disclose any "uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on . . . income from continuing operations."  Defendants violated their Item 303 obligation by failing to disclose in the Company's 2019 Form 10-K, the financial uncertainty arising from a substantial likelihood that TeamHealth would not renew its policy at its early 2020 anniversary

- 92 -

and would instead exercise "its contractual option to purchase extended reporting endorsement or 'tail' coverage" that would require ProAssurance to immediately recognize a significant, material charge upon non-renewal, as more fully alleged at ¶¶225-236, *supra*. This contingent liability related to TeamHealth's tail coverage was an "uncertainty" within the meaning of Item 303(a)(3), as it was expected to materially and unfavorably impact the Company's net income and income from continuing operations by as much as $50 million.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

242.    As set forth *supra*, numerous facts demonstrate that ProAssurance and the Individual Defendants each knew or were severely reckless in not knowing that their Class Period misrepresentations were materially false and misleading when made. Among other things, the above allegations establish that ProAssurance and the Individual Defendants acted with scienter in that they: (a) knew or recklessly disregarded that the statements identified above in §VI., *supra*, were materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading; (b) knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; (c) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and (d) knowingly or recklessly engaged in the fraudulent scheme alleged herein as primary violators of the federal securities laws.

243.    The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly or recklessly issued materially false and misleading statements and/or omissions during the Class Period.

A. **Defendants Repeatedly Represented that They Were Heavily Involved with, and Had Intimate Knowledge of, the Company's Loss Reserves, Underwriting Processes, and Financial Results**

244. As detailed in §VI.A., *supra*, the false and misleading statements at issue in this case all concern ProAssurance's loss reserves and underwriting practices – two specific areas of the Company's operations that Defendants repeatedly asserted they were heavily involved with, and particularly knowledgeable about, both prior to and during the Class Period.

245. With regard to loss reserves, Defendants' annual and quarterly filings with the SEC described in detail how the Individual Defendants were intimately involved with, and responsible for, the Company's processes for establishing, reviewing, and updating its loss reserves:

- "The assumptions used in establishing ProAssurance's reserve are ***regularly reviewed and updated by management*** as new data becomes available";

- "***Management establishes the reserve for losses*** after taking into consideration a variety of factors . . . . ***Management updates and reviews the data*** underlying the estimation of the reserve for losses each reporting period and makes adjustments to loss estimation assumptions that best reflect emerging data"; and

- "These estimates are based upon ***management's estimates of ultimate losses*** . . . . ***Management regularly reviews these estimates and any adjustments necessary*** are reflected in the period in which the estimate is changed."

246. In addition, the Individual Defendants made numerous statements during earnings calls and investor conferences, both prior to and during the Class Period, not only confirming that they were heavily involved with and knowledgeable about the loss reserves processes at the heart of Defendants' fraud, but also repeatedly stressing to investors that Defendants expressly took a "conservative approach" and "conservative view" of these practices.

247. For example, while participating in the JMP Securities Financial Services Conference on June 19, 2018, Defendant Rand stated, in relevant part: "We are taking a more conservative approach to the loss [picks] that we are choosing . . . and we tend to want to be out ahead of that early and be very conservative on how we approach it." Defendant Friedman

- 94 -

similarly stated during the 3Q18 earnings call that "[w]e are continuing to establish and evaluate reserves with the same conservatism we have always used . . . and that conservatism extends to our evaluation of reserves." During the same call, Defendant Friedman confirmed that "we're also being prudent in protecting our balance sheet and thus we come to the crux of the segment's performance in the quarter, as the potential change in severity influences our loss [picks] and affects our evaluation of reserves." During the 4Q18 earnings call, Defendant Friedman stated: "We believe it is more important than ever to establish and evaluate reserves with a conservatism that has resulted in success over the years." Defendant Starnes echoed these sentiments during the Company's 1Q19 earnings call, stating: "If we thought we were going to see unfavorable development, we'd take that into account today, we wouldn't wait for it. So we're doing what we think is called for, which is just reducing the amount of favorable development. We're not having to add to reserves." During the 2Q19 earnings call, Defendant Rand added: "[W]e . . . take a pretty conservative view when we establish those reserves and a pretty pessimistic view of what loss trends will do. And loss trends while worse than they have been over the last number of years, continue to be slightly better than kind of what's embedded in that reserving analysis."

248.    With respect to the Company's underwriting processes, the Individual Defendants made numerous additional statements, both prior to and during the Class Period, confirming their direct involvement and knowledge about these practices. For example, during the 1Q19 earnings call, Defendant Friedman stated, in relevant part, "[w]e continue to uphold our underwriting standards, writing good business in lieu of easy business, emphasizing adequate pricing over retention and walking away from potential accounts we think carry too much risk for the premium." Furthermore, in a press release attached to a Form 8-K filed with the SEC on August 7, 2019, Defendant Rand stated: "'I cannot overstate the importance we place on disciplined underwriting,'" while also declaring "'[o]ur ability to attain appropriate pricing for the risk we

- 95 -

assume is paramount to the success of ProAssurance, and vital to the security we provide to our customers.'"  The next day, Defendant Hendricks noted that "we are dedicated to maintaining the disciplined underwriting standards necessary to write business at premium appropriate to the assumed risk," and reiterated that "[w]e are willing to walk away from business we deem to be underpriced."  Then, during the 3Q19 call with investors, Defendant Boguski stated, "[t]hese results are consistent with our focus on underwriting discipline as we continue to emphasize careful risk selection, rate adequacy and a willingness to walk away from business that does not fit our goal of achieving a long-term underwriting profit."

249.    The Individual Defendants also made numerous statements, both prior to and during the Class Period, confirming that they were heavily involved with and knowledgeable about even minor changes in the Company's financial results pertaining to these areas.  For example, during the Company's 3Q18 call, Defendant Friedman stated that the approximate "1.8 points of the loss ratio increase was driven by our concern about potentially higher losses due to changes in the legal climate."  Similarly, during the Company's 1Q19 earnings call, Defendant Rand noted that the "loss ratio moved 2.5 [percentage] points higher."  In contrast to these small changes in the Company's loss ratio, the TeamHealth-related charges recorded in 4Q19 increased the Company's loss ratio *by approximately 36.1% to 40.8%* (from 82.4%-87.0% to 123.2%).  As further detailed in §VI., *supra*, Defendants made numerous other statements in the Company's earnings calls, SEC filings, and Statutory Filings, all of which demonstrated their detailed awareness of, and involvement in, ProAssurance's reporting processes for the key financial metrics that were materially misstated by Defendants during the Class Period, thus further evidencing Defendants' scienter.

250.    Defendants' numerous statements before and throughout the Class Period concerning ProAssurance's "conservative" and "disciplined" loss reserve and underwriting

practices, and the financial reporting relating to these issues, demonstrate that the Individual Defendants were actively involved with, or intimately knowledgeable about, the specific operational areas responsible for Defendants' fraud. Defendants' direct knowledge and involvement in these operational issues is supported by the other facts alleged herein, including those regarding the importance of the TeamHealth account to ProAssurance's business (*see* §IV.A.1., *infra*), and the importance of frequency and severity data to Defendants' reserves processes (*see* §IV.A.3., *infra*). Accordingly, these statements strongly support a cogent and compelling inference that the Individual Defendants either had direct knowledge about the Company's massively understated loss reserves and deficient underwriting practices for the uniquely structured and extraordinarily risky TeamHealth policy, or were severely reckless disregarding them.

251. Moreover, TeamHealth was the "single largest" premium ever written in the Company's history, and Defendants publicly touted the signing of this account (without identifying TeamHealth by name), even noting that it was a telling indicator of the Company's success and business acumen. Defendants were obviously aware of this account and knew that they signed TeamHealth to a highly unusual, totally unique and risky policy structure that deviated from the Company's purportedly "conservative" and "disciplined" underwriting practices. Furthermore, given the size and importance of this account, Defendants also obviously closely monitored developments with TeamHealth. These facts strongly indicate that the Individual Defendants were aware of the reality that the TeamHealth account presented substantial and unique risks to the Company's operating results, and were indisputably aware of, or severely reckless in not being aware of, the massive problems that arose with the account in early 2018. The Individual Defendants' direct knowledge and involvement in these issues establishes a strong inference of their scienter.

- 97 -

**B.      Defendants Repeatedly Represented that They Regularly Reviewed and Updated the Data Underlying Their Loss Reserves, with a Specific Focus on Severity and Frequency Trends**

252.    As detailed *supra*, the undisclosed problems with the TeamHealth account began in early 2018 when the number of outstanding TeamHealth claims (*i.e.*, frequency) began to skyrocket.  By failing to sufficiently incorporate TeamHealth's frequency data into their loss reserves calculations, Defendants massively understated the Company's loss reserves for its TeamHealth account, as evidenced by the impossibly low average severity rates associated with those reserves from at least 2Q18 through 3Q19, during a time when severity in the HCPL segment was generally ***increasing***, particularly for companies with enhanced risk profiles, like TeamHealth.  *See* §V., *supra*.

253.    Defendants' undeniable awareness of these concealed material facts is confirmed not only by their intimate awareness of, and involvement with, the Company's loss reserves processes, but also Defendants' numerous representations that they were intently focused on the two ***specific issues*** that made the massive understatement of TeamHealth's loss reserves impossible to miss: ***frequency and severity***.  Specifically, Defendants repeatedly represented, both prior to and during the Class Period: (a) that they regularly updated and reviewed the data underlying their loss reserves assumptions; (b) that frequency and severity were two of the most important factors considered in their loss reserves analysis; and (c) that they were "concerned about increasing severity in the broader [HCPL] market."

254.    For example, during the Class Period, Defendants' annual and quarterly filings with the SEC included the following representations regarding ProAssurance's loss reserves process:

- "We re-evaluate our previously established reserve each quarter based on our most recently available claims data and currently available industry trend information";

- "Over the past several years the ***most influential factor*** affecting the analysis of our HCPL reserves and the related development recognized has been ***the change, or lack thereof, in the severity of claims***.  The severity trend is an explicit

component of our pricing models, whereas in our reserving process the severity trend's impact is implicit. ***Our estimate of this trend and our expectations about changes in this trend impact a variety of factors, from the selection of expected loss ratios to the ultimate point estimates established by management***"; and

- "ProAssurance considers the views of the actuaries as well as other factors, such as ***known, anticipated or estimated changes in frequency and severity of claims***, loss retention levels and premium rates, in establishing the amount of its reserve for losses."

255.    In addition, the Individual Defendants made numerous statements during earnings calls and investor conferences, both prior to and during the Class Period, confirming that their reserves processes were heavily focused on the issues of frequency and severity, and that they were both aware of and "concerned about" generally increasing severity rates. *See, e.g.*, ¶62 (during the March 20, 2018 conference Defendant Starnes explained that "[y]ou talk about loss cost in the insurance world with 2 phrases: ***frequency*** and ***severity***" and emphasizing ProAssurance "can respond quickly" to "changes in frequency, because we ***see frequency on a real live – real-time basis***"); ¶148 (3Q18 earnings call – Defendant Friedman assured investors that "***potential change in severity influences our loss [picks] and affects our evaluation of reserves***"); ¶148 (Defendant Friedman noted during the same call that "***there is overall concern in the industry about loss severity***"); ¶152 (Defendant Friedman noting during the 4Q18 earnings call that "we take a ***cautious view of the potential for a rise in severity***).

256.    Accordingly, Defendants repeatedly represented prior to and during the Class Period that their reserve practices placed a tremendous amount of attention and emphasis on data regarding claim frequency and severity, particularly for "large, complex risks" like TeamHealth. Given these representations, it is impossible that Defendants did not know about the skyrocketing claim numbers and dramatically suppressed average severity rates associated with the loss reserves for ProAssurance's TeamHealth account, which conclusively indicated that such reserves were massively understated, as further detailed in §V., *supra*.  As such, the representations set forth in

¶¶254-255 above provide strong indicia of Defendants' scienter in connection with the materially false and misleading statements set forth in §VI., *supra*.

      **C.      The Importance of SP&C to the Company's Financial Results, and the Magnitude of the Fraud's Impact on ProAssurance's Financial Performance, Support an Inference of Scienter**

      257.     Defendants' misstatements and material omissions concerned ProAssurance's core business and largest source of revenue – the SP&C business segment.  SP&C generated *53%* of the Company's total revenue and accounted for *59%* of its net premiums earned during the Class Period.  Moreover, in 2018 and 2019, the HCPL business line, which included the TeamHealth account, was responsible for *89%* of the premiums written for the SP&C segment.  Due to its utmost importance, the SP&C segment's financial performance was discussed extensively by the Individual Defendants during each of the Company's Class Period SEC filings and earnings calls with investors, and securities analysts explicitly recognized the importance of the SP&C segment to ProAssurance's financial success.  For example, on June 19, 2018, Defendant Rand stated "we are a Specialty P&C company" that "focus[es] on the health care segment of the marketplace most significantly" and the SP&C segment is "***core to our operations***."  Similarly, in a February 20, 2020 Piper Sandler report, the analyst noted that the SP&C segment "includes [ProAssurance's] ***most important business*** which is selling medical malpractice insurance to doctors, hospitals, and other medical institutions."  Accordingly, the SP&C segment indisputably was critical to the success of the Company's business and as such the Individual Defendants were keenly aware throughout the Class Period of SP&C's financial performance.

      258.     Throughout the Class Period, the Individual Defendants also knew (or recklessly disregarded) that the Company's massive understatement of loss reserves for TeamHealth, an inherently risky specialty account, was significantly jeopardizing and impairing nearly *all* of ProAssurance's key financial metrics, including its net income, EPS, operating losses, loss

reserves, and loss ratio. Indeed, by the end of the Class Period, the Company had recognized charges of more than $130 million stemming from the TeamHealth account, which wiped out more than two years of the Company's net income (from 4Q17 through 3Q19). The Company also reported FY19 EPS of $0.02, the Company's lowest reported annual EPS figure in nearly three decades. This was more than 11 times lower than the Company's previous lowest annual EPS ($0.23 per share in 2002), and 161 times lower than the Company's average annual EPS from 2009 to 2018 ($3.22). The Company also reported 4Q19 EPS of ***negative*** $1.10, ***242%*** lower than the Company's average quarterly EPS in the past decade.

259. TeamHealth's massive losses also resulted in the Company reporting a prior-year unfavorable reserve development in its SP&C division for the first time in ***17 years***. In addition, the more than $130 million impact of the total TeamHealth-related charges ProAssurance was forced to recognize was greater than the Company's total favorable reserve development in the SP&C segment for 1Q18-3Q19 (as depicted in the chart below).



- 101 -

260.    Defendants also reported on February 20, 2020, that due to TeamHealth, the Company's loss ratio for 4Q19 was 123.2%, the Company's highest loss ratio since at least 1999. Accordingly, 4Q19 was the only quarter that the Company reported a loss ratio over 100% (meaning the Company paid more money in claims than it collected in premiums) since 2002. Similarly, TeamHealth alone raised the Company's loss ratio by 50% from 3Q19 to 4Q19, and as a direct result the Company's combined ratio for 4Q19 was 154.7% (its highest combined ratio since at least 2001) and 130.1% for 2Q20 (the second highest combined ratio since 2001).

261.    Given that each of these metrics suffered from material and historic declines caused solely by a "large national account" that could only have been TeamHealth, the Individual Defendants must have known that they employed unrealistic claim loss assumptions and reported unrealistic loss reserves throughout the Class Period. Accordingly, the magnitude of the fraud and its massively negative financial impacts further supports a strong inference of scienter.

**D.    The Individual Defendants Knew the Company's Deteriorating Operating Results Were Directly Caused by TeamHealth**

262.    Each of the Individual Defendants knew throughout the Class Period that the TeamHealth policy was resulting in ProAssurance "hemorrhaging money," but they intentionally concealed these issues from investors, thereby evidencing their scienter.

263.    During the Class Period, in his role as the Company's Chief Underwriting Officer and President of Healthcare Professional Liability, Defendant Friedman was responsible for "all [HCPL] activities within ProAssurance," including the activities of TeamHealth. Moreover, Defendant Friedman personally oversaw the National Healthcare Team's underwriting of the TeamHealth policy in 2016, and personally approved the pricing, structure, reinsurance coverage, and terms and conditions of that policy, including the option to purchase a tail coverage.

264.    Defendant Starnes likewise was described by the Company as "vital . . . in many key decisions that shaped the Company." In addition, each of Defendants Friedman and Starnes

- 102 -

abruptly ended their long-term employment at ProAssurance largely because of the devastation caused by TeamHealth. And when Defendant Boguski was promoted to President of SP&C in April of 2019, he effectively replaced Defendant Friedman and became directly responsible for cleaning up the TeamHealth mess. Given the above, it is simply unfathomable that these Individual Defendants lacked knowledge of the serious problems ProAssurance experienced with the TeamHealth account before and during the Class Period.

265.    Defendants Starnes, Friedman, and Rand were each Directors of PRA-Specialty, and Defendants Friedman, Rand, Hendricks, and Boguski each signed PRA-Specialty's quarterly and annual statements during the Class Period. The Individual Defendants therefore must have known about the ever-increasing number of claims being reported by TeamHealth, as identified in PRA-Specialty's Statutory Filings.

266.    Significantly, Defendants Rand and Hendricks each spoke at the Summer 2019 Meeting, during which they personally acknowledged that TeamHealth was a "problematic account" that was causing the Company to be "hemorrhaging money," and therefore must have known about the serious problems with TeamHealth that each of them individually reported to all of ProAssurance's employees. Furthermore, both Defendants Friedman and Boguski were in attendance during the Summer 2019 Meeting and could not possibly have been oblivious to the information their colleagues were presenting.

267.    Given their experience and leadership roles at ProAssurance and in the SP&C segment specifically, their access to highly relevant information, and their direct participation in activities associated with TeamHealth, it is more than reasonable to infer that each of the Individual Defendants knew or was severely reckless in disregarding the problems underlying the TeamHealth account and failing to disclose that ProAssurance was substantially under reserved for the TeamHealth policy.

E.    **The Departure and/or Demotion of Several Key Executives Supports
a Strong Inference of Scienter**

268.    Scienter is further substantiated by the wholesale restructuring of ProAssurance's executive management team over the course of 2019.  *See* §IV.F., *supra*.  Indeed, during the Class Period, Defendants disbanded the National Healthcare Team and split ties with the specific individuals deemed responsible for underwriting the TeamHealth policy in 2016.  Defendant Starnes, ProAssurance's long-term CEO with more than three years outstanding on his employment agreement; Defendant Friedman, the senior executive responsible for all policies underwritten by the National Healthcare Team, the Company's Chief Underwriting Officer, and then-President of Healthcare Professional Liability; and Butler, the underwriter of the TeamHealth policy, each left the Company in 2019.

269.    Also in mid-2019, Defendant Rand executed a "'comprehensive underwriting strategy'" in response to the "'emerging loss trends and changing conditions in healthcare professional liability.'"  Importantly, Defendants stated that this strategy included the "'recruitment of additional talent in Specialty underwriting.'"

270.    Given the dramatically rising claims being reported by TeamHealth before and throughout the Class Period, the impending loss of its "***single largest premium ever billed***," and the whopping charges totaling more than $130 million that Defendants soon would be forced to disclose, the timing of Company's decision to rid itself of these employees before shocking the market with the historical losses suffered because of TeamHealth implicates their direct involvement in and knowledge of the fraud.

F.    **The Individual Defendants' Certifications of the Company's Statutory
Filings and SOX Certifications Are Probative of Scienter**

271.    As explained in §V., *supra*, Defendants Rand, Hendricks, Friedman, and Boguski reviewed and signed the Company's state statutory insurance filings.  Lead Plaintiffs' forensic

- 104 -

analysis of the filings revealed that by at least 2Q18, Defendants were intentionally concealing the extent of the losses incurred from the dramatically rising number of TeamHealth-related claims outstanding by employing unrealistic claim loss assumptions and reporting wholly unrealistic loss reserves.  Notably, the loss understatements were so dramatic that they must have been known by the Individual Defendants, who professed intimate knowledge of and extensive involvement in ProAssurance's reserve process, which supports a finding of scienter.

272.    An additional indicia of scienter results from Defendants Starnes, Hendricks, and/or Rand signing SOX Certifications.  The certification requirements set forth in SOX were designed to prevent senior executives from adopting a "head in the sand" defense to actions for securities fraud committed on their watch.  The SEC has expressly warned corporate officers that "a false certification potentially could be subject to . . . both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."

273.    As one commentator explained:

> The usual route for officers and directors facing 10b-5 liability is to plead lack of knowledge or specific intent by relying on failures in the PSLRA's proof of scienter requirement to avoid liability for having signed off on deficient reports.  In an effort to counter such arguments, the SEC implemented rules pursuant to the certification provision of section 302, which specifically mandated that false certifications would expose the CEO and/or CFO to private causes of action under 10b-5.

Kourtney T. Cowart, *The Sarbanes-Oxley Act: How A Current Model in the Law of Unintended Consequences May Affect Securities Litigation*, 42 Duq. L. Rev. 293, 310-11 (2004).

274.    During the Class Period, ProAssurance's Forms 10-Q and 10-K referenced herein included materially false and misleading SOX Certifications signed by Defendants Starnes, Hendricks, and/or Rand.  *See* §VI.B., *supra*.  Defendants Starnes, Hendricks, and/or Rand, as signatories to the SOX Certifications in question, represented, among other things, that they had reviewed the respective quarterly report for which they supplied the certification, and, further, that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

- 105 -

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

275.    The SOX Certifications signed by Defendants Starnes, Hendricks, and/or Rand were materially false and misleading because, at the time they were executed, these Individual Defendants were aware of, or recklessly disregarded, the facts described herein.  As such, Defendants Starnes, Hendricks, and/or Rand's SOX Certifications provide additional evidence of scienter.

**G.    The Individual Defendants' Compensation Incentivized Their Fraud**

276.    The Individual Defendants were incentivized to commit the fraudulent acts alleged herein by the Company's incentive-based compensation structure for its executives and senior management.  The Individual Defendants were motivated to conceal the problems underlying the TeamHealth account and the extent of the resulting losses in order to obtain higher compensation, even though they had an obligation to make sure all reported financial results were true and correct.

277.    For example, the Company's Form DEF-14A filed with the SEC on April 13, 2018, stated that for 2018, Defendants Starnes, Rand, Hendricks, Friedman, and Boguski's annual incentive compensation plans had a performance-based component that was dependent on some of the same financial metrics that Lead Plaintiffs allege were directly impacted by the fraud.  The four relevant metrics included: (a) return on equity; (b) consolidated combined ratio; (c) gross written premium; and (d) operating division metrics.  As discussed in §V., above, Defendants were intentionally concealing the extent of losses incurred from the increasing number of TeamHealth claims, which impacted ProAssurance's financial metrics, including those underlying the Individual Defendants' compensation plan.  Indeed, the Company's consolidated combined ratio, which is the sum of ProAssurance's loss ratio and expense ratio, accounted for a significant portion of the Individual Defendants' annual compensation in 2018 and 2019, but was understated

throughout the Class Period.[45]  Thus, it financially benefitted the Individual Defendants to deceive investors about ProAssurance's true liabilities for TeamHealth during the Class Period.  And had the Individual Defendants not made such misrepresentations regarding TeamHealth-related claims during the Class Period, their compensation would have been lower, which supports an inference of scienter.

### H. ProAssurance Is Legally Responsible for the Conduct of the Individual Defendants

278.    ProAssurance acted with scienter because the knowledge of its most-senior executives, which includes each of the Individual Defendants, is imputed to ProAssurance.  Indeed, the cumulative knowledge of all members of ProAssurance's management team regarding these matters is properly imputed to the corporate defendant – the Company.

279.    Defendants Starnes and Rand were the CEO and/or Chairman of the Board during different times in the Class Period.  Defendants Rand and Hendricks were the CFO at different points throughout the Class Period.  Defendants Friedman and Boguski were the President of SP&C, the segment at issue herein.  The Individual Defendants' scienter, as detailed herein, is indisputably imputed to the Company.

## VIII.  LOSS CAUSATION

280.    As further described above, during the Class Period, Defendants issued a series of false and misleading statements and violated both GAAP and SEC accounting rules.  As a result of Defendants' material misrepresentations and accounting violations, the price of ProAssurance common stock was artificially inflated throughout the Class Period.  As detailed below, the truth

---

[45]   Indeed, 70% of Defendant Starnes, Rand, and Hendricks's incentive-based compensation and 21% of Defendants Friedman and Boguski's incentive-based compensation was based on the Company's consolidated combined ratios in 2018.  Similarly, in 2019, the Company's weighted combined ratio accounted for 60% of Defendants Starnes, Rand, and Hendricks's incentive-based compensation.

was revealed through two corrective disclosures, causing Lead Plaintiffs and the Class to suffer significant damages as a result.

281.    Lead Plaintiffs and members of the Class purchased ProAssurance common stock at artificially inflated prices during the Class Period.    But for Defendants' material misrepresentations and accounting violations, Lead Plaintiffs and members of the Class would not have purchased ProAssurance common stock at artificially inflated prices.

282.    As Defendants' material misrepresentations and accounting violations were gradually revealed to the market through two corrective disclosures, the price of ProAssurance common stock declined significantly.    The corrective impact of the first partial disclosure alleged herein was tempered, however, by Defendants' continued material misrepresentations and accounting violations, as detailed above.

283.    Lead Plaintiffs and the Class suffered economic losses as the price of ProAssurance common stock fell in response to the corrective disclosures, as demonstrated below.    The disclosures described below, however, do not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun.    Lead Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

### A.    January 22, 2020 Corrective Disclosure

284.    On January 22, 2020, after the market closed, ProAssurance filed a Form 8-K accompanied by a press release, which disclosed an "estimate of $37 million of adverse development in [its] prior accident year loss reserves in response to deteriorating loss experience in [its] Specialty Property & Casualty segment for the fourth quarter of 2019."    The press release disclosed that the adverse development was "driven by a large national healthcare account written

- 108 -

since 2016." In addition, ProAssurance disclosed that "the Company expect[ed] to book, in the quarter, a current accident year net loss ratio for the Specialty Property & Casualty segment between 134% and 148%" to reflect the "deteriorating loss experience related to the previously noted national healthcare account" (*i.e.*, TeamHealth), implying a charge of $33 million to $43 million to true-up the Company's loss and loss adjustment expenses for the then-current accident year (2019).

285.    On this news, ProAssurance's stock price declined from a closing price of $37.58 per share on January 22, 2020, to a closing price of $33.40 per share on January 23, 2020, a decline of approximately 11%. ProAssurance's stock price continued to decline on each of the next four trading days, ultimately closing at $30.09 per share on January 29, 2020.

286.    Notwithstanding the price decline following Defendants' January 22, 2020 disclosure, ProAssurance's stock price remained artificially inflated because Defendants did not reveal the entire truth regarding the massive problems associated with the "large national healthcare account" that had driven the charges disclosed on January 22, 2020. In fact, as alleged herein, Defendants knew by the time of this disclosure that TeamHealth was highly unlikely to renew its policy and would instead exercise its option to purchase "tail coverage," which would (and ultimately did) expose ProAssurance to substantial additional losses.

287.    A month later, on February 22, 2020, ProAssurance issued its 4Q19 and full year 2019 financial results wherein Defendants clarified that the "adverse development" for TeamHealth was $44.5 million in 4Q19, thus accounting for more than 100% of the adverse development the Company had disclosed in January. During the conference call that followed the next day, Defendant Boguski further clarified that the problems resulting in the charges were caused by the policy's "unique structure" that was like "no others in our book of business."

### B.     May 7-8, 2020 Corrective Disclosures

288.    On May 7, 2020, after the market closed, ProAssurance filed its 1Q20 Form 10-Q with the SEC.  Among other things, the 1Q20 Form 10-Q revealed that "it is more likely than not" that the undisclosed large national healthcare account "will not renew" its policy and would instead exercise its option for "'tail' coverage," resulting in an additional net loss of up to approximately $50 million in 2Q20.  The 1Q20 Form 10-Q stated more fully, in relevant part, as follows:

> During the fourth quarter of 2019, the Company increased reserve estimates for a large national healthcare account in its Specialty P&C segment that exceeded the assumptions the Company made when originally underwriting the account.  The policy term for this account expires towards the end of the second quarter of 2020. Based on underwriting negotiations with the insured to-date, the Company believes it is more likely than not that the account will not renew on terms offered by ProAssurance and the insured will exercise its option to purchase the extended reporting endorsement or "tail" coverage.  Based on preliminary projected exposure data provided to the Company, if the account exercises its option to purchase tail coverage, a net loss of up to approximately $50 million could be recognized in the second quarter of 2020; if the insured chooses to exercise this tail policy all premium and corresponding losses will be fully recognized in the same period the tail policy is written.

289.    Then, on May 8, 2020, approximately 30 minutes before the market opened, ProAssurance convened an earnings call with investors to discuss its 2Q20 financial results. During the call, Defendant Boguski commented on the undisclosed account's "likely" decision to purchase the "tail coverage" policy, stating in relevant part:

> I wanted to talk about recent developments pertaining to the large national healthcare account we discussed last quarter.  As you'll recall, we increased reserve estimates for this account in the fourth quarter of 2019 as losses exceeded the assumptions the company made when originally underwriting this risk.  The policy term for this account expires towards the end of the second quarter of 2020.  Based on renewal discussions, we believe it is more likely than not that the account will not renew on terms offered by ProAssurance, and the insurer will exercise its option to purchase the extended reporting endorsement or tail coverage.   Based on preliminary projected exposure data provided to the company, if the account exercises its option to purchase tail coverage, a net loss of up to approximately $50 million could be recognized in the second quarter of 2020 as all premium and corresponding losses will be fully recognized in the same period that tail policy is written.

290.    During the question-and-answer portion of the call that followed, Greg Peters, a Raymond James & Associates analyst, asked about "the concept of this incredibly large loss from this one account that I continue to be challenged with," and specifically inquired as to whether ProAssurance had "identified any other areas."  In response, Boguski reiterated that, "this was a unique national account structure – a unique structure for this national account, and there are no other structures in our book of business that would even be close to the structure that was offered here."

291.    In response to these disclosures, ProAssurance's stock price plummeted from a closing price of $20.33 per share on May 7, 2020, to a closing price of $15.95 per share on May 8, 2020, a decline of nearly 22%.

## IX.    CLASS ACTION ALLEGATIONS

292.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants and their families, the officers and directors of ProAssurance, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

293.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, ProAssurance common stock was actively traded on the NYSE.  While the exact number of Class members can only be discovered by appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class.  During the Class Period, there were more than 53 million shares of ProAssurance common stock outstanding and the average daily trading volume was 402,000 shares.  Record owners and other members of the Class may be identified from records maintained by ProAssurance or its

transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

294.    There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants acts and omissions as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(e)    whether the price of ProAssurance stock was artificially inflated during the Class Period; and

(f)    to what extent the members of the Class have sustained damages and the proper measure of damages.

295.    Lead Plaintiffs' claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' unlawful conduct alleged herein.

296.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are experienced in securities and class action litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

297.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    UNDISCLOSED ADVERSE FACTS

298.    The market for ProAssurance common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and misleading statements and omissions described herein, ProAssurance shares traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and the other members of the Class purchased or otherwise acquired ProAssurance common stock relying upon the integrity of the market price of the Company's stock and market information relating to ProAssurance, and have been damaged thereby.

299.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of ProAssurance common stock and maintaining inflation in the stock price, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

300.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and the other members of the Class.  As described herein,

during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about ProAssurance's business, operations, and financial prospects.

301.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE

302.    At all relevant times, the market for ProAssurance common stock was an efficient market for the following reasons, among others:

(a)    ProAssurance met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, ProAssurance filed periodic public reports with the SEC and NYSE.

(c)    ProAssurance regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    ProAssurance was followed by multiple securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. These reports were publicly available and entered the public market

303.    As a result of the foregoing, the market for ProAssurance stock promptly digested statements and information regarding ProAssurance from publicly available sources and reflected such statements and information in the price of the stock. Under these circumstances, all purchasers of ProAssurance common stock during the Class Period suffered similar injury through their purchases of the stock at artificially inflated prices and the fraud-on-the-market presumption of reliance applies.

304.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact, which Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose material, adverse information regarding ProAssurance's underwriting and reserve practices – material information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.    NO SAFE HARBOR

305.    The statements alleged herein to be false and misleading are not subject to the protections of the PSLRA's Safe Harbor for forward-looking statements because: (a) they are not forward-looking; (b) they are subject to an exclusion; and (c) even if purportedly forward-looking, Defendants cannot meet the requirements necessary for invoking the protection, *i.e.*, identifying the statements as forward-looking and demonstrating that the statements were accompanied by

meaningful cautionary language. Many of the statements were also misleading in light of omissions of present or historical facts and cannot be considered forward-looking as a result.

306.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statements is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary statements." 15 U.S.C. §78u-5(c)(1)(A)(i). An oral forward-looking statement must be accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially, and that additional information concerning risk factors is contained in a readily available written document. In addition, the oral statement must: (a) identify the written document, or portion thereof, that contains such risk factor; and (b) the referenced written documents must contain meaningful cautionary language. 15 U.S.C. §78u-5(c)(2)(B).

307.    Furthermore, the Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with GAAP, including those filed with the SEC on Form 8-K. 15 U.S.C §78u-5(b)(2)(A).

308.    In addition, all alleged misstatements set forth in §VI., *supra*, concerning matters of historical fact, current condition, or a mixture thereof are not forward-looking and are not protected by the Safe Harbor.

309.    To the extent any of statements are identified as forward-looking, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those purportedly forward-looking statements. A warning that identifies potential risk, but implies that such risks had not materialized, *i.e.*, states that something might occur but does not state that that something has actually already occurred, is not meaningful and does not fall within the protections of the Safe Harbor.

310.    Meaningful risk disclosures must be substantive and tailored to the forward-looking statement they accompany.  Many of Defendants' purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized prior to the start of 2Q18 and continued throughout, which was material to the reasonable investor. Defendants' risk disclosures were therefore neither substantive nor tailored to the statement and do not satisfy the requirement of the Safe Harbor.

311.    Accordingly, Defendants' forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis when made.  Defendants are liable for those false forward-looking statements because, at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or was authorized and/or approved by an executive of ProAssurance who knew that those statements were false or misleading when made.

## XIII.   COUNTS

### COUNT I

### For Violations of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

312.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

313.    This Count is asserted on behalf of all members of the Class against all Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

314.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

315.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of ProAssurance common stock during the Class Period.

316.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of ProAssurance common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, ProAssurance's business and operations; (b) artificially inflate and maintain the market price of ProAssurance common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

317.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

318.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of ProAssurance stock, were either known to Defendants or were so obvious that Defendants should have been aware of them.

319.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for ProAssurance common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiffs and the Class would not have purchased ProAssurance common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

320.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of ProAssurance common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

321.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

322.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

323.    The Individual Defendants were and acted as controlling persons of ProAssurance within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or

4840-9468-0034.v1

intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

324.    In their capacities as senior corporate officers and/or directors of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company. The Individual Defendants signed the Company's SEC filings during the Class Period, and/or were directly involved in providing false information and certifying and approving the false statements disseminated by ProAssurance during the Class Period. As a result of the foregoing, the Individual Defendants as a group, and individually, were controlling persons of ProAssurance within the meaning of §20(a) of the Exchange Act.

325.    As set forth above, ProAssurance violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.

326.    By virtue of their controlling positions of ProAssurance and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as ProAssurance is liable under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired ProAssurance common stock. Moreover, as detailed above, each of the Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

327.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, pray for judgment as follows:

A.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Lead Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

C.    Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.    Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  March 26, 2021             ROGER BEDFORD, ATTORNEY AT LAW, LLC
                                   ROGER H. BEDFORD, JR. (ASB: 3651 D60R)


                                          s/ ROGER H. BEDFORD, JR.
                                   _____
                                        ROGER H. BEDFORD, JR.

                                   P.O. Box 1149
                                   Russellville, AL  35653
                                   Telephone:  256/332-6966
                                   265/332-6967 (fax)
                                   rogerbedfordattorneyatlawllc@gmail.com

4840-9468-0034.v1

GUIN, STOKES & EVANS, LLC
DAVID J. GUIN
TAMMY M. STOKES
DAWN STITH EVANS
300 Richard Arrington Jr. Blvd. N.
Suite 600/Title Bldg.
Birmingham, AL  35203
Telephone: 205/226-2282
205/226-2357 (fax)
davidg@gseattorneys.com
tammys@gseattorneys.com
devans@gseattorneys.com

Local Counsel for Lead Plaintiffs

ROBBINS GELLER RUDMAN & DOWD LLP
NATHAN R. LINDELL (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
BAILIE L. HEIKKINEN (admitted *pro hac vice*)
REGINALD E. JANVIER (admitted *pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
bheikkinen@rgrdlaw.com
rjanvier@rgrdlaw.com

SAXENA WHITE P.A.
STEVEN B. SINGER (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY  10606
Telephone:  914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com

4840-9468-0034.v1

SAXENA WHITE P.A.
JOSEPH E. WHITE, III (admitted *pro hac vice*)
LESTER R. HOOKER (admitted *pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL  33434
Telephone:  561/394-3399
561/394-3382 (fax)
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Lead Counsel for Lead Plaintiffs

CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

Additional Counsel for Lead Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on March 26, 2021, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and

I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ ROGER H. BEDFORD, JR.
ROGER H. BEDFORD, JR.

ROGER BEDFORD, ATTORNEY AT LAW,
LLC
P.O. Box 1149
Russellville, AL  35653
Telephone:  256/332-6966
265/332-6967 (fax)

e-mail:rogerbedfordattorneyatlawllc@gmail.com

# Mailing Information for a Case 2:20-cv-00856-AKK Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter W Bates**
  Bbates@starneslaw.com

- **Roger H Bedford , Jr**
  rogerbedfordattorneyatlawllc@gmail.com

- **James Bringhurst Eubank**
  James.Eubank@beasleyallen.com

- **Dawn Stith Evans**
  devans@gseattorneys.com

- **Jay M Ezelle**
  JEzelle@starneslaw.com

- **Janet A Gochman**
  jgochman@stblaw.com

- **Cole Robinson Gresham**
  cgresham@starneslaw.com

- **David J Guin**
  davidg@gseattorneys.com

- **Bailie L Heikkinen**
  bheikkinen@rgrdlaw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Reginald E Janvier**
  rjanvier@rgrdlaw.com

- **Michael R Lasserre**
  mrl@starneslaw.com

- **Nathan R Lindell**
  nlindell@rgrdlaw.com

- **Wilson Daniel Miles , III**
  dee.miles@beasleyallen.com

- **Steven B Singer**
  ssinger@saxenawhite.com

- **Tammy McClendon Stokes**
  tammys@gseattorneys.com

- **Joseph E. White**
  jwhite@saxenawhite.com

- **Jonathan K Youngwood**
  jyoungwood@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)