FILED
2021 May-18  PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the fiscal year ended December 31, 2019,**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the transition period from _____ to _____.**

**Commission file number: 001-16533**

# ProAssurance Corporation
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **63-1261433** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **100 Brookwood Place, Birmingham,   AL** | **35209** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(205) 877-4400**
**(Registrant's telephone number,**
**including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | PRA | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

1

person that controls a domestic insurer. Because of these regulatory requirements, any party seeking to acquire control of ProAssurance or any other domestic insurance company, whether directly or indirectly, would usually be required to obtain such approvals.

In addition, certain state insurance laws contain provisions that require pre-acquisition notification to state agencies of a change in control of a non-domestic insurance company admitted in that state. While such pre-acquisition notification statutes do not authorize the state agency to disapprove the change of control, such statutes do authorize certain remedies, including the issuance of a cease and desist order with respect to the non-domestic admitted insurers doing business in the state if certain conditions exist, such as undue market concentration.

*Insurance Regulation Concerning Cybersecurity*

In March 2017, the New York Cybersecurity Regulation took effect for financial institutions, insurers and other companies regulated by the NYDFS. The intent of the regulation is to encourage the protection of consumer information, as well as the technology systems of NYDFS regulated entities. We are currently compliant with the regulation according to the transition periods as defined in the NYDFS Cybersecurity Regulation.

In October 2017, the NAIC adopted the Insurance Data Security Model Law, which created rules for insurers, agents and other licensed entities covering data security and investigation and notification of breach. In May 2018, the European Union implemented the GDPR, designed to protect data privacy of individuals within the European Union and the EEA. We are compliant with the GDPR due to the global nature of our business, including a small amount of international activity in our Specialty P&C segment. In addition, managing agents of Lloyd's syndicates are required to ensure that they meet the requirements of the GDPR and any local data protection regulation based on territories in which they operate. Syndicate 1729 and Syndicate 6131, including their managing agent, are compliant with the GDPR.

Alabama enacted the Alabama Data Breach Notification Act of 2018 effective June 1, 2018, Ohio enacted the Data Protection Act effective November 2, 2018 and South Carolina enacted the South Carolina Department of Insurance Data Security Act effective January 1, 2019. Nevada enacted the Nevada Privacy of Information Collected on the Internet from Consumers Act effective October 1, 2019, amending its previous law which was effective October 1, 2017. New York enacted the Stop Hacks and Improve Electronic Data Security Act (SHIELD Act) on October 23, 2019 which broadened the scope of existing breach notification and data protection laws. Additionally, California's Consumer Privacy Act of 2018 went into effect January 1, 2020 and Michigan's Data Security Act will go into effect January 20, 2021. These state laws require an information security program based on an ongoing risk assessment, overseeing third-party service providers, investigating data breaches and notifying regulators of a cybersecurity event. The GDPR and the California Consumer Privacy Act of 2018 grant individuals the right to request that a company delete or de-identify their personal information. We expect other states, including our states of domicile, to either adopt the NAIC's Insurance Data Security Model Law or enact their own data security regulations. Moreover, we expect to see privacy laws similar to the California Consumer Privacy Act of 2018 and the Nevada Privacy of Information Collected on the Internet from Consumers Act to be enacted in other states, including our states of domicile. We do not expect compliance with the various data security or data privacy acts to have a material impact on our financial condition or results of operations, as they closely resemble the NAIC Model Law, the NYDFS Cybersecurity Regulations and the California Consumer Privacy Act of 2018.

*Statutory Accounting and Reporting*

Insurance companies are required to file detailed quarterly and annual reports with state insurance regulators in their state of domicile and each of the states in which they do business. Their business and accounts are subject to examination by such regulators at any time. The financial information in these reports is prepared in accordance with SAP. Insurance regulators periodically examine each insurer's adherence to SAP, financial condition and compliance with insurance department rules and regulations.

*Regulation of Dividends and Other Payments from Our Operating Subsidiaries*

Our U.S. operating subsidiaries are subject to various state statutory and regulatory restrictions that limit the amount of dividends or distributions an insurance company may pay to its shareholders, including our insurance holding company, without prior regulatory approval. Generally, dividends may be paid only out of unassigned earned surplus. In every case, surplus subsequent to the payment of any dividends must be reasonable in relation to an insurance company's outstanding liabilities and must be adequate to meet its financial needs.

State insurance holding company regulations generally require domestic insurers to obtain prior approval of extraordinary dividends. Insurance holding company regulations that govern our principal operating subsidiaries deem a dividend as extraordinary if the combined dividends and distributions to the parent holding company in any twelve-month period exceed prescribed thresholds. Such thresholds are statutorily prescribed by the state of domicile and currently are based on either net

16

assumptions, uncertainties, model design errors and the inherent limitations of any statistical analysis, including those arising from the use of historical internal and industry data and assumptions. Changes in the social, judicial or economic environments in which we operate may make modeled outcomes less reliable or produce new, non-modeled risks. In addition, the effectiveness of any model can be degraded by operational risks including, but not limited to, the improper use of the model. Consequently, actual results may differ materially from our modeled results. If actual losses exceed assumptions that were made when our products were priced or our models fail to appropriately estimate the risks we are exposed to, our business, financial condition, results of operations or liquidity may be adversely affected. Furthermore, our results may be adversely affected if actual losses exceed assumptions that were made when pricing products that also include features such as an option to purchase extended reporting endorsement or "tail" coverage, which are offered at rates that are tied to expiring premiums charged. The profitability and financial condition of the Company substantially depends on the extent to which our actual experience is consistent with assumptions we use in our models and ultimate model outputs.

*We are exposed to and may face adverse developments involving mass tort claims arising from coverages provided to our insureds.*

Establishing reserves for mass tort claims is subject to uncertainties due to many factors, including expanded theories of liability, geographical location and jurisdiction of the lawsuits. Moreover, it is difficult to estimate our ultimate liability for such claims due to evolving judicial interpretations of various tort theories of liability and defense theories, such as federal preemption and joint and several liability, as well as the application of insurance coverage to these claims.

*If market conditions cause reinsurance to be more costly or unavailable, we may be required to bear increased risk or reduce the level of our underwriting commitments.*

As part of our overall risk and capacity management strategy, we purchase reinsurance for significant amounts of risk underwritten by our insurance subsidiaries. Market conditions beyond our control determine the availability and cost of the reinsurance. We may be unable to maintain current reinsurance coverage or to obtain other reinsurance coverage in adequate amounts and at favorable rates. If we are unable to renew our expiring coverage or to obtain new reinsurance coverage, either our net exposure to risk would increase or, if we are unwilling to bear an increase in net risk exposures, we would need to reduce the amount of our underwritten risk.

*Our claims handling could result in a bad faith claim against us.*

We have been sued from time to time for allegedly acting in bad faith during our handling of a claim. The damages claimed in actions for bad faith may include amounts owed by the insured in excess of the policy limits as well as consequential and punitive damages. Awards above policy limits are possible whenever a case is taken to trial. These actions have the potential to have a material and adverse effect on our financial condition and results of operations.

*If we are unable to maintain favorable financial strength ratings, it may be more difficult for us to write new business or renew our existing business.*

Independent rating agencies assess and rate the claims-paying ability and the financial strength of insurers based upon criteria established by the agencies. Periodically the rating agencies evaluate us to confirm that we continue to meet the criteria of previously assigned ratings. The financial strength ratings assigned by rating agencies to insurance companies represent independent opinions of financial strength and ability to meet policyholder and debt obligations and are not directed toward the protection of equity investors.

Our principal operating subsidiaries hold favorable claims paying ratings with A.M. Best, Fitch and Moody's. Claims-paying ratings are used by agents, brokers and customers as an important means of assessing the financial strength and quality of insurers. If our financial position deteriorates or the rating agencies significantly change the rating criteria that are used to determine ratings, we may not maintain our favorable financial strength ratings from the rating agencies. A downgrade or involuntary withdrawal of any such rating could limit or prevent us from writing desirable business.

22