FILED
2021 May-18  PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 33

So we're doing a lot of investigation, and I would characterize our approach as being a reasonable resolution to some of these broader-based state mandates that are out there right now. We've been working closely with the American Property Casualty Insurance Association and believe that their outline of how this should play out is reasonable. And that's how we've been managing our clients.

**Edward Lewis Rand**
*CEO, President & Director*

Mark, I would just add to -- I'm sorry. I would just add to Kevin. One of the things we are watching very closely are these presumption efforts at the state level that would potentially kind of provide coverage where perhaps coverage was not intended. And they can be pretty broad. There's legislation that's proposed that would say that any day missed from work related to COVID-19, one, is presumed to have been contracted in the workplace, and the employees should not have to take a sick day for it, right? So just broadening the coverage pretty dramatically. As Kevin indicated, there are a lot of industry efforts to try and combat what we think is a legislative overreach. And we're working hard with the industry to make sure that doesn't happen. But that is probably a big unknown that does remain out.

**Mark Douglas Hughes**
*SunTrust Robinson Humphrey, Inc., Research Division*

That's good. I'll ask one more. The large account that you referenced. I think you said that the tail policy, the loss could be as much as $50 million. What would be the premium associated with that? And then what was the premium that, that account generated in 2019?

**Edward Lewis Rand**
*CEO, President & Director*

Yes. We've not given out specifics at that level of detail, partly just out of sensitivity to the insured. But Mike, you may have some further comments.

**Michael Leonard Boguski**
*President of Specialty Property & Casualty*

Yes. Thank you, Ned. Just to give a little bit of a bigger picture color on this. As I said, we had -- it was an account written since 2016. We had the outsized underwriting loss. It's really relative to product structure, severity trend, pricing on that. And there's the option to purchase the extended reporting endorsement later in the second quarter. So when we look at just kind of the limits out there and the premium -- projected premium off of a price that was pretty competitive, we came up with some potential exposures up to that $50 million number. And where we're at is that, there's -- we've been notified of the intent that they want to move forward. But Mark, there's still a binding and a billing process and other negotiation points that will happen over the next couple of weeks that -- so which is why we presented it the way we did. So that's kind of where we're at.

**Mark Douglas Hughes**
*SunTrust Robinson Humphrey, Inc., Research Division*

And just to clarify, Mike, the number that we've put out there is net of any premium that we would expect to receive?

**Michael Leonard Boguski**
*President of Specialty Property & Casualty*

Yes.

**Operator**

Our next question comes from Greg Peters from Raymond James.

**Charles Gregory Peters**
*Raymond James & Associates, Inc., Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Matthew John Carletti**
*JMP Securities LLC, Research Division*

I hate to harp on this tail exposure, but I'm just trying to understand it a little better. When you say -- I think the quote -- [ I wish ] I wrote it down -- was kind of a net loss up to $50 million. Can you just walk us through a little bit of kind of how you get there? And what I mean by that is, that you guys looking at and taking a pretty dire frequency severity, just kind of stressing the exposures there? I know it's hard to max them out against reinsurance, but is that how you're getting there? Is it to your guys' estimate of losses that will come through in that tail period and you're straining that very hard to try to put this behind you for good? Or is there a potential that, even after this $50 million, that there's another surprise down the road?

**Edward Lewis Rand**
*CEO, President & Director*

That's a good question. Mike, do you want to address that?

**Michael Leonard Boguski**
*President of Specialty Property & Casualty*

Yes. Sure, Ned. I mean, we've done a detailed actuarial review internally. And the -- based on those trends, obviously, you'll be getting exposure base for that tail coverage. And as we looked at that, we have a high, high, high confidence level that the $50 million is the top end of that. And so I would not expect any future exposure on that tail provision, Matt.

**Matthew John Carletti**
*JMP Securities LLC, Research Division*

Okay. That's helpful. And then just in terms of the mechanics that we'll see in Q2, and I know you can't give certain numbers, that's fine. But it sounds like, assuming that account doesn't renew, there will be some, presumably, a fairly large number of premium that goes away. But then if they elect this option, I think I heard you say that whatever that premium is, will be kind of fully written and earned in the quarter? And then that the $50 million loss, if you will, the losses as it would come through loss ratio would actually be larger than that, that the $50 million is the spread between the losses and the premiums you recognized. Is that generally correct?

**Edward Lewis Rand**
*CEO, President & Director*

Yes, that's generally correct, with the $50 million being the top end of that. I mean, there's the ability to really look at that closer to see what the actual number would be. So yes, that's correct.

**Matthew John Carletti**
*JMP Securities LLC, Research Division*

Okay. Great. Just a couple other small questions. One is on NPL, just related to broader COVID activity. More so on the premiums, can you walk us through -- I'm thinking about a lot of your insured that your kind of elective procedures or maybe their offices are closed or they're not able to work right now. How does that work in terms of premium recognition? Is it pretty straightforward that if they're closed up for a month or 2 they're going to get premium relief? Or how do the mechanics of that work? I'm just trying to get a feel for what I would presume would be at least in some areas, some specialties, a lack of frequency because there's just no procedures happening against your premium collection against those specialties.

**Michael Leonard Boguski**
*President of Specialty Property & Casualty*

Yes. Ned, I'll take that. There's really 2 aspects to it. One, there's the premium side of it, as you see these business volume reductions and nonelective procedures being canceled. And the exposure base on that can be reduced from, say, a full-time physician to a part-time physician, which is the premium credit number that I referred to in my opening comments. So what we'll be doing there, Matt, is just looking at

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.