FILED

2021 May-18  PM 06:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |
|---|---|
| SHEET METAL WORKERS LOCAL 19 PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PROASSURANCE CORPORATION, W. STANCIL STARNES, EDWARD L. RAND, JR., DANA S. HENDRICKS, HOWARD H. FRIEDMAN, and MICHAEL L. BOGUSKI,<br><br>Defendants. | Civil Action No.: 2:20-cv-00856-AKK<br><br>**Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

STARNES DAVIS FLORIE LLP

Walter W. Bates (ASB-7202-E49W)
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Michael R. Lasserre (ASB-2144-Y61G)
100 Brookwood Place, 7th Floor
P. O. Box 598512
Birmingham, AL 35259-8512
wwb@starneslaw.com
jme@starneslaw.com
crg@starneslaw.com
mrl@starneslaw.com

SIMPSON THACHER & BARTLETT LLP

Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Jacob Lundqvist (*pro hac vice* forthcoming)
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
jgochman@stblaw.com
jacob.lundqvist@stblaw.com

*Attorneys for Defendants ProAssurance Corporation, W. Stancil Starnes, Edward L. Rand, Jr., Dana S. Hendricks, Howard H. Friedman, and Michael L. Boguski.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND....................................................................................4

    A.    PRA's Loss Reserves ...................................................................4

    B.    The Difficulty in Estimating Loss Reserves and Associated
        Risks ..........................................................................................6

    C.    PRA's Statutory Filings ...............................................................7

    D.    The TeamHealth Account ............................................................7

    E.    The Company's Repeated Disclosures Regarding Severity and
        Frequency Changes in the SP&C Segment..........................................8

    F.    The Company Completes an 18-Month Management Transition
        Plan .........................................................................................10

    G.    PRA Announces Adjustments to Its Loss Reserves..........................10

    H.    PRA Discloses That the TeamHealth Policy Likely Will Not Be
        Renewed ...................................................................................11

    I.    This Action ...............................................................................12

ARGUMENT ......................................................................................................13

I.    PLAINTIFFS FAIL TO IDENTIFY ANY ACTIONABLE
    MISSTATEMENTS BY THE DEFENDANTS .........................................13

    A.    Plaintiffs Have Not Alleged Any Material Misstatements or
        Omissions .................................................................................13

    B.    The Complaint Fails to Plead Scienter................................................24

II.    PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY
    AGAINST THE INDIVIDUAL DEFENDANTS.........................................30

CONCLUSION....................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................4

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) ......................................................................4, 24

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ..................................................................... 15, 24

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) .................................................................26

*Cheney v. Cyberguard Corp.*,
2000 WL 1140306 (S.D. Fla. July 31, 2000).......................................................23

*Damian v. Montgomery Cty. Bankshares, Inc.*,
981 F. Supp. 2d 1368 (N.D. Ga. 2013)................................................................26

*Damian v. Montgomery Cty. Bankshares, Inc.*,
255 F. Supp. 3d 1265 (N.D. Ga. 2015)................................................................14

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*,
945 F.2d 1226 (2d Cir. 1991) .............................................................................14

*Druskin v. Answerthink, Inc.*,
299 F. Supp. 2d 1307 (S.D. Fla. 2004)................................................................27

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
594 F.3d 783 (11th Cir. 2010) ....................................................................... 21, 27

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
595 F. Supp. 2d 1253 (M.D. Fla. 2009)...............................................................30

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020)..................................................................27

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ................................................................. 13, 26, 29

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ......................................................23

*In re CIT Grp., Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004) .................................................................18

*In re Colonial Bancgroup, Inc. Sec. Litig.*,
9 F. Supp. 3d 1258 (M.D. Ala. 2014) ........................................................... 24, 29

*In re CRM Holdings, Ltd. Sec. Litig.*,
2012 WL 1646888 (S.D.N.Y. May 10, 2012) .....................................................14

*In re Express Scripts Holding Co. Sec. Litig.*,
2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017).......................................................23

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010)................................................................30

*In re Jiangbo Pharm., Inc., Sec. Litig.*,
884 F. Supp. 2d 1243 (S.D. Fla. 2012)................................................................28

*In re John Alden Fin. Corp. Sec. Litig.*,
249 F. Supp. 2d 1273 (S.D. Fla. 2003) .......................................................... 18, 26

*In re KLX, Inc. Sec. Litig.*,
232 F. Supp. 3d 1269 (S.D. Fla. 2017) ...............................................................28

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
2013 WL 3295951 (S.D. Fla. Apr. 19, 2013).......................................................21

*In re Serologicals Sec. Litig.*,
2003 WL 24033694 (N.D. Ga. Feb. 20, 2003).....................................................19

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999)..................................................................30

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007)..................................................................25

*Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*,
2019 WL 1429667 (M.D. Fla. Mar. 29, 2019) .....................................................22

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ................................................................ 25, 27, 30

*Mogensen v. Body Cent. Corp.*,
   15 F. Supp. 3d 1191 (M.D. Fla. 2014).................................................................25

*Moore v. Potter*,
   2006 WL 2092277 (M.D. Fla. July 26, 2006) ........................................................4

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013) .................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).................................................................................................15

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
   2011 WL 4591541 (S.D. Fla. Sept. 30, 2011) ......................................................24

*Phillips v. Scientific-Atlanta, Inc.*,
   374 F.3d 1015 (11th Cir. 2004) ...........................................................................24

*Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*,
   2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) ......................................................22

*Plumbers Loc. No. 200 Pension Fund v. Wash. Post Co.*,
   831 F. Supp. 2d 291 (D.D.C. 2011)......................................................................29

*Plymouth Cty. Ret. Sys. v. Carter's Inc.*,
   2011 WL 13124501 (N.D. Ga. Mar. 17, 2011) ....................................................28

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   417 F. Supp. 3d 379 (S.D.N.Y. 2019) .................................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..............................................................................................4, 24

*Thompson v. RelationServe Media, Inc.*,
   610 F.3d 628 (11th Cir. 2010) .............................................................................13

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) .................................................................................18

*Water Works Bd. of City of Birmingham v. Ambac Fin. Grp., Inc.*,
  718 F. Supp. 2d 1317 (N.D. Ala. 2010)................................................................23

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) ...................................................... 14, 20, 25

**Statutes**

15 U.S.C. § 78u–4(b)(1) ........................................................................................13

15 U.S.C. § 78u-4(b)(2)(A).....................................................................................24

Defendants ProAssurance Corporation ("PRA" or the "Company"), W. Stancil Starnes, Edward L. Rand, Jr., Dana S. Hendricks, Howard H. Friedman, and Michael L. Boguski (the "Individual Defendants," and with PRA, "Defendants") respectfully submit this Memorandum of Law in support of their motion to dismiss the Amended Complaint (the "Complaint") filed by Plaintiffs Central Laborers' Pension Fund and Plymouth County Retirement System ("Plaintiffs").

## **PRELIMINARY STATEMENT**

Plaintiffs' Complaint embraces hindsight pleading based on an adjustment of loss reserves following unanticipated, adverse business developments, which courts have routinely rejected, and which must be rejected here as well.  Plaintiffs allege that a rise in reported claims associated with a single insured account in one of PRA's reporting segments, coupled with a general increase in claims severity reported in the industry in which the insured operated, demonstrates that PRA underreserved for losses associated with the account.  Plaintiffs also fault PRA for failing to disclose the results of ongoing negotiations over a policy extension for the insured account, framing the results of such discussions as a foregone conclusion.  Plaintiffs' claims are deficient for several reasons.

*First*, the mere increase in claims Plaintiffs contend they uncovered through "forensic accounting" does not demonstrate that PRA's loss reserves were inadequate.  Plaintiffs ignore entirely the fact, well recognized by courts, that loss

reserves amount to nothing more than highly conjectural, "informed guesswork," and PRA's reserve adjustments in early 2020 therefore do not provide a basis for their claim. While Plaintiffs plot a rise in claims over time related to the purportedly problematic insured, the Company knew from experience that the vast majority of claims are dismissed without any payment. Moreover, as Plaintiffs' own Complaint notes, the severity of claims constituted "the most influential factor" affecting PRA's analysis of its loss reserves. Plaintiffs make *no allegations*, however, that PRA was experiencing an increase in severity, and management repeatedly disclosed that general market trends were not apparent in PRA's own claims data.

*Second*, Plaintiffs conveniently ignore that PRA recognized and reacted to emerging severity trends by increasing net loss ratios in the Company's professional liability reporting segment, and the Company's cautious approach was noted by analysts. At the same time, management reminded investors that changing severity trends would become apparent only years after claims were first reported, and that setting reserves was akin to "driv[ing] down the road with the windshield blacked out looking through the rearview mirror." These actions and warnings run directly counter to Plaintiffs' preferred narrative of management's turning a blind eye to risks affecting PRA's results. Plaintiffs cannot now, with the benefit of hindsight, second-guess Defendants because they did not predict the full extent of losses on a single account.

2

*Third*, Plaintiffs entirely ignore that the Company's loss reserves were primarily determined through a detailed actuarial analysis—applying seven different established methodologies—performed throughout the Class Period by both internal Company actuaries and independent external actuaries. Plaintiffs do not allege that the analysis performed was deficient, that the methodologies were defective or that the internal or external, independent experts were complicit in any efforts to suppress the Company's reserves to report artificially inflated results. The independent review and analysis of management's actions undertaken by these experts demonstrates why Plaintiffs' fraud claim lacks merit.

*Finally*, Plaintiffs claim that Defendants failed to disclose the known likelihood that the allegedly problematic insured would not renew its policy and instead purchase "tail" coverage that would expose PRA to further losses. The risks associated with such coverage options were plainly disclosed in the Company's public filings. Defendants further disclosed the likelihood of non-renewal weeks before the policy terminated. Plaintiffs nonetheless claim that Defendants had a duty to disclose this possibility months earlier, relying on hypothetical renewal rates they argue PRA would have had to offer to meet its target loss ratio, and that the insured was unlikely to accept. Plaintiffs make no allegations whatsoever about the *actual* terms offered, that negotiations had stalled, or that the insured had expressed an intent not to renew at any time prior to PRA's disclosure. Plaintiffs' allegations

amount to nothing more than speculation and, thus, must be dismissed.

## FACTUAL BACKGROUND[1]

PRA is a U.S.-based holding company for property and casualty insurance companies. Ex. 1 (2020 10-K) at 9. The Company reports financial results in five segments: (i) Specialty Property & Casualty ("SP&C"); (ii) Workers' Compensation Insurance; (iii) Segregated Portfolio Cell Reinsurance; (iv) Lloyd's Syndicates; and (v) Corporate. *Id.* at 10–11. The SP&C segment focuses on professional liability insurance and medical technology liability insurance. *Id.* at 10. The professional liability business is primarily focused on the healthcare professional liability ("HCPL") market and covers multiple categories of healthcare professionals, institutions, and facilities. *Id.* PRA does not disclose its top customers or largest accounts in its SEC filings.

### A. PRA's Loss Reserves

PRA's SEC filings describe in detail the Company's process for calculating loss reserves. PRA's reserve process generally consists of two steps: (i) establishing

---

[1] The well-pleaded allegations of the Complaint are assumed to be true solely for purposes of this motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). In considering the motion, the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Matters of public record are subject to judicial notice at the motion to dismiss stage. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999); *see also Moore v. Potter*, 2006 WL 2092277, at *5 (M.D. Fla. July 26, 2006) (taking judicial notice of "various filings . . . of administrative agencies"). Citations to "Ex. __" refer to the exhibits to the Transmittal Declaration of Jay M. Ezelle, dated May 18, 2021. Citations to "¶ __" refer to the paragraphs of the Complaint.

the initial reserve for the current accident year; and (ii) determining the re-estimation or "development" of the reserve for prior accident years.  Ex. 2 (2018 10-K) at 38. PRA utilizes both internal and independent actuaries who perform in-depth reviews of loss reserves.  In particular, PRA's consulting actuaries "provide[] an independent view of [PRA's] loss data as well as a broader perspective on industry loss trends." *Id.* at 40.

With respect to reserve development, a "very detailed" and "highly technical" actuarial analysis is performed by independent consultants based on seven actuarial methodologies described in detail in PRA's SEC filings.  *Id.* at 40–41.  PRA evaluates the results of each methodology, in addition to performing a statistical review of claims data and evaluating other factors including severity trends, changes in the legal and legislative environment, and the current economic environment.  *Id.* If this process ultimately indicates that the reserves required for a prior accident year are lower than initially estimated, PRA recognizes "favorable development."  *Id.* at 41.  If increased reserves are required, PRA recognizes "unfavorable development." *Id.*  Because PRA had a long track record of booking conservative loss reserves, it consistently recognized favorable development over time.  *See* Ex. 3 (Boenning & Scattergood 4/11/2017 Report) at 1 (noting that PRA's "[r]eserves have developed favorably in each of the last 14 years and 24 of the last 25 years").

**B. The Difficulty in Estimating Loss Reserves and Associated Risks**

PRA expressly and repeatedly disclosed to investors the "multiple uncertainties" inherent in estimating loss reserves, the risk that those reserves could "vary significantly from the eventual outcome" and, if that occurred, that the Company's "results of operations and financial condition may be affected." *See, e.g.*, Ex. 2 at 19–20. The Company also outlined a number of risk factors that affect its process of estimating loss reserves, including "trends in paid and incurred loss development" and "trends in claim frequency and severity," explaining that:

> [The process of estimating loss reserves] assumes that past experience . . . is an appropriate, but not necessarily accurate, basis for predicting future events. **There is no precise method for evaluating the impact of any specific factor on the adequacy of reserves, and actual results are likely to differ from original estimates**.

*Id.* at 20 (emphasis added). PRA further disclosed that it may suffer adverse effects if the assumptions employed in its various models are inconsistent with actual outcomes and specifically warned of the possibility of losses on "tail" coverage:

> If actual losses exceed assumptions . . . or our models fail to appropriately estimate the risks we are exposed to, our business, financial condition, results of operations or liquidity may be adversely affected. **Furthermore, our results may be adversely affected if actual losses exceed assumptions that were made when pricing products that also include features such as an option to purchase extended reporting endorsement or "tail" coverage** . . . .

Ex. 4 (2019 10-K) at 22 (emphasis added).

6

## C. PRA's Statutory Filings

Insurance companies are required to file detailed reports with state insurance regulators in their state of domicile and each state in which they do business. *See id.* at 16. Unlike the Company's SEC filings, which are made on a consolidated basis, each one of PRA's insurance subsidiaries submits its own statutory filings. ¶ 108. PRA notes in its SEC filings that "[t]he statutory filings of each insurance company with the insurance regulators must be accompanied by a consulting actuary's certification as to their respective reserves." Ex. 2 at 178. PRA's statutory filings—which are available on its website—were closely monitored by analysts. *See, e.g.*, Ex. 5 (4/4/2018 SunTrust Report) at 1 (noting that "an uptick in current accident year losses driven by increased severity [was] corroborated in the greater case reserves in [PRA's] March statutory filings").

## D. The TeamHealth Account

On August 3, 2016, PRA announced that it had added several large accounts in the HCPL segment in Q2 2016, including "a significant multi-state physician group that represented the single largest premium ever billed by ProAssurance." Ex. 6 (8/3/2016 8-K). While PRA, consistent with its practice, did not identify the account by name, Plaintiffs allege that the account was written for TeamHealth, a physician staffing company. *See, e.g.*, ¶ 52. Plaintiffs further claim that the TeamHealth account was underwritten by ProAssurance Specialty Insurance

Company, Inc. ("PRA-Specialty"), but that PRA-Specialty ceded its premiums and "claims-related costs" to another PRA subsidiary, ProAssurance Casualty Company ("PRA-Casualty"). ¶ 135. The certifications affirming the appropriateness of PRA-Specialty's and PRA-Casualty's loss reserves were filed by Willis Towers Watson ("WTW"). WTW certified these subsidiaries' statutory filings every year from 2016 to 2020. *See* Exs. 7–16; *see also, e.g.*, Ex. 17 (PRA-Specialty 2018 Annual Statement) at 15.1. Like the Company's SEC disclosures, the PRA subsidiaries' statutory filings note that the "ultimate cost of resolving" claims by policyholders "may differ from the reserves established, and the resulting difference could have a material effect on the Company's results of operations." *See, e.g.*, Ex. 17 at 14.11; Ex. 18 (PRA-Casualty 2018 Annual Statement) at 14.14.

###    E. The Company's Repeated Disclosures Regarding Severity and Frequency Changes in the SP&C Segment

PRA regularly discussed trends with respect to both claims frequency and severity in investor communications. For example, during the Class Period, PRA noted that a "continued rollback of state-specific damage caps" influenced its severity assumptions. Ex. 19 (Q2 2019 Earnings Call Tr.) at 2. The Company also explained that the severity used to set loss reserves "varies by state and it varies by product." Ex. 20 (Q1 2018 Earnings Call Tr.) at 11. Given the time lag involved in resolving claims, PRA informed investors that "[i]t takes 24 or more months before we begin to have any kind of paid data really emerging out of [prior] accident years

and better claims data." Ex. 19 at 8–9. Regarding claims frequency, PRA reminded investors that a reported claim did not automatically result in increased anticipated losses, and "between 70%, 80% of the lawsuits that come in end up in no indemnity payment at all, get dropped or dismissed." Ex. 21 (3/6/2018 Investor Call Tr.) at 7.

Throughout 2018 and 2019, PRA made repeated disclosures regarding market trends, its own claims data, and the preemptive measures it was taking in response to emerging severity trends in the general HCPL industry. For example:

- **November 7, 2018:** "We have talked for several quarters about signs in the overall market that indicate losses are increasing, although I will underscore that we still see no evidence of that in our paid losses. . . . [I]t's just very difficult in advance to get any meaningful data on [severity]. . . . I remind everybody that we drive down the road with the windshield blacked out looking through the rearview mirror." Ex. 22 (Q3 2018 Earnings Call Tr.) at 4, 9–10.

- **February 22, 2019:** "The results of our [SP&C] segment continue to be affected by our consideration of potentially higher severity trends . . . . Again, we have not seen these trends manifest within our paid losses. . . . "[T]he time lag, as you know, for resolution of claims in this business is measured in years . . . ." Ex. 23 (Q4 2018 Earnings Call Tr.) at 4, 13.

- **November 6, 2019:** "The severity trends continue to influence our view of reserves and our loss assumptions. . . . We expect loss severity trends in healthcare professional liability to continue, affecting our reported results for the remainder of the year and into 2020." Ex. 24 (Q3 2019 Earnings Call Tr.) at 2.

Consistent with management's statements, PRA recognized higher current accident year net loss ratios in 2018 and 2019 due to "recent severity indications" in the HCPL market. Ex. 2 (2018 10-K) at 42; Ex. 25 (Q3 2019 10-Q) at 51.

9

## F.  The Company Completes an 18-Month Management Transition Plan

On February 21, 2019, PRA announced that Mr. Friedman would step back from his day-to-day responsibilities as President of Healthcare Professional Liability but remain involved in a role focused on PRA's actuarial function.  Ex. 26 (2/21/2019 8-K).  Mr. Friedman was succeeded by Mr. Boguski, who assumed a newly created position as President of PRA's SP&C operations.  *Id.*  On May 22, 2019, PRA announced that Mr. Rand would succeed Mr. Starnes as CEO effective July 1, 2019.  Ex. 27 (5/22/2019 8-K).  Mr. Starnes would continue serving on the Company's Board as Executive Chairman.  *Id.*  As PRA noted, the announcement marked "the final step in an orderly, deliberate process initiated by Mr. Starnes and the Board over 18 months ago and will complete the transition to the next generation of experienced, successful leaders across the organization."  *Id.*

## G. PRA Announces Adjustments to Its Loss Reserves

On January 22, 2020, PRA announced that it had made a preliminary estimate of $37 million of adverse development in prior accident year loss reserves in the fourth quarter of 2019 in its SP&C segment "in response to deteriorating loss experience, driven by a large national healthcare account written since 2016."  Ex. 28 (1/22/2020 8-K).  In a press release, Mr. Rand noted that the need for additional reserves became apparent "[f]ollowing our usual year-end review of updated loss data with internal and external actuaries."  *Id.*  On February 20, 2020, PRA

10

announced that it had recognized $51.5 million of unfavorable prior year reserve development related to a large national healthcare account.  Ex. 29 (2/20/2020 8-K). On an earnings call the next day, management reiterated that the recognized unfavorable development "came out of our regular year-end review of updated loss data with internal and external actuaries" and that PRA had made the adjustment in response to "severity over that period that was maybe not [] contemplated as well as we needed to." Ex. 30 (Q4 2019 Earnings Call Tr.) at 4, 11.

As demonstrated in Section E, *supra*, the loss reserve adjustment was made following a period in which the Company had repeatedly discussed deteriorating results in the HCPL industry and made adjustments to limit negative effects.  One analyst commenting on the Company's January 22 disclosure noted that "[m]anagement has talked about deteriorating loss trends in the [HCPL] market for the last 18 months, and they took steps (such as significantly increasing accident year loss ratios) to stay ahead of the worsening trends (trends they didn't actually see in their own paid loss data but were noted by other market participants)." Ex. 31 (1/23/2020 Boenning & Scattergood Report) at 1.

**H. PRA Discloses That the TeamHealth Policy Likely Will Not Be Renewed**

On May 7, 2020, PRA announced results for the first quarter of 2020 and informed investors that it believed it was "more likely than not" the "large national healthcare account" previously discussed would choose not to renew its policy "on

11

terms offered by [PRA]" and would instead "exercise its option to purchase . . . tail coverage." Ex. 32 (Q1 2020 10-Q) at 45. While PRA noted that several "negotiation points" would "happen over the next couple of weeks" before the expiration of the policy toward the end of Q2 2020, PRA nonetheless elected to disclose the likelihood of non-renewal given its view of negotiations to date. Ex. 33 (Q1 2020 Earnings Call Tr.) at 11. Based on preliminary projected exposure data, if non-renewal were to occur, PRA could recognize a net loss of up to $50 million in Q2 2020. *Id.* at 15.

## I. This Action

Plaintiffs bring this action on behalf of a purported class of investors who purchased PRA common stock between August 8, 2018 and May 7, 2020 (the "Class Period"). ¶ 1. Plaintiffs allege that Defendants made materially misleading statements and omissions regarding PRA's loss reserves, its "conservative" reserve practices, and TeamHealth's exercise of its option for tail coverage. ¶¶ 7–12.

The Complaint does not allege that any information was withheld from PRA's external actuaries or auditors, who certified PRA and its subsidiaries' loss reserves every year leading up to and during the Class Period. And while Plaintiffs argue that severity was increasing in the *general* HCPL industry, they do not allege that PRA was observing an increase in severity in its claims data. Plaintiffs also set forth no allegations about the actual negotiations between PRA and TeamHealth prior to the May 7, 2020 disclosure that TeamHealth likely would not renew its policy.

12

**ARGUMENT**

**I.    PLAINTIFFS    FAIL    TO    IDENTIFY    ANY    ACTIONABLE MISSTATEMENTS BY THE DEFENDANTS**

**A. Plaintiffs Have Not Alleged Any Material Misstatements or Omissions**

A Section 10(b) claim requires that plaintiff allege "(1) the existence of a material misrepresentation (or omission), (2) made with scienter . . . (3) in connection with the purchase or sale of any security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiffs' economic loss." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010).  A plaintiff asserting a Rule 10b-5 claim also must satisfy FRCP 9(b) by setting forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") also requires that the complaint specify each allegedly misleading statement as well as "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1).

**1.  Allegations Regarding PRA's Loss Reserve Estimates Fail to Plead a Material Misstatement or Omission**

PRA's loss reserve estimates cannot be a basis for liability under the securities

laws because Plaintiffs have alleged no facts demonstrating that PRA's statements regarding its loss reserves were either false or not honestly believed when made. "[R]egardless of the actuarial method used," the calculation of insurance loss reserves is "based in large part upon informed guesswork." *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1231 (2d Cir. 1991); *see also In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *28 (S.D.N.Y. May 10, 2012) ("Insurance reserves are, by their nature, extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect.") (internal quotation marks and citation omitted). Loss reserves therefore do not qualify as statements of fact, but rather as statements of opinion. *Damian v. Montgomery Cty. Bankshares, Inc.*, 255 F. Supp. 3d 1265, 1275 (N.D. Ga. 2015); *see also Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 222 (S.D.N.Y. 2020) ("[L]oss reserves are statements of opinion.").

A statement of opinion is actionable only if (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact[s] [the speaker] supplied were untrue"; or (3) plaintiff identifies "particular (and material) facts going to the basis for the [speaker's] opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 194 (2015). Satisfying this standard "is no small task for an investor." *Id.*

14

at 194; *see also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019) (applying *Omnicare* and dismissing Sections 10(b), 20(a), and Rule 10b-5 claims). Plaintiffs' loss reserve allegations fail under *Omnicare* for the following reasons.

### i. A Rise in Claims Reported Does Not Satisfy *Omnicare*

Plaintiffs claim to have determined through "forensic accounting" that the TeamHealth account experienced an increase in claims reported beginning in late 2017. ¶ 89. Plaintiffs' analysis, which traces a single line in the statutory filings of a single PRA subsidiary that are all available on PRA's website, purportedly shows that the claims reported under the Tennessee line of the statutory filings for PRA-Specialty increased from 38 in the third quarter of 2017 to 895 in the third quarter of 2019. ¶¶ 115–16. Plaintiffs assume for their own "ease of reference"—but without justification—that 100% of these claims can be attributed to TeamHealth. ¶ 114 & n. 24. Plaintiffs also ignore that the Amount Reported for "Direct Losses *Unpaid*," which is reported under the very same heading as the claims number Plaintiffs focus on, increased by over $50 million during the same time period. *Compare* Ex. 34 (PRA-Specialty Q3 2017 Quarterly Statement), *with* Ex. 35 (PRA-Specialty Q3 2019 Quarterly Statement) at Schedule T Supp. A.

Even if the assumptions underlying Plaintiffs' "forensic accounting" are correct, a mere rise in claims is insufficient to demonstrate that PRA's loss reserves were either false or not honestly believed when made. Management explained that

15

the number of reported claims was routinely discounted to account for the fact that the vast majority of claims submitted were resolved without any losses paid. *See supra* page 9. Management also had informed the market that it would have access to better claims data "24 or more months" after any given accident year. *Id.* The topline claims numbers upon which Plaintiffs base their claims therefore do not reflect a rise in anticipated paid losses necessitating a change in loss reserves.[2]

Moreover, as the Complaint points out, PRA described severity, not frequency, as "the most influential factor affecting the analysis of our HCPL reserves and related development recognized." ¶ 9. Plaintiffs make *no allegations*, however, that PRA was experiencing a rise in severity with respect to its claims data during the Class Period prior to PRA's announcement that it would adjust its loss reserves. Instead, Plaintiffs attempt to rely on a *general* rise in claims severity in the HCPL industry. ¶ 7. Plaintiffs also claim only that severity was increasing for companies "*like* TeamHealth" but do not allege that this trend was true specifically for TeamHealth at any point before PRA adjusted its loss reserves. ¶ 139 (emphasis added). Thus, missing entirely from Plaintiffs' Complaint are any allegations

---

[2] Plaintiffs' claim that Mr. Friedman's statement that PRA was "not yet seeing any change" in frequency was materially false (¶ 86) is premised on a misreading of Mr. Friedman's remarks. As the transcript makes clear, Mr. Friedman's comment on claims frequency was with respect to the SP&C segment *as a whole*. *See* Ex. 36 at 4, 14. Plaintiffs' claim that Mr. Boguski's statement that PRA had observed a "relatively flat [trend] on the frequency side" in the SP&C segment was materially false (¶ 185) fails for similar reasons. Plaintiffs do not allege the percentage of overall claims in the SP&C segment that can be attributed to TeamHealth, nor that the alleged increase in TeamHealth-related claims drove an increase in claims frequency for the entire SP&C segment.

16

indicating that PRA had experienced a change in severity, "the most influential factor" affecting its analysis of HCPL loss reserves. Plaintiffs' reliance on general severity developments—which as disclosed were not affecting PRA—cannot make up for this shortcoming.

### ii.      PRA Repeatedly Discussed and Took Steps to Account for Emerging Severity Trends

As explained above, management repeatedly disclosed and commented on developing severity trends in the HCPL industry while clarifying that those trends were not apparent in the Company's own reported claims data. Nonetheless, to account for market changes, PRA took preemptive steps including increasing PRA's net loss reserves in both 2018 and 2019. PRA's caution was noted by analysts, who reported in early 2020 that PRA had "talked about deteriorating loss trends in the healthcare professional market for the last 18 months" and had "significantly increas[ed] accident year loss ratios" to address this trend. Ex. 31 at 1.

In spite of the cautious analysis undertaken by management to address developing market trends, Plaintiffs claim that Defendants "actively concealed" the need for increased loss reserves from investors. ¶ 3. Plaintiffs can support this narrative only by omitting from their Complaint PRA's careful, preemptive actions to address the very trends Plaintiffs claim were affecting its business. Management's active consideration of potential effects on its business from changing market trends directly contradicts Plaintiffs' allegations that PRA's loss reserves did not reflect

17

management's sincere opinions. "'[S]o long as Defendants conducted a "meaningful" inquiry and in fact held th[e] view' expressed . . . and Plaintiffs fail to plausibly allege they did not do so—the statements of [] reserves are not actionable[.]" *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 398 (S.D.N.Y. 2019) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016)). The fact that those actions in hindsight turned out to be insufficient does not support a securities fraud claim. *In re John Alden Fin. Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1277 (S.D. Fla. 2003) ("The fact that in hindsight the [loss reserve] projection turned out to be wrong does not mean that it lacked a reasonable basis when made."); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004).

### iii.    Plaintiffs' Average Severity Rate Calculations Fail to Demonstrate That PRA Misstated Its Loss Reserves

Having failed to allege that PRA was experiencing an increase in severity, Plaintiffs resort to arguing that PRA's loss reserves could not possibly reflect management's sincere beliefs because the "average severity rate" Plaintiffs calculate with the benefit of hindsight is implausibly low. As Plaintiffs concede, their "average severity rate" has no basis under either Generally Accepted Accounting Principles ("GAAP") or Statutory Accounting Principles ("SAP"), and is not a metric PRA was ever required to report. *See* ¶ 123 n. 25. Plaintiffs first compare the average severity rate for claims purportedly related to TeamHealth versus non-TeamHealth related claims for PRA-Specialty. ¶¶ 123–29. This analysis is deficient

18

for several reasons.  As PRA explained on investor calls, severity estimates "var[y] by state, and . . . by product."  Ex. 20 at 11.  It is undisputed that PRA-Specialty's underwritten business is not limited to HCPL policies, nor to policies written on a claims-made basis.  *See* Ex. 37 (PRA-Specialty 2019 Annual Statement) at 8 (listing premiums written for "Medical professional liability" and "Other liability"); ¶ 111.  Plaintiffs provide no explanation (and there is none) why comparing average severity rates for different types of insured liabilities provides any valid comparative metric.  Even more problematic is Plaintiffs' *ex-post* calculation of a purported "true average severity rate" based on the charges reported by PRA in its 2019 10-K.  ¶¶ 129–31.  "Seizing on figures later used in financial statements exemplifies pleading fraud by hindsight, an impermissible method of pleading fraud."  *In re Serologicals Sec. Litig.*, 2003 WL 24033694, at *10 (N.D. Ga. Feb. 20, 2003).  Plaintiffs' argument that Defendants "must have . . . known" by Q2 2018 that the loss reserves for the SP&C business were understated (¶ 122) is nothing more than insinuation based on PRA's later adjustments.  As explained above, such allegations fail to demonstrate any *actual* belief on Defendants' part that the reserves were underestimated at the time they were established.  *See supra* pages 17–18.

> ### iv.    PRA's External Auditors Repeatedly Confirmed the Propriety of PRA's Loss Reserve Estimates

Plaintiffs' claims based on PRA's loss reserves are directly contradicted by the fact that PRA's statutory filings were certified by external actuaries each year

during the Class Period.  *See supra* pages 7–8.  Similarly, PRA's independent, external auditor found the Company's 10-Ks issued during the Class Period to be materially accurate.  The review and analysis by PRA's independent external actuaries and auditors, which confirmed that PRA maintained reasonable loss reserves throughout the Class Period, defeats Plaintiffs' fraud allegations.  *Woolgar*, 477 F. Supp. 3d at 228 ("[A]llegations regarding the Company's loss reserves are undermined by the fact that its independent auditor, as well as its independent actuary, reviewed their accuracy and concluded that, 'in all material aspects, the Company's financial statements were accurate.'").  In addition, PRA's SEC filings describe the detailed analysis the Company undertakes, using both internal and external consultants, to establish loss reserves.  *See supra* page 6.  Plaintiffs do not allege that Defendants failed to follow that process.  *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (dismissing claims where plaintiffs failed to allege that "defendants manipulated or did not actually perform the multi-factor . . . analysis they said they did" in calculating loss reserves).

> ### v.    The PSLRA's Safe Harbor Provision Protects PRA's Forward-Looking Statements

Under the safe harbor provision of the PSLRA, "an allegation of actual knowledge of falsity will not deprive a defendant of protection by the statutory safe harbor if his forward-looking statements are accompanied by meaningful cautionary

language." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 795 (11th Cir. 2010). The statements Plaintiffs challenge regarding PRA's loss reserves are identified as forward-looking statements and accompanied by meaningful cautionary language. For example, PRA's SEC filings expressly identify the statements regarding loss reserves as forward-looking, and those statements are accompanied by cautionary language highlighting, among other things, "uncertainties inherent in the estimate of our loss and loss adjustment expense reserve." Ex. 2 (2018 10-K) at 6. Thus, because the Company "warned of risks that were 'of a significance similar to that actually realized,'" PRA's loss reserve statements are not actionable under the PSLRA. *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *15 (S.D. Fla. Apr. 19, 2013).

### 2. Allegations Regarding TeamHealth's Non-Renewal of Its Policy Fail to Plead a Material Misstatement or Omission

To prevail on the claim that Defendants were obligated to disclose no later than January 2020 the likelihood of non-renewal on the TeamHealth policy and that TeamHealth would exercise its option for tail coverage, "Plaintiff[s'] allegations must raise a 'strong inference' both that it was 'obvious' that non-renewal was 'reasonably likely to occur,' and that Defendants had actual knowledge of that probability." *Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at *21 (S.D.N.Y. Sept. 30, 2017), *aff'd sub nom. Pipefitters Union Loc. 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630 (2d Cir. 2019).

21

Plaintiffs have failed to do so.

The Complaint does not allege that TeamHealth had expressed any intent to terminate renewal discussions and exercise its right to tail coverage at any point prior to the Company's announcement on May 7, 2020. In fact, the Complaint is *entirely silent* regarding the status of discussions between TeamHealth and PRA about a potential policy renewal. Management's disclosures made clear that PRA would continue negotiating with TeamHealth over the weeks following the May 7, 2020 disclosure. Plaintiffs do not mention those negotiations in their Complaint. Instead, Plaintiffs speculate about the renewal premium PRA would need to charge TeamHealth to bring the account in line with the Company's "target loss ratio," a metric disclosed more than two years before the time of renewal that was not even mentioned in PRA's 2019 10-K. ¶ 235. Such speculation about hypothetical rates based on outdated metrics provides no well-pled facts regarding the status of the *actual* renewal discussions the Company had engaged in with TeamHealth. *See Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667, at *22 (M.D. Fla. Mar. 29, 2019) ("Any prediction as to the outcome of . . . ongoing negotiations [between the parties] would have been purely speculative.").[3] Importantly, the Complaint is devoid of allegations that TeamHealth had expressed

---

[3] As Plaintiffs concede, there were several "unique" features of the TeamHealth policy (*see, e.g.*, ¶¶ 72, 193), and those features could have been renegotiated as part of renewal discussions. Plaintiffs' narrow focus on a hypothetical renewal rate is therefore misleading at best.

22

any intent not to renew its policy at any time prior to PRA's disclosure.  Thus, "the duty to disclose did not ripen earlier because no intent of termination was provided during the Class Period."  *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017).[4]

### 3.  Allegations Regarding PRA's Business Practices Fail to Plead a Material Misstatement or Omission

Plaintiffs claim that PRA's statements about its "reasonable," "disciplined" and "cautious" approach to establishing and reevaluating loss reserves were materially false and misleading.  *See, e.g.*, ¶¶ 138, 144, 148, 152, 155, 159, 160, 174, 175, 177, 181, 183.  Statements regarding general business practices "must, in order to form a basis for fraud, be statements of fact, capable of being proven true or false." *Water Works Bd. of City of Birmingham v. Ambac Fin. Grp., Inc.*, 718 F. Supp. 2d 1317, 1323 (N.D. Ala. 2010), *aff'd*, 534 F. App'x 817 (11th Cir. 2013).  "Statements that an insurer is 'very cautious' or has 'rigorous underwriting standards' do not lend themselves to such proof."  *Id.*  Rather, these statements contain "the kind of vaguely positive assertions that courts have characterized as non-actionable 'puffery.'" *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 2011 WL 4591541, at *14

---

[4] Plaintiffs' claim that Defendants violated various accounting standards by not disclosing the likelihood of non-renewal at an earlier point in time (¶¶ 206–09, 225–41) fails for the same reasons as their allegations of securities fraud.  *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *24 (S.D.N.Y. Sept. 9, 2019) (dismissing claims based on purported violations of GAAP as "derivative of the primary allegations regarding . . . accounting issues"); *Cheney v. Cyberguard Corp.*, 2000 WL 1140306, at *11 (S.D. Fla. July 31, 2000) ("[A]llegations of GAAP . . . violations are insufficient, without more, to state a securities fraud claim.").

(S.D. Fla. Sept. 30, 2011). The Eleventh Circuit has endorsed the defense of puffery at the motion to dismiss stage as "a particularly good fit in the securities context." *Carvelli*, 934 F.3d at 1320. Applying *Carvelli* to Plaintiffs' allegations about PRA's business practices, which contain no more than "generalized, vague, nonquantifiable statements of corporate optimism," requires dismissal of this claim. *Id.* at 1318.

## B. The Complaint Fails to Plead Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. The Eleventh Circuit has defined the requisite degree of scienter as "encompassing at least a showing of severe recklessness." *Bryant*, 187 F.3d at 1286. A "strong inference" of scienter must be "cogent and *at least as compelling* as any opposing inference of nonfraudulent intent." *In re Colonial Bancgroup, Inc. Sec. Litig.*, 9 F. Supp. 3d 1258, 1264 (M.D. Ala. 2014) (quoting *Tellabs*, 551 U.S. at 314). Plaintiffs also must plead facts supporting a strong inference of scienter "for each defendant with respect to each violation." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).

### 1. Plaintiffs' Confidential Witness Allegations Fail to Support a Strong Inference of Scienter

Courts in the Eleventh Circuit have remained "'skeptical' of confidential sources who, from behind the veil of anonymity, provide only non-specific

24

descriptions of meetings and internal documents." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008)).  Such skepticism is justified where, as here, Plaintiffs attribute vague statements to witnesses without providing any basis to infer that they communicated with the Individual Defendants or were in a position to know what information they possessed.  Notably, none of the five CWs were involved in the analysis of loss estimates, and only one CW is alleged to have had exposure to claims-related information.  *See* ¶ 55 & n.9; *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ("Also problematic is the fact that none of the CWs are alleged to have been involved in or to have any familiarity with the process of setting or estimating loss reserves.").

Plaintiffs' allegations also fall short because "[t]he majority of the CWs are not alleged to have had any direct contact with the Individual Defendants at all, let alone know what information they possessed." *Woolgar*, 477 F. Supp. 3d at 220. Only one of the CWs is alleged to have had a reporting relationship to any Individual Defendant.  And the information supplied by these CWs is entirely unremarkable. For example, Plaintiffs rely on CW 1, CW 2, and CW 3 for their purported knowledge that signing the TeamHealth account was celebrated as a success at PRA. *See* ¶ 55.  And CW 4, who was not employed by PRA for most of the Class Period, purportedly knew that underwriting an account of TeamHealth's size "would have"

25

required the approval of PRA executives including Mr. Friedman.  ¶ 56.

The only allegations involving potential communications by any Individual Defendant involve CW 3 and CW 5's descriptions of a meeting in 2019 at which Mr. Rand and Ms. Hendricks allegedly discussed a "problematic account."  ¶ 93. Mr. Rand also allegedly gave a presentation showing losses generated by claims filed by a single account during the same meeting.  *Id.*  The Complaint, however, "fail[s] to identify who authored the alleged [presentation], when it was authored, who reviewed [it], and what data its conclusions were based upon."  *Damian v. Montgomery Cty. Bankshares, Inc.*, 981 F. Supp. 2d 1368, 1378 (N.D. Ga. 2013). The Eleventh Circuit has dismissed fraud allegations premised on similarly vague descriptions of meetings and meeting materials.  *See Garfield*, 466 F.3d at 1265.

Moreover, Plaintiffs' generalized allegations that the TeamHealth account was known at PRA as "problematic" (¶ 93) do not "demonstrate that, at that time, [PRA's] stated [loss] reserves were in fact inaccurate or that Defendants (or others, such as those in accounting) thought the . . . reserves were false."  *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 399 (S.D.N.Y. 2020); *see also John Alden*, 249 F. Supp. 2d at 1279 (auditor's review of defendant's reserve calculations with access to "all relevant information" "suggest[s] a lack of scienter as a matter of law").  Similarly, CW 2's claim that it was "well known" within PRA that TeamHealth would not renew its policy and instead exercise its tail coverage option

26

(¶ 80) fails to demonstrate scienter. *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1333 (S.D. Fla. 2004) (allegations that it was "generally known" company improperly recognized revenue insufficient to support an inference of scienter).

### 2. None of the Additional Allegations Support a Strong Inference of Scienter

Plaintiffs' remaining scienter allegations are based on boilerplate circumstantial claims that fail to create a "cogent and compelling" inference that the Individual Defendants knew about the alleged fraud. *Mizzaro*, 544 F.3d at 1247.

**Management's Involvement:** The fact that management was involved in establishing and reevaluating loss reserves (¶¶ 244–56) does not support an inference that any Individual Defendant *knew* those reserves were inadequate. *See Goodman*, 594 F.3d at 791 (defendant's "responsibility to make decisions" "fail[ed] to raise a strong enough inference of scienter"). To the contrary, "Plaintiffs' allegations are equally consistent with the possibility that [PRA's] . . . close monitoring of claims, conducted by its experienced professionals, revealed information indicating that reserve amounts would be adequate," but "as further data became available and further analysis took place, the need for an increase in reserves . . . became apparent and Defendants revealed this news to the market." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 898 (N.D. Ill. 2020).

Plaintiffs argue that the SP&C segment was of "utmost importance" to PRA (¶ 257), which somehow supports an inference of scienter. "But such an inference

27

is disfavored." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017). "[I]t is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question." *Plymouth Cty. Ret. Sys. v. Carter's Inc.*, 2011 WL 13124501, at *17 (N.D. Ga. Mar. 17, 2011). This is particularly so "where the alleged fraud revolves around accounting practices." *Id.* And while Plaintiffs make much of the size of the reserve adjustment (¶¶ 259–61), that argument is precisely the type of hindsight pleading courts have repeatedly rejected. *See supra* page 18.

**Departure of PRA Employees:** It is well-established that "[t]he mere departure of executives . . . without more, is insufficient to support a strong inference of scienter," especially where, as here, "Plaintiffs fail to allege any facts linking the departures with the alleged accounting fraud." *In re Jiangbo Pharm., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1268 (S.D. Fla. 2012), *aff'd sub nom. Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296 (11th Cir. 2015). Plaintiffs point to the alleged "demotion" of Messrs. Starnes and Friedman, ignoring entirely that this transition followed an 18-month planned succession and that Mr. Starnes and Mr. Friedman both remained involved at PRA. *See supra* page 10. Plaintiffs also allege that the employee who underwrote the TeamHealth policy left PRA in 2019 and that Mr. Rand recruited "additional talent" to the SP&C segment following his appointment

as CEO.  ¶¶ 268–69.  At most, the fact that PRA reorganized the team responsible for the HCPL segment could suggest mismanagement, but "section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement." *Colonial*, 9 F. Supp. 3d at 1264.

**SOX and Statutory Filing Certifications:** The allegation that certain Individual Defendants signed PRA's statutory filings and SOX certifications (¶¶ 271–75) also cannot establish scienter.  A SOX certification "is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."  *Garfield*, 466 F.3d at 1266; *see also Plumbers Loc. No. 200 Pension Fund v. Wash. Post Co.*, 831 F. Supp. 2d 291, 301 (D.D.C. 2011) ("Equating scienter to public filings would eviscerate the heightened PSLRA requirements and establish scienter in every case where there is an error or mistake in a publicly filed document.").  Severe recklessness can be established only when the person signing the filing "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Garfield*, 466 F.3d at 1266.  Because the Complaint fails to identify any such red flags, the mere act of signing PRA's public filings cannot support a strong inference of scienter.

**Compensation:** Plaintiffs' allegations that the Individual Defendants were "incentivized" to commit fraud due to their "incentive-based" compensation

29

structure (¶¶ 276–77) are insufficient as a matter of law "because such facts can be ascribed to virtually all corporate officers and directors." *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1341 (S.D. Fla. 1999); *see also Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010) ("Receipt of a standard incentive-based bonus has limited probative value for scienter.").

In sum, Plaintiffs' allegations fail to show a strong inference of scienter, and the strongest inference to be drawn is that "Defendants were simply unable to shield themselves as effectively as they anticipated from the . . . change" in severity they had discussed with investors. *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1360 (N.D. Ga. 2010).

## II. PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS

Under Section 20(a) of the Securities Exchange Act, Plaintiffs "adequately plead[] a § 20(a) claim only if the primary violation is adequately pleaded." *Mizzaro*, 544 F.3d at 1237. Because Plaintiffs have failed to plead a primary securities fraud violation, their Section 20(a) claim necessarily fails. *Id.* at 1255.

## CONCLUSION

Plaintiffs' Complaint should be dismissed in its entirety and with prejudice.

Dated: May 18, 2021

STARNES DAVIS FLORIE LLP

/s/ *Jay M. Ezelle*

Walter W. Bates (ASB-7202-E49W)
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Michael R. Lasserre (ASB-2144-Y61G)
100 Brookwood Place, 7th Floor
P. O. Box 598512
Birmingham, AL 35259-8512
wwb@starneslaw.com
jme@starneslaw.com
crg@starneslaw.com
mrl@starneslaw.com

SIMPSON THACHER & BARTLETT LLP

Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Jacob Lundqvist (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
jgochman@stblaw.com
jacob.lundqvist@stblaw.com

*Attorneys for Defendants ProAssurance*
*Corporation, W. Stancil Starnes, Edward L.*
*Rand, Jr., Dana S. Hendricks, Howard H.*
*Friedman, and Michael L. Boguski.*

31

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

Steven B. Singer
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, NY 10606

Joseph E. White, III
Lester R. Hooker
SAXENA WHITE P.A.
7777 Glades Road, Suite 300
Boca Raton, FL 33434

Bailie L. Heikkinen
Reginald E. Janvier
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432

David J. Guin
Tammy M. Stokes
Dawn Stith Evans
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. N.
Suite 600/Title Bldg.
Birmingham, AL 35203

Roger H. Bedford, Jr
ROGER BEDFORD, ATTORNEY AT LAW, LLC
P.O. Box 1149
Russellville, AL  35653

32

John T. Long
CAVANAGH & O'HARA
2319 West Jefferson Street
Springfield, IL  62702


                                        /s/ Jay M. Ezelle
                                        STARNES DAVIS FLORIE LLP

33