FILED

2021 Jun-30  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SHEET METAL WORKERS LOCAL 19 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PROASSURANCE CORPORATION, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:20-cv-00856-AKK<br><br>CLASS ACTION<br><br>LEAD PLAINTIFFS' RESPONSIVE SUBMISSION IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS |

4813-8843-9280.v1

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................1

II.  FACTUAL BACKGROUND...............................................................7

   A.   PRA Deviated from Its "Conservative" Practices in 2016 by
        Insuring TeamHealth to a Uniquely Risky Policy ..............................7

   B.   Defendants Falsely Assured Investors that PRA's Reserves
        Were More than Adequate and Based on Real-Time Data...................8

   C.   Defendants Concealed TeamHealth's Skyrocketing Claims and
        Massively Understated TeamHealth's Loss Reserves ......................10

   D.   PRA Is Forced to Recognize More than $130 Million in
        Charges for TeamHealth .................................................................13

III. ARGUMENT......................................................................................14

   A.   The Complaint Alleges Actionable Misrepresentations ....................14

        1.   False Statements About PRA's Loss Reserves.........................14

        2.   PRA's False Financial Statements and Certifications .............18

        3.   Defendants Concealed the Known Impact of
             TeamHealth's Tail Coverage Option......................................21

   B.   The Complaint Alleges a Strong Inference of Scienter ......................24

        1.   Defendants Knew PRA's Reserves Were Understated ...........24

        2.   TeamHealth's Significance to PRA's Business Further
             Establishes Scienter.................................................................26

        3.   Additional Indicia Further Establish Scienter..........................28

IV.  CONCLUSION..................................................................................30

- i -

# TABLE OF AUTHORITIES

**Page**

## CASES

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ..........................................................................16

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................................24

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ..........................................................................29

*Hubbard v. BankAtlantic Bancorp, Inc.*,
2009 WL 3261941 (S.D. Fla. May 12, 2009)......................................................26

*In re Ambac Fin. Grp., Inc.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...........................................................17, 20

*In re Converium Holding AG Sec. Litig.*,
2006 WL 3804619 (S.D.N.Y. Dec. 28, 2006)....................................................21

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)...........................................................26, 28

*In re Express Scripts Holding Co. Sec. Litig.*,
2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017).......................................................23

*In re Flowers Foods Inc., Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)....................................................20

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ..............................................16, 18, 25, 28

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018)...............................................................17

*In re Immucor Inc. Sec. Litig.*,
2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) .................................................26, 27

*In re Jiangbo Pharms., Inc., Sec. Litig.*,
884 F. Supp. 2d 1243 (S.D. Fla. 2012),
*aff'd*, 781 F.3d 1296 (11th Cir. 2015)...............................................................28

- ii -

**Page**

*In re Perrigo Co. PLC Sec. Litig.*,
435 F. Supp. 3d 571 (S.D.N.Y. 2020) ......................................................22, 23

*In re PMA Cap. Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005) .................................................19, 24

*In re Sci. Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002),
*aff'd*, 374 F.3d 1015 (11th Cir. 2004)..............................................................29

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).................................................*passim*

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018),
*aff'd sub nom. Hagan v. Khoja*,
__ U.S. __, 139 S. Ct. 2615 (2019)...................................................................20

*Local 703, I.B. of T. Grocery & Foods Emps. Welfare Fund v.*
*Regions Fin. Corp.*,
2011 WL 12855820 (N.D. Ala. June 7, 2011) ............................................*passim*

*Luczak v. Nat'l Beverage Corp.*,
812 F. App'x 915 (11th Cir. 2020)..........................................................24, 26

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007),
*aff'd*, 312 F. App'x 400 (2d Cir. 2009)..............................................................26

*MAZ Partners, LP v. First Choice Healthcare Sols., Inc.*,
2020 WL 1072582 (M.D. Fla. Feb. 14, 2020)..................................................24

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008) ................................................................24, 30

*Mogensen v. Body Cent. Corp.*,
15 F. Supp. 3d 1191 (M.D. Fla. 2014)..........................................................26

- iii -

4813-8843-9280.v1

**Page**

*Omnicare, Inc. v. Laborers Dist. Council*
  *Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................19, 20

*Primavera Invs. v. Liquidmetal Techs., Inc.*,
  403 F. Supp. 2d 1151 (M.D. Fla. 2005)............................................................27

*SEC v. LeCroy*,
  2010 WL 11565305 (N.D. Ala. Aug. 4, 2010)..................................................20

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ...........................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................14, 24, 29

*Tung v. Dycom Indus.*,
  454 F. Supp. 3d 1244 (S.D. Fla. 2020)............................................................19

*Underland v. Alter*,
  2011 WL 4017908 (E.D. Pa. Sept. 9, 2011)................................................16, 18

*United States v. Levy*,
  379 F.3d 1241 (11th Cir. 2004) .......................................................................14

*West Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015)..............................................21, 26

*Winslow v. BancorpSouth, Inc.*,
  2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) .........................................18, 22

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78j(b)...............................................................................................30
  §78t(a)...............................................................................................30
  §78u-4 ...............................................................................................17
  §78u-5(b)(2)(A) .................................................................................17

- iv -

- v -

**Page**

Federal Rules of Civil Procedure
    Rule 12(b)(6)...............................................................................................14

4813-8843-9280.v1

Lead Plaintiffs ("Plaintiffs") respectfully submit this memorandum in opposition to Defendants' Motion to Dismiss (the "Motion") (ECF No. 51).[1]

## I.    INTRODUCTION

PRA is an insurance company that, throughout the Class Period, went to great lengths to emphasize its purportedly "***disciplined***" and "***conservative***" underwriting and loss reserve practices.  Indeed, Defendants repeatedly assured investors that PRA established reserves "***with the same conservativism we have always used***," and stressed that PRA's practices were so prudent that they gave the Company a competitive advantage.  These assurances were highly material to investors, leading analysts to describe PRA as "***one of the most conservative insurers in the sector***."  As a result, PRA's stock price soared, reaching a Class Period high of $49.40 per share.

As would ultimately be revealed, Defendants' statements were false. Unbeknownst to investors, in 2016, PRA began insuring TeamHealth – "***the single largest premium [PRA] ever billed***."  TeamHealth was an inherently risky physician staffing company with a known profits-over-patients culture that exposed it to enhanced liability for medical malpractice claims.  Significantly, while Defendants touted the signing as "***solid evidence of our ability to succeed***," they did not identify TeamHealth as the insured; nor did they disclose that TeamHealth's policy was so unique and risky – and deviated so dramatically from PRA's purportedly

---

[1]    "Mem." refers to Defendants' Memorandum (ECF No. 53).  "PRA" refers to Defendant ProAssurance.  Unless otherwise indicated all other capitalized terms have the same meaning as in the Consolidated Class Action Complaint (the "Complaint") (ECF No. 44); "¶" cites are to paragraphs of the Complaint; citations are omitted; and emphasis is added.

- 1 -

"conservative" business practices – that, as Defendants would later admit, "*no other*" account "*would even be close to*" TeamHealth's policy structure.

Just one year later, the TeamHealth account was already proving disastrous. By the end of 2017, the number of TeamHealth claims (which Defendants referred to as claim "frequency") started to skyrocket – a trend that continued during the Class Period, rising exponentially *from 3 claims outstanding in 2Q17 to 895 claims outstanding by 3Q19 – an increase of nearly 30,000%*. As confirmed by Plaintiffs' forensic analysis, this dramatic rise in TeamHealth claims rendered PRA's loss reserves woefully inadequate. However, instead of making the necessary adjustments to correct PRA's understated loss reserves, Defendants falsely stated that "*we're not seeing frequency change*" and that "*loss trends . . . are still not at the level that's embedded in our reserve[s]*." Indeed, Defendant Rand went so far as to state: "*I assure you we are being appropriately disciplined in our analysis*."

Defendants, however, knew the opposite was true. Defendants told investors that they would "*re-evaluate*" reserves "*each quarter based on our most recently available claims data and currently available trend information*" – meaning that, by their own admission, Defendants were indisputably aware of the skyrocketing number of claims for their single largest and most important account, and the need to increase TeamHealth's loss reserves as a result. Indeed, Plaintiffs' forensic analysis revealed that the scale of Defendants' reserves deficiency during the Class Period was unmistakable, as evidenced by TeamHealth's impossibly low implied average severity

rates – *i.e.*, the average cost to resolve each outstanding claim based on the amount of loss reserves. Specifically, in 3Q17 – *before* TeamHealth's claim frequency began to dramatically rise – PRA's implied average severity rate for TeamHealth was approximately $170,878 per claim, which was significantly **higher** than the approximately $136,952 per-claim implied severity rate for PRA's less risky, *non*-TeamHealth claims in the same core Specialty Property & Casualty ("SP&C") segment during the same period. However, by the start of the Class Period, the average severity rate implied by PRA's reserves for TeamHealth had dramatically dropped by nearly 50%, to $88,562 per claim – an amount that was *more than 35% lower* than the severity rate for PRA's other, less risky SP&C accounts. This massive disparity not only lacked any reasonable justification – as TeamHealth was, according to Defendants, the type of account that was subject to significantly **higher** claim amounts – but it continued throughout the Class Period, confirming, in real time, that PRA's reserves were massively understated.

Moreover, Defendants were undoubtedly aware of TeamHealth's impossibly low severity rates, and the massively understated reserves they evidenced. Indeed, Defendants repeatedly emphasized that they were personally involved in setting loss reserves, and that their reserving methodology was primarily focused on their "*real-time*" evaluation of this exact same data: *frequency and severity*. In fact, Defendants even described "the severity of claims" as "*the most influential factor affecting the analysis of our HCPL reserves and the related development recognized*."

- 3 -

On January 22, 2020, Defendants finally began to reveal the truth, announcing that inadequate reserves for an unnamed "large national account" (TeamHealth) would force PRA to recognize charges exceeding *$80 million*.  Analysts were stunned, opining that the "*reserve charge is particularly surprising*" given PRA's "conservative" approach "*when it comes to loss reserve adequacy*," causing PRA's stock price to decline more than 11%, from $37.58 per share to $33.40 per share.

Even then, Defendants continued to conceal the full truth, as they knew – but failed to disclose – that TeamHealth would exercise its "tail coverage" option, which would expose PRA to enormous additional losses.  But Defendants did not reveal this information until May 7, 2020, when they again shocked investors by disclosing that the same unnamed "large national account" that had driven the massive charges announced in January would exercise its tail coverage option, leading to an additional "*net loss of up to approximately $50 million*."  Defendants also admitted that the account's losses were due to its highly unusual policy structure, which deviated so radically from PRA's purportedly "conservative" practices that "*no other structures in our book of business . . . would even be close to the structure offered here*."  In response, PRA's stock price plunged another 22%, closing at $15.95 per share on May 8, 2020 – *over 67% lower* than its Class Period high of $49.40 per share.

All told, the extraordinarily risky TeamHealth account caused PRA to incur *more than $130 million* in accounting charges that were so material that they wiped

- 4 -

out nearly all of the profits PRA reported the prior three years, and led to the removal of several key members of PRA's management team.

Defendants' attempts to undermine these well-pled allegations all fail.

First, Defendants' argument that the Complaint "embraces hindsight pleading" and fails to "demonstrate that PRA's loss reserves were inadequate" is flat wrong.  As an initial matter, it was only through Plaintiffs' thorough investigation that they were able to identify TeamHealth as the account that caused PRA's massive losses in 2020.  Defendants do not dispute that allegation.  Nor do they contest the particularized findings of Plaintiffs' forensic analysis, which uncovered contemporaneous claim data available to Defendants demonstrating that PRA's loss reserves for TeamHealth were severely understated throughout the Class Period until Defendants were finally forced to correct the issue in 2020.

Second, Defendants' argument that Plaintiffs' claims are insufficient because the Complaint fails to plead that TeamHealth was experiencing an *increase* in severity during the Class Period misconstrues the findings of Plaintiffs' forensic analysis.  As explained above, that analysis confirmed that Defendants' failure to increase PRA's TeamHealth reserves commensurately with TeamHealth's dramatic increase in *frequency* rendered those reserves massively understated, as evidenced by the dramatic *decline* in TeamHealth's severity rates to levels that lacked any reasonable basis in comparison to PRA's other, less risky clients.  Defendants provide no justification for this massive and inexplicable disparity, and because Defendants were

- 5 -

intimately involved in the reserving process – which, in Defendants' own words, considered severity as "the most influential factor" – it is inconceivable that Defendants would not have been expressly aware of this disparity.

Third, Defendants' argument that their Class Period representations concerning PRA's purportedly "conservative" and "disciplined" underwriting and loss reserve practices constitute non-actionable puffery and opinion also fails. Defendants' statements were highly specific and material, as they were intended to – and did – falsely assure investors that PRA's loss reserve "conservatism" gave the Company a competitive advantage, and that their review of "***real-time***" frequency and severity data supported their determination that reserves were more than adequate. As the Complaint makes crystal clear, these statements were material to investors, and they were demonstrably false ***when made***.

Fourth, while Defendants dispute scienter, Defendants clearly knew, at all times, that TeamHealth was PRA's "***single largest***" account, signed to a "***unique***," highly risky policy that was ***unlike any other account in PRA's portfolio*** and required ***express approval from PRA's most senior officers***. Moreover, Defendants were intimately involved in the reserve process, and they repeatedly represented that they reviewed "***real-time***" frequency and severity data, which clearly demonstrated the inadequacy of their TeamHealth reserves. Further, first-hand CW accounts established that by at least 2018, Defendants knew that "***TeamHealth was definitely a loss proposition***," and by mid-2019, Defendants internally admitted the "***problematic***"

- 6 -

TeamHealth account was causing PRA to "*hemorrhage money*."

## II.    FACTUAL BACKGROUND

### A.    PRA Deviated from Its "Conservative" Practices in 2016 by Insuring TeamHealth to a Uniquely Risky Policy

PRA is one of the country's largest HCPL insurance providers, and the majority of its revenues are generated by HCPL policies in its SP&C segment.  ¶32.  The key to PRA's success was its purported "conservative" practices, which supposedly gave it a competitive advantage.  ¶39.  During the Class Period, Defendants repeatedly stressed that because of PRA's "*disciplined*" underwriting and "*conservative*" reserving, PRA "s[a]t on a very strong reserve position" with "significant [favorable] reserve development" – meaning PRA *over*-reserved and could add excess reserves back to earnings.  ¶¶39-41, 79, 148, 158.  Analysts credited these representations, describing PRA as "one of the most conservative insurers in the sector," and stating that PRA's "significant favorable prior-year loss reserve development" was "*the most important contributor to earnings*."  ¶¶46, 75.

Unbeknownst to investors, in 2016, PRA began insuring the extraordinarily risky TeamHealth account, which was signed by PRA's National Healthcare Team ("NHT") helmed by Defendant Friedman.  ¶¶52, 56.  Defendants were well aware that the TeamHealth account deviated drastically from PRA's purportedly "cautious" underwriting, as it was signed to a "unique" policy structure that was not "even . . . close" to any other policy in PRA's portfolio.  ¶290.  Moreover, Defendants publicly

- 7 -

acknowledged that large physician groups like TeamHealth were inherently risky insureds susceptible to "significant verdicts" "north of $100 million." ¶¶59-66. Further exacerbating this risk, TeamHealth was well known for employing a host of improper practices that subjected its physicians to elevated claims, leading to the filing of numerous lawsuits against TeamHealth *by its own physicians* in 2016 – the same year PRA signed TeamHealth. ¶¶67-71.

The TeamHealth signing was a significant moment for PRA – one which PRA's most senior officers trumpeted as not only the most important account in its history, but also as a symbol of PRA's ability to succeed. ¶¶52, 54. Indeed, after signing TeamHealth, PRA announced in a press release that it had signed what "*represented the single largest premium [PRA] ever billed*," and during the subsequent earnings call, Defendants boasted that the account "*represent[ed] solid evidence of our ability to succeed.*" ¶¶52-53. At no time, however, did Defendants disclose that in securing its "single largest premium," PRA had dramatically deviated from its purportedly "conservative" practices by signing TeamHealth to a policy that differed radically from any policy PRA had ever written.

B.    **Defendants Falsely Assured Investors that PRA's Reserves Were More than Adequate and Based on Real-Time Data**

Defendants stressed to investors during the Class Period that PRA was "*continuing to establish and evaluate reserves with the same conservatism we have always used*" by actively monitoring two key data points: "frequency and severity."

- 8 -

¶¶61-62, 148. For example, PRA's 2Q18 Form 10-Q stated that "*[w]e re-evaluate our previously established reserve each quarter based on our most recently available claims data and currently available trend information*," and, based on this data, "*make adjustments*" as necessary. ¶138. Defendant Starnes further emphasized that "[i]f we thought we were going to see unfavorable development, *we'd take that into account today, we wouldn't wait for it*." ¶164.

Defendants also reassured investors that they faithfully applied this methodology. ¶¶245-250. With respect to frequency, Defendant Friedman claimed in August 2018 that "*we're not yet seeing any change [in frequency]*." ¶142. With respect to severity, while Defendants noted their "concern" about "worsening" severity trends in the industry, they stressed that they were responding to these trends in "*real-time*" with "*increased caution in our analysis of prior period reserves*" (¶¶62, 155, 255) – and that they had "*reevaluate[d] the expected ultimate values of all of the open claims*" (¶162). After completing this "reevaluat[ion]," Defendants assured investors that, at most, PRA may have to reduce its "favorable development," and emphasized: "*We're not having to add to reserves*." ¶164.

Significantly, even when analysts *directly questioned* Defendant Rand in mid-2019 about how PRA continued to "report favorable reserve development" despite the deteriorating loss environment, Rand emphasized that Defendants "*continue[d] to view [PRA's] reserves as adequate*" and that "*loss trends . . . are still not at the level that's embedded in our reserving for those prior accident years*." ¶177.

- 9 -

Remarkably, even as late as November 2019 – a mere two months before Defendants were forced to reveal the truth – Defendants claimed that frequency was "*flat*" and "*even perhaps slightly down*," with Rand stressing to investors: "*I assure you we are being appropriately disciplined in our [reserve] analysis*."  ¶¶181, 185.

### C.  Defendants Concealed TeamHealth's Skyrocketing Claims and Massively Understated TeamHealth's Loss Reserves

By the start of the Class Period, Defendants were well aware that the extraordinary risks associated with the TeamHealth account had fully materialized. Specifically, Plaintiffs' forensic analysis revealed that rather than being "flat" or "slightly down" as Defendants had represented to investors, claims frequency for TeamHealth was skyrocketing in the midst of what Defendants had repeatedly acknowledged was a rapidly worsening loss severity environment.  ¶¶114-121.

For example, in 2Q17, the number of outstanding TeamHealth claims was only three.  ¶¶76, 116.  By 2Q18, however, TeamHealth's claims had grown to 336, *a nearly 11,200% increase in only 4 quarters*, and by 3Q19, TeamHealth's claims had risen to 895 – *a nearly 30,000% increase* from 2Q17.  ¶¶76, 117.  There is no question that Defendants were acutely aware of TeamHealth's increasing claims, as Defendants explicitly emphasized to investors that "*we see frequency on a real live – real-time basis*."  ¶¶62, 255.  Moreover, this claim increase had a profound impact on

- 10 -

PRA's business, comprising *85%* of PRA's net increase in claims outstanding for the entire claims-made HCPL book of business in 2017, and *62%* in 2018.  ¶120.[2]

Plaintiffs' forensic analysis further confirmed that – contrary to Defendants' express assurances that they "reevaluate[d]" reserves and "ma[d]e adjustments" on a quarterly basis "*based on our most recently available claims data and currently available industry trend information*" (¶¶82, 138) – Defendants in fact *did not* incorporate this "emerging data" into PRA's loss reserves during the Class Period (¶¶122-131).  Specifically, in 3Q17, *before* TeamHealth's claim frequency began to dramatically rise, PRA's loss reserves implied that on average it would cost $170,878 to resolve each TeamHealth claim.  ¶¶123-124.  Significantly, this severity rate was materially (and appropriately) *higher* than the approximately $136,952 per-claim severity rate for PRA's other *less risky* accounts during the same period.  *Id.*[3]

Yet, during the Class Period, this dynamic dramatically reversed: as TeamHealth claims exponentially increased, PRA's implied severity rate for those claims inexplicably *dropped*, falling to only $88,562 per claim in 2Q18 and all the way to $79,278 in 3Q19 – a massive decline of *over 50%*.  ¶¶122-124.  There is no plausible non-fraudulent explanation for this enormous decline.  Indeed, while

---

[2]   Defendants' implicit claim that Plaintiffs' forensic analysis unjustifiably assumed that all of these claims were attributable to TeamHealth is meritless.  Mem. at 15.  As alleged in the Complaint, virtually all of the business on PRA Specialty's Tennessee line was attributable to TeamHealth from 2016 on – Defendants offer no facts demonstrating otherwise.  ¶114.

[3]   The average severity rate for an account is calculated by dividing the total loss reserves for the account by the account's total number of claims outstanding, thereby deriving the loss reserves' implied average cost of resolving a claim under the policy, while accounting for the reality that individual claims will be resolved for varying amounts, including – in some instances – for no payment at all.  ¶123 n.25.

4813-8843-9280.v1

TeamHealth severity rates were cut in half, the severity rates for PRA's less risky non-TeamHealth accounts remained virtually unchanged at approximately $134,000 per claim, meaning that the TeamHealth severity rates were *30%-35% less* than the rates for PRA's other accounts.  *Id.*  Defendants knew there was no rational justification for this dramatic disparity, given that TeamHealth was, according to Defendants, a particularly risky account that had been signed to a uniquely risky policy and was subject to elevated claim amounts.  ¶¶125-128.

Moreover, Defendants' own public statements confirm they closely monitored severity rates when setting reserves.  ¶¶245-256.  Indeed, Defendants repeatedly told investors that severity was "*the most influential factor*" affecting their analysis of reserves, and that it was *management* who "*regularly reviewed*" the "assumptions used in establishing [PRA's] reserve" and who would make any necessary "adjustments to loss estimation assumptions that *best reflect emerging data*."  *Id.*

Defendants' knowledge of TeamHealth's understated reserves is further confirmed by detailed witness accounts.  According to CW 3 and CW 5 (a former Sales and Marketing Manager and former Underwriter at PRA, respectively), in mid-2019, PRA held a Company-wide meeting during which Defendants Rand and Hendricks explicitly discussed a "*problematic account*" (TeamHealth) that was causing PRA to "*hemorrhag[e] money*," with Rand specifically highlighting the massive losses PRA was exposed to from the rising TeamHealth claims.  ¶¶92-94.

- 12 -

In addition, PRA's deficient reserves resulted in materially overstated financial results, causing PRA's net income and EPS to be artificially inflated during the Class Period by between 65% to *more than 6,000%* (¶219; Table 8), and resulting in net loss ratios – which Defendants touted as a "key" measure of PRA's performance – that were understated by as much as 65% (¶¶223-224; Table 9).  ¶¶200-224.

### D.    PRA Is Forced to Recognize More than $130 Million in Charges for TeamHealth

On January 22, 2020, Defendants shocked investors by disclosing that a "deteriorating loss experience" for an unnamed "large national healthcare account written since 2016" (TeamHealth) had forced PRA to recognize charges totaling approximately *$80 million*.  ¶¶97-98, 284.  Analysts described the news as "*particularly surprising*" given PRA's reputation as "*one of the most conservative insurers in the industry*," causing PRA's stock price to fall 11%.  ¶¶100-101, 285.

However, Defendants continued to conceal that, in the wake of the charges, PRA would be forced to raise TeamHealth's premium *over 400%*, and that TeamHealth would not renew its policy on those terms and would instead exercise its tail coverage option, which would expose PRA to significant additional losses.  ¶¶102, 286.  Indeed, CW 2 – a former PRA Director of Operations who reported directly to Defendant Friedman – stated that it was well known at PRA *by 2019* that TeamHealth was "*not going to be renewing*" and would instead exercise its tail coverage option.  ¶80.  On May 7, 2020, Defendants belatedly disclosed this information, announcing an

- 13 -

additional "*net loss of up to approximately $50 million*."   ¶¶103, 288-291.   In response, PRA's stock price plunged another *22%* to close at $15.95 per share on May 8, 2020.  ¶¶104, 291.

In total, PRA recorded a staggering $130 million in losses for TeamHealth – charges so material and significant that they wiped out nearly all of PRA's profits *for the prior 3 years*, and forced the Company to report an unfavorable prior-year reserve development in the SP&C segment *for the first time in 17 years*.  ¶259.  As a result, PRA's stock price plummeted *over 57%* in just over four months.

## III.    ARGUMENT

Under Fed. R. Civ. P. 12(b)(6), the Court must consider the Complaint in its entirety, "accept all factual allegations . . . as true" and construe all reasonable inferences in Plaintiffs' favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 322 (2007).  Defendants challenge only falsity and scienter, and have thus waived any challenges to the remaining elements of Plaintiffs' claims, including loss causation.  *See United States v. Levy*, 379 F.3d 1241, 1243 (11th Cir. 2004).

### A.    The Complaint Alleges Actionable Misrepresentations

#### 1.    False Statements About PRA's Loss Reserves

Throughout the Class Period, Defendants repeatedly assured investors that PRA maintained the key "conservatism" that distinguished it from its competitors by "re-evaluat[ing]" its reserves every quarter and "mak[ing] adjustments" based on PRA's "*most recently available claims data and currently available industry trend*

- 14 -

*information*."   ¶138.   Defendants further stated that based on their "*real-time*" evaluation of frequency and severity data, frequency was "*flat*" and "*perhaps even slightly down*," and PRA's loss reserves remained "adequate" because "worsening" severity trends were already "embedded" in existing reserves.  *See, e.g.*, ¶¶62, 148, 152, 155, 159, 162, 177.  These statements were materially false.

Indeed, rather than being "flat" or "slightly down," the claim frequency for PRA's most important account, TeamHealth, was dramatically *rising* leading up to and during the Class Period.  ¶¶76, 115-117.  Defendants blatantly disregarded this information and the obvious "adjustments" it warranted to PRA's reserves, causing PRA's reserves to be massively – and knowingly – understated.  *Id.*  As explained above, the fact that PRA's reserves were unmistakably deficient is clearly evidenced by the TeamHealth account's impossibly low implied average severity rates, which confirm that – contrary to Defendants' many assertions – worsening severity trends were *not* "embedded" in PRA's existing TeamHealth reserves, and such reserves were not "adequate."  *See* §II.C., *supra*.[4]  And, there is no doubt Defendants were expressly aware of this information – and the massively understated reserves it evidenced – given Defendants' repeated representations that severity was "*the most influential factor*" in the reserving process, which they continually "*re-evaluated*" in "*real-time*"

---

[4]    While Defendants make much of their assertion that the Complaint fails to allege that severity increased specifically for TeamHealth's *paid* claims (Mem. at 2, 12, 16-17), this is off base.  Indeed, Defendants explicitly and repeatedly assured investors that PRA was factoring "known, anticipated or estimated" severity trends into its reserves even if not reflected in paid data *because* of the lag between when claims are asserted and when they are paid.  ¶¶138, 162.

- 15 -

based on current data and trends. *See* §II.C., *supra.*

Defendants' abject failure to incorporate the data points they told investors they were actively monitoring and relying upon to ensure "conservative" reserves establishes that their statements were false. *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 782 (E.D. Va. 2015) (failure to incorporate current claims data rendered statements that defendants "'monitor actual experience, and when circumstances warrant, revise our assumptions'" false); *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("Defendants departed from their claimed methodology to calculate the loan loss reserve").[5]

Defendants' assertion that their statements regarding PRA's reserve practices were forward looking and thus protected by the PSLRA's safe harbor is wrong. Mem. at 20-21. First, Defendants' statements were representations of ***current*** conditions regarding Defendants' ***present*** use of their claimed reserve methodology based on their purported analysis of ***real-time*** frequency and severity data – ***not*** future projections. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (statements not forward looking where defendants "spoke to a present state of affairs, not a belief about future events"); *FindWhat Inv. Grp. v.*

---

[5]   Defendants contend that TeamHealth's frequency and severity trends were insignificant because many HCPL claims do not require payment. Mem. at 9, 15-16. This is nonsense, as the number of TeamHealth claims increased by 30,000% in just two years. Moreover, Defendants themselves admitted that they used frequency and severity data when setting reserves, and even if some claims were resolved without payment, this would apply across PRA's entire portfolio and would not explain the dramatic disparity in severity rates between TeamHealth and PRA's other accounts.

- 16 -

*FindWhat.com*, 658 F.3d 1282, 1298-99 (11th Cir. 2011) ("'[w]e employ'" and "'[w]e enforce'" are "affirmative statements of present fact").[6]

Second, even if Defendants' statements were forward looking, PRA's generic cautionary language (*see* Mem. at 6, 20-21) was insufficient because it in no way warned that Defendants would refuse to comply with their self-disclosed reserve practices by ignoring real-time data indicating loss reserves were woefully inadequate. *See, e.g.*, *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1359 (N.D. Ga. 2018) ("boilerplate" cautionary language that did "not caution against the more specific risks . . . known to Defendants" was insufficient).

Nor can Defendants' statements about PRA's "conservative" and "disciplined" reserving practices constitute immaterial puffery, particularly in light of Defendants' claims that their "conservatism" in this regard was precisely what gave PRA its competitive advantage. Mem. at 23-24; ¶¶39-41. Indeed, "courts have recognized that the underwriting practices of mortgage lenders and insurance companies are highly material to investors." *In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 270 (S.D.N.Y. 2010) (collecting cases). Thus, characterizations of underwriting and reserve practices as "'conservative[]'" or "'disciplined'" are "not puffery at all."

---

[6]   The PSLRA safe harbor also cannot protect PRA's Class Period financial reporting of loss reserves because it expressly excludes statements that are "included in a financial statement prepared in accordance with [GAAP]." 15 U.S.C. §78u-5(b)(2)(A); *see also Local 703, I.B. of T. Grocery & Foods Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *6 (N.D. Ala. June 7, 2011) (safe harbor inapplicable to misrepresentations in financial statements).

- 17 -

4813-8843-9280.v1

*Signet*, 2018 WL 6167889, at \*11-\*12.[7]

### 2.    PRA's False Financial Statements and Certifications

Defendants' failure "'to account for current data and known trends when updating reserves'" also "state[s] a claim for violation of GAAP." *Genworth*, 103 F. Supp. 3d at 780-81 (company's failure to "'update its reserve calculations when new experience data showed that the factors underlying its reserves, such as claims duration, had changed'" violated GAAP).[8]   Defendants' gross understatement of PRA's loss reserves artificially inflated PRA's net income and EPS, causing its Class Period financial statements – and Defendants' SOX certifications attesting to the accuracy of those statements – to be materially false and not "prepared in conformity with GAAP."  ¶¶195-197, 200-205; *Underland*, 2011 WL 4017908, at \*9 (because "Plaintiffs have sufficiently alleged that Defendants departed from their claimed methodology to calculate the . . . loss reserve, they have sufficiently alleged that [PRA's] net income, [EPS, net losses, and net loss ratios] were misstated").

Defendants' assertion that their false statements concerning PRA's understated loss reserves constitute non-actionable opinions fails.  Mem. at 13-15.  As an initial matter, courts have recognized that "the characterization of . . . statement[s] as opinion

---

[7]    *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at \*19 (M.D. Tenn. Apr. 26, 2011) ("conservative and disciplined" statements not puffery given "Plaintiff's contention that BancorpSouth loss reserves ignored the declining credit quality of borrowers, [and] failed to inform investors about facts which affected those reserves"); *Regions*, 2011 WL 12855820, at \*7 (statement that "'we are prudently managing our credit risk in establishing the necessary reserves'" was "more than puffery" where defendants had "strayed from the legitimate company procedures").

[8]    Defendants do not contest Plaintiffs' Item 303 allegations (¶¶237-241), and have therefore waived any arguments thereto.

- 18 -

is not for the Court to make at this stage of the case." *Tung v. Dycom Indus.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020). Moreover, many of Defendants' statements regarding PRA's loss reserves (*see, e.g.*, ¶¶138, 144, 148, 164, 177) convey **facts** about the adequacy of PRA's reserves and factors impacting the reserves, which are clearly not opinions. *See Signet*, 2018 WL 6167889, at *13 (finding statements about the "present state of affairs, not a belief about future events" are not opinions). And there is "'nothing unique about representations'" regarding "'loss reserves that removes them from the purview . . . of the federal securities laws,'" and thus "'**[a] company cannot characterize loss reserves as adequate or solid when it knows that the reserves are inadequate or unstable**.'" *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *6 (E.D. Pa. July 27, 2005) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992)).

Even if PRA's understated reserves are deemed "opinion," Plaintiffs have identified "particular . . . facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015); *see, e.g.*, ¶¶139, 145, 149, 153, 156. As set forth above, Defendants claimed PRA's reserves were adequate based on their "real time" observation of frequency and severity data, despite being fully aware that such data clearly indicated that PRA's reserves were dramatically understated. *See* §II.C., *supra*. These material omitted facts go directly to the basis of

Defendants' purported opinions, and they establish that PRA's loss reserves – and Defendants' repeated portrayal of such reserves as "adequate" and "conservative" – lacked any reasonable basis in fact, rendering such statements actionable under the securities laws. *See Omnicare*, 575 U.S. at 188 ("if the real facts are otherwise, but not provided, the opinion statement will mislead its audience").

Defendants also assert that PRA's loss reserves must have been reasonable because they were purportedly certified by independent actuaries. Mem. at 3, 5, 8, 19-20. However, this argument not only impermissibly seeks to judicially notice documents opining on disputed facts to prove the truth of their contents,[9] it also misses the mark. PRA's SEC filings are clear that, while management may consider the opinions of actuaries among many other factors when evaluating reserves, PRA's loss reserves were established "***by management***," were regularly re-evaluated "***by management***," and on January 22, 2020, Defendants represented that "***management*** concluded that additional reserves were needed." ¶¶47, 98, 138. Moreover, the certifications on their face disclose that the actuary's opinion "was based upon data and related information ***prepared by the Company***." *E.g.*, ECF No. 52-10.[10]

---

[9]    *See In re Flowers Foods Inc., Sec. Litig.*, 2018 WL 1558558, at \*4 (M.D. Ga. Mar. 23, 2018) (judicial notice inappropriate """"to prove the truth of the documents' contents""""); *SEC v. LeCroy*, 2010 WL 11565305, at \*4 (N.D. Ala. Aug. 4, 2010) (Kallon, J.) ("to take judicial notice, a fact must be indisputable"). In a securities class action, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), *aff'd sub nom. Hagan v. Khoja*, __ U.S. __, 139 S. Ct. 2615 (2019).

[10]    Thus, Defendants' purported reliance on actuary opinions raises "fact-intensive inquiries" that courts refuse to consider at the pleading stage. *Flowers*, 2018 WL 1558558, at \*18; *see also Ambac*,

Finally, Defendants' contention that the Complaint's allegations constitute "hindsight pleading" is baseless. Mem. at 1-2, 8-9. Despite Defendants' assertions, the loss reserve charges PRA was forced to take in 2020 did ***not*** result from "unanticipated, adverse business developments," but instead from developments Defendants admittedly observed in "***real-time***." Indeed, multiple CWs corroborated that at the Summer 2019 Meeting, Defendants discussed at length TeamHealth's increasing claims and PRA's resulting loss exposure. ¶¶92-94, 266. Thus, Plaintiffs specifically allege that Defendants misrepresented "the adequacy of [PRA's] loss reserve and its financial results" because "Defendants understood that the publicly reported numbers were at odds with [PRA's] internal analyses," and "'misrepresented [PRA's] compliance with its ***own*** stated policies and practices.'" *In re Converium Holding AG Sec. Litig.*, 2006 WL 3804619, at \*13 (S.D.N.Y. Dec. 28, 2006); *West Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at \*14 (E.D. Pa. June 16, 2015) (emphasis in original).

### 3. Defendants Concealed the Known Impact of TeamHealth's Tail Coverage Option

As detailed above, on January 22, 2020, Defendants disclosed that PRA would be forced to take approximately ***$80 million*** in reserve charges related to the TeamHealth account (¶¶97, 187), but they continued to conceal the full truth. ¶102. Indeed, Defendants knew at that time that, as a result of these losses, PRA would need

---

693 F. Supp. 2d at 273 (rejecting argument that loss reserves were adequate because "KPMG issued an unqualified audit opinion").

- 21 -

to raise TeamHealth's premiums by over **400%** – and that TeamHealth would almost certainly not renew its policy on those terms and would instead exercise its tail coverage option, subjecting PRA to **up to $50 million in additional losses**, a staggering and material figure.  ¶¶227, 235.  This was confirmed by CW 2, a former PRA Director of Operations in charge of the Underwriting Advisory Committee, who stated that it was well known internally **by 2019** that TeamHealth would not renew its policy and would exercise its tail coverage option.  ¶80.[11]

Nevertheless, Defendants concealed this highly material information until May 7, 2020 – rendering Defendants' statements in January and February 2020 regarding the significant TeamHealth-related losses PRA had already suffered, and their assurances that the TeamHealth issues were fully resolved, materially false.  ¶¶98, 102, 187-194.  It is axiomatic that "'once a company chooses to speak, it must "provide complete and nonmisleading information with respect to the subjects on which [it] undertakes to speak."'"  *Winslow*, 2011 WL 7090820, at *17.

Defendants' failure to disclose their knowledge that TeamHealth would exercise its tail coverage option also clearly violated ASC 450 (¶¶225-241), which creates an affirmative duty to disclose material loss contingencies that are "reasonably possible" to occur – a threshold that is defined as "'***more than remote***.'"  *See, e.g.*, *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 582-83 (S.D.N.Y. 2020) (failure

---

[11]   Defendants fail to address this allegation from CW 2 (Mem. at 24-25), a high-ranking executive in charge of the Underwriting Advisory Committee who reported directly to Defendant Friedman.  ¶55 n.9.

- 22 -

to disclose "'more than remote'" possibility of adverse result from tax audit violated ASC 450). Defendants knew by at least January 2020 that the likelihood of TeamHealth exercising its tail coverage was far "'more than remote,'" and disclosure under ASC 450 is "triggered by awareness of a reasonably possible [or more than remote] loss," such that "[d]isclosure may not await final determination." *Id.* at 583-84.[12]

Defendants assert that the risks associated with tail policies *in general* "were plainly disclosed" in PRA's SEC filings (Mem. at 3), but this actually *supports* Plaintiffs' claims, as the first time that PRA included this generic warning was in *February 2020* – and tellingly, PRA omitted that the updated warning related to the losses revealed just a month earlier. *Compare* ECF No. 52-2, *with* ECF No. 52-4 at 22. The fact that Defendants updated their risk disclosures *after* Defendants knew that these specific risks had already materialized confirms Plaintiffs' claims. Indeed, "the law provides 'no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that

---

[12] Defendants' contention that TeamHealth's exercise of the tail option was not a "foregone conclusion" because negotiations were "ongoing" misses the mark, as it raises fact questions that may not be resolved at this stage, and actually confirms what Plaintiffs have alleged: that Defendants knew in January 2020 that there was a far "more than remote" *probability* that PRA would incur significant additional losses because TeamHealth intended to exercise its tail coverage. Mem. at 1-2, 21-23. It is Defendants' concealment of this *known* material potential liability that rendered Defendants' January and February 2020 statements misleading. Thus, *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017), where the plaintiff failed to allege "any definitive statement that Anthem no longer intended to do business with Express Scripts during the Class Period," is inapposite. *Id.*; *see* Mem. at 23. Here, Plaintiffs have *specifically alleged* that it was well known internally by 2019 that TeamHealth would terminate its policy and exercise its tail coverage option. ¶80.

- 23 -

the Grand Canyon lies one foot away.'"  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010).

### B.    The Complaint Alleges a Strong Inference of Scienter

A court must accept Plaintiffs' scienter allegations as true and "assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326.  Whether scienter is met "boils down to whether a reasonable person *would* infer that there was at least a fifty-fifty chance" that defendants knew, or were severely reckless in not knowing, about the alleged fraud.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008). Scienter is a "mixed question[] . . . that must typically be resolved by the factfinder." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020).  As set forth below, a strong inference of scienter is easily established here.[13]

### 1.    Defendants Knew PRA's Reserves Were Understated

As detailed above, Plaintiffs' forensic analysis confirmed that PRA's loss reserves were severely understated throughout the Class Period, as evidenced by TeamHealth's exponentially increasing claims and impossibly low severity rates, which were significantly and inexplicably lower than PRA's other, *less risky* accounts.  *See* §II.C., *supra*; *see also PMA*, 2005 WL 1806503, at \*11 (finding "much less conservative loss reserves in the face of more competitive insurance market

---

[13]    Because Plaintiffs adequately plead scienter as to the Individual Defendants, PRA's scienter is also established.  *MAZ Partners, LP v. First Choice Healthcare Sols., Inc.*, 2020 WL 1072582, at \*7 (M.D. Fla. Feb. 14, 2020) (imputing to company scienter found as to individual defendants).

- 24 -

conditions" probative of scienter).  There was no plausible explanation for this dramatic and sustained disparity.  ¶125.

Significantly, the Individual Defendants were undoubtedly aware of TeamHealth's impossibly low implied severity rates, and the massively understated reserves they evidenced, given Defendants' repeated representations that: (1) they were intimately involved in and aware of PRA's reserves process (¶245); (2) those processes focused on "re-evaluat[ing]" "real-time" frequency and severity data and trends, with "the severity of claims" being "***the most influential factor***" (¶¶254-255); and (3) TeamHealth's physician staffing business was subject to enhanced "***risk profiles that are a good bit different than the traditional physician business***" (¶60).[14] Defendants' brief ***fails to even address*** the fact that Defendants' own representations confirm that they were undoubtedly aware of the impossibly low average severity rates implied by TeamHealth's woefully understated reserves.  *See* Mem. at 24-30; *see also Signet*, 2018 WL 6167889, at *15 ("Either Defendants' public statements about ongoing and real-time management were false, or Defendants knew of negative trends developing but did not disclose them.  ***Either scenario supports an inference that***

---

14    *See Genworth*, 103 F. Supp. 3d at 785 ("[b]ecause of the Individual Defendants' self-proclaimed 'personal involvement in [establishing reserves]', the Court may reasonably infer that Defendants possessed knowledge of the true state of affairs of [Genworth's] business, and thus had knowledge that their representations were misleading").

- 25 -

4813-8843-9280.v1

***Defendants acted recklessly*.").[15]**

Moreover, Defendants' knowledge of TeamHealth's severe problems was confirmed by multiple CWs, who provided mutually corroborating accounts of the Summer 2019 Meeting, during which Defendants Rand and Hendricks explicitly discussed that PRA was "hemorrhag[ing] money" due to the "problematic" TeamHealth account. ¶¶53-56, 92-93; *Luczak*, 812 F. App'x at 925 (scienter established where CWs directly contradicted defendant's public statements); *Hubbard v. BankAtlantic Bancorp, Inc.*, 2009 WL 3261941, at *3 (S.D. Fla. May 12, 2009) (scienter found where defendants confronted with concerns regarding lending practices as supported by CWs).[16]

### 2.    TeamHealth's Significance to PRA's Business Further Establishes Scienter

The critical importance of the TeamHealth account further supports scienter. ¶¶32, 257; *see In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *18 (N.D. Ga. Oct. 4, 2006) ("Knowledge of facts relating to the [company's] core functions [is] imputed to a company's key officers."); *DFC*, 2015 WL 3755218, at *16 ("fact that

---

[15]   *See also In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1233 (N.D. Ga. 2019) ("'Plaintiffs may prove . . . recklessness by providing evidence that defendants possessed knowledge of facts or access to information contradicting their public statements . . . .'").

[16]   Defendants' reliance on *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220, 1240 (M.D. Fla. 2014), and *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009), is misplaced. Mem. at 24-27. Unlike *Mogensen*, the Complaint here alleges "what exactly was said . . . by whom [the] statements were said, to whom they were said, on which approximate date they were said, or in what context they were said." 15 F. Supp. 3d at 1219; ¶¶92-93. *Malin* is also distinguishable because each CW was employed by PRA during the Class Period, and two of the CWs were directly involved in the TeamHealth underwriting process. 499 F. Supp. 2d at 141. Here, the Complaint describes each CW's position and establishes their "reliability and personal knowledge." *Regions*, 2011 WL 12855820, at *8.

- 26 -

the allegations of fraud relate to Defendants' core business supports [a strong inference of [scienter]").  Indeed, TeamHealth was PRA's "single largest premium ever billed," and was by far the most prominent of PRA's HCPL policies, which generated 90% of the revenues for PRA's core SP&C segment.  ¶¶32, 52-56.

Taken with the Individual Defendants' senior positions and admitted close monitoring of highly relevant data regarding PRA's loss reserves, underwriting processes and overall financial metrics (¶¶244-251), the core operations of PRA that are at issue here further bolsters scienter. *Signet*, 2018 WL 6167889, at *15 (finding monitoring of reserves by management who affirmatively stated that "'[w]e watch [reserves] closely,'" and represented in its SEC filings that "'on an ongoing basis, management monitors [its] credit exposure'" probative of scienter).[17]

This strong inference of scienter is even more compelling here, given Defendants' ***personal involvement*** in the negotiation of the TeamHealth policy and their unquestioned awareness that it had a uniquely risky policy structure that was not "even . . . close" to any other policy in PRA's book of business, which warranted heightened scrutiny and attention from senior management.  ¶¶56, 104.[18]

---

[17]  *See also Primavera Invs. v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1158 (M.D. Fla. 2005) (finding scienter where the individual defendants had unfettered access to internal information and ample opportunity to prevent the release of any misleading statement).

[18]  *See Immucor*, 2006 WL 3000133, at *18 ("That [Defendants] never disclosed the full scope of the [TeamHealth] situation, even after it is apparent that [Defendants] knew of its scope and gravity, lends strength to the inference that [Defendants] intentionally or recklessly withheld from investors a full and fair statement of the problems [with TeamHealth] and their possible consequences.").

### 3.      Additional Indicia Further Establish Scienter

Numerous other facts support a strong inference of Defendants' scienter.

First, the magnitude of the fraud – $130 million in charges that wiped out nearly three years of profits, leading to two substantial stock price drops of 11% and 22%, respectively – is probative of scienter.  ¶¶258-261; *see Genworth*, 103 F. Supp. 3d at 786 (scienter found given "'[s]ignificant overstatements of revenue,'" including adverse reserve charge that reduced quarterly net operating income by "2,156%").  Indeed, the charges taken caused a 4Q19 SP&C segment operating loss that was *2,274.4% higher than the segment's loss for the same quarter in 2018*.  ¶¶97, 100, 103, 106; *see also Signet*, 2018 WL 6167889, at *16 ($170 million loss that "was equal to an entire quarter's worth of pretax income – speaks for itself").

Second, the wholesale restructuring of PRA's executive management team starting in mid-2019 – which coincided with the Summer 2019 Meeting during which Defendants explicitly discussed the "problematic" TeamHealth account that was "hemorrhag[ing] money" – also contributes to a strong inference of scienter.  ¶¶268-270; *Equifax*, 357 F. Supp. 3d at 1245-46 (sudden departure of high-ranking executives probative of scienter).[19]  While Defendants dismiss this management exodus as merely the result of "mismanagement" (Mem. at 29), the fact that numerous high-ranking executives specifically associated with TeamHealth simultaneously left

---

[19]   In contrast to *In re Jiangbo Pharms., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1268 (S.D. Fla. 2012), *aff'd*, 781 F.3d 1296 (11th Cir. 2015), Plaintiffs have specifically alleged "facts linking the departures with the alleged . . . fraud."  *See* ¶¶88-96, 268-270.

- 28 -

PRA at a time when TeamHealth's claims were skyrocketing – including Defendant Friedman, leader of the NHT team responsible for signing TeamHealth, and then-CEO Starnes who departed despite having ***three years*** left on his five-year employment contract (¶¶268-270) – is highly probative of scienter.

Third, courts have found GAAP violations to be probative of scienter when coupled with other allegations of fraud. *See Regions*, 2011 WL 12855820, at *9 (misclassification of loans, coupled with other indicia of fraud, probative of scienter); *In re Sci. Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1366 (N.D. Ga. 2002) (accounting violations probative of scienter where defendants had prior notice of error and signed financial statements), *aff'd*, 374 F.3d 1015 (11th Cir. 2004). Defendants' numerous GAAP violations here (¶¶200-236) – which resulted in materially understated reserves and overstated financials during the Class Period – support a strong inference of scienter.[20]

Fourth, while motive is not required to plead scienter (*see Tellabs*, 551 U.S. at 325), the Complaint alleges that the Individual Defendants were incentivized to conceal the problems underlying the TeamHealth account in order to obtain higher compensation, which was directly tied to PRA's falsely inflated financial metrics. ¶¶276-277; *see Tellabs*, 551 U.S. at 310, 325 (allegations of "personal financial gain

---

[20]  Defendants' SOX certifications are also "probative of scienter" where, as here, defendants "had reason to know, or should have suspected [misstatements], due to . . . 'red flags.'" *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). Here, Defendants Rand, Hendricks, Friedman, and Boguski signed SOX certifications and insurance filings despite knowing full well that these financials were false throughout the Class Period. ¶¶107-113, 271-275.

4813-8843-9280.v1

may weigh heavily in favor of a scienter inference"); *Regions*, 2011 WL 12855820, at

*8 (compensation tied to company performance supports scienter).[21]

## IV.   CONCLUSION[22]

For the foregoing reasons, Defendants' Motion should be denied.

DATED:  June 30, 2021                    Respectfully submitted,

                                          ROGER BEDFORD, ATTORNEY AT
                                          LAW, LLC
                                          ROGER H. BEDFORD, JR. (ASB: 3651
                                          D60R)


                                          ___s/ ROGER H. BEDFORD, JR.___
                                              ROGER H. BEDFORD, JR.
                                          P.O. Box 1149
                                          Russellville, AL  35653
                                          Telephone:  256/332-6966
                                          265/332-6967 (fax)
                                          rogerbedfordattorneyatlawllc@gmail.com

---

[21]   Defendants' argument that compensation is insufficient by itself to raise a strong inference of scienter because similar motivations exist for all executives is unavailing.  Mem. at 30.  The Individual Defendants' compensation was based in part on metrics specifically inflated by the fraud (¶277 n.45), and is only one of many compelling indicia of scienter.

[22]   Because the Complaint adequately alleges primary violations of §10(b), the Complaint satisfies the §20(a) control person requirement.  *Mizzaro*, 544 F.3d at 1237.

- 30 -

4813-8843-9280.v1

GUIN, STOKES & EVANS, LLC
DAVID J. GUIN
TAMMY M. STOKES
DAWN STITH EVANS
300 Richard Arrington Jr. Blvd. N.
Suite 600/Title Bldg.
Birmingham, AL  35203
Telephone: 205/226-2282
205/226-2357 (fax)
davidg@gseattorneys.com
tammys@gseattorneys.com
devans@gseattorneys.com

Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN & DOWD
LLP
NATHAN R. LINDELL (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD
LLP
BAILIE L. HEIKKINEN (admitted *pro hac vice*)
REGINALD E. JANVIER (admitted *pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
bheikkinen@rgrdlaw.com
rjanvier@rgrdlaw.com

- 31 -

SAXENA WHITE P.A.
STEVEN B. SINGER (admitted *pro hac vice*)
SARA DILEO (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY  10606
Telephone:  914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
sdileo@saxenawhite.com

SAXENA WHITE P.A.
JOSEPH E. WHITE, III (admitted *pro hac vice*)
LESTER R. HOOKER (admitted *pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL  33434
Telephone:  561/394-3399
561/394-3382 (fax)
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Lead Counsel for Lead Plaintiff

CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

Additional Counsel for Lead Plaintiff

- 32 -

4813-8843-9280.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 30, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ ROGER BEDFORD
ROGER BEDFORD

ROGER BEDFORD, ATTORNEY AT LAW, LLC
P.O. Box 1149
Russellville, AL  35653
Telephone:  256/332-6966
265/332-6967 (fax)

E-mail:
rogerbedfordattorneyatlawllc@gmail.com

4813-8843-9280.v1

# Mailing Information for a Case 2:20-cv-00856-AKK Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter W Bates**
  Bbates@starneslaw.com

- **Roger H Bedford , Jr**
  rogerbedfordattorneyatlawllc@gmail.com

- **Sara M. DiLeo**
  sdileo@saxenawhite.com

- **James Bringhurst Eubank**
  James.Eubank@beasleyallen.com

- **Dawn Stith Evans**
  devans@gseattorneys.com

- **Jay M Ezelle**
  JEzelle@starneslaw.com

- **Janet A Gochman**
  jgochman@stblaw.com

- **Cole Robinson Gresham**
  cgresham@starneslaw.com

- **David J Guin**
  davidg@gseattorneys.com

- **Bailie L Heikkinen**
  bheikkinen@rgrdlaw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Reginald E Janvier**
  rjanvier@rgrdlaw.com

- **Michael R Lasserre**
  mrl@starneslaw.com

- **Nathan R Lindell**
  nlindell@rgrdlaw.com

- **Carl Jacob Lundqvist**
  jacob.lundqvist@stblaw.com

- **Wilson Daniel Miles , III**
  dee.miles@beasleyallen.com

- **Steven B Singer**
  ssinger@saxenawhite.com

- **Tammy McClendon Stokes**
  tammys@gseattorneys.com

- **Joseph E. White**
  jwhite@saxenawhite.com

- **Jonathan K Youngwood**
  jyoungwood@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)