FILED

2021 Dec-10  AM 09:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHEET METAL WORKERS LOCAL 19 PENSION FUND,** individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | Civil Action Number **2:20-CV-00856-AKK** |
| **v.** | ) ) | |
| **PROASSURANCE CORPORATION, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION</u>

This federal securities case arises from a medical malpractice insurance account that, under the plaintiffs' retelling, was doomed from the start. The lead plaintiffs, the Central Laborers' Pension Fund and the Plymouth County Retirement System, allege that ProAssurance Corporation and several of its high-ranking officials[1] actively concealed or misstated facts regarding an unprecedently large and uniquely structured deal with a physician staffing company called TeamHealth. *See* doc. 44. When ProAssurance ultimately shared aspects of the TeamHealth deal and its corresponding losses with investors over the course of several months in 2020,

---

[1] The individual defendants are former CEO W. Stancil Starnes, current CEO Edward L. Rand, Jr., current CFO Dana S. Hendricks, former President of Healthcare Professional Liability Howard Friedman, and current President of Specialty Property and Casualty Operations Michael Boguski. Doc. 44 at 1, 9–10.

ProAssurance's stock price apparently plummeted, and three years' worth of income was nearly wiped out. *See id.* The plaintiffs thereafter filed suit, alleging federal securities law violations for misrepresentations regarding the TeamHealth account that purportedly led to the disaster. *See id.*

In particular, the plaintiffs plead violations of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 against ProAssurance and the executives and violations of Section 20(a) of the Securities Exchange Act against the executives as the company's "control persons." *Id.* at 117–19. The defendants collectively move to dismiss the claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Docs. 51; 53. The parties have fully briefed the motion, which is thus ready for resolution. *See* docs. 55; 58–59. The court finds that the motion is due to be granted only as to the § 10(b) claims against Starnes, Rand, and Hendricks altogether and as to the § 10(b) claims against Friedman, Boguski, and ProAssurance for the alleged category of omissions regarding TeamHealth's decision to purchase tail coverage instead of renewing its policy. As to all other claims, the motion is due to be denied.

## I.

The court begins with the multi-layered pleading standard that private securities fraud litigants must satisfy. First, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This

pleading standard does not require "detailed factual allegations," but it demands more than unadorned accusations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And when a complaint fails to state a claim on which relief can be granted, Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the court to dismiss it. FED. R. CIV. P. 12(b)(6). Generally speaking, to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts, taken as true, to state a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678.

However, like other fraud claims, securities fraud claims fall under the purview of Rule 9(b) of the Federal Rules of Civil Procedure and therefore must also "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). To satisfy Rule 9(b), a complaint must set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007). Rule 9(b) does not require specific facts about the defendant's state of mind when the alleged statements were made; rather, conditions of a person's state of mind "may be alleged generally." FED. R. CIV. P. 9(b); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). In short, Rule 9(b) requires plaintiffs to plead "the who, what,

when, where, and how of the allegedly false statements" but allows plaintiffs to "allege generally that those statements were made with the requisite intent." *Mizzaro*, 544 F.3d at 1237.

The Private Securities Litigation Reform Act of 1995 layers atop these requirements a further-heightened pleading standard in private securities litigation. *See* 15 U.S.C. § 78a *et seq.*  As to allegations of material misstatements and omissions, the PSLRA provides:

> [A] complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

*Id.* § 78u-4(b)(1).  In addition, the PSLRA tightens the application of Rule 9(b)'s scienter standard, requiring that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2).  Thus, to survive a motion to dismiss under the PSLRA, the factual allegations must raise a "strong inference" that is "'cogent and compelling,' that the named defendants acted with the requisite scienter."  *Mizzaro*, 544 F.3d at 1235; *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) ("In this context, a 'strong inference' of scienter is one that is 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'").

Taken together, the court must accept all factual allegations in the complaint as true, consider the complaint in its entirety, determine whether all of the facts alleged collectively give rise to a strong inference of scienter, and account for plausible opposing inferences. *Thompson*, 610 F.3d at 633–34 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). *See also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317–18 (11th Cir. 2019) (discussing "triple-layered pleading standard"); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

## II.

The 123-page amended complaint[2] is a putative class action alleging violations of federal securities law on behalf of shareholders who purchased or acquired ProAssurance common stock between August 8, 2018 and May 7, 2020, inclusive ("the Class Period"). Doc. 44 at ¶ 1. ProAssurance is a Birmingham, Alabama-based holding company that provides insurance, including healthcare professional liability ("HCPL") insurance, through its subsidiaries. *Id.* ¶¶ 3–4; doc. 53 at 4. The plaintiffs pin responsibility for alleged securities fraud on ProAssurance and several of its past and present officers: former CEO Starnes, current CEO Rand,

---

[2] The court accepts the allegations of the complaint as true and construes them in the light most favorable to the plaintiff on a Rule 12(b)(6) motion. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). Thus, the factual allegations are derived from the amended complaint, doc. 44.

current CFO Hendricks, former President of Healthcare Professional Liability Friedman, and current President of Specialty Property and Casualty Operations Boguski.  Doc. 44 at 1, 9–10.

## A.

Before describing the specific facts giving rise to this lawsuit, some background is in order.  Allegedly, conservatism in underwriting and in the maintenance of loss reserves[3] has historically set ProAssurance apart from its competitors.  *Id.* ¶ 5.  Before and throughout the Class Period, ProAssurance and its officers emphasized the company's "disciplined approach to business" to investors in earnings calls and in its 2015–2018 Forms 10-K,[4] highlighting its conservative underwriting, risk-averse reserves practices, and reinsurance protection,[5] which

---

[3] "Loss reserves are estimates of amounts insurers will have to pay for losses that have been reported but not yet paid, for losses that have been incurred but not yet reported, and for administrative costs of resolving claims."  *Atl. Mut. Ins. Co. v. C.I.R.*, 523 U.S. 382, 384 (1998). As the plaintiffs state, "[t]he establishment of loss reserves is meant to ensure that sufficient financial resources will be available to ultimately cover the cost of claims filed. . . . The adequacy of such reserves for unpaid claims must be reevaluated and adjusted in each successive accounting period."  Doc. 44 at ¶ 43.

[4] The court has reviewed each statement that the plaintiffs characterize as an actionable misstatement or omission, and the court summarizes or cites certain illustrative examples—but not to the exclusion of the statements not expressly mentioned.  *See Carvelli*, 934 F.3d at 1315 n.1 ("We have carefully reviewed each statement that the [plaintiff] assails as an actionable misrepresentation; this opinion addresses illustrative examples as necessary to our analysis.").

[5] "Reinsurance" is essentially insurance for insurers.  *Id.* ¶ 48.  An insurer can reduce its liability exposure by paying a third-party insurer part of a policy's premium in exchange for assuming a portion of that policy's liability.  *Id.*

were designed to limit the company's liability on the insurance policies it issued.  *Id.* ¶¶ 39–41, 50.  Traditionally, professional liability policies for solo practitioners and small physician groups comprised the bulk of ProAssurance's HCPL business.  *Id.* ¶ 51.

Beginning around 2015, the broader HCPL industry shifted toward underwriting policies for larger groups of physicians, such as hospitals and national healthcare providers.  *See id.*  For larger policies like these, appropriate underwriting and reserve-setting are of great importance, because large hospital and physician groups have the increased potential for more severe claims with higher frequency compared to solo physicians and smaller groups.[6]  *See id.* ¶¶ 59, 66.   In 2015 or 2016, responding to this shifting HCPL landscape, ProAssurance created the "National Healthcare Team," a group of underwriters "specifically tasked with selling HCPL policies to large physician groups."  *Id.* ¶ 51.

ProAssurance designated Friedman, then-President of Healthcare Professional Liability, as the leader of this team.  *See id.*  This role apparently required Friedman to approve underwriting decisions with respect to HCPL policies. *See id.*   In addition, ProAssurance's senior management—including the other individual defendants—purportedly established the loss reserves for the HCPL

---

[6] "Severity" refers to how "bad" a particular claim is, meaning how much it costs to resolve.  *Id.* ¶ 61.  "Frequency" refers to the number of claims reported.  *See id.*

policies. *Id.* ¶ 47. The HCPL policies, the process by which the company set its loss reserves, the statements senior management made about them, and the ultimate loss reserves estimates are at issue in this case.

### B.

In 2016, the National Healthcare Team underwrote an insurance policy for the physician staffing firm TeamHealth. *Id.* ¶ 5. Neither ProAssurance nor its executives identified TeamHealth as the insured or discussed the terms of the new account with investors. *See id.* However, Friedman addressed the significance of the TeamHealth signing during an earnings call in mid-2016 in which he noted that ProAssurance had increased its yearly premium billings in part due to "several large accounts[,] including the multistate account mentioned in the news release." *Id.* ¶ 53. Friedman described this account as having "the single largest premium [the company had] ever written." *Id.* Confidential former employees CW 1[7] and CW 2[8] told the plaintiffs that the TeamHealth account "was the biggest account written that

---

[7] CW 1, who worked in ProAssurance's Florida office as an account executive from July 1997 to March 2020, "was responsible for marketing and selling professional medical liability insurance to physicians, physician groups, and hospitals." *Id.* ¶ 55 n.8.

[8] CW 2 worked for ProAssurance in Alabama as Director of Operations and Assistant Vice President of Operations from September 2014 to August 2019. *Id.* ¶ 55 n.9. CW 2 "was responsible for implementing an Underwriting Advisory Committee to assist with improving communication between different ProAssurance departments, which exposed CW 2 to information concerning both underwriting and claims." *Id.* CW 2 reported to several managers, including Friedman. *Id.*

year," and CW 3[9] purportedly stated that landing the TeamHealth deal alone generated 20 percent of ProAssurance's goal of selling 50 million dollars' worth of new policies in 2016. *Id.* ¶ 55. The magnitude of this deal signaled to CW 3 and CW 4[10] that ProAssurance must have required Friedman to specifically approve the underwriting of the policy. *Id.* ¶ 56.

The TeamHealth policy embodied "an unusual, particularly risky contractual structure unlike any other in ProAssurance's portfolio." *Id.* ¶ 5. Allegedly, TeamHealth was highly susceptible to "enhanced medical malpractice liability risks." *Id.* The plaintiffs claim that TeamHealth's "unique corporate structure" enabled TeamHealth "to evade laws intended to promote adequate medical care" and that TeamHealth, which was owned by a private equity firm and was facing lawsuits for alleged malpractice and fraudulent billing, "had a profits-over-patients culture that exposed it to higher rates of medical malpractice claims." *Id.* ¶¶ 5, 67, 70–71. And TeamHealth "was a particularly risky client" because of its "massive scale," the "increasing risks posed by large physician groups in general," and "TeamHealth's well-known, and controversial, profits-centric philosophy." *Id.* ¶ 57.

---

[9] CW 3 worked in ProAssurance's Florida office from 2001 to April 2020 as a manager of customer service, sales, and marketing. *Id.* ¶ 55 n.10.

[10] CW 4 worked at ProAssurance from February 2012 to September 2018. *Id.* ¶ 56 n.11.

Indeed, ProAssurance began to observe a "dramatic increase" in reported outstanding claims by the end of 2017. *Id.* ¶¶ 76–77. Simultaneously, the HCPL industry experienced a rise in the severity of reported claims. *Id.* ¶ 7. In light of this and given that the defendants monitored the frequency of claims reported to ProAssurance in real time, the plaintiffs argue that the "extraordinary increase" in claims in connection with a large and risky national account placed the defendants on notice of the risks associated with the TeamHealth policy and especially the allegedly limited reserves ProAssurance had set for this account. *See id.* ¶¶ 77–78.

To be specific, the plaintiffs cite several factors allegedly indicating that the company's reserves were inadequate at the time they were set and as they were regularly re-evaluated. For one, the defendants expressly acknowledged that they used claim frequency and severity data to calculate and re-assess HCPL loss reserves. *Id.* ¶¶ 78, 80, 252–53. Because claims rose exponentially as severity in the HCPL industry worsened, allegedly, the defendants knew or were severely reckless in not knowing that ProAssurance required a sufficient and corresponding increase to its reserves. *See id.* ¶ 9. In addition, the plaintiffs argue that quarterly and annual statements with state insurance departments reveal that the reserves reported for TeamHealth's claims corresponded to "impossibly low" average

severity rates.[11]  *Id.* ¶ 8.  Specifically, because the loss reserves for the TeamHealth account apparently suggested average severity rates 35.5 percent lower than the average severity rates implied for ProAssurance's other accounts, the plaintiffs claim that TeamHealth's average severity rate should have been at least as high, if not significantly higher.  *Id.*  Generally, because of the "significant impact" of the TeamHealth account, including its all-time high premium and sky-high claims frequency, the defendants were allegedly "expressly aware" of the problems with the TeamHealth account well before the defendants shared these issues with investors.  *See id.* ¶¶ 8–10.

But the defendants apparently concealed these issues and reported loss reserves that "massively understated" liabilities on the TeamHealth account.  *Id.* ¶¶ 77–78.  This allegedly led ProAssurance to violate GAAP and SEC disclosure rules by misstating the company's net losses, loss adjustment expenses, net loss ratio, net income, earnings per share, and related financial metrics.  *Id.*  The lack of full disclosure rendered the multitude of statements the defendants made about

---

[11] The plaintiffs define "average severity rate" as "the approximate average cost of resolving a claim under a given policy or policies."  *Id.* ¶ 123 n.25.  Apparently, "[i]t is generally calculated by dividing the total amount of loss reserves by the total number of claims outstanding."  *Id.*  Because ProAssurance did not report these rates in its public filings, the plaintiffs state that they derived the rates from their own examination of ProAssurance's statutory filings.  *See id.*  The defendants generally contest this, arguing that the average severity rate "has no basis under either Generally Accepted Accounting Principles ('GAAP') or Statutory Accounting Principles ('SAP')" and "is not a metric [ProAssurance] was ever required to report."  Doc. 53 at 18.

ProAssurance's "conservative" and "disciplined" underwriting and reserve practices false and misleading. *See id.*

C.

In early 2019, in light of the growing issues with the TeamHealth account, ProAssurance engaged in "a complete restructuring of its executive management team." *Id.* ¶ 10. Specifically, the company "part[ed] ways" with Starnes and Friedman and disbanded the National Healthcare Team. *Id. See also id.* ¶¶ 90–91 (noting the company announced in February 2019 that Friedman "was retiring" and in May 2019 that Starnes "was being replaced effective as of July 1, 2019"). But "even after implementing such corrective measures," the defendants purportedly "continued to conceal the massive problems related to the TeamHealth account and continued to misstate ProAssurance's reported financial results" by "materially understating" loss reserves. *See id.* ¶¶ 3, 5.

Allegedly, in July 2019, shortly after Rand replaced Starnes as CEO, ProAssurance held a company-wide meeting attended by all of its senior executives and Friedman, who had recently retired. *Id.* ¶ 92. According to CW 3 and CW 5,[12] who attended this meeting, Rand and Hendricks spoke about the worsening situation with a "problematic account," which they did not identify by name but described as

---

[12] CW 5 apparently worked as an underwriter at ProAssurance from February 2016 to August 2020. *Id.* ¶ 92 n.19.

"a larger HCPL account underwritten by the National Healthcare Team." *Id.* ¶ 93. The executives stated that this account was "hemorrhaging money," and a presentation by Rand included slides highlighting "massive losses" generated by the voluminous number of claims. *Id.* After this meeting, CW 5 learned from colleagues that the unnamed account was TeamHealth and that its extremely problematic nature had been apparent for some significant period. *Id.* Soon after, ProAssurance replaced the National Healthcare Team with new underwriters tasked with evaluating the HCPL book "with a critical eye" and re-underwriting policies. *See id.* ¶¶ 94–95.

These issues came to light on January 22, 2020, when ProAssurance "shocked the market" by disclosing that higher-than-anticipated medical malpractice claims for a "large national account," which it did not name, had resulted in an estimated loss of $37 million for its loss reserves. *Id.* ¶ 11.  ProAssurance also announced that it expected charges of $33 million to $43 million to "true-up" its current accident year loss and loss adjustment expenses in connection with the same account. *Id.* The next day, the company's stock price fell from $37.58 to $33.40 per share. *Id.*

Significantly, by the time of the January announcement, the defendants apparently already knew[13] that TeamHealth was "unlikely" to renew its policy and

---

[13] According to CW 2, it was "well known internally by 2019" that TeamHealth would not renew its policy and would instead exercise its tail coverage option. *Id.* ¶ 80; doc. 55 at 22.

would instead purchase "tail coverage."[14] *Id.* ¶ 5.  This would widen ProAssurance's

exposure to additional claims amidst the ongoing losses, as the defendants

purportedly knew but did not disclose.  For instance, the plaintiffs claim that a

February 2020 press release "misleadingly stated" that "accomplishments in the past

year position[ed] ProAssurance well for the next chapter in the company's story,"

rather than disclosing information about TeamHealth's decision to purchase tail

coverage.  *Id.* ¶ 102.  Essentially, the plaintiffs contend that the defendants knew

before the January announcement that TeamHealth would not renew its policy and

should have disclosed this information.

Allegedly, the defendants sat on this knowledge until May 7, 2020, when

ProAssurance announced that the large national account had decided not to renew

and to instead purchase tail coverage, driving an estimated net loss of "up to

approximately $50 million." *Id.* ¶ 12.  The company's stock price subsequently fell

from $20.33 to $15.95 per share. *Id.*  Ultimately, the company saw a charge of $45.7

million in the second quarter of 2020 due to the tail coverage. *Id.*  By the end of the

Class Period, ProAssurance had lost $130 million, nearly negating its last three

years' worth of net income. *See id.* ¶ 3.  Moreover, its stock price had fallen from

---

[14] Tail coverage is a coverage option in which ProAssurance continues to provide insurance for a certain period of time after a prior policy period expires, thus extending the window for reporting a covered claim to ProAssurance. *Id.* ¶ 37.

its Class Period high of $49.40 to $15.95 per share, a loss of over 67 percent. *See id.* ¶ 3. This lawsuit followed. *See* doc. 1.

## III.

Essentially, the plaintiffs contend that the defendants made materially misleading or false statements and omissions by (1) representing that ProAssurance's loss reserves were adequate and predicated upon certain data, (2) failing to disclose TeamHealth's nonrenewal and purchase of tail coverage prior to May 2020, and (3) affirming ProAssurance's commitment to conservative underwriting and reserves practices throughout the Class Period. *See* doc. 44. The plaintiffs assert that these misrepresentations violate § 10(b), which in turn furnishes a predicate securities violation required for § 20(a) control-person liability. *See id.*

In their motion to dismiss, the defendants collectively contend that the § 10(b) claim must fail in the absence of (1) actionable misstatements or omissions or (2) the requisite scienter. *See* docs. 51 at 2; 53 at 13, 24. The executive-defendants argue separately that the § 20(a) claim lacks a primary securities violation. *See* docs. 51 at 2; 53 at 30. The court addresses these arguments in turn, beginning in Subsection A with whether the plaintiffs have sufficiently pleaded facts showing that the alleged statements at issue rise to actionable misstatements and omissions and, if yes, whether the defendants made them with the requisite scienter. In Subsection B, the

court addresses the individual defendants' contention that the § 20(a) claims lack a primary securities violation.

A.

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ in connection with the . . . sale of any security . . . any manipulative or deceptive device or contrivance."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 prohibits the making of "any untrue statement of a material fact" or the omission of a "material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To establish a § 10(b) violation, a plaintiff must allege (1) a material misrepresentation or omission, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) on which the plaintiff relied, (5) causally connected to (6) the plaintiff's economic loss.  *See Thompson*, 610 F.3d at 633 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).  Only the first two elements are at issue—*i.e.*, whether the plaintiffs plead actionable misstatements or omissions and the required scienter.

1.

A misrepresentation or omission is material "if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'"  *Carvelli*, 934 F.3d at 1317.  *See also Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438,

16

449 (1976)).  However, "[i]mmaterial puffery," "mere statements of opinion," and statements "simply not alleged to be false" do not rise to actionable, material misrepresentations or omissions under § 10.  *See Carvelli*, 934 F.3d at 1318; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Puffery refers to "generalized, vague, nonquantifiable statements of corporate optimism."  *Carvelli*, 934 F.3d at 1318, 1321 (citing *Omnicare*, 575 U.S. at 183–84).

a.

The defendants assert first that the plaintiffs cannot show a misrepresentation or omission related to ProAssurance's loss reserves.  More specifically, the defendants contend that ProAssurance's calculations, statements, and omissions regarding its loss reserves are nonactionable for four primary reasons.  First, the defendants assert that the plaintiffs do not allege the challenged statements "were either false or not honestly believed when made."  Doc. 53 at 13–14.  Second, that reserve-setting is "nothing more than highly conjectural, 'informed guesswork,'" rendering the loss reserves nonactionable statements of opinion.  *See id.* at 1–2, 13–14.  Third, that the severity of claims constituted "the most influential factor" in the setting of loss reserves, and there is no evidence that the severity in the general HCPL market existed in ProAssurance's claims.  *Id.* at 2.  And finally, that a "mere rise in claims" cannot demonstrate that the reserves-related statements were

17

false or that they did not honestly believe the statements when they made them.  *Id.* at 15.  The defendants are generally correct.

Two analogous cases from the Northern District of Georgia are instructive on what constitutes a misleading or false statement or omission.  In *Damian v. Montgomery County Bankshares, Inc.*, a court dismissed a § 10(b) claim in part because the plaintiff failed to allege actionable false statements regarding loan losses. 255 F. Supp. 3d 1265, 1269, 1279 (N.D. Ga. 2015).  In particular, the plaintiff alleged that a bank and its officers "vastly understat[ed]" the bank's allowance for loan losses, pointing to the substantial increase in adversely classified loans that she contended was not reflected in the bank's loan loss calculations.  *Id.* at 1269, 1277.  However, the court remarked that the loan loss amount "[was] an estimate of probable credit losses that [were] inherent in the loan portfolio as of a given date" and that the allegations did not demonstrate the defendants failed to account for the risk of nonpayment or level of substandard loans when calculating the loan losses.  *See id.*  In other words, the plaintiff "merely suggest[ed] that because the percentage of adversely rated loans was so high compared to previous periods and because [the bank] eventually had to make more charge-offs, the [loan loss] must have been undervalued."  *Id.* at 1278.  The court held that the allegations were insufficient to show that the loan loss calculations were false or misleading and further explained that even if it "determined that the comparison of [the loan loss] to the percentage of

adversely classified loans sufficiently supported an allegation that the [loan loss] calculations were objectively false," the plaintiff failed to show that the defendants "*knew* they were false at the time they were reported." *Id.* at 1279 (emphasis in original).

Conversely, in *In re Netbank, Inc. Securities Litigation*, another judge declined to dismiss a § 10(b) claim in which the plaintiffs alleged that a bank "*knew* its underwriting guidelines were insufficient, and that the reserves that it knew or should have known were necessary were not in place." No. 1:07-CV-2298-BBM, 2009 WL 2432359, at *7 (N.D. Ga. Jan. 29, 2009). The plaintiffs alleged that the bank's own analyses had indicated that it needed to increase its reserves and that one officer stated in a call with analysts that "[a]s soon [as] [the bank] bec[a]me aware of a loan in a problem, [it] allocate[d] reserves to it." *Id.* The court concluded that because "this [was] not a mere allegation that the . . . reserves ultimately proved to be inadequate after the fact," dismissal was not appropriate. *Id.*

Turning to the allegations here, to support their claims, the plaintiffs cite a variety of statements, many conveying that ProAssurance "[made] adjustments to loss estimation assumptions that [it] believe[d] best reflect[ed] emerging data" and that it "believe[d] that the methods it use[d] to establish reserves [were] reasonable and appropriate." *See* docs. 44 at ¶¶ 138, 254; 52-2 at 8, 13. There are several problems with the plaintiffs' arguments. First, rather than being false or misleading,

the cited statements relayed opinions—*i.e.*, senior management's beliefs about the reserves.  The statements fell short of conveying a great sense of certainty and instead signaled the executives' confidence in, but not conclusions about, the predictions about how much ProAssurance would have to pay for future claims based on the data the company considered.  Statements about what a company "believe[d]" or "expect[ed]" with regard to its investments and improvements are nonactionable opinions.  *Carvelli*, 934 F.3d at 1322–23.

Second, the plaintiffs do not support their allegations regarding ProAssurance's statements about its loss reserves with facts indicating that the speakers did not actually believe those statements.  Rather, the majority of the cited statements demonstrate that the defendants openly acknowledged the various types of data that influenced their assumptions, estimations, and ultimate calculations regarding loss reserves.  Though the plaintiffs allege that claim frequency rose precipitously during the Class Period against a backdrop of rising industry-wide claim severity, the complaint is devoid of facts establishing that the defendants entirely ignored these trends and thereby misled investors when they stressed the significance of frequency and severity in their calculations.

Third, the statements do not contain embedded factual representations.  Again, the statements reflected beliefs based in part on guesswork.  Moreover, the plaintiffs do not plausibly plead that the defendants did not believe that the loss reserve

assumptions "best reflect[ed]" ongoing and projected data or that the methods ProAssurance used to set its reserves were "reasonable and appropriate." Doc. 44 at ¶¶ 138, 254. "At best," the complaint establishes that ProAssurance "perhaps *could or should* have known" it needed to better tailor its assumptions to meet observed data, *see Carvelli*, 934 F.3d at 1322–23 (emphasis in original), or that ProAssurance did not utilize past and ongoing data trends as effectively as it should or could have. Such a contention, however, does not rise to an actionable misstatement. *See id.*[15]

To be sure, the plaintiffs do cite statements in which ProAssurance and its executives acknowledged to investors that ProAssurance set and re-assessed loss reserves based on recent claims data, available industry trends, and real-time evaluations of claim frequency and severity. *See* docs. 44 at 98–99; 55 at 15. These constitute statements of fact, not opinion, as they explain without caveat which factors the company relied upon to calculate and re-evaluate its loss reserves. Still,

---

[15] In a case with similar allegations, *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, the court dismissed a § 10(b) action premised on the adequacy of SunTrust's loan loss reserves, explaining:

> Whether SunTrust had adequate reserves for its predicted loan losses generally [was] not a matter of objective fact, but rather a statement of SunTrust's opinion regarding what portion of its loan portfolio would be uncollectable. [The plaintiff did] not allege that SunTrust did not actually hold the opinion it expressed in its financial statements at the time they became effective. Absent an allegation that [the defendants] did not believe the statements incorporated into [the Registration Statement and Prospectus Supplement], [the plaintiff had] not stated a claim for misstatements relating to SunTrust's opinion regarding the adequacy of its loan reserves.

No. 1:09-CV-1185-WSD, 2010 WL 3545389, at *6 (N.D. Ga. Sept. 10, 2010) (citing *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690–91 (S.D.N.Y. 2004)).

with the exception of a few statements regarding observed frequency trends, which the court will address next, dismissal is still warranted because the plaintiffs do not sufficiently plead that these statements were false or misleading.

i.

A small category of statements presents an exception to this general finding. The plaintiffs cite several instances in which Friedman and Boguski represented to investors that ProAssurance had not observed any changes in claims frequency in 2018 or 2019. *See, e.g.*, doc. 44 at ¶ 142 (citing Friedman's August 2018 statement that "while [ProAssurance] logically may [have] expect[ed] a frequency increase, [the company was] not seeing frequency change at this point in time"); *id.* ¶ 185 (citing Boguski's November 2019 statement that trends had "been relatively flat on the frequency side, even perhaps slightly down"). These statements convey factual representations about empirical observations the company made during late 2018 and late 2019. And contrary to these representations, the plaintiffs plead that ProAssurance in fact observed a rise in claims that skyrocketed dramatically beginning in late 2017 and into 2019, when the defendants finally acknowledged in a meeting internally that a large and "problematic" national account had been "hemorrhaging money." *Id.* ¶¶ 92–93, 143. Thus, the plaintiffs plausibly plead that Friedman's and Boguski's statements about observed frequency changes in 2018 and 2019 were false or misleading at the time both made them.

22

ii.

The defendants also argue that ProAssurance's reserves-related representations and calculations constitute "forward-looking" statements with meaningful cautionary language immunized from liability under the PSLRA.[16] *See* doc. 53 at 20. The defendants claim that they accompanied the challenged statements with statements "highlighting, among other things, 'uncertainties inherent in the estimate of [ProAssurance's] loss and loss adjustment expense reserve.'" Docs. 53 at 21; 58 at 6. The plaintiffs counter that the statements represented the defendants' present use of a reserve methodology based on real-time frequency and severity data. Doc. 55 at 16. Allegedly, ProAssurance's "generic language" did not caution investors that the defendants "would refuse to comply with their self-disclosed reserve practices by ignoring real-time data indicating loss reserves were woefully inadequate." *Id.* at 17.

The safe-harbor provision provides "three independent, alternative means of inoculating forward-looking statements: those that are (1) accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge of their falsity." *Carvelli*, 934 F.3d at 1326 (citing 15 U.S.C. § 78u-

---

[16] This "safe harbor" provision in the PSLRA for forward-looking statements, which include predictions, projections, and plans, is designed to incentivize companies to share this type of information with the public. *See Carvelli*, 934 F.3d at 1324 (citing 15 U.S.C. § 78u-5(c)(1)); *Harris v. IVAX Corp.*, 182 F.3d 799, 804 (11th Cir. 1999).

5(c)(1)); *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 794–95 (11th Cir. 2010).  On a motion to dismiss, the court must "consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).  Therefore, the court begins with ProAssurance's statements about its loss reserves cited by the plaintiffs—and whether they are forward-looking—before turning to the cautionary language.  In so doing, the court notes that the only statements about loss reserves that the plaintiffs plausibly plead as false or misleading are Friedman's and Boguski's claims about frequency data.  However, for completeness, the court reviews other alleged misstatements in its forward-looking analysis.

Whether a statement is forward-looking depends upon the nature and specificity of each alleged misstatement or omission.  *See Harris v. IVAX Corp.*, 182 F.3d 799, 804 (11th Cir. 1999).  Statements about expectations of future economic performance squarely fall under the definition of "forward-looking."  *Id.* (citing 15 U.S.C. § 78u-5(i)(1)(c)).[17]  Also included are statements about projections of

---

[17] For example, statements about "the state of a company whose truth or falsity is discernible only after it is made," whether a company's "challenges [are] behind it," whether a company "is well positioned," and whether a company's "strategies remain intact" are forward-looking.  *See Harris*, 182 F.3d at 804–05.  In *Harris v. IVAX Corp.*, for example, the court concluded that IVAX's statements suggesting "that the hard times were over and that the state of the company was strong" were "nothing more than projections intended to advise the market of anticipated third quarter financial results."  998 F. Supp. 1449, 1453 (S.D. Fla. 1998), *aff'd*, 182 F.3d 799 (11th Cir. 1999).  The court also rejected the argument that IVAX's "alleged failure to disclose the impaired value

revenue, income, and other financial items and metrics; statements regarding "plans and objectives of management for future operations"; and statements about assumptions underlying these projections, plans, or objectives. *See* 15 U.S.C. § 78u-5(i)(1). On the other hand, statements that "[speak] to a present state of affairs, not a belief about future events," do not qualify as forward-looking. *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018).[18]

Some of the statements the plaintiffs cite are forward-looking and address future projections or expectations regarding ProAssurance's financial performance. These include Starnes' statement that ProAssurance "[would] always take the actions needed to ensure the strength of [its] balance sheet, no matter the short-term impact," doc. 44 at ¶ 158, and Boguski's statement that ProAssurance's

---

of its goodwill in its press releases was a material omission of a present business condition." *Id.* Rather, the court found that this alleged omission was a projection subject to change, and the "decision not to factor in the goodwill writeoff in those projections was also necessarily forward-looking" because it reflected "the judgment of the corporation that goodwill was strong and that no such writeoff would be necessary." *Id.* The court thus held that the alleged misstatements and omissions fell under the PSLRA's safe harbor. *Id.*

[18] In *In re Signet Jewelers Ltd. Securities Litigation*, the court held that qualitative statements about Signet's portfolio, including that it was "strong," "healthy," "conservatively managed," and "highly disciplined," "were neither forward-looking nor estimative." *See* 2018 WL 6167889, at *11, 13. Rather, the statements "spoke to a present state of affairs," and, to put a finer point on the matter, Signet's executives were allegedly aware that a "substantial and growing" portion of Signet's portfolio "contained subprime loans [but] chose to disregard internal warnings about that fact." *Id.* In addition, Signet's alleged corporate policy "was to aggressively push credit on customers." *Id.* "Viewing these statements collectively and 'in context,'" the court concluded that the plaintiffs plausibly alleged that Signet's portfolio was not as healthy and carefully managed as the defendants suggested. *Id.*

"underwriting discipline combined with [its] deep specialization, high quality risk selection[,] and ability to obtain the right price for the exposure [were] the cornerstones of [the company's] strategy to achieve a long-term underwriting profit," *id.* ¶ 175.  Still, to prevail on their motion, the defendants must show that they accompanied these statements with meaningful cautionary language—*i.e.*, that they "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).

This language need not identify the *specific* factor that ultimately caused the different results or *all* of the factors that could cause different results.  *Harris*, 182 F.3d at 807.  "In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  *Id.*  *See also In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *13 (S.D. Fla. Apr. 19, 2013).  But boilerplate language is not enough.  *See id.*  Rather, cautionary language should connect to the projections or predictions about which the plaintiffs complain.  *See id.* (citing *Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 45 F.3d 399, 400 (11th Cir. 1995)).[19]

---

[19] For example, in *In re HomeBanc Corp. Securities Litigation*, the court dismissed a § 10(b) claim in part because it was "rife with forward-looking statements made by HomeBanc that were accompanied by meaningful risk disclosures."  706 F. Supp. 2d 1336, 1354 (N.D. Ga. 2010).  The

Here, the defendants refer the court to ProAssurance's 2018 Form 10-K.  The Form 10-K contained a "Caution Regarding Forward-Looking Statements" with "factors that could affect the actual outcome of future events," such as "uncertainties inherent in the estimate of [ProAssurance's] loss and loss adjustment expense reserve and reinsurance recoverable."  Doc. 52-2 at 3.[20]  The Form 10-K also noted that "[e]stimating losses requires ProAssurance to make and revise judgments and

---

plaintiff alleged that HomeBanc misled investors when it stated in various disclosures that it "presently believe[d] its current cash balances, funds available under [its] financing arrangements . . . and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, [would] be sufficient for [its] liquidity requirements for the next 12 months."  *Id.*  But HomeBanc warned in those same disclosures that it "[could not] ensure" it would be able to "access the capital markets or obtain any additional financing," which could lead to "slowed or suspended" growth; that a "prolonged economic slowdown" or "declining real estate values" could reduce its "growth and profitability"; and that its "ability to meet [its] long-term liquidity requirements" was contingent upon "the renewal of credit and repurchase facilities" or obtaining other financing sources.  *Id.*  The court held that these warnings "as a whole erode[d] the essential allegations" of the complaint and that the allegedly misleading statements were nonactionable because they were forward-looking with appropriate risk disclosures.  *See id.*

[20] Describing its decision-making in areas "such as pricing and reserving," ProAssurance cautioned:

> We use various modeling techniques and data analytics to analyze and estimate exposures, loss trends and other risks associated with our assets and liabilities. . . . The modeled outputs and related analyses from both proprietary and third parties are subject to various assumptions, uncertainties, model design errors and the inherent limitations of any statistical analysis, including those arising from the use of historical internal and industry data and assumptions. In addition, the effectiveness of any model can be degraded by operational risks including, but not limited to, the improper use of the model. Consequently, actual results may differ materially from our modeled results. . . . If, based upon these models or other factors, we misprice our products or fail to appropriately estimate the risks we are exposed to, our business, financial condition, results of operations or liquidity may be adversely affected.

Doc. 52-2 at 5.

assessments regarding multiple uncertainties over an extended period of time," and that consequently "the reserve estimate may vary considerably from the eventual outcome." *Id.* at 13.

This language addresses the risks associated with estimating the potential value of future claims. It demonstrates that ProAssurance warned investors of the inherent uncertainty that attaches to the setting of loss predictions before claims are filed. Moreover, the cautionary language warned of the risks described and meaningfully accompanied the forward-looking statements about ProAssurance's loss reserves. Ultimately, ProAssurance had no obligation to warn investors of every factor that would weigh on the outcome of its losses or to identify the one factor that would eventually cause its losses. *See Harris*, 182 F.3d at 807. Therefore, the motion to dismiss is due to be granted as to the bulk of the alleged statements and calculations regarding loss reserves because they are nonactionable statements of opinion and/or immunized by the PSLRA's safe harbor for forward-looking statements.

However, some of the other statements regarding the loss reserves, *e.g.*, Friedman's and Boguski's statements about then-observed frequency trends, are an exception. They describe the data or methods underlying the reserves calculations at the time the statements were spoken and are not forward-looking. And, because the defendants do not assert that Friedman's and Boguski's factual statements about

frequency trends fall under either of the other two PSLRA safe harbors, the defendants can only avoid liability for them if they were not made with scienter—an issue the court will address in Section III.A.2.

b.

The plaintiffs also plead that the alleged failure to disclose information regarding TeamHealth's nonrenewal and tail coverage purchase is a material, misleading omission.  Material omissions require a "substantial likelihood" that a reasonable investor would view the omitted fact as "significantly alter[ing] the total mix of information made available," that is, "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *See Basic Inc.*, 485 U.S. at 231–32.  *See also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  But the omission of a material fact is proscribed "only when the defendant has a duty to disclose," which can arise if the defendant previously spoke voluntarily.  *Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1316 (11th Cir. 2014) (quoting *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986)). "[A] duty exists to update prior statements if the statements were true when made, but misleading or deceptive if left unrevised."  *Id.* at 1317.  However, the duty attaches only to prospective statements containing "an implicit factual representation that remain[s] alive in the minds of investors as a continuing representation."  *Id.*

(internal quotation marks omitted).  Whether a company had a duty to revise a prior disclosure is generally an issue for a factfinder.  *Id.*

In this case, the plaintiffs claim that, although ProAssurance knew as early as 2019 that TeamHealth would not renew its policy and would exercise instead the more costly option for ProAssurance, the tail coverage option, ProAssurance waited until May 2020 to disclose this development to investors.  *See* doc. 55 at 21–22.  A few months before making this disclosure, ProAssurance announced in January and February 2020 other significant TeamHealth-related losses.  *See id.* at 22.  The plaintiffs contend that ProAssurance had a duty to reveal the nonrenewal- and tail coverage-related information when the company announced the other significant losses and that by failing to do so, the defendants' early 2020 announcement "assur[ed] [investors] that the TeamHealth issues were fully resolved."  *Id.*[21] Allegedly, the defendants' silence violated the "affirmative duty to disclose material loss contingencies that are 'reasonably possible' to occur."  *Id.* (citing *In re Perrigo Co. PLS Sec. Litig.*, 435 F. Supp. 3d 571, 582–83 (S.D.N.Y. 2020)).

---

[21] As an example, the plaintiffs allege that on February 20, 2020, ProAssurance described the extent of its losses for the TeamHealth account for 2019.  *See* doc. 44 at ¶ 102.  The plaintiffs assert that Rand's statements, in which he acknowledged that 2019 financial results "were not acceptable," painted a picture that the company had disclosed all of the negative information it knew about TeamHealth at the time, even though the company did not announce that TeamHealth was not renewing its policy—something ProAssurance apparently already expected as of 2019.  *See id.*

For their part, the defendants characterize the TeamHealth negotiations as ongoing, meaning ProAssurance could not have disclosed information regarding the potential nonrenewal and tail coverage purchase any sooner. *See* doc. 53 at 22. In support, the defendants state that management's disclosures "made clear that [ProAssurance] would continue negotiating with TeamHealth over the weeks *following* the May 7, 2020 disclosure." *Id.* The defendants deny that "it was 'well known' TeamHealth would not renew its policy" by 2019, doc. 58 at 7, and assert that ProAssurance did not have a duty to disclose "because no intent of termination [by TeamHealth] was provided during the Class Period." Doc. 53 at 22–23.

At the pleading stage, the court must accept the plaintiffs' allegations as true. And in light of the plaintiffs' allegation that ProAssurance knew—in fact, that it was "well known internally"—that TeamHealth would not renew its policy and would instead purchase tail coverage in 2019, docs. 44 at ¶ 80; 55 at 22, the plaintiffs plausibly allege that ProAssurance had a duty to disclose this development in January 2020 when it voluntarily disclosed other information about the company's TeamHealth-related losses. Given the significance of the TeamHealth account, the early 2020 disclosures of ProAssurance's TeamHealth-related losses, and the risk of additional losses, it is plausible that ProAssurance's investors would have considered TeamHealth's nonrenewal and tail coverage purchase important in their investment decisions. *See Basic Inc.*, 485 U.S. at 231–32. The plaintiffs thus have

pleaded material, misleading omissions regarding TeamHealth's nonrenewal and tail coverage purchase.[22]

c.

The plaintiffs also cite to ProAssurance's more general commitment to "conservative" and "disciplined" business practices in support of their claims.  At issue here is whether the statements qualify as nonactionable puffery, *i.e.*, "generalized, vague, nonquantifiable statements of corporate optimism."  *Carvelli*, 934 F.3d at 1318, 1321; doc. 53 at 23–24.  The court notes that although a statement that "smacks of puff is certainly a strong indicator of immateriality," "it's not necessarily a clincher."  *Carvelli*, 934 F.3d at 1320.  Rather, the court must still "consider the possibility—however remote—that in context and in light of the 'total mix' of available information, a reasonable investor might nonetheless attach importance to the statement."  *Id.*  Hence, a court should not grant a motion to dismiss a securities-fraud action "unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Id.*

---

[22] The plaintiffs also argue that the defendants' failure to disclose this information violated SEC Rule Item 303, which "requires that an issuer's filings '[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'"  *See* doc. 44 at ¶ 237.  *See also Carvelli*, 934 F.3d at 1330 (citing 17 C.F.R. § 229.303(a)(3)(ii)).  However, the court does not rest its finding on this ground because an Item 303 violation does not *ipso facto* give rise to 10b-5 liability.  *Id.* at 1331.

i.

The court again looks to analogous case law.  In *FindWhat Investor Group*, the Eleventh Circuit, though affirming the dismissal of a § 10 securities-fraud complaint on scienter grounds,[23] determined that the district court erred when it held that no portion of a Form 10-K was materially misleading because it contained "affirmative statements of present fact."  658 F.3d at 1298.  Specifically, the Form 10-K contained statements like "*[w]e employ* an integrated system . . . that continuously monitor[s] traffic" and "*[w]e enforce* strict guidelines . . . to ensure the quality of traffic."  *Id.* (alterations and emphases in original).  The Circuit described these statements as "unquestionably creat[ing] the impression that [the company] maintain[ed] an active and sophisticated monitoring system for screening fraudulent traffic," which the company allegedly did not.  *Id.*  "To avoid being misleading," the Circuit explained, the defendants needed to "disclose the grave defects that existed within the 'enforce[ment]' system they voluntarily touted."  *Id.* at 1298–99.  And because the defendants did not disclose these defects, the Circuit held that their statements were "materially misleading" and that the company failed to cure their

---

[23] Investors accused FindWhat.com and its officers of misleading them into believing that FindWhat.com had a system in place that would detect and remove partners engaged in fraudulent revenue-generating practices (*e.g.*, click fraud, or the use of illicit practices such as spyware or "bots" to generate clicks on advertisements and force advertisers to pay for the clicks).  *See* 685 F.3d at 1291–92, 1298.

misleading nature with "any general cautionary or risk-disclosing language." *Id.* at 1299.

Outside of this Circuit, a court in the Southern District of New York held in *In re Signet Jewelers Ltd. Securities Litigation* that qualitative statements about the health and management of Signet's portfolio, including its "strong," "healthy," "conservatively managed," and "highly disciplined" credit portfolio, constituted actionable misstatements under § 10. *See* 2018 WL 6167889, at *11. In so holding, the court rejected the company's contention that these statements were either puffery or statements of opinion. *Id.* In particular, the court noted that, viewed in context, many of the statements regarding the management of Signet's portfolio "were made in response to direct questions" and "in an effort to reassure the investing public about the portfolio's health." *Id.* at *12. Thus, the court held, once the defendants "conveyed to the market with dogged insistence that Signet's credit portfolio was carefully managed and of a high quality, they had a duty to speak about any developments so as to render their earlier statements not misleading." *Id.*

On the other hand, in *Philadelphia Financial Management of San Francisco, LLC v. DJSP Enterprises, Inc.*, a court in this Circuit agreed with the defendants that their statements representing that the company "employed 'rigorous' processes to ensure the 'efficient' and 'accurate' handling of foreclosures" were not false or misleading and instead constituted nonactionable puffery. No. 10-61261-CIV, 2011

34

WL 4591541, at *14 (S.D. Fla. Sept. 30, 2011). The plaintiffs claimed these statements failed to disclose that DJSP routinely engaged in improper shortcuts and that its processes were actually "entirely chaotic and in substantial disarray." *Id.* The court disagreed, finding that the plaintiffs did not adequately allege that these statements, when viewed in context, were false or misleading. *Id.* Rather, the court held that the references to "efficiency" and "accuracy" concerned the company's use of technology to streamline foreclosures and the company's hiring and training of employees and that the plaintiffs failed to "allege that DJSP did not use the technology it claimed or that these systems did not improve the firm's efficiency and accuracy in processing foreclosures." *Id.*

"[M]ore important[ly]," the court held that the statements about the "rigor" of the company's processes, the "efficiency" and "accuracy" of its operations, and its "effective" staff training were immaterial. *Id.* The court reasoned:

> As a general matter, all of these traits would have been important to the success of DJSP's foreclosure-processing business. But as used in the statements identified by [the] [p]laintiffs, these terms do not assert specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell DJSP's securities.

*Id.* (citing *Basic Inc.*, 485 U.S. at 240). Accordingly, the court held that the statements made "the kind of vaguely positive assertions" that counted as nonactionable puffery. *See id.* at *14–15.

ii.

The court distills several principles from the case law.  First, the court must view the alleged misstatements regarding ProAssurance's conservatism, discipline, and caution in the broader context in which they were made.  *See FindWhat Inv'r Grp.*, 658 F.3d at 1298; *Philadelphia Fin. Mgmt. of San Francisco, LLC*, 2011 WL 4591451, at *14; *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11.  Second, if the defendants essentially "conveyed to the market with dogged insistence" that ProAssurance's reserves were "carefully managed," they had a duty to speak about developments that would "render their earlier statements not misleading."  *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11; *Carvelli*, 934 F.3d at 1317 ("[A]bsent a duty, material information needn't be disclosed unless its omission would render misleading other information that an issuer *has* disclosed.").  Third, to be actionable, the statements must convey factual content, *i.e.*, something concrete enough to be verifiable.  *See Carvelli*, 934 F.3d at 1322–23; *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020).  And finally, the statements must be of the kind on which reasonable investors rely in making investment decisions.  *See Carvelli*, 934 F.3d at 1322–23; *Philadelphia Fin. Mgmt. of San Francisco*, 2011 WL 4591451, at *14.

Here, the defendants characterize their statements about ProAssurance's "reasonable," "disciplined," "conservative," "prudent," and "cautious" approaches to setting its reserves, underwriting, and protecting its balance sheet as statements about "general business practices" that constitute puffery. *See* doc. 53 at 23 (citing, *e.g.*, doc. 44 at ¶¶ 138–49). But these statements are not "so exaggerated or so vague" that reasonable investors would not rely on them. *See Carvelli*, 934 F.3d at 1322–23. *See also In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) (citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 200–01 (3d Cir. 1990)). Rather, viewed in context, the defendants made many of the statements about ProAssurance's discipline and conservatism in calls with analysts to, in the plaintiffs' words, "allay investor concerns about increasing loss severity in the [HCPL] industry" and "assure[] investors that [ProAssurance] had taken steps to address 'increased severity' in the market." *See, e.g.*, doc. 44 at ¶¶ 148, 152.[24]

---

[24] For example, the plaintiffs allege that Friedman represented that ProAssurance would not be negatively affected by severity trends in the industry due to the company's "prudent" and "conservative" practices. Doc. 44 at ¶ 148. In an early 2019 call, Friedman stated that "with the broader loss environment continuing to show signs of increased severity, [ProAssurance] selected higher initial loss ratios . . . to reflect the caution expressed above." *Id.* ¶ 152. Friedman continued, in the present tense: "We believe it is more important than ever to establish and evaluate reserves with a conservatism that has resulted in success over the years. . . . [T]he rewards of conservative reserving practices and rational pricing are paid back with interest." *Id.*

It is true that the defendants used the word "believe" to couch some of their statements about conservative practices.  But this does not render the statements automatically nonactionable.  The plaintiffs plausibly allege that these statements of opinion contained embedded statements of fact that the defendants allegedly knew were false or misleading.  *See Carvelli*, 934 F.3d at 1322–23; *Omnicare*, 575 U.S. at 183–84.  For example, Friedman's statement that ProAssurance "believe[d]" it would benefit as the market reacted to emerging loss trends contains within it a factual representation that ProAssurance was "tak[ing] a cautious view of the potential for a rise in severity, which in turn influence[d] [its] loss picks and color[ed] the valuation of [its] reserves."  Doc. 44 at ¶ 152.  And Friedman's statement that ProAssurance "believe[d] it [was] more important than ever to establish and evaluate reserves with a conservatism that ha[d] resulted in success over the years" necessarily suggested that the company *was* acting conservatively in estimating and setting its loss reserves.  *See id.*[25]  Given negative trends in the

---

[25] These examples are meant to be illustrative rather than exclusive.  Moreover, not all of the defendants' statements about ProAssurance's practices used terms like "believe" or "think."  For instance, in a 2019 press release, Starnes discussed the company's monitoring of the increasing severity in the HCPL insurance industry, stating:

> Our concern about the broad loss trends in healthcare professional liability continues to have a major impact on operating results, and this increasing severity will likely affect our results for the foreseeable future. Our view of these trends influences our current accident year loss picks, which continue to rise, and leads us to increased caution in our analysis of prior period reserves, both of which have a significant impact on the operating results of our largest operating segment, Specialty P&C. . . . As has historically been the case the caution we take in

broader industry environment, a reasonable investor would rely on statements like these to decide whether and how to invest in ProAssurance securities.

Further, the defendants underscored ProAssurance's commitment to conservatism on many occasions throughout the Class Period. Indeed, the defendants' statements suggested that discipline and caution constituted a hallmark of ProAssurance's business—one that investors and analysts would cite as reasons to invest in the company. For example, in an April 2019 call, Starnes emphasized that the company would "continu[e] to do as [it] always [had]: reserve cautiously, underwrite responsibly[,] and price logically." *Id.* ¶ 158. Rand echoed this sentiment, stating that "the continued success of [ProAssurance's] underwriting teams and their ability to adequately price for the assumed risk [was] evidence of a prudent strategy." *Id.* ¶ 159. And Friedman added that ProAssurance "continue[d] to uphold [its] underwriting standards" by, among other things, "walking away from potential accounts" that the company thought carried "too much risk for the premium."[26] *Id.* ¶ 160. Friedman also stated that "[w]hile this disciplined approach

---

establishing our reserves allows us to focus on our future without undue concerns about past liabilities. . . .

Doc. 44 at ¶ 155.

[26] Rand reiterated this statement during an August 2019 call in which he stated that ProAssurance was able to secure rate increases across its Specialty Property Casualty segment with only a "modest impact" to its retention because of the company's "dedication to disciplined underwriting, making sure [it] wr[o]te business and assume[d] risk only if [it could] get appropriate premium through the exposure that[] [was] presented." Doc. 44 at ¶ 174.

ha[d] so far enabled [ProAssurance] to avoid any unexpected increases in severity in [its] paid losses, the risk of increasing severity [was] all too real." *Id.* Given the defendants' insistence that ProAssurance acted cautiously and conservatively, they may have "had a duty to speak about any developments so as to render their earlier statements not misleading," including the uniquely risky arrangement of and increasing dangers associated with the TeamHealth account. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11; *Carvelli*, 934 F.3d at 1317.

The court thus finds that, at this stage, the defendants' statements about ProAssurance's "conservative," "disciplined," "cautious," and otherwise "reasonable" practices are neither nonactionable statements of opinion nor immaterial puffery. Rather, these statements indicate more sweeping and certain attitudes about the company's current financial conditions, especially with respect to the TeamHealth account, on which a reasonable investor would rely. Thus, the plaintiffs plead actionable misstatements and omissions with regard to business practices which were, allegedly, in fact risky and not aligned with ProAssurance's stated commitment to caution and conservatism in light of the circumstances surrounding the unique TeamHealth deal.

The court proceeds next to review whether these statements, as well as the material misstatements and omissions regarding claim frequency data and

40

TeamHealth's decision not to renew and to exercise its tail coverage option, as outlined above, meet the scienter requirements under § 10 and the PSLRA.

2.

A plaintiff can establish scienter under § 10(b) and the PSLRA by pleading with particularity facts giving rise to a "strong inference"[27] of either the intent to deceive, manipulate, or defraud investors or, in this Circuit, "severe recklessness." *See Mizzaro,* 544 F.3d at 1238; *Philadelphia Fin. Mgmt. of San Francisco*, 2011 WL 4591541, at \*12. *See also Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648–49 (2010) (noting that § 10 requires a plaintiff to prove "that a defendant made a material misstatement *with an intent to deceive*—not merely innocently or negligently"). When evaluating a motion to dismiss under the PSLRA, the court must "carefully examine the complaint to determine whether the allegations, taken as a whole, create a cogent and compelling inference that the named defendants acted with the requisite scienter." *Mizzaro*, 544 F.3d at 1240; *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004). The allegations must create an inference of scienter that is at least as probable as a nonfraudulent explanation. *Edward J. Goodman*, 594 F.3d at 789; *Rosenberg v. Gould*, 554 F.3d 962, 966 (11th Cir. 2009). "Severe recklessness" refers to

---

[27] A "strong inference" of scienter "means an inference that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Mizzaro*, 544 F.3d at 1238 (quoting *Tellabs, Inc.*, 551 U.S. at 324).

> those highly unreasonable omissions or misrepresentations that involve
> not merely simple or even inexcusable negligence, but an extreme
> departure from the standards of ordinary care, and that present a danger
> of misleading buyers or sellers which is either known to the defendant
> or so obvious that the defendant must have been aware of it.

*Edward J. Goodman*, 594 F.3d at 790; *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).  Although allegations of "motive and opportunity" may be relevant to show severe recklessness, without more, such allegations are insufficient to establish scienter.  *Bryant*, 187 F.3d at 1285–86; *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999).  Likewise, allegations that a defendant was "incentivized to boost its net income or retain investments" are "too generalized to state a claim for securities fraud."  *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 502 (S.D.N.Y. 2013).

Because "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute," *see Mizzaro*, 544 F.3d at 1238, the court evaluates whether the plaintiffs meet the scienter requirements as to each named defendant's involvement in (1) the misstatements regarding ProAssurance's loss reserves (*i.e.*, the statements about claims frequency data), (2) the omissions regarding TeamHealth's nonrenewal and purchase of tail coverage, and (3) the misstatements regarding ProAssurance's commitment to conservatism.

a.

The plaintiffs first assert that all of the individual defendants "were intimately involved with, and responsible for, [ProAssurance's] processes for establishing, reviewing, and updating its loss reserves."  Doc. 44 at ¶ 245.  In support, they cite statements in annual and quarterly SEC filings as well as executives' statements during calls and press releases that reiterate that management established and regularly reviewed and updated company reserves and the data underlying reserves estimates.  *Id.*  They also cite the company's "impossibly low implied severity rates" for the TeamHealth account and the real-time frequency data, severity in the industry, and difference in "risk profiles" in the TeamHealth policy compared to other accounts.  *See* doc. 55 at 25.  To bolster these allegations, the plaintiffs highlight the company's "wholesale restructuring" of its executive management team in mid-2019 and the alleged violations of GAAP.  *See id.* at 28–29.  These allegations do not establish that all of the individual defendants acted with the intent to defraud or with severe recklessness.

For one, the majority of the alleged statements regarding loss reserves are not actionable: they are statements of opinion, are not sufficiently alleged as false or misleading, and/or are forward-looking with meaningful cautionary language.  *See supra* § III.A.1.  Second, these allegations do not indicate that all of the individual defendants were at least severely reckless as to the establishment and revision of

43

reserves.  At most, these statements reflect the defendants' involvement with loss reserves for what turned out to be a problematic account.

In addition, the failure to follow GAAP, on its own, does not establish severe recklessness.  *See Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1225 (S.D. Fla. 2007) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1269 (11th Cir. 2006)). The plaintiffs do not cite other facts that, with the alleged GAAP violations, raise a cogent and compelling inference of scienter specific to each defendant.[28]  Nor does the departure of executives, without more, support a strong inference of scienter, particularly where the plaintiffs, as here, fail to link the resignations or terminations with fraud (as opposed to, say, poor economic performance or a desire to retire).  *See In re Jiangbo Pharm., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1268 (S.D. Fla. 2012), *aff'd*, 781 F.3d 1296 (11th Cir. 2015).

b.

Turning now to each defendant separately, Starnes served as CEO from 2007 through July 1, 2019 and as a director of ProAssurance Specialty Insurance

---

[28] "Courts have identified several factors or 'red flags' that often provide the necessary additional support for a finding of scienter based on GAAP violations, including allegations of insider trading, the magnitude of the improperly recognized revenue, whether the violations related to major balance sheet items based on contracts of great financial importance, and whether the GAAP violation violates the corporation's internal policies."  *Schultz*, 488 F. Supp. 2d at 1225 (citing *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1166 (S.D. Fla. 2004)).  To be sure, the TeamHealth deal allegedly represented a sizable portion of ProAssurance's HCPL line, but the court does not find that this fact and the alleged GAAP violations together sufficiently establish scienter as to all of the defendants generally.

Company, Inc. from 2015 through mid-2019 and is currently the executive chairman of ProAssurance's board of directors.  Doc. 44 at ¶ 17.  Allegedly, Starnes certified several Forms 10-Q and "regularly spoke with investors and securities analysts" about the company.  *Id.*  The plaintiffs primarily cite statements in which Starnes acknowledged that reserves calculations hinged on two factors, frequency and severity, and that ProAssurance reviewed frequency on a real-time basis to decide whether to add to its reserves.  *See, e.g.*, *id.* ¶¶ 247, 255.  The plaintiffs note that Starnes signed off on statements stressing the company's commitment to conservatism and discipline—some of which were materially false or misleading when made.

It is true that these allegations imply Starnes' familiarity with the frequency of claims reported to ProAssurance, raising the inference that Starnes would have seen the rising number of TeamHealth claims starting in late 2017.  It is also true that Starnes' signing off on company forms suggests his endorsement of the notion that the company engaged in conservative, disciplined, and cautious underwriting and reserves practices.  But the allegations do not suggest that Starnes stated as much with knowledge of or severe recklessness as to the opposite being true.  Though these statements might have been misleading when made, it is more plausible that Starnes was simply acknowledging a hallmark of ProAssurance's business without awareness of how sharply the TeamHealth deal was departing or would depart from

that standard or that reserves would thus be inadequate.  *See Thompson*, 610 F.3d at 633 (noting that a "strong inference" of scienter "'must be cogent and at least as compelling as any opposing inference of nonfraudulent intent'").  In other words, even accepting that ProAssurance's statements about its commitment to caution and conservatism were false or misleading in the context in which they were made, the plaintiffs have not pleaded facts that establish scienter with regard to Starnes.

c.

Rand succeeded Starnes as CEO in 2019 after holding prior roles with ProAssurance during the Class Period.  *Id.* ¶ 18.  Rand allegedly certified several Forms 10-Q and 10-K, "regularly spoke with investors and securities analysts," and signed each quarterly and annual statutory insurance filing for ProAssurance Specialty Insurance from 2015 through the second quarter of 2018.  *Id.*

The plaintiffs cite various statements in which Rand underscored ProAssurance's conservative and disciplined approaches to reserves and underwriting.  *See, e.g.*, doc. 44 at ¶¶ 247–48.  Allegedly, these statements indicate Rand's involvement in and knowledge of the fine details of ProAssurance's reserves and underwriting.  *See id.* ¶ 249.  And the plaintiffs plead that, in ProAssurance's February 2020 press release, Rand acknowledged that "[ProAssurance's] results for 2019 were not acceptable" but that the company's "accomplishments in the past year position[ed] [it] well for the next chapter in the company's story."  *Id.* ¶ 102.

As with Starnes, the plaintiffs fail to point to specific facts demonstrating a strong, cogent, and compelling inference of Rand's intent to defraud or severe recklessness as to the circumstances of the TeamHealth deal or ProAssurance's conservatism. The plaintiffs do not cite, for example, facts demonstrating Rand's knowledge of TeamHealth's decision to purchase tail coverage rather than renew its policy, and instead the plaintiffs only assert generally that it was "well known internally" by 2019 that TeamHealth would not renew its policy. *Id.* ¶ 80. Further still, Rand's comments are not incompatible with the plausible competing inference that he truthfully believed ProAssurance was well-positioned to take on 2020, notwithstanding any knowledge of the likelihood of TeamHealth's nonrenewal. *See Thompson*, 610 F.3d at 633. Thus, the plaintiffs fail to plead scienter as to Rand.

d.

Hendricks has served as ProAssurance's CFO since September 2018 and formerly worked as the Senior Vice President of Business Operations for a subsidiary. *Id.* ¶ 19. Hendricks allegedly certified the Forms 10-Q and 10-K and "regularly spoke with investors and securities analysts." *Id.* Hendricks also signed each quarterly and annual statutory insurance filing for ProAssurance Specialty Insurance from the third quarter of 2018 through the end of the Class Period. *Id.*

The plaintiffs emphasize that Hendricks spoke at the July 2019 company-wide meeting in which he and Rand acknowledged that a "problematic account" was

47

"hemorrhaging money." *See id.* ¶ 266.  Later in 2019, Hendricks stated to analysts that the financial results in the company's Specialty P&C segment "continue[d] to reflect [ProAssurance's] cautious approach to the loss environment." *Id.* ¶ 172.  On February 20, 2020, ProAssurance filed its 2019 Form 10-K, signed by Rand and Hendricks, that acknowledged "unfavorable development" in the Specialty P&C segment driven by "the previously mentioned large national healthcare account that ha[d] experienced losses far exceeding the assumptions [ProAssurance] made when underwriting the account, beginning in 2016." *Id.* ¶ 190.  The plaintiffs essentially allege that Hendricks must have known about TeamHealth's nonrenewal and should have included this in ProAssurance's announcement.[29]  *See id.* ¶ 191.

These allegations do not give rise to the plausible inference that Hendricks specifically knew or was severely reckless in not disclosing this information to investors sooner than 2020, nor do the allegations plausibly suggest that Hendricks intended to defraud or behaved recklessly when he reiterated the company's dedication to caution in the "loss environment."  While the plaintiffs maintain that Hendricks' acknowledgment of the problematic account to employees and his later statement to analysts that the company's financial results continued to reflect its cautious practices suggest Hendricks was misleading investors, these allegations

---

[29] But, as with Rand, the only allegation connecting Hendricks in 2019 to the knowledge of TeamHealth's nonrenewal is the general contention that it was "well known internally by 2019" that TeamHealth would not renew and would instead buy tail coverage.  Doc. 44 at ¶ 80.

also give rise to the more plausible inference that Hendricks was working to identify problems with the account in a manner he perceived as cautious and disciplined. *See Thompson*, 610 F.3d at 633. The plaintiffs thus fail to plead scienter as to Hendricks.

e.

Friedman served as ProAssurance's President of Healthcare Professional Liability from January 2014 to May 2019. *Id.* ¶ 20. Friedman also allegedly "regularly spoke with investors and securities analysts," signed each quarterly and annual statutory insurance filing for ProAssurance Specialty Insurance from 2015 through early 2019, and served as one of its directors during that time period. *Id.* Importantly, until mid-2019, Friedman led the team that underwrote the TeamHealth policy, and he thus signed off on its structure and terms. *See id.* ¶¶ 10, 51.

The plaintiffs have pleaded facts giving rise to a cogent and compelling inference of, at the least, severe recklessness as to Friedman's statements and omissions about the frequency data underlying ProAssurance's reserves calculations and commitment to caution and discipline in an atmosphere of increasing HCPL severity. For one, the plaintiffs plead that Friedman signed quarterly and annual statements, which illustrated an increasing number of claims that skyrocketed between 2017 and 2019. At the same time—in August 2018—Friedman represented to investors that ProAssurance "[was] not seeing frequency change at this point in time." *See, e.g.*, *id.* ¶ 86. Therefore, the plaintiffs plausibly allege that Friedman

was aware of the dramatically rising number of claims associated with TeamHealth during this time period yet told investors otherwise, all while stressing that ProAssurance would implement its "disciplined approach" against the backdrop of rising HCPL severity.  *See id.* ¶ 160.

Other allegations bolster this inference of scienter.  CW 2, who alleges that it was "well known internally by 2019" that TeamHealth would not renew and would instead exercise its tail coverage option, reported to Friedman as a manager, suggesting that Friedman stayed abreast of TeamHealth-related developments until the National Healthcare Team's disbandment during 2019.  *See id.* ¶¶ 55 n.2, 80. Friedman led the team that signed and underwrote the TeamHealth deal, and he subsequently approved its terms, meaning that he had specific familiarity with the apparently risky nature of the policy, including its pricing, structure, reinsurance coverage, and tail coverage option.  *See id.* ¶ 263.  *See also* doc. 55 at 27.  Friedman spoke about the magnitude and details of this deal in a 2016 earnings call, when he acknowledged that the TeamHealth policy was "the single largest premium [ProAssurance had] ever written."  Doc. 44 at ¶¶ 53–54.  In total, the plaintiffs have thus established scienter as to Friedman in connection with his statements about frequency data and his assurances regarding ProAssurance's caution and conservative practices.

f.

Boguski has served as President of ProAssurance's SP&C operating division since May 13, 2019. *Id.* ¶ 21. Apparently, Boguski effectively replaced Friedman after the restructuring in 2019. *Id.* Before then, Boguski ran ProAssurance's workers' compensation insurance operating subsidiary. *Id.* Allegedly, Boguski "regularly spoke with investors and securities analysts" and signed each quarter and annual statutory insurance filing for ProAssurance Specialty Insurance from the third quarter of 2018 through the end of the Class Period. *Id.*

As with Friedman, the plaintiffs have pleaded facts giving rise to a cogent and compelling inference of, at the least, severe recklessness as to Boguski's statements about the frequency data underlying ProAssurance's reserves calculations and commitment to caution and discipline. Boguski apparently claimed, while TeamHealth claims continued to rise, that as to ProAssurance's current trends, it had "been relatively flat on the frequency side, even perhaps slightly down" during a November 2019 analyst call. *See id.* ¶ 185. Allegedly, Boguski made this claim even though he signed ProAssurance Specialty Insurance's quarterly and annual statements beginning in late 2018, which indicated "the ever-increasing number of claims being reported by TeamHealth." *Id.* ¶ 265. The plaintiffs also plead facts suggesting that as of 2019, Boguski knew ProAssurance had a "problematic account" that was "hemorrhaging money," as evidenced by Boguski's attendance at

the July 2019 company-wide meeting. *See id.* ¶ 266. Yet, throughout the tail end of the Class Period, Boguski reiterated ProAssurance's commitment to underwriting discipline and high-quality risk selection, even as he allegedly oversaw the company's riskiest account and admitted it was a "unique national account structure" and that "there [were] no other structures in [ProAssurance's] book of business that would even be close to the structure that was offered here." *Id.* ¶¶ 104, 175, 183. Based on these contentions, the plaintiffs sufficiently plead scienter as to these two categories of claims against Boguski.

However, the plaintiffs have failed to plead the requisite scienter as to their contention that Boguski allegedly failed to disclose TeamHealth's nonrenewal and purchase of tail coverage sooner than May 2020. To support their contention, the plaintiffs cite Boguski's exchange with an analyst during a February 2020 call and argue that Boguski insinuated that he did not anticipate further negative fallout from the TeamHealth account by stating that ProAssurance was "encouraged" it had identified the account as problematic, did not have any "similar structures," and "just [had] to take it from here." *Id.* ¶ 194. These allegations fail to establish that Boguski clearly knew TeamHealth would not renew and would instead buy tail coverage as early as 2019. That this fact was purportedly "well known internally" by 2019, *id.* ¶ 80, is far different from pleading that Boguski had the specific knowledge. Moreover, notwithstanding his purported knowledge, these statements align with the

more plausible inference that Boguski merely believed ProAssurance had reviewed its other accounts and singled out TeamHealth as problematic—not that he necessarily thought that problems with the TeamHealth account were fully resolved. *See Thompson*, 610 F.3d at 633.  Taking the allegations together, the plaintiffs have not established that Boguski acted with intent to defraud or severe recklessness when he allegedly failed to disclose that TeamHealth would purchase tail coverage instead of renewing its policy in 2020.

g.

Finally, the plaintiffs contend that ProAssurance acted with scienter because "the knowledge of its senior-most executives," including the individual defendants, "is imputed to ProAssurance."  *Id.* ¶ 278.  "A company may be held liable for statements made to analysts that reach the market, where the plaintiff alleges entanglement between the [c]ompany's executives and the analysts."  *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d at 1339.  Moreover, the "knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation."  *Id.* at 1340 (citing *Am. Standard Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 270–71 & n.16 (5th Cir. 1981)).

Having found that Friedman and Boguski acted with scienter when they allegedly misstated the frequency data underlying ProAssurance's reserve estimates and misleadingly emphasized the company's commitment to conservative business

practices, the court concludes that ProAssurance similarly acted with scienter as to these material misrepresentations.  The complaint clearly alleges that Friedman and Boguski "regularly spoke with investors and securities analysts" about ProAssurance.  *See* doc. 44 at ¶¶ 20–21.  Moreover, Friedman's and Boguski's alleged misstatements occurred during analyst calls and in filings—public statements meant to convey information about the company's observations and financial results.  *See, e.g.*, *id.* ¶¶ 79, 86, 104, 185.  Friedman allegedly oversaw all HCPL activities within ProAssurance, led the team that underwrote the TeamHealth deal, and thus was "responsible for approving all underwriting decision-making and overseeing the activities of team members, including other high-level executives."  *Id.* ¶¶ 51, 263.  Boguski allegedly took over this role from Friedman in mid-2019.  *Id.* ¶ 21.  In sum, Friedman's and Boguski's scienter as to the misrepresentations regarding the frequency data underlying the loss reserves and the company's alleged commitment to conservative business practices may be properly imputed to ProAssurance.

## B.

The court turns finally to the claims against the individual executives under § 20(a) of the Securities Exchange Act.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled

person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The provision therefore "imposes derivative liability on persons that control primary violators of the Act."  *Mizzaro,* 544 F.3d at 1237 (quoting *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008)).  Section 20(a) "is remedial and is to be construed liberally.  It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable."  *Laperriere*, 526 F.3d at 724 (citing *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967)).

To establish control-person liability under § 20(a), a plaintiff must establish that (1) the defendant-company committed a primary violation of the securities laws, (2) the individual defendants had the power to control the general business affairs of the defendant-company, and (3) the individual defendants had the requisite power to directly or indirectly control or influence the corporate policy that resulted in primary liability.  *Mizzaro,* 544 F.3d at 1237.  "Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim," the Eleventh Circuit has held that "a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded."  *Id.*  Moreover, § 20(a) imputes liability to a controlling person based on the relationship to the primary violator, not on any independent violation by the controlling person.  *Laperriere*, 526 F.3d at 725.

1.

In this case, the individual-executive defendants principally challenge whether the plaintiffs state a predicate securities violation. However, the plaintiffs have adequately pleaded a § 10(b) violation by ProAssurance when, through the public statements and knowledge of Friedman and Boguski, the company materially misrepresented the frequency data underlying its reserves estimates and materially misled investors by repeatedly stressing its commitment to conservative underwriting and reserves practices despite an inherently and increasingly risky large national account growing worse throughout the Class Period. *See supra* § III.A.2.g. Thus, the plaintiffs have satisfied the first element required for § 20(a) control-person liability.

2.

In addition to an underlying securities violation, the § 20(a) claim requires pleading that the individual defendants had the power to control the company's general business affairs and that they had the power to directly or indirectly control or influence company policy that resulted in § 10(b) liability. *See Mizzaro,* 544 F.3d at 1237. Along these lines, the plaintiffs plead that four of the five individual defendants—Friedman, Rand, Hendricks, and Boguski—each signed ProAssurance Specialty Insurance's quarterly and annual statutory filings, attesting to the truth and completeness of the financial reports and data contained within them. *See* doc. 44

at ¶ 112.  Starnes, who served as ProAssurance's CEO until mid-2019, also held a director role at ProAssurance Specialty Insurance from 2015 through mid-2019.  *Id.* ¶ 113.  All of the defendants worked as senior corporate officers or high-level directors at ProAssurance during the Class Period and, in these roles, allegedly spoke directly with analysts and, in some cases, made statements in press releases regarding the data underlying ProAssurance's analyses and financial results.  *See id.* ¶¶ 323–24.  These statements, in conjunction with the data contained in the statutory filings, form the basis of the company's § 10(b) liability as to the misrepresentations regarding the company's frequency data and its commitment to conservative underwriting and reserves practices.  Thus, at this juncture, the plaintiffs adequately state § 20(b) claims against each of the individual named defendants.

## IV.

To close, the bulk of the plaintiffs' § 10(b) claims predicated on ProAssurance's loss reserves and TeamHealth's nonrenewal and tail coverage must be dismissed.  Though the plaintiffs claim that ProAssurance and its executives failed to account for important factors in the company's reserves calculations despite their public statements to the contrary, the complaint fails to give rise to the strong and compelling inference that the defendants acted with the intent to defraud or with severe recklessness when they made announcements about ProAssurance's methodologies or announced TeamHealth-related losses.  At best, most of these

allegations amount to claims that ProAssurance and its executives could have done a better job at estimating losses.

However, the court finds that the plaintiffs sufficiently plead § 10(b) claims against Friedman, Boguski, and ProAssurance based on their material misstatements regarding observed frequency data underlying the company's reserve estimates and the company's commitment to conservative underwriting and reserve-setting. Given that the plaintiffs thus state a predicate securities violation, the plaintiffs also plausibly plead § 20(b) claims against the five executive-defendants as controlling persons of ProAssurance.

**DONE** the 10th day of December, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE