FILED
2022 Apr-01  PM 02:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ALABAMA

# SOUTHERN DIVISION

| | | |
|---|---|---|
| SHEET METAL WORKERS LOCAL 19 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 2:20-cv-00856-AKK |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) ) | LEAD PLAINTIFFS' INITIAL SUBMISSION IN SUPPORT OF MOTION TO CERTIFY CLASS, |
| vs. | ) | APPOINT CLASS |
| PROASSURANCE CORPORATION, *et al.*, | ) ) | REPRESENTATIVES AND APPOINT CLASS COUNSEL |
| | ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................. 5

III.  ARGUMENT ..................................................................................... 8

    A.    Securities Class Actions Are Ideally Suited for Class
        Certification ................................................................................ 8

    B.    This Action Satisfies the Requirements of Rule 23(a) ....................... 8

        1.    The Class Is So Numerous, Joinder Is Impracticable ................ 9

        2.    Common Questions of Law and Fact Exist ............................. 9

        3.    Plaintiffs' Claims Are Typical of the Class ...........................10

        4.    Plaintiffs Will Fairly and Adequately Represent the Class ......11

    C.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ......13

        1.    Common Questions of Law and Fact Predominate..................14

            i.    Plaintiffs Are Entitled to the Fraud-On-The-
               Market Presumption of Reliance ..................................15

            ii.   Plaintiffs Are Entitled to a Presumption of
               Reliance Under *Affiliated Ute* .......................................21

            iii.  Damages Will Be Calculated on a Class-Wide
               Basis ............................................................................22

        2.    A Class Action Is Superior to Other Methods of
            Adjudication ...................................................................24

IV.   CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)..................................................................................21, 22

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)....................................................................................8, 14

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................................14, 22

*Aranza v. Catalyst Pharms. Partners, Inc.*,
302 F.R.D. 657 (S.D. Fla. 2014) ......................................................................19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...........................................................................................15

*Brown v. Electrolux Home Prods., Inc.*,
817 F.3d 1225 (11th Cir. 2016)........................................................................23

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989)...........................................................16, 17, 19

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003) .....................................................................25

*Cherry v. Dometic Corp.*,
986 F.3d 1296 (11th Cir. 2021)...................................................................... 8

*City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*,
2019 WL 3449671 (N.D. Ga. July 17, 2019)..........................................10, 23, 24

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).............................................................................................23

*Dickens v. GC Servs. Ltd. P'ship*,
706 F. App'x 529 (11th Cir. 2017)...................................................................11

*Erica P. John Fund Inc., v. Halliburton Co.,*
563 U.S. 804 (2011) ............................................................................. 14, 15

*FindWhat Inv'r Grp. v. FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011) ............................................................. 18, 20

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.,*
141 S. Ct. 1951 (2021) ............................................................................. 16

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014) .............................................................................. 15, 20

*Herrera v. JFK Med. Ctr. L.P.,*
648 F. App'x 930 (11th Cir. 2016) .......................................................... 22, 23

*In AmeriFirst Sec. Litig.,*
139 F.R.D. 423 (S.D. Fla. 1991) .................................................................. 24

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.,*
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ........................................................... 22

*In re HealthSouth Corp. Sec. Litig.,*
257 F.R.D. 260 (N.D. Ala. 2009) ................................................................... 8

*In re Jeld-Wen Holding, Inc. Sec. Litig.,*
2021 WL 1186326 (E.D. Va. Mar. 29, 2021) ...................................................... 4

*In re Netbank, Inc. Sec. Litig.,*
259 F.R.D. 656, (N.D. Ga. 2009) ........................................................ 18, 19, 24

*In re Novo Nordisk Sec. Litig.,*
2020 WL 502176 (D.N.J. Jan. 31, 2020) .......................................................... 4

*In re Theragenics Corp. Sec. Litig.,*
205 F.R.D. 687 (N.D. Ga. 2002) .................................................................... 3

*In re Vesta Ins. Grp., Inc., Sec. Litig.,*
1999 WL 34831475 (N.D. Ala. Oct. 25, 1999) .................................................... 9

*J.W. v. Birmingham Bd. of Educ.,*
2012 WL 3849032 (N.D. Ala. Aug. 31, 2012) ................................................ 10, 13

iii

*Kirkpatrick v. J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987)................................................................. 8

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001).......................................................21

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  762 F.3d 1248 (11th Cir. 2014)......................................................*passim*

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ...................................................20

*Monroe Cty. Emp.s' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ..................................................*passim*

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
  2020 WL 5757695 (D. Minn. Sept. 28, 2020) .............................................12, 13

*Rensel v. Centra Tech, Inc.*,
  2 F.4th 1359 (11th Cir. 2021)................................................................ 8

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,
  Inc.*, 552 U.S. 148 (2008)................................................................21

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)................................................*passim*

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017).................................................................20

*Wilson v. LSB Indus., Inc.*,
  2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)................................................23

## RULES

Rule 23 of the Federal Rules of Civil Procedure .............................................*passim*

## OTHER AUTHORITIES

1995 U.S.C.C.A.N. 730 ...................................................................... 4

H.R. Conf. Rep. No. 104-369.............................................................4, 12

Court-appointed Lead Plaintiffs, Central Laborers' Pension Fund ("Central Laborers") and Plymouth County Retirement Association ("Plymouth County") (collectively, "Plaintiffs"),[1] respectfully submit this initial memorandum in support of their motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), seeking: (1) certification of a class consisting of all persons or entities who purchased or otherwise acquired the common stock of ProAssurance between August 8, 2018 and May 7, 2020, inclusive (the "Class Period"), and who were damaged thereby (the "Class");[2] (2) appointment of Plaintiffs as Class Representatives; and (3) appointment of Saxena White P.A. ("Saxena White") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

## I.   INTRODUCTION

This is a securities fraud class action against ProAssurance, one of the largest providers of healthcare professional liability ("HCPL") insurance coverage in the United States.  The Complaint asserts that Defendants made a series of materially false and misleading statements and omissions regarding ProAssurance's purported

---

[1] Defendants are ProAssurance Corporation ("ProAssurance" or the "Company"), W. Stancil Starnes, Edward L. Rand, Jr., Dana S. Hendricks, Howard Friedman, and Michael Boguski (collectively, "Defendants").   Unless otherwise noted: (1) capitalized terms have the same meanings as in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 44); (2) "¶_" references are to paragraphs of the Complaint; (3) all emphasis is added and internal citations and quotation marks are omitted; and (4) "Ex. _" references are to the exhibits attached to the Declaration of Nathan R. Lindell ("Lindell Decl.") filed simultaneously herewith.

[2] Excluded from the Class are Defendants and their families, the officers and directors of ProAssurance, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest. ¶292.

1

commitment to "disciplined" and "conservative" underwriting and reserve-setting practices, falsely assuring investors that ProAssurance prudently guarded itself against the liability risks plaguing its competitors.  None of these representations were true for ProAssurance's largest and most important HCPL policy, which had been issued in 2016 to TeamHealth, a large physician staffing company with an inherently risky business model.  In truth, the TeamHealth policy was highly risky and uniquely structured, thus exposing the Company to extraordinary levels of liability.  In addition, Defendants concealed that TeamHealth was reporting claims at increasingly high frequency rates during a time when the severity of medical malpractice claims was rising.  Although Defendants were aware of the mounting risks from the TeamHealth account, they failed to disclose those risks or incorporate them into ProAssurance's loss reserves, in direct contrast to Defendants' repeated public commitments to "disciplined" and "conservative" practices.

Unlike Defendants, investors were not aware of the dangers posed by the "problematic [TeamHealth] account" until they were revealed throughout the first half of 2020, when ProAssurance—the purportedly conservative, risk-adverse Company—announced via two corrective disclosures that the TeamHealth policy caused collective losses of *more than $130 million*—nearly equal to ProAssurance's total income for the *three prior years*.  These revelations caused ProAssurance's stock price to plummet over 67% from its Class Period high.

2

On December 10, 2021, the Court issued an Opinion denying in part, and granting in part, Defendants' motion to dismiss (the "MTD Opinion") (ECF No. 61). The MTD Opinion found that Plaintiffs adequately alleged falsity and scienter for numerous misstatements and omissions alleged in the Complaint. *Id*. at 58. Notably, Defendants' motion to dismiss did not challenge the issue of loss causation or the proposed Class Period, and the Court did not dismiss either of the two corrective disclosures alleged in the Complaint. *Id*. at 15, 58. Plaintiffs now seek to certify the Class pursuant to Rule 23(a) and (b)(3), as detailed below.

"It is well-established that class actions are a particularly appropriate means for resolving securities fraud actions." *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *5 (S.D. Fla. Mar. 16, 2016). The "Eleventh Circuit has explicitly recognized that securities class actions serve both the public interest in maintaining the integrity of the securities markets and the private interests of investors who would not otherwise obtain redress of grievances through a multiplicity of small individual damage suits." *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 693-94 (N.D. Ga. 2002). Here, Plaintiffs' claims are ideally suited for class treatment.

*First*, the proposed Class easily satisfies the numerosity, commonality, and typicality requirements of Rule 23(a). Additionally, Plaintiffs are clearly adequate, as they are precisely the type of sophisticated institutional investors that Congress sought to lead securities class actions when enacting the Private Securities Litigation

Reform Act of 1995 ("PSLRA"). *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733; *see also* Ex. B, ¶¶2-3, Ex. C, ¶¶2-3. Moreover, Plaintiffs have selected Saxena White and Robbins Geller as Class Counsel—both highly experienced litigators of securities class actions.

*Second*, the requirements of Rule 23(b)(3) are also satisfied. Courts routinely find that predominance is met where, as here, Defendants engaged in a common course of conduct, the securities traded in an efficient market, and damages can be calculated on a Class-wide basis. To demonstrate market efficiency, Plaintiffs submit the Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA (the "Feinstein Report"),[3] a widely respected expert whose opinions have been relied upon to certify classes in securities class actions across the country, including within the Eleventh Circuit.[4] The Feinstein Report also demonstrates that damages in this action can reliably be measured on a Class-wide basis, as courts have regularly reaffirmed in countless securities fraud cases.

Accordingly, Plaintiffs respectfully submit that their motion should be granted in its entirety.

---

[3] References to "Feinstein ¶_" are to paragraphs of the Feinstein Report, attached as Ex. A to the Lindell Decl.

[4] *See e.g.*, *Monroe Cty. Emp.s' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 401 (N.D. Ga. 2019); *In re Jeld-Wen Holding, Inc. Sec. Litig.*, 2021 WL 1186326, at *10 (E.D. Va. Mar. 29, 2021); *In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *3 (D.N.J. Jan. 31, 2020).

## II.    STATEMENT OF FACTS

ProAssurance is one of the nation's largest HCPL insurance providers.  ¶¶4, 32.    During the Class Period, Defendants repeatedly touted ProAssurance's "disciplined" underwriting and "conservative" reserve practices as the hallmarks of their business strategy, which purportedly gave ProAssurance an advantage over its competitors.    ¶¶39-41, 79, 148, 158.    Analysts credited these representations, describing the Company as "one of the most conservative insurers in the sector," and stating that ProAssurance's "significant favorable prior-year loss reserve development" was "the most important contributor to earnings."  ¶¶46, 75.

Unbeknownst to investors, ProAssurance sharply deviated from its purportedly "cautious" practices when its National Healthcare Team underwrote a uniquely structured and highly risky HCPL policy for TeamHealth in 2016, in exchange for "the single largest premium ever billed" by the Company.  ¶¶5, 52-53, 215, 251.    Indeed, as Defendants would later admit, the TeamHealth policy was so unique that "there [were] no other structures in [ProAssurance's] book of business that *would even be close* to the structure that was offered" to TeamHealth.  ¶¶72, 104, 193.  Moreover, TeamHealth, a large physician group with a well-known profit-over-patients business model, was an exceptionally high-risk insured that was uniquely susceptible to large medical malpractice claims.  ¶¶58-60, 64-65, 67-71.

5

By 2018, the severity of claims reported by large physician groups like TeamHealth was rising industry-wide. *See* ¶¶7, 64. Defendants acknowledged that they were monitoring this trend throughout the Class Period, while at the same time continuing to assure investors that ProAssurance's conservative and disciplined reserve practices mitigated against such risks. *See*, *e.g.*, ¶¶7, 61-66, 79, 148-149, 152-156, 158-161, 166-167, 255. For instance, in November 2018, while Defendant Friedman asserted "there is overall concern in the industry about loss severity," he emphasized that "the potential change in severity influences our loss [picks] and affects our evaluation of reserves," and touted "the caution we are using as we evaluate reserves and determine loss ratios." ¶65.

Defendants concealed from investors, however, that the frequency of claims reported by TeamHealth was also rising exponentially during this same time. ¶¶7-8, 76-87, 114-31, 252. In fact, Defendants affirmatively misrepresented that trends had been "relatively flat on the frequency side, even perhaps slightly down," while continuing to tout their supposedly "cautious" and "disciplined" analysis with regards to "reserves and … loss assumptions." *See* ¶¶81-87, 122-131, 141-143, 181-186. Further, despite the dramatic rise in claim frequency, ProAssurance inexplicably failed to correspondingly increase its TeamHealth reserves, as evidenced by the remarkable *decline* in the implied average severity rates for the TeamHealth account—at a time when Defendants publicly acknowledged that

6

severity rates for large physician groups were significantly rising.  ¶¶8-9, 66, 76-80, 122-131.

The truth about ProAssurance's fraud was revealed through two corrective disclosures in 2020.  ¶¶3, 6, 11, 97-106, 280-291.  First, on January 22, 2020, Defendants shocked the market by disclosing an estimated $37 million adverse development for the Company's prior accident year loss reserves, driven by losses on a large, unnamed national account (*i.e.*, TeamHealth).  *See* ¶¶11, 284-285.  On this news, ProAssurance's stock price fell 11%, from $37.58 per share on January 22, 2020, to $33.40 per share on January 23, 2020, ultimately closing at $30.09 per share on January 29, 2020.  ¶285.[5]

Then, on May 7-8, 2020, Defendants further revealed the truth about ProAssurance's undisciplined, non-conservative underwriting and reserve practices for the TeamHealth account by announcing that TeamHealth would exercise the tail coverage option in its policy, exposing the Company to approximately $50 million of ***additional losses***.  ¶¶103-106, 288-291.  In explaining the causes for these additional losses, Defendant Boguski stated that the TeamHealth account "was a unique national account structure . . . and there are no other structures in our book

---

[5]   On February 20, 2020, ProAssurance clarified that the estimated $37 million adverse development disclosed on January 22, 2020, was driven by a $44.5 million adverse development attributable solely to the unnamed national account (TeamHealth), which brought the total TeamHealth-related adverse development for the entire fiscal year 2019 to $51.5 million.  ¶¶102, 189-91, 287.

of business that would even be close to the structure that was offered here."  ¶¶104, 290.  In response, the price of ProAssurance common stock plummeted nearly 22%, or $4.38 per share, to close at $15.95 per share on May 8, 2020.  ¶¶12, 104, 291.

## III.   ARGUMENT

### A.   Securities Class Actions Are Ideally Suited for Class Certification

The Eleventh Circuit recognizes the utility of class actions in cases "governing the securities markets." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987).  Class actions protect the "interest of investors whose redress of grievances is not limited to a multitude of small individual claims." *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 271 (N.D. Ala. 2009).  For that reason, class actions are "a particularly appropriate means for resolving securities fraud actions." *Thorpe*, 2016 WL 4006661, at *15.

### B.   This Action Satisfies the Requirements of Rule 23(a)

The proposed Class readily satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.[6]  *See* Fed. R. Civ. P. 23(a); *Amchem Prods. v. Windsor*, 521 U.S. 591, 613 (1997).

---

[6]   The proposed Class also satisfies Rule 23's implied ascertainability prerequisite, which requires only that "membership is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302-03 (11th Cir. 2021).  Here, membership in the Class is readily ascertained by "the objective, verifiable criterion of having purchased a particular security within a particular date range," as proven through the "submission of claims forms verified by transaction records." *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1370 (11th Cir. 2021).

### 1.    The Class Is So Numerous, Joinder Is Impracticable

Rule 23(a)(1)'s requirement that "the class is so numerous that joinder of all members is impracticable" is easily satisfied here.    During the Class Period, ProAssurance had over 53 million shares of common stock outstanding, with an average daily trading volume of 279,419 shares.    Feinstein ¶¶52, 88.[7]    Moreover, ProAssurance common stock traded on the NYSE (¶16), and there is "a firm recognition that Rule 23(a)(1) is satisfied in a securities fraud action where securities are traded on a national public exchange."    *Thorpe,* 2016 WL 4006661, at *6; *see also In re Vesta Ins. Grp., Inc., Sec. Litig.*, 1999 WL 34831475, at *1 (N.D. Ala. Oct. 25, 1999) (numerosity satisfied "when dealing with allegations of fraud in the sale of securities traded on the New York Stock Exchange").

### 2.    Common Questions of Law and Fact Exist

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."    In the Eleventh Circuit, commonality is a "low hurdle," as "[e]ven a single common question will do."    *Monroe Cnty.*, 332 F.R.D. at 378.    Here, all putative Class members are alleged to have been harmed as a result of a common course of conduct arising from material misrepresentations and omissions that Defendants made during the Class Period.    Thus, the common questions of law and fact include:

---

[7] The Complaint mistakenly alleged that ProAssurance's "average daily trading volume was 402,000 shares." ¶293. The proper figure for this metric is 279,419 shares. Feinstein ¶52.

> (a) whether the federal securities laws were violated by Defendants acts and omissions; (b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts; (c) whether Defendants failed to convey material facts or to correct material facts previously disseminated; (d) whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts; (e) whether the price of ProAssurance stock was artificially inflated during the Class Period; and (f) to what extent the members of the Class have sustained damages and the proper measure of damages.

¶294; *see also Monroe Cnty.*, 332 F.R.D. at 378 (finding similar common questions evidenced commonality); *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, 2019 WL 3449671, at *4 (N.D. Ga. July 17, 2019) (same).

### 3.    Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3)'s typicality requirement seeks to ensure that the representative parties possess the same interest and suffered the same injury as the other members of the proposed class. *See J.W. v. Birmingham Bd. of Educ.*, 2012 WL 3849032, at *9 (N.D. Ala. Aug. 31, 2012) (Kallon, J.).  The requirement is satisfied where "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Thorpe*, 2016 WL 4006661, at *7.

Typicality is easily met here, as "Plaintiffs' claims are founded on the same alleged facts and legal theories as the claims of all other Class members – *i.e.*, Defendants' Class Period false statements and omissions and their effect on [the Company's] stock price." *Monroe Cnty.*, 332 F.R.D. at 379.  Further, Plaintiffs'

10

injury is "the same as the injury suffered by all members of the putative Class." *Id.*; *see also Thorpe*, 2016 WL 4006661, at \*8 (typicality established where "[t]he alleged fraudulent statements comprise the wrongful acts which will serve as the *same* factual predicate for Plaintiffs and all members of the class and which will determine whether Defendants are liable under the *same* securities fraud theories") (emphasis in original).

### 4.    Plaintiffs Will Fairly and Adequately Represent the Class

To determine whether the proposed class representatives will "fairly and adequately protect the interests of the class" under Rule 23(a)(4), courts consider "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Dickens v. GC Servs. Ltd. P'ship*, 706 F. App'x 529, 535 (11th Cir. 2017). Plaintiffs readily satisfy Rule 23(a)(4) here.

*First*, there are no conflicts between Plaintiffs and the proposed Class. Like other potential Class members, Plaintiffs purchased ProAssurance common stock at artificially inflated market prices during the Class Period and were injured by the same material misrepresentations and omissions. Thus, Plaintiffs' and the putative Class's interests in establishing Defendants' liability and maximizing recovery are aligned. *Monroe Cnty.*, 332 F.R.D. at 379.

11

*Second*, as set forth in their respective Declarations in support of this motion, Plaintiffs have demonstrated their adequacy by consistently taking an active role in and exerting control over this litigation to protect the interests of the Class, including by receiving frequent status updates from counsel, seeking appointment as Lead Plaintiffs, filing a highly detailed Complaint, defeating in part Defendants' motion to dismiss, vigorously pursuing fact discovery, and preparing to respond to discovery requests served by Defendants. *See* Ex. B, ¶¶6-7; Ex. C, ¶¶6-7. Numerous courts have found that such actions "demonstrate[] a willingness to assert and defend the interests of putative Class members." *See, e.g.*, *Monroe Cnty.*, 332 F.R.D. at 379.

*Third*, Plaintiffs are pension funds who regularly act as fiduciaries, collectively overseeing billions of dollars in assets on behalf of their beneficiaries. *See* Ex. B, ¶2; Ex. C, ¶2. Thus, Plaintiffs are precisely the type of institutional investors that Congress and the Eleventh Circuit prefer to lead securities class actions. *See* H.R. Conf. Rep. No. 104-369, at 34 (1995); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014) ("Sophisticated institutional investors . . . are preferred as class representatives"). Indeed, both Plaintiffs were recently appointed co-class representatives in a separate securities class action that is currently pending settlement approval. *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at *8 (D. Minn. Sept. 28, 2020) (finding Plymouth County and Central Laborers adequate class representatives).

12

*Fourth*, Plaintiffs' selected counsel, Saxena White and Robbins Geller, are well-qualified to prosecute this action on behalf of Plaintiffs and the Class, thereby satisfying the requirements of Rule 23(a)(4) and (g). *See* Ex. D (Saxena White Firm Resume); Ex. E (Robbins Geller Firm Resume); s*ee also Birmingham Bd. of Educ.*, 2012 WL 3849032, at *9 ("Counsel will be deemed adequate if they are shown to be qualified, adequately financed, and possess sufficient experience in the subject matter of the class action"). "Saxena White and Robbins Geller are experienced in leading large securities class actions and have obtained substantial recoveries for plaintiffs in such lawsuits." *Patterson,* 2020 WL 5757695, at *8. Indeed, as Court-appointed Lead Counsel, Saxena White and Robbins Geller have already committed substantial time, energy, and resources to advocating for the interests of Plaintiffs and the Class by, among other things, preparing a detailed Complaint sufficient to withstand Defendants' motion to dismiss, pursuing extensive discovery supportive of Plaintiffs' claims, retaining necessary experts, and assembling a qualified team of attorneys and staff dedicated to prosecuting this action.

In sum, Plaintiffs and Class Counsel are highly capable of prosecuting this action and will fairly and adequately protect the interests of the proposed Class.

### C.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) authorizes certification where: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual

13

members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Those requirements are met here.

### 1.   Common Questions of Law and Fact Predominate

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and, as the Supreme Court has found, "[p]redominance is a test readily met in … cases alleging … securities fraud." *Amchem*, 521 U.S. at 594, 625.

As discussed in §III.B.2 above, this action is replete with questions common to the proposed Class.  Moreover, in "a private securities fraud action, questions of materiality and loss causation are considered common questions and thus remain outside the judicial inquiry in a class certification motion, as do, generally, questions of individualized damages." *Thorpe*, 2016 WL 4006661, at *12 (collecting cases); *see also  Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013) ("This Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified.").  Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund Inc., v. Halliburton Co.,* 563 U.S. 804, 810 (2011) ("*Halliburton I*").

### i.    Plaintiffs Are Entitled to the Fraud-On-The-Market Presumption of Reliance

Plaintiffs are entitled to a Class-wide presumption of reliance in accordance with the fraud-on-the-market doctrine, enunciated by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*").  As courts recognize, "[i]t is common … for securities fraud plaintiffs to invoke the fraud on the market doctrine." *E.g.*, *Thorpe*, 2016 WL 4006661, at \*12.

Under the fraud-on-the-market doctrine, reliance on material statements and omissions is presumed so long as the stock traded in an efficient market.  *See Halliburton II*, 573 U.S. at 267-68; *Basic*, 485 U.S. at 247.  This is because an efficient market rapidly reacts to new information about a listed company, causing the price of its securities to incorporate and reflect such news.  By purchasing a security at the price set by an efficient market, an investor is therefore constructively relying upon all of the public information about the company, regardless of whether the investor personally read or knew anything about such information.  *See Basic*, 485 U.S. at 241-42; *Halliburton I*, 563 U.S. at 810-11.  Here, Plaintiffs and the Class relied on the integrity of the market price for ProAssurance common stock when making their transactions.  Indeed, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity.  Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47.

15

To invoke the fraud-on-the-market doctrine at the class certification stage, a plaintiff need only show "that the alleged misrepresentation was publicly known," "that the stock traded in an efficient market," and "that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958-59 (2021).

Each of these elements is readily satisfied here. The alleged misrepresentations, all of which were disseminated to investors via ProAssurance's SEC filings, press releases, earnings calls, and conferences, were publicly known. ¶¶136-194. Further, for the reasons set forth below and in the Feinstein Report, the market for ProAssurance common stock was undoubtedly efficient throughout the Class Period. Feinstein ¶¶51-155. Indeed, ProAssurance shares were traded on the NYSE, and "[t]he Eleventh Circuit has noted that securities trading on national exchanges like the NYSE are often presumed to be traded on an efficient market." *Monroe Cnty.*, 332 F.R.D. at 382. Finally, Plaintiffs, like other members of the Class, purchased or acquired ProAssurance common stock after Defendants' misrepresentations were made and before the full truth regarding those misrepresentations was revealed. ¶¶14-15; Ex. B, ¶5; Ex. C, ¶5.

In evaluating whether the market for an individual security is efficient, courts often consider the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989). These factors are: (1) whether the stock trades at a high weekly

16

volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC Registration Form S-3, as opposed to Form S-1 or S-2; and (5) whether there is empirical evidence suggesting a causal connection between new information and price movements. *See id.*[8]  As set forth below, each of the *Cammer* factors supports a finding that ProAssurance common stock traded in an efficient market during the Class Period. *See also* Feinstein ¶¶51-83.

*High Average Trading Volume*.  The Eleventh Circuit has held that "high-volume trading activity" is a "general sign[] of an efficient market." *Regions*, 762 F.3d at 1255.  This is because "it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286.  Under *Cammer*, a "weekly trading volume of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Id.*  Here, the average weekly trading volume of ProAssurance common stock during the Class Period was approximately 1.4 million shares, which is 2.6% of the shares outstanding during the Class Period.  Feinstein ¶¶52-54.  This satisfies *Cammer* and supports "a strong presumption of market

---

[8] The Eleventh Circuit has declined to adopt the *Cammer* factors as a mandatory analytical framework, but noted that a court can use the factors to "guide its analysis." *Regions*, 762 F.3d at 1254-55.  Because there is overlap between the traditional indicia of efficiency identified by the Eleventh Circuit and *Cammer*, Plaintiffs analyze these factors concurrently.

17

efficiency." *Id.* ¶¶53-54; *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 670 (N.D. Ga. 2009) (average weekly trading volume of 1.36 million indicative of market efficiency).

*Significant Analyst Coverage*.  The Eleventh Circuit has further held that the presence of securities "analysts who 'study the available information and influence the stock price through trades and recommendations" is another "general sign[] of an efficient market."  *Regions*, 762 F.3d at 1255 (quoting *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011)).[9]  ProAssurance was covered by at least nine analyst firms throughout the Class Period and there were at least 331 articles published about the Company.  Feinstein ¶¶55-60, 65.  Such coverage demonstrates that Company-specific news was widely disseminated, supporting market efficiency.  *See Monroe Cnty.*, 332 F.R.D. at 383 (citing cases where coverage by four or five analysts was sufficient).

*The Presence of Market Makers*.  "Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with individual investors, institutions and other market makers."  Feinstein ¶68.  The more market makers a security has, the more efficient the market will be in responding to new

---

[9] The Eleventh Circuit has similarly found high institutional ownership of a security to be indicative of market efficiency for the same reasons.  *See Regions*, 762 F.3d at 1258.  Here, at least 430 major institutions owned ProAssurance stock during the Class Period, which further supports a finding of market efficiency.  Feinstein ¶¶61-63.

information about the issuer, thereby incorporating that information into the market price.  *See Cammer*, 711 F. Supp. at 1286-87.  "The NYSE–one of the most renowned and liquid stock exchanges in the world–employs a Designated Market Maker ('DMM') for each listed stock."  *Monroe Cnty.*, 332 F.R.D. at 383; Feinstein ¶69.  ProAssurance stock was listed on the NYSE, overseen by its DMM, and had 75 market makers throughout the Class Period.  Feinstein ¶73.  These facts further support a finding of market efficiency.  *See Aranza v. Catalyst Pharms. Partners, Inc.*, 302 F.R.D. 657, 668-69 (S.D. Fla. 2014) (acknowledging "the Eleventh Circuit noted that high-volume trading activity and a presence of 'market makers,' . . . generally render a market efficient" and finding the presence of 44 market makers supportive of market efficiency).

*Form S-3 Eligibility*.  A company's eligibility to file a Form S-3 Registration Statement—which requires the issuer to have, among other things, a float of over $75 million and to have filed SEC reports for at least twelve consecutive months—is also a factor supportive of market efficiency.  *See Regions*, 762 F.3d at 1258; *Cammer*, 711 F. Supp. at 1287.  This is true because such eligibility is permitted "only on the premise that the stock is already traded on an open and efficient market."  *NetBank*, 259 F.R.D. at 671-72.  ProAssurance, which had an average float of $1.99 billion during the Class Period, was eligible to file a Form S-3 and, in fact, did so on May 24, 2019.  Feinstein ¶¶81-83.  Thus, this factor also supports market efficiency.

*Price Reaction to New Information*.  The Eleventh Circuit has cautioned that a finding of market efficiency does ***not*** "always require[] proof that the alleged misrepresentations had an immediate effect on the stock price." *Regions*, 762 F.3d at 1256; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (same). Nevertheless, clear evidence exists of a cause-and-effect relationship between Company news and ProAssurance's stock price during the Class Period.  Feinstein ¶100.  Specifically, Professor Feinstein conducted a collective event study, which tests whether "a company's news events collectively exhibit a significantly greater frequency of statistically significant stock price movements than do non- or lesser-news days." *Id*. ¶105; *see also id.* ¶¶106-152.[10]  "If the stock price is significantly more likely to change on [n]ews [d]ays than on [n]on-[n]ews [d]ays, that suggests a causal relationship between material news and the stock price." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 430 (S.D.N.Y. 2014) (endorsing use of collective event study methodology).  According to Professor Feinstein's study, ProAssurance's "earnings announcement days did, in fact, exhibit a significantly greater incidence of statistically significant returns compared to all other days"—

---

[10] As the Supreme Court recognized in *Halliburton II*, event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events."  573 U.S. at 280.  Event studies "are a common method of establishing loss causation, used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price" whose use "has been sustained by many circuits." *FindWhat*, 658 F.3d at 1313 & n.31.

20

60.0% versus 5.8%—further demonstrating that the market for ProAssurance common stock was efficient.  Feinstein ¶151; *see also id.* ¶¶149-152.

*Additional Factors Support Efficiency*.  Some courts also consider the factors set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001), as indicators of market efficiency.  *See, e.g., Monroe Cnty.*, 332 F.R.D. at 383-84.  The *Krogman* factors include: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')."  *Id.*  As set forth in the Feinstein Report, these factors further establish that ProAssurance common stock traded in an efficient market:

- *Market Capitalization*: Over the entire Class Period, ProAssurance's market capitalization averaged $2.03 billion, which was larger than 75% of all publicly traded companies in the United States.  Feinstein ¶¶85-86.

- *Bid-Ask Spread*: A narrow bid-ask spread is an indicator of market efficiency, and ProAssurance had a low average bid-ask spread of 0.05%, or $0.02 per share—whereas the average bid-ask spread for other companies during this period was 0.63%, or $0.15 per share.  *Id.* ¶¶90-93.

- *Float*: A larger float indicates market efficiency because it suggests greater liquidity, and ProAssurance's float was, on average during the Class Period, 98.30%.  *Id.* ¶¶87-89.

These facts establish the efficiency of the market for ProAssurance common stock during the Class Period, thus entitling the Class to a presumption of reliance.

### ii.    Plaintiffs Are Entitled to a Presumption of Reliance Under *Affiliated Ute*

Plaintiffs also are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  The *Affiliated Ute* presumption applies to claims involving material omissions.  *Id*; *see, e.g., Stoneridge*

*Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). The presumption reflects the reality that where information is omitted, "reliance as a practical matter is impossible to prove." *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013). Thus, in such circumstances, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.*[11]

The Complaint alleges actionable omissions. Indeed, the Court aptly noted in its MTD Opinion that "the plaintiffs plead actionable misstatements ***and omissions*** with regard to business practices which were, allegedly, in fact risky and not aligned with ProAssurance's stated commitment to caution and conservatism in light of the circumstances surrounding the unique TeamHealth deal." *Id.* at 40. Thus, Plaintiffs also are entitled to rely on the *Affiliated Ute* presumption to establish reliance.

### iii.    Damages Will Be Calculated on a Class-Wide Basis

In the Eleventh Circuit, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Herrera v. JFK Med. Ctr. L.P.*, 648 F. App'x 930, 936 (11th Cir. 2016). Rather, "common issues

---

[11] Since materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 467.

predominate if liability can be determined on a class-wide basis." *Id.*; *Monroe Cnty.*, 332 F.R.D. at 397. Moreover, the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), "did not change the law about the effect of individual damages on predominance." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1238 (11th Cir. 2016). It "simply requires a plaintiff to show a linkage between its theory of liability and theory of damages." *FleetCor*, 2019 WL 3449671, at *6.

Here, the Feinstein Report clearly demonstrates that damages in this action are capable of being calculated on a Class-wide basis through application of the well-accepted out-of-pocket damage methodology, consistent with Plaintiffs' theory of the case. Feinstein ¶¶156-167; *see also FleetCor*, 2019 WL 3449671, at *6-7 ("Plaintiff's theory of liability is that Defendants made public misstatements that artificially inflated stock price and when the truth was later revealed, this inflation was removed from the stock price . . . Thus, Plaintiff's damage model is sufficiently linked to its theory of liability to satisfy predominance"). Indeed, the same damages methodology applied by Professor Feinstein "has been accepted in securities fraud class actions in cases like this one, where Plaintiffs seek out-of-pocket damages to recover artificial inflation caused by Defendants' misrepresentations." *Monroe Cnty.*, 332 F.R.D. at 398; *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *16 (S.D.N.Y. Aug. 13, 2018) (same).

### 2.    A Class Action Is Superior to Other Methods of Adjudication

"As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases."  *NetBank*, 259 F.R.D. at 676. To establish superiority, Rule 23(b)(3) sets forth the following four factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

Each of these factors weighs in favor of class treatment here.  *First*, the Class consists of a large number of geographically dispersed investors in ProAssurance common stock whose individual damages are small enough to render individual litigation prohibitively expensive.   As such, absent class treatment these stockholders would either be left with no recourse or be required to file a multiplicity of suits resulting in the inefficient administration of justice.  *See In AmeriFirst Sec. Litig.*, 139 F.R.D. 423, 435 (S.D. Fla. 1991).  *Second*, Plaintiffs are not aware of any other pending Section 10(b) litigation commenced by Class members regarding the alleged fraud, further confirming the limited ability or interest of individual Class members in prosecuting individual actions.  *See FleetCor*, 2019 WL 3449671, at *7. *Third*, concentrating the litigation in this Court will eliminate the risk of inconsistent

adjudications and promote the fair and efficient use of judicial resources. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 502 (S.D. Fla. 2003). *Finally*, there is no reason to expect any difficulties in the management of this action as a class action. Lead Counsel have handled numerous similar actions, and the appropriate procedures for the management of such actions are well-established.

Accordingly, a class action is the superior method of adjudication.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this action as a class action; (2) certify Plaintiffs as Class Representatives; and (3) appoint Saxena White and Robbins Geller as Class Counsel.

DATED: April 1, 2022          Respectfully submitted,

ROGER BEDFORD, ATTORNEY AT LAW, LLC
ROGER H. BEDFORD, JR. (ASB: 3651 D60R)

s/ ROGER H. BEDFORD, JR.
ROGER H. BEDFORD, JR.

P.O. Box 1149
Russellville, AL 35653
Telephone: 256/332-6966
265/332-6967 (fax)
rogerbedfordattorneyatlawllc@gmail.com

25

GUIN, STOKES & EVANS, LLC
DAVID J. GUIN
TAMMY M. STOKES
DAWN STITH EVANS
300 Richard Arrington Jr. Blvd. N.
Suite 600/Title Bldg.
Birmingham, AL 35203
Telephone: 205/226-2282
205/226-2357 (fax)
davidg@gseattorneys.com
tammys@gseattorneys.com
devans@gseattorneys.com

Local Counsel for Lead Plaintiffs

ROBBINS GELLER RUDMAN & DOWD LLP
NATHAN R. LINDELL (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
BAILIE L. HEIKKINEN (*pro hac vice*)
REGINALD E. JANVIER (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
bheikkinen@rgrdlaw.com
rjanvier@rgrdlaw.com

SAXENA WHITE P.A.
STEVEN B. SINGER (*pro hac vice*)
SARA DILEO (*pro hac vice*)
KYLA GRANT (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: 914/437-8551
888/631-3611 (fax)
ssinger@saxenawhite.com
sdileo@saxenawhite.com
kgrant@saxenawhite.com

SAXENA WHITE P.A.
JOSEPH E. WHITE, III (*pro hac vice*)
LESTER R. HOOKER (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: 561/394-3399
561/394-3382 (fax)
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Lead Counsel for Lead Plaintiffs
CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL 62702
Telephone: 217/544-1771
217/544-9894 (fax)
johnlong@cavanagh-ohara.com

Additional Counsel for Lead Plaintiffs

27

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 1, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ ROGER H. BEDFORD, JR.
ROGER H. BEDFORD, JR.

ROGER BEDFORD, ATTORNEY AT LAW, LLC
P.O. Box 1149
Russellville, AL 35653
Telephone: 256/332-6966
265/332-6967 (fax)
rogerbedfordattorneyatlawllc@gmail.com

28

# Mailing Information for a Case 2:20-cv-00856-AKK Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter W Bates**
  Bbates@starneslaw.com

- **Roger H Bedford , Jr**
  rogerbedfordattorneyatlawllc@gmail.com

- **Sara M. DiLeo**
  sdileo@saxenawhite.com

- **James Bringhurst Eubank**
  James.Eubank@beasleyallen.com

- **Dawn Stith Evans**
  devans@gseattorneys.com

- **Jay M Ezelle**
  JEzelle@starneslaw.com

- **Janet A Gochman**
  jgochman@stblaw.com

- **Kyla Grant**
  Kgrant@saxenawhite.com

- **Cole Robinson Gresham**
  cgresham@starneslaw.com

- **David J Guin**
  davidg@gseattorneys.com

- **Bailie L Heikkinen**
  bheikkinen@rgrdlaw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Reginald E Janvier**
  rjanvier@rgrdlaw.com

- **Michael R Lasserre**
  mrl@starneslaw.com

- **Nathan R Lindell**
  nlindell@rgrdlaw.com

- **Carl Jacob Lundqvist**
  jacob.lundqvist@stblaw.com

- **Wilson Daniel Miles , III**
  dee.miles@beasleyallen.com

- **Steven B Singer**
  ssinger@saxenawhite.com

- **Tammy McClendon Stokes**
  tammys@gseattorneys.com

- **Joseph E. White**
  jwhite@saxenawhite.com

- **Jonathan K Youngwood**
  jyoungwood@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)