FILED

2022 Jun-17  PM 05:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |
|---|---|
| SHEET METAL WORKERS LOCAL 19 PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>PROASSURANCE CORPORATION, W. STANCIL STARNES, EDWARD L. RAND, JR., DANA S. HENDRICKS, HOWARD H. FRIEDMAN, and MICHAEL L. BOGUSKI,<br><br>    Defendants. | Civil Action No.: 2:20-cv-00856-AKK |

## DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

STARNES DAVIS FLORIE LLP

Walter W. Bates (ASB-7202-E49W)
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Michael R. Lasserre (ASB-2144-Y61G)
100 Brookwood Place, 7th Floor
P. O. Box 598512
Birmingham, AL 35259-8512
wwb@starneslaw.com
jme@starneslaw.com
crg@starneslaw.com
mrl@starneslaw.com

SIMPSON THACHER & BARTLETT LLP

Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Jacob Lundqvist (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
jgochman@stblaw.com
jacob.lundqvist@stblaw.com

*Attorneys for Defendants ProAssurance Corporation, W. Stancil Starnes, Edward L. Rand, Jr., Dana S. Hendricks, Howard H. Friedman, and Michael L. Boguski.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND.....................................................................................3

      A.     The Court Significantly Narrows the Case ............................................4

      B.     The Remaining Alleged Misstatements .................................................4

      C.     Plaintiffs' Motion for Class Certification ..............................................7

ARGUMENT .............................................................................................................7

I.     EVEN IF A CLASS IS CERTIFIED, ANY CONCEIVABLE CLASS
      PERIOD SHOULD END ON JANUARY 22, 2020........................................8

      A.     The Class Period Is Overbroad in Light of this Court's Decision
             on Defendants' Motion to Dismiss .......................................................8

II.    CLASS CERTIFICATION SHOULD BE DENIED GIVEN THE
      LACK OF PRICE IMPACT FROM THE ALLEGED
      MISSTATEMENTS ......................................................................................15

      A.     Defendants Can Rebut the *Basic* Presumption with Evidence
             That the Remaining Alleged Misstatements Did Not Impact
             PRA's Stock Price .................................................................................15

III.   CLASS CERTIFICATION SHOULD ALSO BE DENIED GIVEN
      THE PREDOMINANCE OF INDIVIDUALIZED ISSUES .......................22

IV.   CLASS CERTIFICATION SHOULD BE DENIED FOR THE
      ADDITIONAL REASON THAT PLAINTIFFS ARE INADEQUATE
      CLASS REPRESENTATIVES ....................................................................24

CONCLUSION ........................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)......................................................................................22

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................ 15, 16

*Brown v. Am. Airlines, Inc.*,
  285 F.R.D. 546 (C.D. Cal. 2011).................................................................15

*Brown v. Electrolux Home Prods., Inc.*,
  817 F.3d 1225 (11th Cir. 2016) .....................................................................8

*Butterworth v. Quick & Reilly, Inc.*,
  171 F.R.D. 319 (M.D. Fla. 1997) ................................................................24

*Carter v. L'Oreal USA, Inc.*,
  2020 WL 1931270 (S.D. Ala. Apr. 21, 2020) ............................................14

*City of Cape Coral Mun. Firefighters' Ret. Plan v.
  Emergent Biosolutions, Inc.*,
  322 F. Supp. 3d 676 (D. Md. 2018)...............................................................9

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).........................................................................................8

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP
  Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ........................................................................21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ("*Halliburton I*") ......................................................16

*Eslava v. Gulf Tel. Co.*,
  2007 WL 2298222 (S.D. Ala. Aug. 7, 2007)...............................................25

*Fernau v. Enchante Beauty Prods., Inc.*,
  847 F. App'x 612 (11th Cir. 2021).............................................................22

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ....................................................... 13, 14

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021 ......................................................... 16, 17, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ("*Halliburton II*") ....................................... 15, 16

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ................................... 13

*In re HealthSouth Corp. Sec. Litig.*,
  213 F.R.D. 447 (N.D. Ala. 2003) ........................................................ 8

*In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*,
  251 F.R.D. 656 (D. Utah 2008) ......................................................... 15

*King v. CVS Caremark Corp.*,
  2 F. Supp. 3d 1252 (N.D. Ala. 2014) ............................................... 14

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare
  Fund v. Regions Fin. Corp.*,
  762 F.3d 1248 (11th Cir. 2014) .......................................................... 8

*Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering
  Sec. Litig.)*,
  471 F.3d 24 (2d Cir. 2006) ............................................................... 23

*Spinelli v. Cap. One Bank*,
  265 F.R.D. 598 (M.D. Fla. 2009) ..................................................... 25

*Vignola v. Fat Brands, Inc.*,
  2020 WL 1934976 (C.D. Cal. Mar. 13, 2020) ................................... 23

*W. Va. Pipe Trades Health & Welfare Fund v.
  Medtronic, Inc.*,
  325 F.R.D. 280 (D. Minn. 2018) ......................................................... 8

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................... 8

*Water Works Bd. of City of Birmingham v. Ambac Fin.*
    *Grp., Inc.*,
        718 F. Supp. 2d 1317 (N.D. Ala. 2010)...............................................................19

*Wein v. Master Collectors, Inc.*,
    1995 WL 550475 (N.D. Ga. Aug. 15, 1995)......................................................25

## PRELIMINARY STATEMENT

In moving to certify a class of putative investors in this securities action, Plaintiffs bear the burden of demonstrating strict compliance with all requirements under Federal Rule of Civil Procedure 23(a) and 23(b)(3).  Plaintiffs' motion for class certification (the "Motion") has failed to do so.  Even if the Court were to certify a class, any conceivable Class Period should end on January 22, 2020 in light of this Court's decision granting in part Defendants' Motion to Dismiss.  As explained in detail below, however, there are several reasons why a class should not be certified and Plaintiffs' Motion should be denied in full.

*First*, because the Court dismissed all alleged misstatements and omissions that were "corrected" by the disclosures made on May 7–8, any Class Period ends on January 22, 2020, the first (and only remaining) alleged corrective disclosure date.  This conclusion is mandated by Plaintiffs' own Complaint, which expressly claims that the ***only*** undisclosed information following January 22, 2020 related to TeamHealth's likely decision not to renew its policy and instead purchase tail coverage.  This is the exact category of alleged misrepresentations this Court has already dismissed.  Plaintiffs' Motion attempts to circumvent the Court's decision by raising novel allegations that the May 7–8 disclosures somehow revealed new information regarding PRA's "conservative" business practices.  The Court gave Plaintiffs the opportunity to amend their pleadings to raise these allegations.

1

Plaintiffs' attempt to do so via briefing on class certification must be rejected.

*Second*, Plaintiffs' Motion should be denied in full because neither remaining category of alleged misstatements caused any inflation in PRA's stock price. *Any* evidence demonstrating the lack of price impact must be considered at the class certification stage. Here, the remaining alleged misstatements did not result in any front-end price inflation or "maintain" artificial inflation in PRA's stock price. Consistent with recent Supreme Court precedent, the expert report of Bruce Deal submitted herewith demonstrates that no reasonable investor could have relied on Defendants' generic statements regarding PRA's "conservative" and "disciplined" business practices or the remaining alleged misstatements regarding observed frequency trends in 2018–2019. The lack of analyst commentary reporting on these alleged misstatements at the time they were made and following the alleged corrective disclosures, along with the evidence from Mr. Deal's industry survey of similar statements by PRA's competitors regarding their commitment to "conservative" and "disciplined" business practices, provide sufficient evidence to rebut price impact by a preponderance of the evidence.

*Third*, the Motion should be denied because Plaintiffs' Complaint raises issues regarding individual investors' review of and understanding of publicly available information Plaintiffs claim was omitted from Defendants' disclosures. If Plaintiffs' assertion that this information was "virtually indecipherable" to some—but not all—

2

investors were credited, individualized inquiries would be necessary to establish whether each investor relied on the alleged misstatements.  It is axiomatic that such inquiries are unsuitable in a class action.

*Finally*, the Motion should be denied because discovery has revealed that neither Lead Plaintiff meets the adequacy requirements to serve as a class representative.  Lead Plaintiffs could not identify the Defendants in the case, nor did they have any understanding of numerous key allegations in the Complaint.  Plaintiffs' testimony has also made plain that Plaintiffs have failed to serve as a check on their counsel in a lawyer-driven action.

## FACTUAL BACKGROUND

PRA is a U.S.-based holding company for property and casualty insurance companies.  Ex. 1 (2019 10-K) at 9.  The Company's largest reporting segment is Specialty Property & Casualty ("SP&C"), which includes professional liability insurance and medical technology liability insurance.  *Id.* at 10.  PRA's professional liability business is focused on the healthcare professional liability ("HCPL") market that covers healthcare professionals, institutions, and facilities.  *Id.*  In 2016, PRA added several large accounts in the HCPL segment including TeamHealth, a large, multi-state physician group based in Tennessee.  ¶ 52.[1]

---

[1] Citations to "¶ __" refer to the paragraphs of the Amended Complaint (ECF No. 44) (the "Complaint").  Citations to "Ex. __" refer to the exhibits to the Transmittal Declaration of Jay M. Ezelle, submitted herewith.

The Complaint alleges that Defendants made various misstatements which arose from the TeamHealth policy, including with respect to (1) PRA's publicly reported loss reserves, (2) PRA's "conservative" practices, and (3) TeamHealth's likely exercise of its option for tail coverage. ¶¶ 7–12.

### A. The Court Significantly Narrows the Case

On December 10, 2021, this Court issued a 58-page decision granting in part Defendants' Motion to Dismiss. (ECF No. 61) (the "MTD Order"). Notably, the Court dismissed Plaintiffs' claims in their entirety with respect to tail coverage (Category 3) and dismissed most of Plaintiffs' claims with respect to loss reserve statements (Category 1). In the Court's own words, "the bulk of the plaintiffs' § 10(b) claims predicated on ProAssurance's loss reserves and TeamHealth's nonrenewal and tail coverage must be dismissed." *Id.* at 57; *see also id.* at 2 (Plaintiffs failed to plead claims for "omissions regarding TeamHealth's decision to purchase tail coverage instead of renewing its policy"). The Court also dismissed Plaintiffs' 10(b) claims in full against three Individual Defendants: W. Stancil Starnes, Edward L. Rand, Jr., and Dana S. Hendricks. *Id.* at 2.

### B. The Remaining Alleged Misstatements

Following the MTD Order, the only alleged misstatements that remain in this case are "[a] small category of statements" by Mr. Friedman and Mr. Boguski regarding observed frequency trends in 2018 and 2019 (*id.* at 22), as well as general

4

statements by Mr. Friedman and Mr. Boguski (and imputed to PRA) regarding the Company's "'conservative,' 'disciplined,' 'cautious,' and otherwise 'reasonable' practices." *Id.* at 40.

**The Frequency Trend Statements**: Plaintiffs allege that Mr. Friedman and Mr. Boguski made misstatements regarding "frequency" trends observed in 2018–2019. *See* ¶¶ 142, 185. Specifically, in August 2018, Mr. Friedman stated that "while [PRA] logically may [have] expect[ed] a frequency increase, we're not seeing frequency change at this point in time." ¶ 142. And in November 2019, Mr. Boguski similarly stated that trends had "been relatively flat on the frequency side, even perhaps slightly down." ¶ 185. To support their allegations that these statements were misleading, Plaintiffs claim PRA saw a dramatic increase in claims associated with TeamHealth (¶ 76), ignoring that the statements described trends in the SP&C segment as a whole—not trends related to a single insured account. Plaintiffs also define "frequency" as "an increase in the number of claims being reported." ¶ 61. This definition is unrelated to how PRA repeatedly defined "frequency" in its SEC filings. *See, e.g.*, Ex. 2 (2017 10-K) at 38 (defining "frequency" as the "number of claims per exposure unit"). In other words, even if an insurer experiences an increase in claims reported, that increase may not translate to an increase in frequency if its number of exposure units (insured physicians) has increased more than the net change in claims.

**The Conservative Business Practices Statements**: Plaintiffs further allege that Defendants made multiple misleading statements regarding PRA's "conservative" and "disciplined" business practices in view of the "uniquely structured agreement with TeamHealth." ¶¶ 152, 161. Of these, the only such statements not dismissed were those made by Mr. Friedman and Mr. Boguski. Although, in response to Interrogatories, Plaintiffs have refused to identify the statements which they assert remain in the case, the Complaint alleges generic business practice statements by Mr. Friedman and Mr. Boguski on five days: November 7, 2018, February 22, 2019, April 26, 2019, August 8, 2019, and November 6, 2019.

**Alleged Corrective Disclosures**: The Complaint alleges two corrective disclosure dates: January 22, 2020, and May 7–8, 2020. On January 22, PRA announced that it had made a preliminary estimate of $37 million of adverse development in prior accident year loss reserves in the fourth quarter of 2019 in its SP&C segment. ¶ 11. According to the Complaint, this disclosure revealed the impact of "higher-than-anticipated medical malpractice claims" for the TeamHealth account. *Id.* Nevertheless, Plaintiffs allege that the "full truth" remained unknown to investors after this date because Defendants did not disclose the "likelihood" that TeamHealth would not renew its policy prior to its expiration in mid-2020 and instead exercise its option to purchase tail coverage from PRA. ¶ 12. Plaintiffs

6

claim this fact became known to investors on May 7–8, 2020.  *See* ¶¶ 102–103 ("Defendants knew that TeamHealth would almost certainly not renew the policy . . . and would instead exercise its tail coverage option . . . .  Defendants did not disclose this fact until almost three months later, on May 7, 2020[.]").  The Complaint alleges no other allegedly concealed information that was revealed on May 7–8.

### C. Plaintiffs' Motion for Class Certification

Faced with the Court's dismissal of all claims related to TeamHealth's exercise of its tail coverage option, Plaintiffs' Motion introduces a new theory of the case, namely that the disclosure on May 7–8 that TeamHealth was unlikely to renew its policy and would instead purchase tail coverage revealed the "truth" about PRA's allegedly "undisciplined, non-conservative underwriting and reserve practices." Mot. at 7.  This argument stands in stark contrast with Plaintiffs' Complaint, which repeatedly claims that the "full truth" remained concealed to investors after January 22, 2020, *only* because "TeamHealth was highly unlikely to renew its policy and would instead exercise its option to purchase 'tail coverage.'"  ¶¶ 12, 187–194.  The Court dismissed all claims in this category.  *See* MTD Order at 2, 57.

### ARGUMENT

In considering a motion for class certification, the Court must conduct a "rigorous analysis" to determine whether Plaintiffs can prove each element of both Federal Rule of Civil Procedure ("FRCP") 23(a) and (b)(3) by a preponderance of

the evidence.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).

This rigorous analysis of the evidentiary record occurs at the class certification stage

even though it may overlap with a merits inquiry.  *See Comcast Corp. v. Behrend*,

569 U.S. 27, 33 (2013); *see also In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447,

456 (N.D. Ala. 2003) ("[C]lass certification should not be automatically granted in

light of Supreme Court and Eleventh Circuit precedent mandating 'rigorous

analysis' before certifying a class.").  "The party seeking class certification has the

burden of proof" to demonstrate compliance with each requirement under FRCP 23.

*Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016).

## I.  EVEN IF A CLASS IS CERTIFIED, ANY CONCEIVABLE CLASS PERIOD SHOULD END ON JANUARY 22, 2020

### A. The Class Period Is Overbroad in Light of this Court's Decision on Defendants' Motion to Dismiss

The MTD Order significantly narrowed the case by dismissing all claims that

were allegedly "corrected" by disclosures made on May 7–8.  To conform the Class

Period with this ruling, it should end on January 22, 2020, the date of the first (and

only remaining) alleged corrective disclosure.  It is well-established that a court can

"modify the class period during the class-certification stage." *W. Va. Pipe Trades*

*Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 294 (D. Minn. 2018);

*see also Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin.*

*Corp.*, 762 F.3d 1248, 1261 (11th Cir. 2014) (finding that class period should

8

exclude "individuals who purchased their shares on January 20, 2009," because the "corrective disclosure on January 20 was made before the market opened for trading"). Certifying a class of investors based on the Class Period as originally pled would be inconsistent with Plaintiffs' own allegations, which make clear that the May 7–8 corrective disclosures relate solely to a category of alleged omissions that this Court has already dismissed. Plaintiffs' arguments for nonetheless extending the Class Period to May 7 reflect an improper attempt to retrospectively revise their pleadings, and should be rejected.

### 1. This Court Has Dismissed All Alleged Misrepresentations That Were "Corrected" on May 7–8, 2020

The MTD Order rejected Plaintiffs' allegations that Defendants failed to disclose information regarding TeamHealth's nonrenewal and purchase of tail coverage. MTD Order at 2, 57. Accordingly, the Class Period must be shortened to match the narrowed scope of the case. *See, e.g.*, *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 682 (D. Md. 2018) ("[T]he Court is required at the class certification stage to limit the proposed Class based on the alleged misrepresentations found to be actionable.").

The Class Period ends no later than January 22, 2020—the date of the alleged first corrective disclosure announcing a $37 million reserve adjustment tied to TeamHealth. ¶ 11. Plaintiffs' novel argument at class certification that alleged misrepresentations other than the now-dismissed tail policy omissions were not

9

"corrected" by the disclosures on January 22, 2020, is fundamentally inconsistent with the Complaint. Plaintiffs claim that ***all*** alleged misstatements or omissions on or after January 22, 2020, were false for the ***sole*** reason that at the time such statements were made Defendants knew TeamHealth was "highly unlikely" to renew its policy and would instead exercise its option to purchase tail coverage:

- ¶ 188: Statements made on January 22, 2020, were "materially misleading when made, because Defendants knew at the time that ***TeamHealth was highly unlikely to renew its policy at its spring 2020 anniversary date, and would instead exercise its option for tail coverage***."

- ¶ 191: Statements made on February 20, 2020, "were materially false and misleading when made, because Defendants knew at that time . . . that ***TeamHealth was highly unlikely to renew its policy at its spring 2020 anniversary date, and would instead exercise its option for tail coverage***."

- ¶ 194: Statements made on February 21, 2020, "were materially misleading when made, because Defendants knew at the time that ***TeamHealth was highly unlikely to renew its policy at its spring 2020 anniversary date, and would instead exercise its option for tail coverage***."

Plaintiffs also allege that the only new "truth" revealed on May 7, 2020, pertained solely to TeamHealth's allegedly concealed decision to exercise tail coverage rather than renew its policy. Specifically, under the heading entitled "May 7–8 Corrective Disclosures," the Complaint states that on May 7, 2020, "the 1Q20 Form 10-Q revealed that 'it is more likely than not' that [TeamHealth] 'will not renew' its policy and would instead exercise its option for '"tail" coverage,' resulting in an additional net loss of up to approximately $50 million in 2Q20." ¶¶ 288–289; *see also* ¶¶ 102–103 (alleging it was not until "May 7, 2020, when Defendants once

10

again stunned investors when they revealed that [TeamHealth] was unlikely to renew its policy, and would instead exercise its option for tail coverage[.]").

The Court accepted these allegations as true in ruling on the Motion to Dismiss. *See* MTD Order at 14 ("[P]laintiffs contend that the defendants knew before the January announcement that TeamHealth would not renew its policy and should have disclosed this information. Allegedly, the defendants sat on this knowledge until May 7, 2020[.]"); *id.* at 30 ("[P]laintiffs contend that ProAssurance had a duty to reveal the nonrenewal- and tail coverage-related information when the company announced the other significant losses [in January 2020.]"). Thus, because this Court dismissed Plaintiffs' claims based on TeamHealth's exercise of tail coverage, the Class Period ends on January 22, 2020.

Faced with the consequences of the MTD Order, Plaintiffs attempt to reframe their allegations to argue that the May 7–8 disclosures somehow "corrected" Defendants' statements regarding PRA's conservative business practices. Plaintiffs claim that Defendants "further revealed the truth about ProAssurance's undisciplined, non-conservative underwriting and reserve practices for the TeamHealth account by announcing that TeamHealth would exercise the tail coverage option in its policy." Mot. at 7. Plaintiffs do not claim that offering tail coverage, which PRA offers on all its claims-made policies, is inconsistent with conservative underwriting as a general matter. Thus, the mere disclosure that

11

TeamHealth would likely exercise a generally available option to extend coverage did not "correct" any prior statements regarding PRA's conservatism.

The size of the potential loss announced on May 7 is similarly not corrective. By May 7, PRA had already disclosed that it had experienced a $44.5 million adverse development from a single "large national healthcare account." ¶ 102. Investors were on notice that the policy at issue was claims-made, and therefore would include a tail coverage option offered "at rates that are tied to expiring premiums charged." Ex. 1 (2019 10-K) at 22.[2] Plaintiffs do not allege that the TeamHealth tail coverage was structured differently from other tail endorsements on PRA's claims-made policies. Thus, the $50 million potential loss was in line with what a reasonable investor would have expected with awareness of (i) PRA's previous announcements of losses of a similar magnitude for the policy; and (ii) the fact that the policy was claims-made and could therefore be extended at rates tied to the premiums PRA had already acknowledged were insufficient to balance the Company's losses on the policy.

Plaintiffs also point to statements by Mr. Boguski on May 8, 2020, describing TeamHealth as a "unique national account structure" and the fact that there were "no

---

[2] PRA offers tail coverage on all claims-made policies. Ex. 3 (2018 10-K) at 70. Investors would have known no later than February 20, 2020, when PRA filed its 2019 10-K, that the TeamHealth policy was claims-made since the $37 million reserve adjustment is reflected in the claims-made part of PRA's HCPL reserves. *See* Ex. 1 (2019 10-K) at 155.

other structures in [PRA's] book of business" like it as somehow corrective of prior statements regarding PRA's "discipline." Mot. at 7–8. Plaintiffs omit that Mr. Boguski had described the TeamHealth policy using nearly identical terms months earlier on PRA's February 21, 2020 earnings call. *See* Ex. 4 at 11 (describing the large national healthcare account as having "a unique structure" and noting that "[we] have looked at our overall specialty book of business to make sure we don't have any similar structures, and we don't"); *see also* ¶ 216 (noting that "Defendant Boguski effectively admitted on February 21, 2020," that the TeamHealth policy was "unique").[3] Courts may consider at the class certification stage "whether the information in the alleged corrective disclosure is new," and "if it is not new then it cannot be corrective." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *23 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020). Because there was nothing new about Mr. Boguski's description of TeamHealth's "unique structure," it was not a corrective disclosure. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011) (a corrective disclosure "obviously must disclose new information, and cannot be merely confirmatory.").

Finally, the May 7–8, 2020 disclosures could not have "corrected" earlier

---

[3] Boguski also noted on the May 8 earnings call that "losses exceeded the assumptions the company made when originally underwriting this risk." ¶ 289. Defendants described the TeamHealth policy in these very terms in the 2019 10-K issued on February 20, 2020. *See* ¶ 190.

alleged misstatements regarding observed frequency trends. Plaintiffs claim that these statements were misleading because Mr. Friedman and Mr. Boguski were allegedly aware of increases in frequency *at the time* those statements were made. *See* ¶¶ 143, 186. By contrast, the May 7–8 disclosure regarding TeamHealth's likely exercise of a tail coverage option is *forward-looking*, and discussed the likely outcome if TeamHealth would purchase tail coverage. This disclosure says nothing about frequency trends PRA was observing several months, or even years, earlier. *See FindWhat*, 658 F.3d at 1311 n.28 ("In order to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement.").

Plaintiffs' Motion is an ill-disguised attempt to circumvent the Court's MTD Order and make up for the fundamental mismatch between the Class Period alleged in the Complaint and the claims that remain at issue in this case. But "Plaintiffs may not reframe their claim for purposes of class certification." *Carter v. L'Oreal USA, Inc.*, 2020 WL 1931270, at \*20 (S.D. Ala. Apr. 21, 2020). The proper procedure for Plaintiffs to assert novel claims would have been to amend their Complaint. The Court specifically gave Plaintiffs this opportunity by granting in part Defendants' Motion to Dismiss without prejudice. *See* ECF No. 62. Having elected to proceed based on the Complaint as limited by the MTD Order, Plaintiffs cannot now amend their pleadings through briefing. *See King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1272 (N.D. Ala. 2014) ("[A] district court's consideration of *any critical*

14

*amendment* asserted merely as part of the briefing process is disfavored."); *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011) ("Class certification is not a time for asserting new legal theories that were not pleaded in the complaint."). Plaintiffs' attempt to circumvent the MTD Order must be rejected and the Class Period shortened in accordance with the Court's holding. *See In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 666 (D. Utah 2008) (declining to certify class on "claim [that] has been dismissed").

## II.    CLASS CERTIFICATION SHOULD BE DENIED GIVEN THE LACK OF PRICE IMPACT FROM THE ALLEGED MISSTATEMENTS

### A. Defendants Can Rebut the *Basic* Presumption with Evidence That the Remaining Alleged Misstatements Did Not Impact PRA's Stock Price

Class certification should in any event be denied because Defendants have rebutted the presumption that any reasonable investor relied on the remaining alleged misstatements. Plaintiffs seek to certify a class by invoking the fraud on the market doctrine. *See* Mot. at 15–21. This doctrine requires that Plaintiffs affirmatively show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 248 n.27 (1988)). The "fundamental premise" of the fraud on the market doctrine is that

15

"an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*").

A defendant can rebut the *Basic* presumption of reliance by showing that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock," in other words, "that the misrepresentation had no 'price impact.'" *Halliburton II*, 573 U.S. at 264, 280.  This analysis is conducted on a misrepresentation-by-misrepresentation basis. *See id.* at 280.  "*Any showing* that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248 (emphasis added).

In its recent decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, the Supreme Court emphasized that "the generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification." 141 S. Ct. 1951, 1958 (2021).  Courts may therefore "consider expert testimony and use their common sense in assessing whether a generic misrepresentation had a price impact." *Id.* at 1960; *see also id.* ("In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.") (internal quotation marks and citation omitted).

16

Plaintiffs who rely on an "inflation-maintenance theory" must argue that the price impact is "the amount that the stock's price would have fallen without the false statement." *Id.* at 1961. In *Goldman Sachs*, the Supreme Court emphasized that where plaintiffs pursue an inflation-maintenance theory and "there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* The Court specifically noted that "when the earlier [alleged] misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations') . . . it is less likely that the specific disclosure actually corrected the generic misrepresentation." *Id.*

### 1. Defendants Have Rebutted Price Impact with Respect to Statements Regarding PRA's Conservative Business Practices

Applying the Supreme Court's guidance to this case demonstrates that price impact is absent given the fundamental disconnect between the alleged misstatements regarding PRA's conservatism and the subsequent corrective disclosures. The event study conducted by Plaintiffs' expert, Dr. Steven Feinstein, demonstrates that the price of PRA common stock either declined or increased by a statistically insignificant amount on the dates when Mr. Friedman and Mr. Boguski made the alleged misstatements regarding PRA's conservative business practices: November 7, 2018; February 22, 2019; April 26, 2019; August 8, 2019; and

17

November 6, 2019. *See* Feinstein Ex. 8. For each of these dates, when Mr. Friedman and Mr. Boguski spoke generally about PRA's "conservatism," "disciplined approach," and "underwriting discipline," (*e.g.*, ¶¶ 148, 160, 175), there was no inflationary price impact. In fact, on three of the dates, February 22, 2019, April 26, 2019, and August 8, 2019, the price of PRA common stock experienced declines of 2.6%, 1.1%, and 0.9% respectively, controlling for market and industry movements. Feinstein Ex. 8. On the other dates, November 7, 2018, and November 6, 2019, the price increase was either statistically insignificant or only statistically significant at the 90% confidence level, which is not a widely accepted threshold for statistical significance. *See* Ex. 11 (Expert Report of Bruce Deal ("Deal")) ¶ 23. These price movements contradict Plaintiffs' claim that statements regarding PRA's conservative business practices "artificially inflated" PRA's stock price. ¶ 280.

Plaintiffs' only remaining theory of price impact is, therefore, that the conservative business practice statements "maintained" inflation in PRA's stock price. Applying the guidance from *Goldman Sachs* demonstrates that this theory fails given the fundamental mismatch between the generic statements regarding PRA's "conservatism" and the specific disclosures regarding a single account in early 2020. As this Court recognized in its MTD Order, the alleged misstatements regarding PRA's conservative business practices described a "general commitment." MTD Order at 32. These general statements stand in stark contrast to the specific

18

disclosures related to a single account that followed in early 2020. Disappointing results related to a single account do not call into question PRA's description of its general business practices. In fact, R. Todd Vingers, the portfolio manager responsible for Lead Plaintiffs' investments in PRA during the purported Class Period, testified that ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Ex. 5 (Vingers Tr.) 125:9–12; *see also id.* 142:1–4

(████████████████████████████████████████████████████

████████████████████████████████████████████████). Defendants' statements regarding PRA's business practices said nothing about PRA's underwriting of TeamHealth or even its underwriting of large accounts. There is no reason to believe that any reasonable investor would rely on these generic statements, nor that disclosures regarding a single account would have corrected these "general commitments." *See Water Works Bd. of City of Birmingham v. Ambac Fin. Grp., Inc.*, 718 F. Supp. 2d 1317, 1323 (N.D. Ala. 2010), *aff'd*, 534 F. App'x 817 (11th Cir. 2013) ("Statements that an insurer is 'very cautious' or has 'rigorous underwriting standards' . . . are too much akin to 'we are the best in the business'" and "cannot form a basis for claiming misrepresentation or deceit").

This finding is further bolstered by the expert report of Mr. Bruce Deal. *See* Ex. 11. Mr. Deal conducted a survey of analyst reports issued at relevant time

19

periods following the alleged corrective disclosure dates. Deal ¶ 33. If analysts did not discuss an alleged misstatement when initially made, that would suggest the information in the alleged misstatement was not important and, therefore, did not impact price. *Id.* ¶ 29. Similarly, if analysts' views on a particular issue did not change after an alleged corrective disclosure that purportedly corrected the market's understanding of that particular issue, that would suggest the particular issue and its purported correction did not impact the price. *Id.*

Mr. Deal's analysis identified no commentary suggesting that analysts no longer considered PRA to be a conservative insurer following either of the corrective disclosure dates alleged in the Complaint. *Id.* ¶¶ 33–36. To the contrary, analysts expressed their belief that PRA *remained* a conservative insurer after *both* alleged corrective disclosure dates. Indeed, one analyst described ProAssurance as "one of the most conservative insurers in the sector" and "one of the more conservative companies we cover" after *both* alleged corrective disclosure dates. *See* Ex. 6 (3/10/2020 Boenning & Scattergood Report) at 1; Ex. 7 (5/11/2020 Boenning & Scattergood Report) at 1. Another analyst continued to emphasize PRA's "strong balance sheet and *track record of underwriting performance*" as a key part of its investment thesis for PRA after May 7. *See* Ex. 8 (5/8/2020 SunTrust Report) at 4 (emphasis added). This commentary demonstrates that analysts' views of PRA's conservative business practices did not change following the alleged corrective

20

disclosures, undermining any inference of price impact.  *See Goldman Sachs*, 141 S. Ct. at 1960 ("In assessing price impact at class certification," courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.") (citation omitted).

The lack of price impact is further demonstrated by the fact that similar generic statements regarding "conservative" underwriting practices are routinely made by insurers industry-wide.  Over three quarters (15 out of 19) of the peer companies PRA identifies in its SEC filings described their underwriting and/or reserve setting practices during the putative Class Period as "conservative," "disciplined," "prudent," or "cautious," or used similar terms.  Deal ¶¶ 43–45.  The fact that statements regarding insurers' commitment to conservatism were exceedingly common among companies in PRA's industry further shows that these statements had no price impact.  *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("No investor would take . . . statements" regarding investment bank's "set[ting] the standard for best practices in risk management techniques . . . seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements").

### 2. Defendants Have Rebutted Price Impact with Respect to the Alleged Frequency Misstatements

The remaining alleged misstatements with respect to observed frequency

trends should similarly be dismissed given the evidence rebutting price impact.  Dr. Feinstein's event study shows that PRA common stock had a statistically significant price increase only on one of the two dates of the alleged frequency misstatements: August 8, 2018.  *See* Feinstein Ex. 8.  On the second alleged frequency misstatement date, November 6, 2019, PRA's stock price did not increase by a statistically significant amount.  *Id.*  Moreover, analyst commentary around both dates did not specifically discuss Mr. Friedman or Mr. Boguski's frequency statements in the weeks following the investor presentations in which those remarks were made.  Deal ¶¶ 39–40. This comes as no surprise, since analysts reviewed and analyzed PRA's statutory filings, which Plaintiffs point to as the source of information allegedly contradicting the statements made by Mr. Friedman and Mr. Boguski in 2018 and 2019.  *Id.* ¶ 41.  Had the alleged misstatements regarding frequency trends been significant to investors in view of the total mix of information available to them, analysts would have reported on them.  The lack of analyst commentary further demonstrates why these statements did not cause any inflation in PRA's stock price.[4]

## III.  CLASS CERTIFICATION SHOULD ALSO BE DENIED GIVEN THE PREDOMINANCE OF INDIVIDUALIZED ISSUES

Certifying a class is appropriate only where "law or fact questions common to

---

[4] Plaintiffs claim entitlement to the presumption of reliance established in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), but that presumption "does not apply where, as here, the plaintiffs have pleaded mixed claims of misrepresentations and omissions."  *Fernau v. Enchante Beauty Prods., Inc.*, 847 F. App'x 612, 623 (11th Cir. 2021).

22

the class predominate over questions affecting individual members." *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 32 (2d Cir. 2006). Here, class certification must be denied because Plaintiffs' own pleadings demonstrate that individualized issues will predominate over common ones. Plaintiffs do not dispute that PRA's statutory filings, which include the information Plaintiffs claim show that PRA experienced an "exponential" increase in TeamHealth claims, were publicly available. ¶ 6, 107. Plaintiffs argue, however, that PRA's statutory filings are "virtually indecipherable to those outside of the insurance industry." ¶ 109. This argument is contradicted by Plaintiffs' expert, Dr. Feinstein, who opines that PRA's common stock traded in an "efficient market," *i.e.*, one in which the market price will "always 'fully reflect' available information" or will "reflect all publicly available information." Feinstein ¶¶ 17, 33, 37.

If Dr. Feinstein is correct, the claims information Plaintiffs argue contradicts the alleged frequency misstatements was already reflected in PRA's stock price, and those statements were thus not "corrected" by subsequent disclosures. On the other hand, if Plaintiffs are correct that the statutory filings are "indecipherable" to some, it raises issues regarding each investor's review of and understanding of those filings, rendering class certification inappropriate. *See* Deal ¶¶ 56–57; *Vignola v. Fat Brands, Inc.*, 2020 WL 1934976, at *5 (C.D. Cal. Mar. 13, 2020) (denying class certification because "knowledge issues as to . . . publicly available and widely

23

known omitted information would require individualized inquiries").

## IV.    CLASS CERTIFICATION SHOULD BE DENIED FOR THE ADDITIONAL REASON THAT PLAINTIFFS ARE INADEQUATE CLASS REPRESENTATIVES

Class certification should be denied where the proposed class representatives are not "familiar with the facts" of the case and cannot demonstrate "knowledge of the essential issues of the case." *Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319, 322–23 (M.D. Fla. 1997). Here, the proposed class representatives lack knowledge of several fundamental aspects of the case. Central Laborers' 30(b)(6) witness testified that ███████████████████████████████████████

███████████████████████████████. Ex. 9 (Koeppel Tr.) 105:23–106:4. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ *Id.* 117:6–9. Plymouth County's 30(b)(6)

witness testified that ███████████████████████████████████████ Ex.

10 (Sullivan Tr.) 130:13–17. ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Ex. 9 (Koeppel Tr.) 109:7–8 (████████████████

████████████); Ex. 10 (Sullivan Tr.) 160:1–5 (████████████████████

████████████████████). Plaintiffs' testimony demonstrates that they have

no "working knowledge of the case," let alone "a level of understanding of the

24

case . . . to be capable of controlling or prosecuting the litigation." *Eslava v. Gulf Tel. Co.*, 2007 WL 2298222, at *3 (S.D. Ala. Aug. 7, 2007).

Discovery has further revealed that Plaintiffs have failed to meet their duty of serving as a "check" on counsel. Class certification is properly denied where "the class representative's participation in the litigation is so minimal that she has essentially abdicated her role as representative to class counsel." *Wein v. Master Collectors, Inc.*, 1995 WL 550475, at *2 (N.D. Ga. Aug. 15, 1995). Mr. Koeppel and Mr. Sullivan both testified that ███████████████████████████

██████████████████████████████████████████████████████████.

*Id.* 131:2–7; Ex. 10 (Sullivan Tr.) 86:6–14. ███████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 9

(Koeppel Tr.) 132:19–133:13 (emphasis added). This complete deference shows that Lead Plaintiffs have the neither the "willingness [n]or ability to protect the interests of the class against the 'possibly competing interests of the attorneys.'" *Spinelli v. Cap. One Bank*, 265 F.R.D. 598, 615 (M.D. Fla. 2009) (citation omitted).

## CONCLUSION

The Motion for Class Certification should be denied. Alternatively, the Class Period should end no later than January 22, 2020.

Dated: June 17, 2022

STARNES DAVIS FLORIE LLP

/s/ *Cole R. Gresham*
Walter W. Bates (ASB-7202-E49W)
Jay M. Ezelle (ASB-4744-Z72J)
Cole R. Gresham (ASB-8993-L74G)
Michael R. Lasserre (ASB-2144-Y61G)
100 Brookwood Place, 7th Floor
P. O. Box 598512
Birmingham, AL 35259-8512
wwb@starneslaw.com
jme@starneslaw.com
crg@starneslaw.com
mrl@starneslaw.com

SIMPSON THACHER & BARTLETT LLP

Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Jacob Lundqvist (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
jgochman@stblaw.com
jacob.lundqvist@stblaw.com

*Attorneys for Defendants ProAssurance Corporation, W. Stancil Starnes, Edward L. Rand, Jr., Dana S. Hendricks, Howard H. Friedman, and Michael L. Boguski.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system, which will send notification of such filing to the following:

Roger H. Bedford, Jr.
ROGER BEDFORD, ATTORNEY AT LAW, LLC
P. O. Box 1149
Russellville, AL  35653
rogerbedfordattorneyatlawllc@gmail.com

David J. Guin
Tammy M. Stokes
Dawn Stith Evans
GUIN, STOKES, & EVANS, LLC
300 Richard Arrington Jr. Blvd. N.
Suite 600, Title Bldg.
Birmingham, AL  35203
davidg@gseattorneys.com
tammys@gseattorneys.com
devans@gseattorneys.com

Nathan R. Lindell (*pro hac vice*)
ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
nlindell@rgrdlaw.com

Bailie L. Heikkinen (*pro hac vice*)
Reginald E. Janvier (*pro hac vice*)
ROBBINS GELLER RUDMAN & DOWN, LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
bheikkinen@rgrdlaw.com
rjanvier@rgrdlaw.com

Joseph E. White, III (*pro hac vice*)
Lester R. Hooker (*pro hac vice*)
SAXEN A. WHITE, P.A.
7777 Glades Road, Suite 300

{B4343879}                                27

Boca Raton, FL  33434
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
SAXEN A. WHITE, P.A.
10 Bank Street, 8th Floor
White Plains, NY  10606
ssinger@saxenawhite.com

*s/ Cole R. Gresham*
Cole R. Gresham