Exhibit 2

# United States
# Securities and Exchange Commission
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒      **Annual report pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934 [Fee Required]**
      **for the fiscal year ended December 31, 2017 ,**

or

☐      **Transition report pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934 [No Fee Required]**
      **for the transition period from _____ to _____ .**

**Commission file number: 001-16533**

# ProAssurance Corporation
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **63-1261433** |
| **(State of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **100 Brookwood Place, Birmingham, AL** | **35209** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(205) 877-4400**
**(Registrant's Telephone Number, Including Area Code)**
**Securities registered pursuant to Section 12(b) of the Act:**

| <u>Title of Each Class</u> | <u>Name of Each Exchange On Which Registered</u> |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒     No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐     No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒     No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | ☐ | | | |

Emerging growth company

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐     No ☒

The aggregate market value of voting stock held by non-affiliates of the registrant at June 30, 2017 was $3,178,564,902 .

As of February 16, 2018 , the registrant had outstanding approximately 53,457,021 shares of its common stock.

trend and our expectations about changes in this trend impact a variety of factors, from the selection of expected loss ratios to the ultimate point estimates established by management.

Because of the implicit and wide-ranging nature of severity trend assumptions on the loss reserving process it is not practical to specifically isolate the impact of changing severity trends. However, because severity is an explicit component of our HCPL pricing process we can better isolate the impact that changing severity can have on our loss costs and loss ratios in regards our pricing models for this business component. Our current HCPL pricing models assume a severity trend of 2% to 3% in most states and products. We have observed potentially higher severity trends in our case reserve estimates but these have not been confirmed by actual claim payments. If the severity trend were to be higher by 1 percentage point, the impact would be an increase in our expected loss ratio for this business of 3.2 percentage points, based on current claim disposition patterns. An increase in the severity trend of 3 percentage points would result in a 10.1 percentage point increase in our expected loss ratio. Due to the long-tailed nature of our claims and the previously discussed historical volatility of loss costs, selection of a severity trend assumption is a subjective process that is inherently likely to prove inaccurate over time. Given the long tail and volatility, we are generally cautious in making changes to the severity assumptions within our pricing models. All open claims and accident years are generally impacted by a change in the severity trend, which compounds the effect of such a change.

For the 2004 to 2009 accident years, both our internal and consulting actuaries observed an unprecedented reduction in the frequency of HCPL claims (or number of claims per exposure unit) that cannot be attributed to any single factor. Since 2009, claim frequency has been relatively constant, at a lower level than had historically existed. For a number of years, we believed that much of the reduction in claim frequency was the result of a decline in the filing of non-meritorious lawsuits that had historically been dismissed or otherwise resulted in no payment of indemnity on behalf of our insureds. With fewer non-meritorious claims being filed we expected that the claims that were filed had the potential for greater average losses, or greater severity. To date, however, this effect has not materialized to the extent we anticipated. The uncertainty as to the impact this decline in frequency might ultimately have on the average cost of claims complicated the selection of an appropriate severity trend for our pricing model for these lines, and factoring severity into the various actuarial methodologies we use to evaluate our reserve has been increasingly challenging. Based on the weighted average of payments, typically 91% of our HCPL claims are resolved after eight years for a given accident year.

Although we remain uncertain regarding the ultimate severity trend to project into the future due to the long-tailed nature of our business, we have given consideration to observed loss costs in setting our rates. For our HCPL business this practice has resulted in rate reductions in recent years. For example, on average, excluding our podiatry business acquired in 2009, we have gradually reduced the premium rates we charge on our standard physician renewal business (our largest HCPL line) by approximately 16% from the beginning of 2006 to December 31, 2017 . Loss ratios for the current accident years have thus remained fairly constant because expected loss reductions have been reflected in our rates.

*Workers' Compensation.* The projection of changes in claim severity trend has not historically been an influential factor affecting our workers' compensation analysis of reserves, as claims are typically resolved more quickly than the industry norm. As previously mentioned, the determination and calculation of loss development factors, in particular, the selection of tail factors which are used to extend the projection of losses beyond historical data, requires considerable judgment.

Loss Development

We recognized net favorable reserve development of $134.4 million for the year ended December 31, 2017 , of which $119.3 million related to our Specialty P&C segment, $14.3 million related to our Workers' Compensation segment and $0.8 million related to our Lloyd's Syndicate segment.

Net favorable development recognized within the Specialty P&C segment was primarily attributable to the favorable resolution of HCPL claims during the period and an evaluation of established case reserves and paid claims data that indicated that the actual severity trend associated with the remaining HCPL claims is less than we had previously estimated. The Specialty P&C segment also reflected favorable development of $10.1 million attributable to our medical technology liability line of business and $5.2 million attributable to our legal professionals liability line of business for the year ended December 31, 2017 .

Net favorable development recognized within the Workers' Compensation segment for 2017 included $5.7 million attributable to our traditional business of which $1.6 million related to the amortization of the purchase accounting fair value adjustment. Excluding the purchase accounting fair value adjustment, net favorable development in our traditional business was $4.1 million which primarily reflected better than expected claims results related to accident years 2015 and 2016 . The remaining net favorable development in our Workers' Compensation segment of $8.6 million was attributable to our SPC s which are evaluated at the cell level. Because a relatively small number of claims are open per cell, the closing of claims can affect the actuarial projections for the remaining open claims in the cell to an extent that indicates development should be recognized for the cell.

38