FILED

2023 Dec-08  PM 03:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SHEET METAL WORKERS LOCAL 19 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 2:20-cv-00856-RDP |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | JOINT DECLARATION OF NATHAN R. LINDELL AND LESTER R. HOOKER IN |
| vs. | ) ) | SUPPORT OF: (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION |
| PROASSURANCE CORPORATION, et al., | ) ) ) | SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION, AND (II) MOTION FOR |
| Defendants. | ) ) | AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

WE, NATHAN R. LINDELL and LESTER R. HOOKER, declare as follows:

1.    Nathan R. Lindell is an attorney duly licensed to practice before all of the courts of the State of California, and has been admitted *pro hac vice* to appear before this Court in the above-captioned action (the "Action" or the "Litigation").[1] Lester R. Hooker is an attorney duly licensed to practice before all of the courts of the State of Florida, and has been admitted *pro hac vice* to appear before this Court in the Action.  Nathan R. Lindell is a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), and Lester R. Hooker is a member of the firm of Saxena White P.A. ("Saxena White").  Together, Robbins Geller and Saxena White have been appointed as Lead Counsel for Lead Plaintiffs Central Laborers' Pension Fund ("Central Laborers") and Plymouth County Retirement Association ("Plymouth County") (collectively, "Lead Plaintiffs" or "Plaintiffs"), and the Settlement Class.[2] We have been actively involved in the prosecution and resolution of this Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein based on our active participation and supervision of all material aspects of the Action.

2.    We submit this declaration in support of Plaintiffs' motion and memorandum of law for final approval of the Settlement ("Final Approval Motion"), which provides for a cash payment of $28,000,000 (the "Settlement Amount"), and for approval of the proposed Plan of Allocation.  We

---

[1]    All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation of Settlement (ECF No. 157) (the "Stipulation" or the "Settlement Agreement").

[2]    The Settlement Class is defined as: all Persons who purchased or otherwise acquired ProAssurance common stock between August 8, 2018 and May 7, 2020, inclusive, and were alleged to be damaged thereby.  Excluded from the Settlement Class are: (i) the Defendants; (ii) the current and Class Period officers and directors of ProAssurance; (iii) the Immediate Family Members of the Individual Defendants; and (iv) the legal representatives, affiliates, heirs, successors-in-interest or assigns of any such excluded party and any entity in which such excluded persons have or had a controlling interest.  Also excluded from the Settlement Class is any Person who would otherwise be a Member of the Settlement Class but who validly and timely requests exclusion in accordance with the requirements set by the Court in connection with the Settlement.  ECF No. 157, ¶1.36.

also submit this declaration in support of Lead Counsel's motion for an award of attorneys' fees and expenses and memorandum of law in support thereof ("Fee Motion").

## I. PRELIMINARY STATEMENT

3. The $28,000,000 proposed Settlement is the culmination of years of tireless, hard-fought litigation. As detailed below, Plaintiffs, through Lead Counsel, zealously prosecuted their claims at every stage of this Action. The Settlement, which represents approximately 16%-31% of the estimated recoverable damages, is truly a remarkable result for the Settlement Class.

4. Indeed, the Settlement was only achieved after Lead Counsel, *inter alia*:

- conducted a thorough and wide ranging investigation concerning the alleged fraudulent misrepresentations made by Defendants,[3] which included an extensive review and analysis of publicly available information concerning ProAssurance and a forensic analysis of ProAssurance's regulatory insurance filings, as well as information obtained through interviews with multiple confidential witnesses;

- prepared and filed the comprehensive Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF No. 44);

- defeated, in part, Defendants' motion to dismiss the Complaint;

- prepared for and participated in multiple depositions in connection with Plaintiffs' motion for class certification, including the depositions of Plaintiffs' representatives and investment advisor, as well as Defendants' price impact expert;

- conducted extensive party and non-party written discovery for more than a year, involving the exchange, careful review, and analysis of more than 2.8 million pages of documents and Plaintiffs' issuance of three sets of interrogatories to Defendants;

- responded to Defendants' document requests and multiple sets of interrogatories;

- engaged in numerous lengthy and contentious discovery-related disputes concerning the scope of fact discovery and the date range for production of documents, including successfully obtaining an order substantially expanding the scope of Defendants' document production following a June 10, 2022 discovery conference with the Court (ECF No. 95);

- retained and consulted with multiple experts and consultants concerning various issues, including the Complaint's forensic analysis, market efficiency, damages,

---

[3] The Defendants are ProAssurance, W. Stancil Starnes, Edward L. Rand, Jr., Dana S. Hendricks, Howard H. Friedman, and Michael L. Boguski.

price impact, insurance underwriting, loss reserves, and the insurance investment market;

- attended an in-person mediation session with a highly experienced, well-regarded mediator and engaged in extensive post-mediation negotiation efforts;

- prepared for and conducted 15 fact witness depositions; and

- fully briefed Plaintiffs' motion for class certification, including multiple supplemental submissions, and prepared for oral argument on the motion, which was scheduled for April 4, 2023, at the time the parties agreed to settle the case.

5.    As further detailed herein, given Lead Counsel's comprehensive prosecution of this Action, Plaintiffs fully understood the strengths of their case, as well as the substantial risks they faced in proceeding with the Litigation at the time that the Settlement was reached.  And, while Plaintiffs are confident that their claims are supported by both the documentary evidence and deposition testimony produced and developed throughout fact discovery, Plaintiffs understood the legitimate risks associated with obtaining certification of the full Class Period and proving their claims at summary judgment and trial.

6.    In the Complaint, Plaintiffs allege that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, Defendants engaged in a fraudulent scheme to artificially inflate the price of ProAssurance common stock by making materially false and misleading statements and/or omissions regarding ProAssurance's purported commitment to "disciplined" and "conservative" underwriting and reserve-setting practices, falsely assuring investors that ProAssurance prudently guarded itself against the liability risks plaguing its competitors and concealing that ProAssurance had dramatically deviated from its stated underwriting and reserve-setting practices in connection with an undisclosed insurance policy issued to the largest account in the Company's history, TeamHealth.  ECF No. 44, ¶¶73-75.  Defendants, on the other hand, have consistently argued that the alleged misstatements were true when they were made, and that their statements regarding ProAssurance's commitment to "conservative" and "disciplined" business practices constituted non-actionable puffery and opinion

statements. *See, e.g.*, ECF No. 53 at 13-23. Defendants have further argued that, even if they did make materially false or misleading statements, Plaintiffs would be unable to prove that such statements were made with scienter. *Id.* at 24-30.

7. The parties have also battled over the issues of price impact, loss causation, and damages. For example, in opposing Plaintiffs' motion for class certification, Defendants argued that: (1) the last alleged corrective disclosure did not reveal any new information regarding the alleged misrepresentations, and thus, should not be included in the case, thereby shortening the proposed Class Period and significantly reducing the Class's recoverable damages; and (2) information regarding the alleged misrepresentations was available to the market prior to the alleged corrective disclosures, thereby precluding a showing of price impact based upon those disclosures. There is no doubt that Defendants and their experts would have continued to raise these, and potentially other, arguments to contest any showing of loss causation and damages at summary judgment and trial.

8. Accordingly, the proposed Settlement avoids the substantial additional costs and risks associated with further litigation of Plaintiffs' claims. At the time of Settlement, Plaintiffs faced multiple legitimate challenges that could have significantly reduced the Settlement Class's recoverable damages (or resulted in no recovery whatsoever), including the possibility that: (i) the Court may have denied their motion for class certification or significantly shortened the Class Period; (ii) any order granting certification may have been overturned by the Eleventh Circuit on appeal; or (iii) Defendants may have prevailed at summary judgment or trial regarding any one or more of the elements required to prove Plaintiffs' claims. Given the significant risks in continuing to litigate this Action, Plaintiffs and Lead Counsel concluded that accepting the $28,000,000 Settlement was in the best interest of the Settlement Class.

9.      Lead Counsel prosecuted this Action on a wholly contingent basis and, thus, have advanced or incurred all the litigation expenses, charges, and costs to date.  Lead Counsel shouldered substantial risk in doing so and, to date, have not received any compensation for their efforts. Accordingly, in consideration of Lead Counsel's extensive efforts on behalf of the Settlement Class, Lead Counsel are applying for an award of attorneys' fees in the amount of 33% of the Settlement Amount, plus interest accrued thereon.  Such a fee award is fair and reasonable and is within the range of fee percentages frequently awarded in these types of complex securities class actions. Further, it is more than justified by the particular facts of this case, including the substantial benefits conferred to the Settlement Class, the risks undertaken by Lead Counsel, the quality of representation, the nature and extent of the legal services performed, and the fact that the parties settled after a protracted mediation process near the close of fact discovery.

10.      Both the Settlement and Lead Counsel's fee request have been approved by Lead Plaintiffs Central Laborers and Plymouth County, each institutional investors with significant financial interests in the outcome of the case, and which remain actively engaged in its progress.  *See* Declaration of Kenton W. Day, ¶¶10-15, on behalf of Central Laborers, attached as Exhibit A hereto; and Declaration of Padraic P. Lydon, ¶¶11-16, on behalf of Plymouth County, attached as Exhibit B hereto.  Because this is the type of involvement envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4, *et seq*. (the "PSLRA"), Lead Plaintiffs' approval of the relief sought here is entitled to significant weight by the Court in considering the proposed Settlement and awarding fees to Lead Counsel.

11.      Lead Counsel also seek payment of $1,240,844.77 in expenses, costs, and charges that were reasonably and necessarily incurred in connection with prosecuting this Action.  These expenses, charges, and costs include: (i) the costs associated with taking and defending fact and expert witness depositions, such as travel expenses and fees related to court reporting and

videography services; (ii) hosting and managing the database of over 2.8 million pages of documents produced in the course of discovery; (iii) online factual and legal research; (iv) the fees and expenses of Plaintiffs' expert witnesses and consultants, whose services were necessary for the successful prosecution of this Action; and (v) mediation fees.  As will be evident from the discussion below regarding the efforts required by Lead Counsel, these expenses were reasonable and necessary in order to achieve this outstanding Settlement.

## II.      THE LITIGATION

### A.      Central Laborers and Plymouth County Are Appointed Lead Plaintiffs and Defeat Defendants' Motion to Dismiss

12.      On June 16, 2020, plaintiff Sheet Metal Workers Local 19 Pension Fund filed the initial complaint in this Action against ProAssurance and the Individual Defendants alleging that Defendants violated §§10(b) and 20(a) of the Exchange Act by making materially false and misleading statements and omissions.  ECF No. 1.

13.      On August 17, 2020, Central Laborers and Plymouth County moved to be appointed as Lead Plaintiffs and for approval of their selection of Robbins Geller and Saxena White as Lead Counsel, and Guin, Stokes & Evans, LLC and Roger Bedford, Attorney at Law, LLC as Liaison Counsel.  ECF No. 29.  On the same day, Ohio Carpenters Pension Fund also moved for appointment as lead plaintiff.  ECF No. 28. On September 11, 2020, the Court granted Plaintiffs' motion, appointing Central Laborers and Plymouth County as Lead Plaintiffs, Robbins Geller and Saxena White as Lead Counsel, and Guin, Stokes & Evans, LLC and Roger Bedford, Attorney at Law, LLC as Liaison Counsel.  ECF No. 32.

14.      Thereafter, Lead Counsel conducted an extensive factual investigation prior to filing the Complaint, analyzing years of ProAssurance's public filings with the Securities and Exchange Commission ("SEC"), media reports, analyst reports, and trading data.  Lead Counsel also retained a consultant to review years of voluminous regulatory state insurance filings and provide a forensic

analysis supporting the allegations of the Complaint.  As part of their investigation, Lead Counsel, with the assistance of investigators, also located and spoke with several witnesses with first-hand knowledge of the alleged fraud, including multiple confidential witnesses whose allegations were detailed in the Complaint.  Following their thorough investigation, Plaintiffs filed the Complaint on March 26, 2021.  ECF No. 44.

15.     The 121-page Complaint alleges violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of all persons who purchased or otherwise acquired ProAssurance common stock during the Class Period.  *Id.* at 1.  More specifically, the Complaint alleges that, during the Class Period, Defendants made a series of materially false and misleading statements and omissions regarding ProAssurance's purported commitment to "disciplined" and "conservative" underwriting and reserve-setting practices, falsely assuring investors that ProAssurance prudently guarded itself against the liability risks plaguing its competitors.  The Complaint alleges that these representations were materially false and misleading, as they concealed that ProAssurance had dramatically deviated from its stated underwriting and reserve-setting practices in connection with an undisclosed insurance policy issued to a physician staffing company by the name of TeamHealth, which was the largest account in the Company's history.  Unbeknownst to investors, the TeamHealth policy was highly risky and uniquely structured, thus exposing the Company to extraordinary and unprecedented levels of liability.  In addition, Defendants concealed that TeamHealth was reporting claims at increasingly high frequency rates during a time when the severity of medical malpractice claims was rising in the industry.  According to the Complaint, although Defendants were aware of the mounting risks associated with the TeamHealth account, they failed to either disclose such risks or incorporate them into ProAssurance's loss reserves, in direct contrast to Defendants' repeated public statements regarding ProAssurance's purported commitment to "disciplined" and "conservative" business practices.

Ultimately, Defendants revealed through two corrective disclosures that the TeamHealth policy had caused collective losses of more than $130 million – an amount that was nearly equal to ProAssurance's total combined net income over the three prior years.

16.     Defendants moved to dismiss the Complaint on May 18, 2021, asserting various arguments under Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.  ECF No. 53. Specifically, Defendants contended that the Complaint failed to adequately allege falsity, scienter, and control person liability.  *Id*. at 13-30.  Plaintiffs opposed the motion on June 30, 2021, and Defendants filed their reply brief on July 28, 2021.  ECF Nos. 55, 58.

17.     On December 10, 2021, the Court issued an Opinion denying in part, and granting in part, Defendants' motion to dismiss.  ECF No. 61.  Specifically, the Opinion found that Plaintiffs adequately alleged falsity and scienter for several misstatements and omissions alleged in the Complaint concerning changes in the frequency of ProAssurance's reported claims and the Company's purported commitment to conservative underwriting and reserve-setting practices, but dismissed certain alleged misstatements regarding Defendants' loss reserve estimates.  *Id*. at 58. With regard to the §10(b) claims, the Court found that Plaintiffs adequately pled a strong inference of scienter as to Defendants Friedman and Boguski.  *Id.* at 57-58.  Lastly, the Court denied in its entirety Defendants' motion to dismiss Plaintiffs' §20(a) claims.  *Id.* at 54-57.

### B.     Defendants' Answer to the Complaint

18.     Defendants answered the Complaint on January 24, 2022.  ECF No. 65.  Defendants' answer denied all of Plaintiffs' material allegations and raised 40 separate affirmative defenses.  *Id.*

### C.     Plaintiffs' Motion for Class Certification

19.     On April 1, 2022, Plaintiffs filed a motion for class certification, which requested that the Court certify the putative class, appoint Central Laborers and Plymouth County as class representatives, and appoint Robbins Geller and Saxena White as class counsel.  ECF Nos. 78-80. Plaintiffs argued that the Action was appropriate for class action treatment and that the applicable

requirements of Federal Rule of Civil Procedure 23 were satisfied. *Id.* In support of their motion, Plaintiffs submitted an expert report from Professor Steven P. Feinstein, Ph.D., CFA. Among other things, Professor Feinstein's report: (i) detailed how the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) – factors that courts routinely consider in addressing market efficiency at the class certification stage – supported a finding that ProAssurance common stock traded in an efficient market throughout the Class Period; (ii) detailed the event study he undertook concerning ProAssurance's stock price movements during the Class Period; and (iii) concluded that ProAssurance common stock traded in an efficient market throughout the Class Period. ECF No. 80-1. Professor Feinstein also opined that damages pursuant to Plaintiffs' theory of the case could be calculated on a class-wide basis.

20.    Following the filing of Plaintiffs' motion for class certification, Lead Counsel participated in and/or defended multiple depositions noticed by Defendants in connection with the class certification motion. Specifically, Lead Counsel prepared for and defended Defendants' depositions, pursuant to Federal Rule of Civil Procedure 30(b)(6), of Central Laborers (Dan Koeppel) and Plymouth County (David Sullivan) on May 26, 2022 and June 2, 2022, respectively, and Lead Counsel participated in Defendants' deposition of Plaintiffs' outside investment manager LMCG Investments, LLC, now known as Leeward Investments, LLC (Richard Todd Vingers) on June 15, 2022.

21.    On June 17, 2022, Defendants filed their opposition to Plaintiffs' motion for class certification, asserting several arguments against certification of the class. ECF Nos. 92-93. First, Defendants argued that, in light of the Court's ruling on Defendants' motion to dismiss, any conceivable Class Period was required to end on January 22, 2020, as opposed to the May 7, 2020 end date alleged in the Complaint and requested by Plaintiffs' motion. ECF Nos. 92 at 8-15. Second, Defendants argued that no class should be certified at all because Defendants had rebutted

the fraud-on-the market presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) by proving that the alleged misrepresentations did not impact the price of ProAssurance's common stock. *Id.* at 15-22. Third, Defendants asserted that no class should be certified because individualized issues regarding class members' knowledge of purportedly publicly-available information concerning the alleged misrepresentations would predominate over issues common to the class. *Id*. at 22-24. Defendants' opposition brief attached eleven different exhibits, including a report on price impact from their expert, Bruce Deal. ECF No. 93-11.

22. Shortly thereafter, on August 12, 2022, Lead Counsel deposed Defendants' expert, Mr. Deal. Lead Counsel prepared extensively for the deposition of Mr. Deal, dissecting his report, unpacking his analyses, scrutinizing his evidence and conclusions, and working closely with Plaintiffs' own experts and consultants.

23. Plaintiffs filed a reply brief in further support of their motion for class certification on August 19, 2022, which addressed and disputed each of Defendants' arguments in opposition to class certification. ECF Nos. 102-103.

24. The Court held a status conference on January 10, 2023, during which the Court directed all parties to simultaneously submit executive summaries and replies regarding the primary issues related to Plaintiffs' motion for class certification. Pursuant to this directive, Plaintiffs filed two executive summary briefs on February 3, 2023, and two reply briefs to Defendants' executive summaries on February 17, 2023, respectively. ECF Nos. 113-126, 134-143.

25. On January 17, 2023, the Court scheduled oral argument on Plaintiffs' motion for class certification for April 4, 2023 – six days after the date on which the parties ultimately reached an agreement-in-principle to the settle this Litigation.

### D.    Fact Discovery

26.    As set forth herein, Lead Plaintiffs were relentless in their discovery efforts throughout this Litigation.  Among other things, these efforts included: (i) serving more than 45 requests for production of documents to Defendants; (ii) serving document subpoenas on 20 different non-parties; (iii) successfully negotiating and/or arguing for production of millions of pages of documents from Defendants and non-parties; (iv) carefully reviewing and analyzing such documents; (v) serving three sets of interrogatories, totaling 35 interrogatories, on Defendants; (vi) responding and objecting to Defendants' 29 document requests and 16 interrogatories to Lead Plaintiffs; (vii) providing deposition testimony; and (viii) taking 16 fact and expert witness depositions.

### 1.    Requests for Documents

#### a.    Document Requests Directed at Defendants

27.    Plaintiffs served their First Set of Requests for Production of Documents to Defendants ("Plaintiffs' First RFPs") on February 18, 2022.  Defendants served their Responses and Objections to Plaintiffs' First RFPs on March 21, 2022.

28.    Over the following months, the parties met and conferred numerous times and exchanged detailed correspondence and counterproposals regarding issues related to Defendants' production of documents in response to Plaintiffs' First RFPs.  Among other things, these issues included the appropriate sources to be searched for responsive documents, the relevant time period for such searches, the custodians to be searched, and the search terms to be utilized.  Through these extensive discussions, the parties were able to resolve many of the issues regarding Defendants' production of documents in response to Plaintiffs' First RFPs.  However, as further detailed below, the parties were unable to resolve all of their disputes regarding the appropriate scope of Defendants' document production, and were thus required to seek the Court's guidance to resolve certain disputes during a June 10, 2022 discovery conference.

29.     Defendants made their first production of documents on March 25, 2022.  Defendants substantially completed their document production on September 9, 2022, and produced their privilege log on September 16, 2022.  In total, Defendants produced more than 169,800 documents (comprising over 1,643,000 pages) from the files of more than 30 custodians.

30.     The careful examination and analysis of the documents produced by Defendants required a massive undertaking by a large team of attorneys.  Specifically, the attorneys: (i) organized, reviewed, and analyzed the documents; (ii) identified those documents that provided support for Plaintiffs' allegations or could potentially be used in support of Defendants' defenses; (iii) identified relevant witnesses and issues based upon the documents produced; and (iv) established procedures to identify additional relevant documents and information that had not been produced.  Further, because Defendants' production included many complex, technical documents regarding ProAssurance's underwriting and reserving-setting practices, Lead Counsel engaged multiple expert witnesses and/or consultants with specialized expertise in such areas to assist with the review and analysis of Defendants' documents, which included numerous lengthy reports, audit papers, and complex spreadsheets.

**b.     Document Requests Directed at Plaintiffs**

31.     On March 25, 2022, Defendants served their First Set of Requests for Production of Documents to Plaintiffs ("Defendants' First RFPs").  Plaintiffs served their Responses and Objections to Defendants' First RFPs on April 25, 2022.

32.     In response to Defendants' First RFPs, Plaintiffs produced more than 15,700 pages of responsive, non-privileged documents on a rolling basis, along with a detailed privilege log.

**2.     Interrogatories**

**a.     Interrogatories Directed at Defendants**

33.     On May 3, 2022, Plaintiffs served their First Set of Interrogatories to all Defendants. Defendants served their Responses and Objections to Plaintiffs' First Set of Interrogatories on June

6, 2022. Plaintiffs subsequently served their Second and Third Sets of Interrogatories to all Defendants on December 19, 2022, and February 15, 2023, respectively. Defendants served their Responses and Objections to Plaintiffs' Second Set of Interrogatories on February 8, 2023, and their Responses and Objections to Plaintiffs' Third Set of Interrogatories were outstanding at the time of Settlement.

### b.    Interrogatories Directed at Plaintiffs

34.    On March 25, 2022, Defendants served their First Set of Interrogatories on both Plaintiffs. Lead Plaintiffs served separate Responses and Objections to Defendants' First Set of Interrogatories on April 25, 2022. Defendants served their Second Set of Interrogatories on both Plaintiffs on December 21, 2022, and Lead Plaintiffs served separate Responses and Objections to Defendants' Second Set of Interrogatories on February 10, 2023.

### 3.    Discovery Disputes with Defendants

35.    The parties litigated multiple discovery disputes during the Litigation. Prior to formally submitting these disputes to the Court, Lead Counsel devoted significant time and resources to refining Plaintiffs' positions, analyzing Defendants' document production, and attempting to resolve or narrow the disputes with Defendants while still aggressively pursuing the discovery rights of the Settlement Class.

36.    Following extensive meet-and-confer efforts through both telephonic conferences and exchanges of written correspondence, the parties remained at an impasse regarding three disputes related to the scope of Defendants' document production in response to Plaintiffs' First RFPs. The specific disputes concerned: (i) whether Defendants' production of certain categories of documents should be limited to the time period of June 30, 2018 through January 22, 2020, as proposed by Defendants, or the time period of January 1, 2016 through November 7, 2020, as proposed by Plaintiffs; (ii) whether Defendants should be required to produce documents related to the tail coverage option in the insurance policy issued by ProAssurance to TeamHealth; and (iii) whether

- 13 -

Defendants should be required to produce documents and other information concerning ProAssurance's document retention/deletion policies and practices.

37.     Pursuant to the Court's Standing Order, the parties notified the Court of these discovery disputes on May 27, 2022, and the Court subsequently scheduled a telephonic conference concerning the disputes for June 10, 2022.  On June 3, 2022, pursuant to the Court's Standing Order, Plaintiffs submitted 230 pages of source materials relevant to the parties' outstanding discovery disputes, which consisted of Plaintiffs' First RFPs, Defendants' responses and objections thereto, and all written correspondence exchanged in connection with the parties' disputes.  On June 10, 2022, the parties participated in a telephonic conference, during which the Court heard arguments from the parties concerning the three disputed issues.

38.     On June 23, 2022, the Court issued an Order regarding the discovery disputes presented at the June 10, 2022 discovery conference.  ECF No. 95.  The Court's Order largely overruled Defendants' objections and resolved the disputed issues in Plaintiffs' favor.  Specifically, the Court held that the relevant time period for Defendants' production of the disputed categories of documents should be July 1, 2016 through November 7, 2020, and ordered Defendants to produce the disputed tail coverage option documents.  *Id.* at 15.  With regard to the third dispute concerning ProAssurance's document retention/deletion policies and practices, the Court ordered the parties to continue their meet-and-confer efforts.  *Id*.

### 4.     ProAssurance Fact Depositions

39.     In preparation for summary judgment and trial, Lead Counsel took the depositions of 14 current or former ProAssurance employees.  Lead Counsel expended significant time and effort preparing for these depositions by conferring with their consultants and experts, identifying relevant exhibits from among the millions of pages of documents produced in discovery, and preparing outlines.

40.    The 14 ProAssurance depositions taken by Lead Counsel in connection with fact discovery are set forth below:

| Deponent | Date | Location | Description |
|---|---|---|---|
| Sokol Berisha | November 8, 2022 | Birmingham, AL | Senior VP, Actuary |
| Michael Boguski | January 20, 2023 | Birmingham, AL | Defendant – President, Specialty P&C |
| Wesley Butler | January 5, 2023 | Washington D.C. | Former Sr. Underwriting |
| Randy Chaffinch | January 11, 2023 | Birmingham, AL | Actuary |
| Rob Francis | November 1, 2022 | Birmingham, AL | Executive VP, HCPL |
| Howard Friedman | March 1-2, 2023 | Baltimore, MD | Defendant – Former President, HCPL |
| Dana Hendricks | December 21, 2022 | Birmingham, AL | Defendant – Executive VP, CFO and Treasurer |
| Daniel Liliac | November 2, 2022 | Birmingham, AL | VP Finance Specialty P&C |
| Bill O'Malley | October 20, 2022 | Cleveland, OH | Regional VP, Claims |
| Edward Rand, Jr. | December 20, 2022 | Birmingham, AL | Defendant – President and CEO |
| W. Stancil Starnes | December 12, 2022 | Birmingham, AL | Defendant – Former CEO and Chairman of the Board |
| Shep Tapasak | November 15, 2022 | Birmingham, AL | Senior VP, Specialty Underwriting |
| Darryl Thomas | December 22, 2022 | Birmingham, AL | Chief Claims Officer and Senior VP – Head of Claims |
| Anne Louise Waters (30(b)(6)) | March 22, 2023 | Birmingham, AL | VP Finance and Corporate Controller |

41.    The depositions identified above were critical to establishing evidence concerning the high-risk nature of ProAssurance's underwriting and reserve-setting practices in connection with the TeamHealth account, the increasing frequency of TeamHealth's claims during the Class Period, and Defendants' knowledge of material, undisclosed facts concerning these matters.  In addition, these depositions were critical to establishing the foundation and admissibility of relevant documentary evidence to be used at summary judgment and trial.

42.    In total, Plaintiffs, through Lead Counsel, marked over 500 exhibits in connection with the above depositions.

### 5.    Discovery Directed at Non-Parties

43.    Beginning on April 26, 2022, Plaintiffs served 20 document subpoenas on relevant non-parties, including TeamHealth, TeamHealth's insurance broker, TeamHealth's claims administer, ProAssurance's auditor, ProAssurance's actuary, numerous securities analysts, and two ratings agencies.

44.    Set forth below is a list of the 20 non-parties upon whom Plaintiffs served document subpoenas:

| Person/Entity | Subpoena Date | Relationship |
|---|---|---|
| Alliant Insurance Services, Inc. | 6/29/2022 | Insurance Broker for TeamHealth |
| Boenning & Scattergood, Inc. | 5/4/2022 | Securities Analyst |
| Capital Returns Management, LLC | 5/4/2022 | Securities Analyst |
| Dowling & Partners Securities, LLC | 5/4/2022 | Securities Analyst |
| Ernst & Young, LLP | 5/4/2022 | ProAssurance's Auditor |
| Institutional Investor LLC | 5/4/2022 | Securities Analyst |
| JMP Securities LLC | 5/4/2022 | Securities Analyst |
| Keefe, Bruyette & Woods, Inc. | 5/4/2022 | Securities Analyst |
| Lafferty & Lahey Partners, LLC | 5/4/2022 | Securities Analyst |
| Moody's Investors Service, Inc. | 5/4/2022 | Ratings Agency |
| Piper Sandler Companies, f/k/a Piper Jaffray & Co. | 5/4/2022 | Securities Analyst |
| Raymond James & Associates, Inc. | 5/4/2022 | Securities Analyst |
| S&P Global, Inc. | 5/4/2022 | Ratings Agency |
| Sandler O'Neil & Partners LLC | 5/4/2022 | Securities Analyst |
| TeamHealth Holdings, Inc. | 4/26/2022 | Physician Staffing Company Insured by ProAssurance |
| The Buckingham Research Group Incorporated | 5/4/2022 | Securities Analyst |
| Truist Securities, Inc. | 5/4/2022 | Securities Analyst |
| Western Litigation Inc. | 6/27/2022 | TeamHealth's Claims Administer |
| Willis Towers Watson US LLC | 4/26/2022 | ProAssurance's Actuary |
| Zacks Investment Research, Inc. dba Zacks Equity Research | 5/4/2022 | Securities Analyst |

45.    Lead Counsel engaged in numerous meet-and-confers with most of the subpoenaed non-parties to discuss their objections to the subpoenas, negotiate the scope of the document

requests, and arrange for the production of responsive documents.  In total, Plaintiffs' non-party document subpoenas and subsequent negotiations resulted in the production of approximately 1.2 million pages of documents.  Lead Counsel expended significant resources obtaining, reviewing, and analyzing these documents.

46.     In addition, pursuant to Federal Rule of Civil Procedure 30(b)(6), Lead Counsel deposed one of the above non-parties, Alliant Insurance Services, Inc., on March 23, 2023, and noticed and began preparing to take the deposition of another, Willis Towers Watson US LLC, which deposition was scheduled to take place on April 26, 2023, but was canceled after the parties reached an agreement-in-principle to settle Plaintiffs' claims.

### E.     Expert Witnesses and Consultants

47.     As set forth below, to assist Lead Counsel in investigating and proving Plaintiffs' claims, as well as navigating the complex issues involved in this Action, the services of certain consultants and experts were required.  In addition, Lead Counsel took the deposition of Defendants' price impact expert, Mr. Deal, and responded to the opinions set forth in a formal expert report Mr. Deal submitted in connection with Defendants' opposition to Plaintiffs' motion for class certification.

### 1.     Plaintiffs' Expert Witnesses and Consultants

48.     Lead Counsel retained the services of Crowninshield Financial Research, Inc., an economic consulting firm, and its founder and president, Steven P. Feinstein, Ph.D., CFA ("Professor Feinstein"), to analyze data and provide expert opinions and consultations regarding the issues of market efficiency, price impact, loss causation, and damages.  Professor Feinstein is an Associate Professor of Finance at Babson College who has had academic research published in peer-reviewed journals and presented research at many professional and academic conferences.  In addition, Professor Feinstein has provided numerous expert reports and testimony in securities class actions, such as this one, as well as in litigation concerning business solvency and valuation.

49.     Among other things, the contributions of Professor Feinstein and his team in this Action included: (i) submitting a formal expert report concerning market efficiency and a model for calculating damages on a class-wide basis that was filed in support of Plaintiffs' motion for class certification; (ii) reviewing the expert report submitted by Defendants' price impact expert, Mr. Deal, and assisting in Lead Counsel's efforts to prepare for the deposition of Mr. Deal; (iii) submitting a declaration concerning price impact in support of Plaintiffs' motion for class certification; (iv) providing analyses for quantifying loss causation and damages in connection with settlement negotiations; (v) preparing a formal expert report on the issues of loss causation and damages that would have been submitted in support of Plaintiffs' claims had the Settlement not been reached; and (vi) developing the Plan of Allocation that was included in the Notice to Settlement Class Members.

50.     In connection with the above contributions, Professor Feinstein expended a significant amount of time reviewing the record, certain publicly-available information concerning ProAssurance, and certain documents produced by Defendants and non-parties.  In addition, Professor Feinstein conducted a detailed economic analysis, including a thorough event study, to demonstrate that ProAssurance common stock traded in an efficient market during the Class Period, and relied on his extensive financial expertise to opine on the ability to calculate damages on a class-wide basis consistent with and pursuant to Plaintiffs' theory of liability.

51.     Lead Counsel also engaged several other expert witnesses and/or consultants to assist with Lead Counsel's investigation underlying the Complaint, analysis of underlying facts and strategy, and/or to prepare formal expert reports that would have been submitted in support of Plaintiffs' claims had the Settlement not been reached.  These expert witnesses and/or consultants included: (i) an actuarial expert with more than 30 years of experience reviewing the reasonableness of loss reserves reported by insurance companies, who assisted Lead Counsel with their discovery

efforts, including preparing to take depositions, and was in the process of preparing a formal expert report regarding ProAssurance's reserve-setting practices for the TeamHealth account at the time the Settlement was reached; (ii) an insurance underwriting expert with more than 42 years of experience regarding underwriting of complex insurance policies and programs, who assisted Lead Counsel with their discovery efforts, including preparing to take depositions, and was in the process of preparing a formal expert report regarding ProAssurance's underwriting of the TeamHealth policy at the time the Settlement was reached; (iii) an insurance industry investment analyst with more than 30 years of experience analyzing financial investments in insurance companies, who was in the process of preparing a formal expert report regarding the materiality of Defendants' alleged misrepresentations at the time the Settlement was reached; (iv) an economic consultant with extensive experience investing in and analyzing insurance companies, who assisted with Lead Counsel's factual investigation, including a forensic analysis of ProAssurance's regulatory insurance filings, case strategy, and discovery efforts; and (v) a finance consultant who provided analysis regarding the issues of loss causation and damages in the preliminary stages of the case.

### 2. Defendants' Expert Witness

52. As discussed above, given the highly technical nature of securities litigation, Defendants retained financial expert Bruce Deal, who submitted a formal report in support of Defendants' price impact arguments at the class certification stage.

53. Lead Counsel expended substantial time and effort preparing for and taking the deposition of Mr. Deal. This preparation included an extensive review of documents produced in discovery, an analysis of the parties' respective positions on issues that were the subject of expert testimony, and consultation with Professor Feinstein regarding appropriate examination topics and strategy for Mr. Deal's deposition. In addition, Plaintiffs' reply brief in further support of their motion for class certification responded to and countered each of the opinions offered in Mr. Deal's

expert report. In so doing, Plaintiffs relied upon extensive documentary evidence and Mr. Deal's deposition testimony.

54. If the parties did not settle, Lead Counsel likely would have been required to depose and/or cross examine Mr. Deal – or another expert – on the issues of loss causation and damages at summary judgment and trial. Further, it is highly likely that Defendants would have retained additional experts concerning other topics, which would have required Lead Counsel to expend significant amounts of additional time and resources to challenge.

## III.    MEDIATION AND SETTLEMENT EFFORTS

55. The Settlement Agreement is the product of hard-fought, arm's-length settlement negotiations. Lead Counsel participated in an in-person mediation session before David M. Murphy, Esq. of Phillips ADR on November 29, 2022. In addition, the parties participated in multiple separate teleconferences with Mr. Murphy both before and following the in-person session. *See* Declaration of David M. Murphy of Phillips ADR, attached as Exhibit C hereto. Lead Counsel believe that their continued and diligent work following the mediation strengthened Plaintiffs' negotiating position and eventually led to the Settlement.

56. On November 3, 2022, the parties exchanged and submitted to Mr. Murphy mediation statements, which detailed the strengths of their respective claims and defenses and included extensive citations to relevant evidence and legal authorities. Plaintiffs' opening mediation statement included 51 exhibits totaling over 530 pages. Defendants' opening mediation statement included 43 exhibits totaling over 550 pages. On November 17, 2022, the parties exchanged and submitted to Mr. Murphy mediation reply briefs responding to the points raised in the parties' respective opening statements and providing additional support for their respective claims and defenses.

57.    On November 29, 2022, the parties participated in a full-day in-person mediation session with Mr. Murphy in Corona del Mar, California, at which Lead Counsel made a thorough and lengthy presentation advocating the strength of their claims supported by references to evidence obtained in discovery, among other things.  The case did not settle at the mediation.  Accordingly, Lead Counsel continued to vigorously prosecute the Action.  Indeed, over the next six months, Plaintiffs took 10 fact depositions, served additional written discovery requests and responses, obtained additional document productions from non-parties, submitted additional briefing regarding Plaintiffs' motion for class certification, and prepared for oral argument on Plaintiffs' motion for class certification.

58.    While the above litigation efforts remained ongoing, the parties continued their post-mediation negotiations through Mr. Murphy.  On March 24, 2023, following numerous teleconferences with the parties, Mr. Murphy provided a mediator's proposal to settle the Action in exchange for a cash payment of $28,000,000, subject to Court approval, which all parties accepted on March 29, 2023.  The next day, the parties jointly sought a 30-day continuance and stay of all Court-ordered deadlines pending finalization of the Settlement, which the Court granted.  ECF No. 151.  Thereafter, Lead Counsel worked diligently to negotiate the terms of the Settlement Agreement with Defendants' Counsel and prepared preliminary approval papers.

59.    On June 22, 2023, Plaintiffs filed an unopposed motion and supporting papers seeking preliminary approval of the proposed Settlement.  ECF Nos. 155-157.  The Court granted Plaintiffs' motion for preliminary approval on August 25, 2023, and scheduled the Settlement Hearing for January 17, 2024, at 10:00 a.m.  ECF No. 162.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

60.    The Settlement of $28,000,000 was the result of extensive, arm's-length negotiations among the parties, which appropriately reflects the strengths and weaknesses of the case, and would not have been achieved without Lead Counsel's extensive efforts described herein.

61.    Lead Counsel further believe that our reputation as attorneys who will zealously prosecute a case through trial and any subsequent appeals, in addition to our effective and aggressive litigation of this Action, put the Settlement Class in a strong position with the Defendants and Defendants' insurance carriers and led to the superior result achieved here.

62.    As set forth below and in Lead Plaintiffs' accompanying Final Approval Motion, the Settlement is a favorable result for the Settlement Class when evaluated in light of the risks of continued litigation and all of the other circumstances that courts consider when determining whether to grant final approval of a proposed class action settlement under Rule 23(e) of the Federal Rules of Civil Procedure.

63.    At the time the Settlement was reached, Lead Counsel had a comprehensive understanding of the strengths and weakness of Plaintiffs' claims, including the underlying evidence obtained in discovery, as well as the risks of further litigation.  While Plaintiffs and Lead Counsel believe that the claims asserted against Defendants are meritorious, they also recognize that there were considerable challenges to continuing to pursue the Action against Defendants, including, but not limited to, obtaining class certification for the full Class Period alleged in the Complaint, and proving that Defendants made materially false statements and omissions, that such misrepresentations were made with scienter, and that the Settlement Class suffered compensable damages that were caused by the revelation of the truth concerning those misrepresentations.  Thus, the Settlement results from a realistic assessment by both sides of the strengths and weaknesses of

the parties' respective claims and defenses, as well as the risks of further litigation, and is a fair, reasonable, and adequate resolution of the Action for the Settlement Class.

64.     Under Rule 23, courts assess whether a proposed settlement is fair, reasonable, and adequate by examining whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

65.     Courts within the Eleventh Circuit generally apply the following criteria when evaluating the fairness of a proposed class action settlement: (i) the plaintiffs' likelihood of success at trial; (ii) the range of possible recovery; (iii) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (iv) the complexity, expense, and duration of litigation; (v) the substance and amount of opposition to the settlement; and (vi) the stage of proceedings at which the settlement was achieved. *See, e.g.*, *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

66.     Under the foregoing factors, discussed in further detail in the Final Approval Motion, the proposed Settlement is fair, reasonable, and adequate and warrants the Court's final approval.

**A.     The Strengths and Weaknesses of the Case Favor Settlement**

67.     As noted above, the Settlement was the product of contentious and protracted negotiations between the parties and reflects the strengths and weaknesses of the case.  The extraordinary Settlement would not have been achieved absent Lead Counsel's tireless efforts described above to plead securities fraud claims and obtain the evidence necessary to prove such

claims and certify the case as a class action. Nor would the Settlement have been achieved without the substantial participation and assistance of Mr. Murphy, a neutral mediator with experience in negotiating resolution of complex actions of this type.

68.    There is no doubt that Plaintiffs and Lead Counsel had sufficient knowledge and information to evaluate the strengths and weaknesses of their claims and the virtues of the Settlement. While Plaintiffs and Lead Counsel believe their case against Defendants had merit and were prepared to proceed through expert discovery and on to summary judgment and trial, they also realize that they faced considerable challenges and defenses on every element of their claims. As discussed below, there were a number of factors that made the outcome of continued litigation, and ultimately a trial in the Action (and the inevitable appeals that would follow), uncertain. In addition, at the time of the Settlement, the parties were awaiting a ruling on Lead Plaintiffs' fully briefed motion for class certification – the outcome of which could have significantly reduced the Settlement Class's recoverable damages (or eliminated the possibility of any recovery at all) or led to significant additional briefing in connection with potential appeals of the Court's ruling.

69.    Some of the risks Plaintiffs faced are discussed in the following paragraphs. Lead Plaintiffs and Lead Counsel carefully considered each of these risks. Given these risks, which were thoroughly vetted during the course of fact discovery and the parties' settlement discussions, Plaintiffs and Lead Counsel believe the Settlement is in the best interests of the Settlement Class, as well as fair, reasonable, and adequate.

**1.    Risks Regarding the Falsity of the Alleged Misrepresentations**

70.    Plaintiffs faced significant risks in proving that Defendants' alleged statements and omissions were materially false and misleading when made. For example, Plaintiffs faced risks in proving that Defendants' statements concerning their purported commitment to "conservative" and "disciplined" underwriting and reserve-setting practices were materially false or misleading and

actionable.  According to Defendants, such statements amount to nothing more than non-actionable puffery and statements of opinion and concerned the Company's business practice generally (as opposed to their practices regarding TeamHealth, specifically) – and thus, a reasonable investor would not have been misled by Defendants' failure to disclose alleged issues with a single account.

71.    Additionally, Plaintiffs argued that Defendants made misstatements regarding observed increases in claims frequency trends in 2018 and 2019.  Defendants, however, have asserted that internal analysis and documentary evidence confirm that claims frequency remained stable for the TeamHealth account – and for ProAssurance in general – at all relevant times during the Class Period.  Accordingly, Defendants contend that Plaintiffs would be unable to establish that these frequency statements were materially false or misleading when made.

72.    While Plaintiffs are confident that documentary evidence and testimony support their claims and contradict Defendants' arguments, there was a real risk that the Court at summary judgment or a jury at trial could find that Lead Plaintiffs had failed to sufficiently demonstrate falsity for some or all of the alleged misrepresentations that were sustained.

### 2.    Risks Regarding Scienter

73.    In addition to the risks that Plaintiffs faced in establishing that Defendants' statements were materially false and misleading when made, Plaintiffs faced considerable challenges in demonstrating Defendants' scienter with respect to such statements.

74.    As demonstrated in their motion to dismiss, Defendants have argued, and likely would continue to argue, that there was no evidence of scienter because the Individual Defendants did not have any intent to deceive, nor did they make the alleged misstatements with severe recklessness.  Plaintiffs, however, have alleged and believe that documentary evidence and testimony confirm that Defendants were aware of the material undisclosed issues regarding the TeamHealth account throughout the Class Period.

75.      While Plaintiffs are confident that they would have been able to support their claims regarding scienter with persuasive evidence, it is impossible to predict the Court's or a jury's reactions, interpretations, and inferences gleaned from the evidence and testimony concerning the Defendants' state of mind.  This was a significant risk to Plaintiffs' claims, as a failure to prove that Defendants acted with scienter would have insulated Defendants from any liability for the alleged misrepresentations.

### 3.      Risks Regarding Loss Causation and Damages

76.      Plaintiffs also faced significant hurdles to establishing loss causation and damages. On these issues, Plaintiffs would ultimately have to prove through expert testimony that the revelation of the alleged fraud in a series of corrective disclosures made on January 22, 2020 and May 7-8, 2020 proximately caused the substantial decline in the price of ProAssurance common stock following those disclosures.

77.      While Defendants opted not to challenge loss causation in their motion to dismiss, Defendants argued during discovery and at class certification that Plaintiffs could not prove that any losses suffered by the Settlement Class were attributable to the alleged misrepresentations. Defendants also claimed that ProAssurance's alleged corrective disclosures contained information related to certain alleged false statements that were dismissed, the impact of which would have to be disaggregated from the impact of the information corrective of the remaining misstatements at issue, which could have significantly reduced or entirely eliminated any damages.  Defendants further asserted that the Class Period should end on January 22, 2020, thus eliminating the May 7-8, 2020 corrective disclosures because they were purportedly not corrective of any upheld misstatements.

78.      Although Plaintiffs are confident that they would be able to provide strong and reliable evidence regarding loss causation and damages, these issues presented yet another uncertain and significant risk to Plaintiffs' recovery in this Action.

79.     Given the challenges of continuing to pursue the claims against Defendants and the guaranteed recovery the Settlement provides for the Settlement Class now, Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate and should be approved.

**B.     Considering the Range of Possible Recovery, the Settlement Is Within the Range of Reasonableness**

80.     The Settlement provides for an all-cash payment of $28,000,000.  This Settlement Amount represents approximately 16%-31% of the estimated recoverable damages, assuming that Plaintiffs had achieved certification of the full Class Period and prevailed on all elements of their claims at summary judgment and trial.  This amount far exceeds the 5% median recovery in settlements of 10b-5 litigation between 2013 and 2021.[4]

81.     Given this range of possible recovery, and the possibilities that the Settlement Class may not have been certified, that the Class Period could have been significantly shortened, or that Defendants could have succeeded at summary judgment or trial (resulting in no recovery whatsoever), the $28,000,000 Settlement is an excellent result.  Accordingly, this factor highlights that the Settlement is fair, reasonable, and adequate, and should be approved.

**C.     The Complexity, Expense, and Likely Duration of Continued Litigation Support Approving the Settlement**

82.     The continuation of this Action would be long, complex, and costly to all parties involved.  Were the litigation to proceed, expert discovery, summary judgment motions, trial, and possible appeals would be lengthy and would entail significant additional costs.  Indeed, the case schedule contemplated that summary judgment would be fully briefed in November 2023, followed by motions *in limine* and a pretrial conference.  Realistically, this case would not have been tried until sometime in 2024, with inevitable appeals thereafter.

---

[4]     *See Securities Class Action Settlements, 2022 Review and Analysis* (Cornerstone Research 2023) ("Cornerstone Report") at 6, available at https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf.

83.     In contrast, the proposed Settlement at this juncture will result in a present and certain recovery for the Settlement Class.  As such, this factor supports final approval of the Settlement.

**D.     The Stage of Proceedings at which the Settlement Was Reached Supports Approving the Settlement**

84.     As detailed above, the parties have been actively litigating this case since 2020.  Over the course of such litigation, Lead Counsel undertook extensive investigation, research, and analysis of the Settlement Class's claims.  Among other things, such efforts included: (i) drafting the Complaint on the basis of investigative interviews of several former ProAssurance employees and a thorough review of SEC filings, state regulatory filings, conference calls, analyst reports, and news media reports; (ii) opposing Defendants' motion to dismiss, which required extensive legal research and additional factual research; (iii) conducting significant document discovery, including reviewing and analyzing more than 2.8 million pages of documents that were produced by Defendants and non-parties as a result of Lead Counsel's exhaustive efforts to pursue such productions; (iv) filing detailed and expansive class certification briefing; (v) conducting, defending, and/or attending 19 expert and fact depositions; and (vi) commencing preparation of multiple expert reports.

85.     At the time of Settlement, the parties had fully briefed issues concerning class certification, largely completed fact discovery, begun the preparation of multiple expert reports, and engaged in a protracted and contentious mediation process.  The knowledge and insight gained during the years of investigating, developing, and refining their claims through various stages of litigation provided Plaintiffs and Lead Counsel with sufficient information to make an informed assessment of the strengths and weaknesses of the case.  Based upon these efforts, we respectfully submit that this factor weighs heavily in favor of finding the Settlement is fair, reasonable, and adequate.

E.      The Reaction of the Settlement Class to the Proposed Settlement to
        Date Warrants Approval of the Settlement

86.     As of December 6, 2023, a total of 22,535 Postcard Notices have been emailed or mailed to potential Settlement Class Members and nominees.  *See* Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Murray Decl."), ¶11, attached as Exhibit D hereto.  Pursuant to the Court's Memorandum Opinion and Order Preliminarily Approving Settlement and Directing Notice to the Class (ECF No. 162 at 17-18), and as set forth in the Notice, the deadline for Class Members to object to any aspect of the Settlement, including the Plan of Allocation and request for fees, costs, and expenses, or to request exclusion from the Class, is December 22, 2023.  To date, there have been no objections to the Settlement and no requests for exclusion from the Settlement Class.  Murray Decl., ¶16.

V.      THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

87.     The Plan of Allocation is set forth in the Notice of Pendency and Proposed Settlement of Class Action (Murray Decl., Ex. B) ("Notice"), and provides that the Net Settlement Fund will be distributed to Settlement Class Members who submit timely, valid Proofs of Claim and whose claims for recovery have been permitted under the terms of the Settlement Agreement, including the Plan of Allocation ("Authorized Claimants").  The Plan of Allocation provides that Settlement Class Members will only be eligible to participate in the distribution of the Net Settlement Fund if they purchased or otherwise acquired ProAssurance common stock during the Class Period and were damaged thereby.

88.     The Plan of Allocation was based on an analysis performed by Plaintiffs' damages expert, Professor Feinstein, and reflects the estimated amount of alleged artificial inflation in the per share price of ProAssurance publicly traded common stock that was allegedly proximately caused by Defendants' alleged scheme and fraudulent course of conduct and material misrepresentations.  In calculating the estimated artificial inflation allegedly caused by Defendants' alleged

misrepresentations and omissions, Professor Feinstein considered price changes in ProAssurance common stock in reaction to the public disclosures that allegedly corrected the respective alleged misrepresentations, adjusting the price changes for factors that were attributable to market or industry forces, and for non-fraud related Company-specific information.

89.    Under the Plan of Allocation, for each Class Period purchase of ProAssurance common stock that is properly documented, a "Recognized Loss" will be calculated according to the formulas described in the Notice (Murray Decl., Ex. B, Notice at 12-15).[5]  As set forth in greater detail in the Notice, the calculation of a Claimant's Recognized Loss is based upon a formula that takes into account such information as: (a) when a Claimant's share was purchased and whether they sold their stock, or retained their stock beyond the end of the Class Period; (b) the amount of the alleged artificial inflation per share; (c) the purchase price of the share; and (d) the purchase price minus the average closing price for ProAssurance common stock during the 90-day look-back period described in Section 21(D)(e)(1) of the Exchange Act.

90.    In sum, the Plan of Allocation, which is similar to hundreds of plans approved by courts over decades, represents a reliable method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants.  To date, not a single Settlement Class Member has objected to the proposed Plan of Allocation.

## VI.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

91.    Lead Counsel zealously and diligently litigated this Action on behalf of Lead Plaintiffs and the Settlement Class for more than three years.  Lead Plaintiffs' Counsel undertook this effort on a wholly contingent basis, and expended over 27,200 hours of professional and

---

[5]    If, however, as expected, the amount in the Net Settlement Fund is not sufficient to permit payment of the total Recognized Loss of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Loss bears to the total of the Recognized Loss of all Authorized Claimants – *i.e.*, the Authorized Claimant's *pro rata* share of the Net Settlement Fund.

paraprofessional time litigating this Action.   In addition, Lead Plaintiffs' Counsel incurred $1,240,844.77 in litigation expenses, costs, and charges.   Accordingly, Lead Counsel respectfully request an award of attorneys' fees in the amount of 33% of the Settlement Amount and $1,240,844.77 in expenses.   Lead Plaintiffs' Counsel have submitted declarations that provide additional support for the requested fees and expenses.   *See* Declaration of Nathan R. Lindell Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("RGRD Decl."), attached as Exhibit E hereto; Declaration of Lester R. Hooker Filed on Behalf of Saxena White P.A. in Support of Application for Award of Attorneys' Fees and Expenses ("Saxena Decl."), attached as Exhibit F hereto; and Declaration of David J. Guin Filed on Behalf of Guin, Stokes & Evans, LLC in Support of Application for Award of Attorneys' Fees and Expenses, attached as Exhibit G hereto.

92.     In the Eleventh Circuit, attorneys' fees are calculated as a reasonable percentage of the recovery received by the class.   *See, e.g.*, *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 773 (11th Cir. 1991); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1363 (S.D. Fla. 2011).   In determining whether a fee request is reasonable, courts in the Eleventh Circuit look to the following factors:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*In re Checking Account Overdraft Litig.*, 2020 WL 4586398, at *17 (S.D. Fla. Aug. 10, 2020) (citing *Camden I*, 946 F.2d at 772 n.3).

93.     As demonstrated below and in the Fee Motion, an analysis of the applicable factors strongly supports the reasonableness of Lead Counsel's requested fee.

**A.      Lead Counsel's Fee Request Is Reasonable**

**1.      The Time and Labor Expended Supports the Reasonableness of Lead Counsel's Fee Request**

94.      Lead Counsel dedicated a substantial amount of time, effort, and resources to advocate on behalf of Plaintiffs and the Settlement Class.  Throughout the entirety of this Litigation, Defendants have adamantly denied all of the Complaint's material allegations and sought to have the case dismissed and/or narrowed at every juncture.  In response, Lead Counsel aggressively rebutted each of the Defendants' attacks while simultaneously strengthening the merits of Plaintiffs' allegations through their relentless discovery efforts.

95.      The substantial amount of time and effort Lead Counsel expended to litigate this Action to a successful resolution for Plaintiffs and the Settlement Class is demonstrated by the over 27,200 hours of professional and paraprofessional time spent working on this case since its inception.  As such, this factor readily supports the reasonableness of Lead Counsel's requested fee.

**2.      The Novelty and Difficulty of the Issues Warrants Approval of Lead Counsel's Fee Request**

96.      As detailed above in §IV.A., *supra*, this Action presented a number of multi-faceted, complex issues of both fact and law, and the Settlement Class faced formidable defenses to liability and damages.  For instance, the issues surrounding market efficiency, price impact, falsity, scienter, loss causation, and damages required repeated rounds of briefing, extensive work with expert witnesses, depositions of fact and expert witnesses, and other expansive discovery efforts.  §§II.C.-E., *supra*.

97.      In sum, given the novelty and difficulty of the issues presented in this Litigation, the Settlement is an extremely favorable recovery for the Settlement Class that reflects the sophistication and diligence of Lead Counsel's work.  As such, this factor supports the reasonableness and fairness of Lead Counsel's requested fee.

**3.    The Skill Required to Perform the Legal Service Adequately Supports the Reasonableness of the Requested Fee**

98.    As noted above, given the complexity of the issues involved and the existence of numerous hotly contested issues, the efforts of highly skilled counsel with extensive expertise in securities litigation were essential to the successful representation of the Settlement Class. Further, Lead Counsel had to be particularly zealous and skilled in this case due to the fact Defendants' Counsel are also highly experienced, diligent attorneys well-versed in complex securities litigation. Lead Counsel's experienced and skilled work secured a highly favorable recovery for the Settlement Class. Accordingly, this factor provides further support for the Court's approval of Lead Counsel's requested fee.

**4.    The Preclusion of Other Employment Favors Lead Counsel's Fee Request**

99.    Lead Plaintiffs' Counsel expended over 27,200 hours over more than three years prosecuting this Action on behalf of Plaintiffs and the Settlement Class. Because these substantial hours could have been devoted to other cases, this factor further demonstrates the reasonableness of Lead Counsel's fee award request.

**5.    The Contingent Nature of this Action Supports the Reasonableness of Lead Counsel's Fee Request**

100.    Lead Counsel undertook this Litigation on a wholly contingent basis. Accordingly, to date, Lead Counsel have borne all of the expenses and risks of this complex, costly litigation with no guarantee that their investment would ever be recovered. Nevertheless, Lead Counsel undertook this significant responsibility and, as a result, were required to ensure that sufficient attorney, expert, and paraprofessional resources were allocated to effectively prosecute this Action. Further, because of the nature of a contingency fee practice, where cases often last for several years, Lead Counsel, like other contingent-fee litigation firms, have had to pay regular overhead as well as advance the expenses of this Litigation. In addition to advancing litigation expenses and paying overhead, Lead

Counsel faced the very real possibility of receiving no attorneys' fees or reimbursement of their expenses in this case.

101.    Given the real and substantial risk that Lead Counsel's significant investment of time, effort, and money would have resulted in $0 in fees or expenses, this factor also weighs in favor of approving Lead Counsel's requested fee award.

### 6.    The Amount Involved and the Excellent Results Obtained Support Lead Counsel's Request

102.    "The result achieved by counsel is a major factor to consider in making a fee award." *Sawyer v. Intermex Wire Transfer, LLC*, 2020 WL 5259094, at *1 (S.D. Fla. Sept. 3, 2020) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).  Here, the $28,000,000 all-cash Settlement obtained for the benefit of the Settlement Class represents approximately 16%-31% of the estimated recoverable damages.  The Settlement is an excellent recovery, far exceeding the 4.9% median recovery in Eleventh Circuit settlements and returning more than 2 times the median recovery of $11.9 million in Eleventh Circuit securities class action settlements.[6]

103.    Given the risks of continued litigation, the Settlement Amount is a tremendous recovery for the Settlement Class and warrants approval of Lead Counsel's requested fee.

### 7.    The Experience, Reputation, and Ability of the Attorneys Supports Lead Counsel's Fee Request

104.    Lead Counsel are among the most knowledgeable and capable practitioners in the field of securities class actions.  The experience and skill of Robbins Geller and Saxena White attorneys is demonstrated by each firm's remarkably successful record in securities class actions in both federal and state courts throughout the United States.  *See* RGRD Decl., Ex. F and Saxena Decl., Ex. E (Robbins Geller and Saxena White firm resumes, respectively).  Accordingly, the experience, ability, and reputation of Lead Counsel further supports the requested attorneys' fees.

---

[6]    *See* Cornerstone Report at 19, available at https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf.

**8.    The Undesirability of the Case Supports the Reasonableness of the Requested Fee**

105.    As noted above, Lead Counsel undertook the prosecution of this complicated case on a wholly-contingent basis, and pursued the Settlement Class's claims against a large, sophisticated corporation with endless resources to fight such allegations. Notably, only one other party moved for appointment as lead plaintiff in this Action. As such, the "undesirability" of this case supports the requested fee percentage.

**9.    Awards in Similar Cases Support Lead Counsel's Fee Request**

106.    Lead Counsel's request is in line with fee awards approved in similar class action cases within the Eleventh Circuit. *See, e.g.*, *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1300 (11th Cir. 1999) (affirming fee award of 33-1/3% of the $40 million settlement fund); *Cabot E. Broward 2 LLC v. Cabot*, 2018 WL 5905415, at *4 (S.D. Fla. Nov. 9, 2018) (awarding a fee equal to one-third of the settlement fund, "consistent with what courts routinely award in class actions"); *In re Checking Account Overdraft Litig.*, 2020 WL 4586398, at *16 (awarding fee equal to 35% of the settlement fund); *Sawyer*, 2020 WL 5259094, at *1 (awarding fee equal to one-third of the settlement fund); *Hanley v. Tampa Bay Sports & Ent. LLC*, 2020 WL 2517766, at *6 (M.D. Fla. Apr. 23, 2020) (noting "district courts in the Eleventh Circuit routinely approve fee awards of one-third of the common settlement fund"); *In re Walter Energy, Inc. Sec. Litig.*, 2016 WL 7230505, at *1 (N.D. Ala. May 3, 2016) (awarding fee of 33% of the $25 million settlement amount). Given that Lead Counsel's request is consistent with the awards provided in similar cases, this factor warrants approval of the requested fee.

**B.    Lead Counsel's Request for an Award of Expenses**

107.    Lead Counsel also request an award of $1,240,844.77 for expenses incurred in prosecuting this Action on behalf of Plaintiffs and the Settlement Class. These expenses include, for example: (i) fees paid to Plaintiffs' experts and consultants; (ii) the costs associated with attending

court hearings and status conferences and making court filings; (iii) the costs associated with taking and defending depositions throughout the United States; (iv) the costs necessary to provide document management and review; and (v) the costs associated with the parties' mediation. The following paragraphs provide a more detailed description of certain of Lead Counsel's expenses.

108.   Lead Counsel retained six experts to consult and assist Lead Counsel's understanding and development of the facts supporting the Complaint's allegations. Lead Counsel also retained four of those experts to prepare expert reports and expert testimony that was or would have been used to address the complex factual issues in the case and challenge Defendants' experts' own assertions regarding such matters.

109.   Lastly, additional expenses arose from photocopying documents, online factual and legal research, messenger services, postage and delivery, transportation, meals, domestic travel, and other incidental expenses directly related to the prosecution of this Action. In sum, these expenses were necessary to Lead Counsel's success in achieving the tremendous result for Plaintiffs and the Settlement Class.

## VII.   CONCLUSION

110.   In light of the outstanding $28,000,000 Settlement obtained, the substantial challenges and risks Lead Counsel faced, the exceptional quality of Lead Counsel's work, the contingent nature of the requested fee, and the substantial complexity of the case, as described above and in the accompanying memoranda in support of their motions, Plaintiffs and their counsel respectfully submit that the Court should approve the Settlement and Plan of Allocation as fair, reasonable, and adequate, and approve Lead Counsel's application for an award of attorneys' fees and expenses.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th day of December, 2023, at San Diego, California.

s/ NATHAN R. LINDELL

NATHAN R. LINDELL

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th day of December, 2023, at Boca Raton, Florida.

s/ LESTER R. HOOKER

LESTER R. HOOKER

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 8, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DAVID J. GUIN
DAVID J. GUIN

300 Richard Arrington Jr. Blvd. N.
Suite 600/Title Bldg.
Birmingham, AL  35203
Telephone: 205/226-2282
205/226-2357 (fax)

Email:  davidg@gseattorneys.com

# Mailing Information for a Case 2:20-cv-00856-RDP Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  jaya@rgrdlaw.com

- **Walter W Bates**
  Bbates@starneslaw.com

- **Roger H Bedford , Jr**
  rogerbedfordattorneyatlawllc@gmail.com

- **Sara M. DiLeo**
  sdileo@saxenawhite.com

- **James Bringhurst Eubank**
  James.Eubank@beasleyallen.com

- **Dawn Stith Evans**
  devans@gseattorneys.com

- **Jay M Ezelle**
  JEzelle@starneslaw.com

- **Janet A Gochman**
  jgochman@stblaw.com

- **Kyla Grant**
  Kgrant@saxenawhite.com

- **Cole Robinson Gresham**
  cgresham@starneslaw.com

- **David J Guin**
  davidg@gseattorneys.com

- **Bailie L Heikkinen**
  bheikkinen@rgrdlaw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Jonathan Dov Lamet**
  jlamet@saxenawhite.com

- **Michael R Lasserre**
  mrl@starneslaw.com

- **Nathan R Lindell**
  nlindell@rgrdlaw.com

- **John T Long**
  johnlong@cavanagh-ohara.com

- **Carl Jacob Lundqvist**
  jacob.lundqvist@stblaw.com

- **Craig Corey Maider**
  cmaider@saxenawhite.com

- **Wilson Daniel Miles , III**
  dee.miles@beasleyallen.com

- **Mason G Roth**
  mroth@rgrdlaw.com

- **Steven B Singer**
  ssinger@saxenawhite.com

- **Ellen Gusikoff Stewart**
  elleng@rgrdlaw.com

- **Tammy McClendon Stokes**
  tammys@gseattorneys.com

- **Joseph E. White**
  jwhite@saxenawhite.com

- **Jonathan K Youngwood**
  jyoungwood@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)